## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PARKER DRILLING COMPANY, *et al.*,[1] | Case No. 18-36958 (MI) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN
ORDER (I) AUTHORIZING THE DEBTORS TO (A) ASSUME CERTAIN
EXIT FINANCING AGREEMENTS AND (B) INCUR AND PAY RELATED
FEES, INDEMNITIES, AND EXPENSES, AND (II) GRANTING RELATED RELIEF**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**
>
> **A HEARING WILL BE HELD ON THIS MATTER ON JANUARY 15, 2019, AT 3:30 P.M. (CT) BEFORE THE HONORABLE MARVIN ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), respectfully state the following in support of this motion (this "<u>Motion</u>"):[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2] The detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, is set forth in greater detail in the *Declaration of John Edward Menger, Chief*

**Preliminary Statement**

1. The *Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtors Affiliates* [Docket No. 17] (the "Plan"),[3] which is supported by stakeholders holding approximately 77% of the Debtors' unsecured notes, approximately 62% of the Debtors' outstanding Preferred Stock, and a material amount of the Debtors' outstanding Common Stock (the "Consenting Stakeholders") party to the Restructuring Support Agreement, dated as of December 12, 2018 (the "Restructuring Support Agreement"), proposes to deleverage the Debtors' balance sheet by approximately $375.0 million (by way of equitization of the existing unsecured notes) and provide the Debtors with $95.0 million in fully-committed new equity capital by way of a fully-backstopped rights offering open to all holders of Notes, Existing Preferred Stock, and Existing Common Stock. Pursuant to the Plan, the Debtors have a path to pay in full all General Unsecured Claims and to provide a meaningful recovery to holders of Existing Preferred Stock and Existing Common Stock as a gift. The Debtors' emergence from chapter 11 pursuant to the Plan will leave the Debtors a stronger, better-capitalized enterprise, and will preserve more than 2,400 jobs throughout the Company.

2. To pave the way for the Debtors to successfully emerge from these chapter 11 cases with access to additional liquidity to fund their businesses, the Debtors have engaged in a good faith, arm's-length marketing and negotiation process to procure a committed exit financing facility. As part of this process, and as described in detail below and in the Latif Declaration,

---

*Restructuring Officer of Parker Drilling Company, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"). In support of this Motion, the Debtors submit the *Declaration of Bassam J. Latif in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Assume Certain Exit Financing Agreements and (B) Incur and Pay Related Fees, Indemnities, and Expenses, and (II) Granting Related Relief*, attached hereto as **Exhibit B** (the "Latif Declaration").

[3]  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan.

2

Moelis & Company LLC ("Moelis"), acting as investment banker for the Debtors, conducted a broad marketing effort through which the Debtors were able to leverage numerous proposals to accomplish their financing objectives, all despite the volatility in the financial markets and the decline and increased volatility in oil prices that occurred contemporaneously with the Debtors' financing efforts.

3. These efforts resulted in the Debtors' entry into the exit facility commitment letter attached as **Annex 1** to the Order (including the exhibits and attachments thereto, collectively, the "Commitment Letter") prior to commencing the chapter 11 cases, pursuant to which Bank of America, N.A. ("Bank of America") and Deutsche Bank AG New York Branch ("Deutsche Bank" and, together with Bank of America, the "Exit Commitment Parties") have committed (the "Exit Facility Commitment") to fund, subject to Court approval of the Commitment Letter and the related fee letter attached as **Annex 2** to the Order (the "Fee Letter" and, together with the Commitment Letter, the "Exit Financing Agreements"), an exit financing facility (the "Exit Facility") consisting of a $50.0 million fully-committed asset-based revolver with a four year maturity, which allows additional commitments from lenders other than the Exit Commitment Parties to fund up to an additional $50.0 million.

4. In exchange for the Exit Facility Commitment, the Debtors have agreed, pursuant to the Exit Financing Agreements and subject to Court approval to, among other things: (a) pay certain fees of the Exit Commitment Parties (the "Exit Financing Fees"), as described below; (b) pay the Exit Commitment Parties' reasonable out-of-pocket fees and expenses incurred in connection with the Exit Facility, as set forth in the Exit Financing Agreements (the "Exit Expense Reimbursement"); and (c) indemnify the Exit Commitment Parties in accordance with the Exit Financing Agreements (the "Exit Indemnification Obligations"). As a condition to obtaining the

3

.
.

Exit Facility Commitment, the Debtors have already paid to the Exit Commitment Parties an amount equal to 50% of the Exit Financing Fees before commencing the chapter 11 cases.  In order to maintain the Exit Facility Commitment, the Debtors must obtain entry of an order granting the foregoing relief by no later than January 26, 2019.

5. Accordingly, by this Motion, the Debtors seek authority to assume the Exit Financing Agreements and thereby obtain the benefits of the Exit Facility, along with the undertaking by the Exit Commitment Parties to seek additional commitments of up to $50.0 million in accordance with the syndication process set forth in the Exit Financing Agreements and including payment of all fees and expenses thereunder.[4]

**Relief Requested**

6. The Debtors seek entry of an order, substantially in the form attached hereto as (the "Order"):  (a) authorizing the Debtors to (i) assume and perform the obligations under the Commitment Letter, substantially in the form annexed as **Annex 1** to the Order, and the Fee Letter, substantially in the form annexed as **Annex 2** to the Order,[5] and (ii) pay the Exit Financing Fees and Exit Expense Reimbursement and incur the Exit Indemnification Obligations; and (b) granting related relief.

---

[4] The Debtors are not, by this Motion, seeking to access any portion of the Exit Facility today, or seeking approval of any aspects of the Plan.  The Debtors will seek confirmation of the Plan at the Confirmation Hearing.

[5] The Fee Letter has been filed under seal, and the Debtors will provide an unredacted copy of the Fee Letter to: (i) the Court; (ii) the United States Trustee for the Southern District of Texas (the "U.S. Trustee"); (iii) any statutory committee appointed in these cases (on a confidential and professional eyes only basis); and (iv) any other party as may be ordered by the Bankruptcy Court or agreed to by the Debtors and the Exit Commitment Parties, in each case under appropriate confidentiality agreements reasonably satisfactory to the Debtors and the Exit Commitment Parties that preserve the confidentiality of the Fee Letter (and any information derived therefrom).

**Jurisdiction, Venue, and Procedural Background**

7. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The statutory bases for the relief requested herein are sections 362, 363(b), 365(a), 503(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code").

10. On December 12, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court has ordered procedural consolidation and entered a final order for joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 41]. The U.S. Trustee has not appointed an official committee of unsecured creditors. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

**The Exit Financing Agreements and Exit Facility[6]**

11. As described above, before the Petition Date, Moelis and the Debtors canvassed the market for indications of interest from both traditional and non-traditional financial institutions to

---

[6] The following summary is qualified in its entirety by reference to the Exit Financing Agreements. In the event this summary is inconsistent with the terms of the Exit Financing Agreements, the Exit Financing Agreements shall govern in all respects. Capitalized terms used but not defined in the following summary have the meaning ascribed to such terms in the Exit Financing Agreements.

5

provide the Debtors with postpetition and exit financing. As set forth in the Latif Declaration, thirteen of the institutions contacted either signed confidentiality agreements, or were already subject to a confidentially agreement, with the Debtors and were provided with access to an electronic data room containing customary due diligence information relating to the Debtors and their financing needs. As part of this marketing effort, Moelis conducted multiple phone calls and held in-person meetings with interested financial institutions. Through this process, the Debtors received comprehensive proposals for debtor-in-possession financing and exit financing facilities from six lending institutions. *See* Latif Declaration ¶ 8.

12. As a result of these efforts, the Debtors entered into the Commitment Letter pursuant to which the Exit Commitment Parties are committing to underwrite $50.0 million of the proposed $100.0 million Exit Facility. The terms of the Exit Facility are further summarized below:

| Term | Description |
|---|---|
| **Exit Facility** | |
| Commitments | $50.0 million fully-committed, with an additional Uncommitted Portion, as defined in the Commitment Letter, of up to $50.0 million. |
| Maturity | The Maturity Date occurs on the fourth anniversary of the Closing Date. |
| Borrowers | Parker Drilling Company and certain of its subsidiaries. |
| Guarantors | All other Debtors. |
| Security | First-priority security interest in substantially all assets of the Debtors, other than, among other exceptions, real estate. |
| Interest Rate | At the Debtors' option, the Base Rate plus the Applicable Rate (initially 1.25%) or the Eurodollar Rate plus the Applicable Rate (initially 2.25%). |
| Availability | Based on a borrowing base comprised of eligible domestic receivables and eligible rental equipment. |

13. In addition, the Debtors have agreed, in return for the Commitment Parties' undertakings and subject to Court approval, to pay to the Exit Commitment Parties or other applicable parties certain fees the Exit Financing Fees in accordance with the Exit Financing Agreements and Exit Facility Documents. The aggregate amount of the Exit Financing Fees, exclusive of administration fees, is $975,000, $487,500 of which was paid by the Debtors prior to the Petition Date.

14. The Exit Financing Agreements also require that the Debtors reimburse the Exit Commitment Parties' expenses and indemnify the Exit Commitment Parties in accordance therewith, as is ordinary and customary for similar financings.

15. The fees, expense reimbursement, and indemnities sought by the Exit Commitment Parties are a reasonable and proper price to pay for the immediate benefits of a committed Exit Facility provided by the Exit Financing Agreements, especially in the current volatile market environment, and are reasonable under the circumstances. *See* Latif Declaration ¶ 12. Given the extensive good faith, arm's-length marketing and negotiation process conducted by the Debtors and Moelis, the manifest benefits arising from the Exit Financing Agreements, and the broader benefits arising from the Debtors' ability to confirm their Plan and emerge from chapter 11 in the near term with sufficient liquidity to fund their businesses, the Debtors believe that assumption of the Exit Financing Agreements is in the best interests of their estates. *See* Latif Declaration ¶ 13. Therefore, the Debtors respectfully submit that they should be authorized to assume the Exit Financing Agreements.

**Basis for Relief**

**I.      Assumption of the Exit Financing Agreements is an Exercise of the Debtors' Sound Business Judgment.**

16.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Bankruptcy Code does not define the term "executory contract," but the Fifth Circuit has characterized an executory contract as one "on which performance remains due to some extent on both sides." *Matter of Murexco Petroleum, Inc.*, 15 F.3d 60, 61 (5th Cir. 1994) (quoting *NLRB v. Bildisco & Bildisco*, 104 S.Ct. 1188, 1194 n.6 (1984)). The Exit Financing Agreement is an executory contract because both the Debtors and the Exit Commitment Parties have material performance obligations remaining thereunder.

17.     A debtor's decision to assume or reject an executory contract pursuant to section 365(a) of the Bankruptcy Code is governed by the "business judgment" test—which is a debtor-centric presumption that, in making business decisions, directors and officers act on an informed basis and under an honest belief that such action was in the best interests of the company. *See In re Grp. of Institutional Inv'rs, Inc. v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *see also In re Mirant Corp.*, 378 F.3d 511, 524 (5th Cir. 2004); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well established that 'the question of whether [executory contracts] should be rejected . . . is one of business judgment.'").

18.     Similarly, a debtor may use property of the estate outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, if the debtor satisfies the "business judgment" test. *See, e.g., In re Ondova Ltd. Co.*, 620 F. App'x 290, 291 (5th Cir. 2015) (sale of debtors' assets under section 363(b) of the Bankruptcy Code "is an exercise of the Trustee's sound business judgment . . . ."); *In re Moore*, 608 F.3d 253, 258 (5th Cir. 2010) (stating that the proposed

sale of assets is "supported by an articulated business justification, good business judgment, or sound business reasons"); *In re ASARCO, LLC*, 441 B.R. 813, 830 (Bankr. S.D. Tex. 2010) (outside of the ordinary course of business, "for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property" (internal quotation marks omitted)).

19. When applying the business judgment standard, courts give great deference to the debtor's decision-making. *See, e.g.*, *Summit Land Co. v. Allen*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) ("[C]ourt approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course."). In fact, the business judgment test merely requires a showing that a debtor reasonably believe that the assumption (or rejection) of an executory contract will benefit the debtor's estates. *See In re Pisces Energy, LLC*, No. 09-36591, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("In the absence of a showing of bad faith . . . , the debtor's business judgment will not be altered."); *In re TransWorld Airlines*, 261 B.R. 103, 121 (Bankr. D. Del. 2003) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'") (quoting *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 849–50 (W.D. Penn. 1987)); *In re Trans World Airlines*, No. 01-0056, 2001 WL 1820019, at *2 (Bankr. D. Del. Mar. 16, 2001) (noting that the standard under section 365 requires consideration of the benefit to the debtor's estate).

20. To determine whether the business judgment test is satisfied, courts require "a showing that the proposed course of action will be advantageous to the estate." *In re Pisces Energy, LLC*, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009). In the absence of a showing of bad faith or an abuse of business discretion, a debtor's business judgment will not be

altered. *See*, *e.g.*, *id.*; *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982)*, aff'd,* 465 U.S. 513 (1984); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985). "Great judicial deference is given" to the "exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

21. Courts have frequently authorized a debtor's assumption of or entry into agreements similar to the Exit Financing Agreements under the business judgment standard. *See*, *e.g.*, *In re Ultra Petroleum Corp.*, No. 16-32202 (Bankr. S.D. Tex. Mar. 14, 2016) (Docket No. 1324) ("The Debtors have exercised their reasonable business judgment in determining to enter into the Exit Facility . . ."); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 2, 2016) (Docket No. 901) ("[T]he relief requested . . . is in the best interests of the Debtors' estates, their creditors, and other parties in interest . . . [and is] a reasonable exercise of the Debtors' business judgment."); *In re Energy XXI, Ltd*, Case No. 16-31928 (DRJ) (Bankr. S.D. Tex. Dec. 13. 2016) (Docket No. 1809) ("Entry into the Exit Facility . . . is in the best interests of the Debtors, their Estates, and all holders of Claims or Interests. The Debtors have exercised reasonable business judgment in determining to enter into the Exit Facility."); *In re Light Tower Rentals, Inc.*, Case No. 16-34284 (DRJ) (Bankr. S.D. Tex. Sept. 30, 2016) (Docket No. 157) (same); *In re Mirant Corp.*, Case No. 03-46590 (DML) (Bankr. N.D. Tex. May 13, 2005) (Docket No. 11073) (same); *In re ASARCO LLC*, 441 B.R. 813, 828 (S.D. Tex. 2010) (affirming the bankruptcy court's decision to authorize the payment of "due diligence fees in order to entice potential lenders"); *In re Pilgrim's Pride Corp.*, Case No. 08–45664 (DML) (Bankr. N.D. Tex. Aug. 11, 2009) (Docket No. 2996) (authorizing payment of expenses related to exit financing pursuant to section 363(b) of the Bankruptcy Code).

22. Here, maintaining the Exit Facility Commitment by assuming the Exit Financing Agreements is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' business judgment. The Exit Financing Agreements are the products of an extensive marketing process and good faith, arm's-length negotiations between the Debtors and several financial institutions. The terms of the Exit Financing Agreements are reasonable. The availability of the Exit Facility proceeds to provide additional liquidity after the Debtors emerge from chapter 11 pursuant to the Plan will provide significant benefits to the Debtors and all stakeholders in these chapter 11 cases. Among other things, entry into the Exit Facility will allow the Debtors to emerge with sufficient liquidity to continue to operate their business in the ordinary course and to endeavor to meet their investment and financial goals, including allowing the Debtors to invest in new opportunities as they arise. For these reasons, the Debtors respectfully submit that assuming the Exit Financing Agreements at this time is an exercise of their sound business judgment and should be approved.

**II.    The Exit Financing Fees, Exit Expense Reimbursement, and Exit Indemnification Obligations Should Be Approved Because They Are Reasonable, Market-Based, and Essential Terms of the Exit Financing Agreements.**

23. The Exit Financing Fees, Exit Expense Reimbursement, and Exit Indemnification Obligations are essential components of the Exit Financing Agreements. Such fees, reimbursements, and obligations are necessary and market-based compensation for the substantial undertakings of the Exit Commitment Parties and thus constitute "necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Absent these fees, reimbursements, and indemnification obligations, the Exit Commitment Parties would not have been willing to commit to provide the Exit Facility Commitment. Without access to the Exit Facility proceeds, the Debtors would not be able to emerge with the requisite liquidity to meet their investment and financial goals and may not be able to invest in new opportunities that arise in the marketplace. Therefore,

without agreeing to pay the Exit Financing Fees and Exit Expense Reimbursement and incur the Exit Indemnification Obligations, the Debtors would not be able to restructure pursuant to the Plan in a manner that maximizes the value of the Debtors' estates. Thus, the fees and costs associated with the Exit Financing should be accorded administrative expense status under section 503(b)(1) of the Bankruptcy Code, and should be accorded priority under section 507(a)(2) of the Bankruptcy Code.

24. For these reasons, the Debtors determined, in their business judgment and with the support of the Consenting Stakeholders, that agreeing to pay the Exit Financing Fees and Exit Expense Reimbursement and to incur the Exit Indemnification Obligations was an essential and fair means to obtain the Exit Facility Commitment. Compared to the substantial value provided by the Exit Facility Commitment, such fees, reimbursements and indemnification obligations are a reasonable use of estate resources and should therefore be accorded administrative expense priority.

### III. The Court Should Modify the Automatic Stay

25. The proposed order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be vacated and modified to permit the Exit Commitment Parties to perform under the Exit Financing Agreements and to exercise any and all of their contractual rights thereunder. This proposed stay modification is reasonable and fair under the circumstances of these chapter 11 cases and a sound exercise of the Debtors' business judgment.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

26. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

27. Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances. Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the United States Trustee for the Southern District of Texas; (b) entities listed as holding the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Debtors' debtor-in-possession lenders; (d) the indenture trustee for each of the Debtors' unsecured notes; (e) counsel to the Consenting Stakeholders; (f) counsel to the Debtors' largest known common equityholder; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
December 21, 2018

/s/ *Brian E. Schartz, P.C.*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:     (713) 836-3601
Email:         brian.schartz@kirkland.com
               anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Jamie Rose Netznik (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               jamie.netznik@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac vice*)
Matthew Fagen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:         christopher.marcus@kirkland.com
               matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Service**

      I certify that on December 21, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                                /s/ *Brian E. Schartz, P.C.*
                                                                Brian E. Schartz, P.C.