### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) Case No. 18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

### ORDER (I) AUTHORIZING THE DEBTORS TO (A) ASSUME CERTAIN EXIT FINANCING AGREEMENTS AND (B) INCUR AND PAY RELATED FEES, INDEMNITIES, AND EXPENSES, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (a) authorizing the Debtors to (i) assume certain Exit Financing Agreements and (ii) incur and pay related fees, indemnities, and expenses, and (b) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     Assumption of the Exit Financing Agreements is a reasonable exercise of the Debtors' business judgment.  The Debtors are authorized to assume the Exit Financing Agreements and perform their obligations thereunder, including payment of all fees and expenses and incurrence of all indemnification obligations contemplated thereby.

2.     The Exit Financing Fees, Exit Expense Reimbursement and Exit Indemnification Obligations contemplated by the Exit Financing Agreements are actual, necessary costs and expenses of preserving the Debtors' estates and shall be treated as allowed administrative expenses of the Debtors pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, without the need for the Exit Commitment Parties or any other party to file any further motion or application or proof of claim for allowance of such administrative expenses and notwithstanding any Administrative Claims Bar Date (as defined in the Plan), and may be paid without further notice or order of the Court.

3.     The Debtors are authorized and directed to take any action that may be required or appropriate to comply with the terms set forth in the Exit Financing Agreements and to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.     The Exit Financing Agreements have been negotiated in good faith and at arm's length between the Debtors and the parties to such agreements.

5.     The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to enable the Exit Commitment Parties to perform under the Exit Financing Agreements and to exercise any and all of their contractual rights thereunder, in accordance with the Exit Financing Agreements.

6.     The terms and provisions of this Order shall be binding in all respects upon all parties in these chapter 11 cases, the Debtors, their estates, and all successors and assigns thereof, including any chapter 7 trustee or chapter 11 trustee appointed in any of these cases or after any conversion of any of these cases to cases under chapter 7 of the Bankruptcy Code.

7.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: _____, 2019

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Annex 1</u>**

**Commitment Letter**

*EXECUTION VERSION*

BANK OF AMERICA, N.A.  DEUTSCHE BANK AG NEW YORK BRANCH
901 Main Street, 11th Floor  DEUTSCHE BANK SECURITIES INC.
Dallas, TX 75202  60 Wall Street
New York, New York 10005

CONFIDENTIAL

**December 12, 2018**

PARKER DRILLING COMPANY
Five Greenway Plaza, Suite 100
Houston, Texas 77046
Attention: John Edward Menger and Jennifer Simons

Re:  Exit Facility Commitment Letter
$50,000,000.00 Asset-Based Revolving Credit Facility

Ladies and Gentlemen:

Parker Drilling Company ("**PKD**" or "**you**") has advised Bank of America, N.A. ("**BoA**") and Deutsche Bank AG New York Branch ("**DBNY**" and together with BoA in their capacities as lenders under the ABL Facility (as defined below), each an "**Initial Lender**", and collectively, the "**Initial Lenders**", "**we**" or "**us**") that PKD and certain of its subsidiaries (collectively with PKD, the "**Borrowers**") seek financing to (a) refinance that certain Debtor-in-Possession Credit Agreement, to be dated on or around December 13, 2018 (the "**DIP Credit Agreement**" and the loans made thereunder, the "**DIP Loans**"), among PKD and the other borrowers thereunder, BofA, DBNY, and the other lenders party thereto (such refinancing, the "**Refinancing**"), (b) pay fees, commissions and expenses in connection with the Transactions (as defined below) and (c) finance ongoing working capital requirements and other general corporate purposes, all as more fully described in the Summary of Terms and Conditions attached hereto as <u>Exhibit A</u> (the "**Term Sheet**"). This Commitment Letter (as defined below) describes the general terms and conditions for a senior secured credit facility to be provided to the Borrowers consisting of an asset-based revolving credit facility (the "**ABL Facility**") in an aggregate principal amount of $50,000,000 (the "**Committed Amount**"), which amount may be increased by up to $50,000,000 (such additional amount being referred to herein as the "**Uncommitted Portion**") to an aggregate amount of $100,000,000 in the event additional commitments under the ABL Facility are received from lenders other than the Initial Lenders (the sum of the Committed Amount and the Uncommitted Portion, the "**Facility Amount**"), all as more fully described in the Term Sheet. Unless otherwise defined herein, each capitalized term used in this Commitment Letter has the meaning assigned to such term in the Exhibits hereto.

As used herein, the term "**Transactions**" means, collectively, the Refinancing, the initial borrowings and other extensions of credit under the ABL Facility on the date the ABL Facility becomes effective (the "**Closing Date**") and the payment of fees, commissions and expenses in

connection with each of the foregoing.  This letter, including the Term Sheet and any other annexes, exhibits or other attachments hereto, are hereinafter collectively referred to as the "**Commitment Letter**".

1.      Commitment.  Upon the terms and subject to the conditions set forth in this Commitment Letter and the fee letter dated the date hereof from the Commitment Parties (as defined below) to you (the "**Fee Letter**"), each Initial Lender hereby advises you of its several, but not joint, commitment to provide to the Borrowers $25,000,000 of the principal amount of the ABL Facility (each a "**Commitment**", and collectively, the "**Commitments**"). The Commitment of each Initial Lender is set forth next to such Initial Lender's name on Annex A attached hereto, as such annex may be amended or supplemented in accordance with the terms of this Commitment Letter.

2.      Titles and Roles.  BoA and Deutsche Bank Securities Inc. ("**DBSI**") will act as the joint bookrunners and joint lead arrangers (in such capacities, the "**Lead Arrangers**"; together with the Initial Lenders, the "**Commitment Parties**") in arranging and syndicating the ABL Facility.  BoA will act as the sole administrative agent (in such capacity, the "**Administrative Agent**") and sole collateral agent for the ABL Facility.  You agree that (x) no additional agents, co-agents, arrangers or bookrunners will be appointed, no other titles will be awarded and (y) no other compensation will be paid (other than compensation expressly contemplated by this Commitment Letter and the Fee Letter) unless you and we shall reasonably agree in writing; provided that, in any event, BoA will have the "left" placement and DBSI will have immediate right placement in any marketing materials or other documentation used in connection with the ABL Facility.

3.      Conditions to Commitment.  The Commitments and undertakings of the Commitment Parties hereunder are subject solely to the satisfaction of the conditions precedent set forth in the Term Sheet under the headings "**Conditions Precedent to Closing Date and Making of Initial Credit Extensions**" and "**Conditions Precedent to Credit Extensions**".

4.      Syndication.

(a)      The Lead Arrangers shall utilize their reasonable best efforts to obtain commitments from additional lenders for the Uncommitted Portion of the ABL Facility in an aggregate principal amount of $50,000,000.00 such that the amount of the ABL Facility as of the Closing Date would equal $100,000,000.00 (the completed syndication of the entire Uncommitted Portion of the ABL Facility being referred to herein as a "**Successful Syndication**") and reserve the right, both prior to and after the Closing Date, to secure additional commitments for the ABL Facility from a syndicate of banks, financial institutions and other entities (such banks, financial institutions and other entities committing to the ABL Facility, the "**Additional Lenders**" and together with the Initial Lenders, the "**Lenders**" and each a "**Lender**"), such Lenders to be mutually agreed upon by PKD and the Lead Arrangers, upon the terms and subject to the conditions set forth in this Commitment Letter.  To assist us in our syndication efforts, until the earlier to occur of (x) a Successful Syndication and (y) the Closing Date (such period, the "**Syndication Period**"), PKD agrees that it will (i) provide to the Commitment Parties and the other Lenders promptly upon request all information reasonably deemed necessary by the Lead Arrangers to assist the Lead Arrangers and each Lender in their evaluation of the Transactions and to

complete the syndication, (ii) make its senior management available to prospective Lenders on reasonable prior notice and at reasonable times and places, (iii) host, with the Lead Arrangers, one or more meetings and/or calls with prospective Lenders at mutually agreed times and locations, and (iv) assist, and cause its advisors to assist, the Lead Arrangers in the preparation of one or more confidential information memoranda and other customary marketing materials in form and substance reasonably satisfactory to the Lead Arrangers to be used in connection with the syndication.

(b)    The Lead Arrangers will exclusively manage, in consultation with you, all aspects of the syndication of the ABL Facility, including decisions as to the selection and number of potential other Lenders to be approached, when they will be approached, whose commitments will be accepted, any titles offered to the Lenders and the final allocations of the commitments and any related fees among the Lenders (it being agreed and understood that you shall not be required to pay any fees other than those specifically agreed to in the Fee Letter); <u>provided</u> that any Lender (other than an Initial Lender) from which commitments have been accepted shall be reasonably acceptable to you.

(c)    Notwithstanding the Lead Arrangers' right to syndicate the ABL Facility and receive commitments with respect thereto, unless agreed to by you, (i) no Initial Lender shall be relieved or released from its obligations hereunder (including its obligation to fund its respective Commitment in respect of the ABL Facility on the Closing Date) in connection with any syndication, assignment or participation in the ABL Facility, including its respective Commitment, until the Closing Date has occurred, (ii) no assignment by any Initial Lender shall become effective with respect to all or any portion of such Initial Lender's Commitment until the Closing Date has occurred and (iii) unless you and the applicable Initial Lender agree to in writing, each Initial Lender will retain exclusive control over all rights and obligations with respect to its respective Commitment in respect of the ABL Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Closing Date has occurred.

5.    <u>Information</u>.

(a)    You represent and warrant that (i) all written information and written data (other than the Projections (as defined below), other forward-looking information and information of a general economic or general industry nature) concerning you and your subsidiaries and the Transactions that has been or will be made available to the Commitment Parties or the Lenders by any Borrower, or any of your respective representatives, subsidiaries or affiliates (or on your or their behalf) (the "**Information**"), when taken as a whole, (x) is, and in the case of Information made available after the date hereof, will be, complete and correct in all material respects and (y) does not, and in the case of Information made available after the date hereof, will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not materially misleading (after giving effect to all supplements and updates thereto from time to time) and (ii) all financial projections and other forward-looking information concerning you and your subsidiaries, taking into account the consummation of the Transactions, that have been or will be made available to the Commitment Parties or the Lenders by any Borrower or any of your respective representatives, subsidiaries or affiliates (or on your or their behalf) (the "**Projections**") have been and will be prepared in good faith based upon assumptions believed by you to be

reasonable at the time made available to the Commitment Parties or the Lenders, it being understood that such Projections are not to be viewed as facts and that actual results may vary materially from the Projections.  You agree that if, at any time prior to the Closing Date, you become aware that any of the representations and warranties contained in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections so that (to your knowledge) such representations are correct in all material respects under those circumstances; <u>provided</u>, that any such supplementation shall cure any breach of such representations.  We will be entitled to use and rely upon, without responsibility to verify independently, the Information and the Projections.

(b)      You acknowledge that (i) the Lead Arrangers will make available, on your behalf, the Information, Projections and other marketing materials and presentations, including the confidential information memoranda (collectively, the "**Informational Materials**"), to the potential Lenders by posting the Informational Materials on Syndtrak, ClearPar, IntraLinks or by other similar electronic means (collectively, the "**Electronic Means**") and (ii) certain prospective Lenders may be "public side" (i.e., lenders that have personnel that do not wish to receive material non-public information (within the meaning of the United States federal securities laws, "**MNPI**") with respect to the Borrowers or their respective subsidiaries or affiliates or any of their respective securities, and who may be engaged in investment and other market-related activities with respect to such entities' securities  (such Lenders, "**Public Lenders**")).  At the reasonable request of the Lead Arrangers, (A) you will assist the Lead Arrangers in the preparation of Informational Materials to be used in connection with the syndication of the ABL Facility to Public Lenders, which will not contain MNPI (the "**Public Informational Materials**" and all other Informational Materials other than Public Informational Materials, the "**Private Informational Materials**")), (B) you will, at our request, identify and conspicuously mark any Public Informational Materials "*PUBLIC*", and (C) you will, at our request, identify and conspicuously mark any Informational Materials that include any MNPI as "*PRIVATE AND CONFIDENTIAL*" (it being agreed and understood that any Informational Materials that do not contain a conspicuous mark of "*PUBLIC*" or "*PRIVATE AND CONFIDENTIAL"* shall be deemed to be Private Informational Materials for all purposes hereunder).  Notwithstanding the foregoing, you agree that the Commitment Parties may distribute the following documents to all prospective Lenders (including the Public Lenders) on your behalf (unless you advise the Lead Arrangers in writing (including by email) that such material should not be distributed to Public Lenders and provided that you have been given a reasonable opportunity to review such documents and comply with applicable legal requirements): (x) administrative materials for prospective Lenders such as lender meeting invitations and funding and closing memoranda, (y) notifications of changes in the terms of the ABL Facility and (z) other materials intended for prospective Lenders after the initial distribution of the Informational Materials, including drafts and final versions of the Term Sheet and the definitive documentation for the ABL Facility (the "**Financing Documentation**").  If you advise us in writing (including by email) that any of the foregoing items (other than the Financing Documentation) should not be distributed to Public Lenders, then the Commitment Parties will not distribute such materials to Public Lenders without further discussions with you.  Before distribution of any Informational Materials to prospective Lenders, you shall, if requested by any Commitment Party, provide us with a customary letter authorizing the dissemination of the Informational Materials and confirming the accuracy and completeness in all material respects of the information contained

therein and, in the case of Public Informational Materials, confirming the absence of MNPI therefrom.

6.     Indemnification.  You agree to indemnify and hold harmless the Commitment Parties and each of their respective affiliates, and the respective directors, officers, employees, partners, representatives, advisors and agents of each of the foregoing (each, an "**Indemnified Party**") from and against any and all actions, suits, losses, claims, damages, penalties, liabilities and expenses of any kind or nature, joint or several, to which such Indemnified Party may become subject or that may be incurred or asserted or awarded against such Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter, the Fee Letter, the Transactions or any related transaction (including, without limitation, the execution and delivery of this Commitment Letter and the Financing Documentation and the closing of the Transactions) or (b) the use or the contemplated use of the proceeds of the ABL Facility, and will reimburse each Indemnified Party for all reasonable and documented out-of-pocket expenses (but limited, in each case of legal fees and expenses, to those of one counsel to all Indemnified Parties taken as a whole and, solely in the case of an actual or reasonably perceived conflict of interest, one additional counsel to all affected Indemnified Parties, taken as a whole and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such Indemnified Parties, taken as a whole) on demand as they are incurred in connection with any of the foregoing; provided that no Indemnified Party will have any right to indemnification for any of the foregoing to the extent resulting from (i) such Indemnified Party's (or any of its Related Parties' (as defined below)) own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment or pursuant to any agreement governing any settlement referred to below, or (ii) any dispute solely among Indemnified Parties, other than any claims against any Commitment Party in its respective capacity or in fulfilling its role as an administrative agent or arranger or any similar role hereunder or under the ABL Facility, and other than any claims arising out of any act, omission, or representation on the part of, or any information provided by or on behalf of, any Borrower, or any subsidiary or affiliate thereof.  In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equity holders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Commitment Parties will only have liability to you (as opposed to any other person), and each of BoA and DBNY shall be liable solely in respect of its own Commitment to the ABL Facility on a several, and not joint, basis with any other Lender. No Indemnified Party or any other party hereto will be liable for any indirect, consequential, special or punitive damages in connection with this Commitment Letter, the Fee Letter, the Financing Documentation or any other element of the Transactions.  For the avoidance of doubt, the parties hereto acknowledge and agree that a claim for indemnity under the preceding provisions of this Section 6, to the extent covered thereby, is a claim of direct or actual damages and nothing contained in the foregoing sentence shall limit your indemnification obligations to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnified Party is otherwise entitled to indemnification hereunder.  No Indemnified Party or any other party hereto will be liable for any damages arising from the use by others of Informational Materials or other materials obtained by Electronic Means, except to the extent any such damages arise from the gross

negligence or willful misconduct of such Indemnified Party (or any of its Related Parties) or such other party hereto, as applicable, in each case as determined by a final non-appealable judgment of a court of competent jurisdiction or pursuant to any agreement governing any settlement referred to below.  You shall not be liable for any settlement effected by any Indemnified Party without your consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if any proceeding is settled with your written consent, or if there is a final judgment against an Indemnified Party in any such proceeding, you agree to indemnify and hold harmless such Indemnified Party in the manner set forth above; provided nothing in this sentence shall limit your indemnification obligations hereunder with respect to such damages.  You shall not, without the prior written consent of each Indemnified Party affected thereby (which consent shall not be unreasonably withheld, conditioned or delayed), settle any threatened or pending claim or action that would give rise to the right of any Indemnified Party to claim indemnification hereunder unless such settlement (x) includes a full and unconditional release of all liabilities arising out of such claim or action against such Indemnified Party, (y) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of such Indemnified Party and (z) requires no action on the part of the Indemnified Party other than its consent. Notwithstanding the foregoing, each Indemnified Party shall be obligated to refund or return any and all amounts paid by you under this Section 7 to such Indemnified Party for any losses, claims, damages, liabilities and expenses to the extent such Indemnified Party is not entitled to payment of such amounts in accordance with the terms hereof.  For purposes hereof, "Related Party" and "Related Parties" of an Indemnified Party means any (or all, as the context may require) of such Indemnified Party's affiliates and controlling persons and its or their respective directors, officers, employees, partners, agents, advisors and other representatives.

7.    <u>Expenses</u>.  You agree to reimburse each of the Commitment Parties, from time to time within 10 days of demand, for (a) all reasonable and documented out-of-pocket costs and expenses of the Commitment Parties, including, without limitation, reasonable and documented out-of-pocket legal fees and expenses (but limited to the reasonable fees, charges and disbursements of one primary counsel to the Commitment Parties, taken as a whole (and, if reasonably necessary, of one or more regulatory counsels and one local counsel in any relevant jurisdiction to all such persons, taken as a whole)), due diligence expenses and all printing, reproduction, document delivery, travel, CUSIP, electronic platform costs and communication costs, incurred in connection with the syndication and execution of the ABL Facility and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Fee Letter, the Financing Documentation and any security arrangements in connection therewith and (b) all reasonable and documented out-of-pocket costs and expenses of the Commitment Parties incurred in connection with the enforcement of this Commitment Letter, the Fee Letter, the Financing Documentation and any security arrangements in connection therewith.

8.    <u>Fees</u>.  As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to cause to be paid the fees described in the Fee Letter on the terms and subject to the conditions set forth therein.

9.    <u>Confidentiality</u>.

(a)    This Commitment Letter and the Fee Letter (collectively, the "**Commitment Documents**") and the existence and contents hereof and thereof shall be

confidential and may not be disclosed, directly or indirectly, by you in whole or in part to any person without the prior written consent of the respective Commitment Parties that are party hereto or thereto, except for disclosure (i) hereof or thereof on a confidential basis to your affiliates and your and your affiliates' directors, officers, employees, accountants, attorneys and other advisors, (ii) in any legal, judicial or administrative proceeding (other than pursuant to your or your subsidiaries' bankruptcy cases which are addressed in clauses (iii) and (iv) below), or as otherwise required by law or regulation or as requested by any governmental authority (in which case, you agree, to the extent not prohibited by law, to inform us promptly in advance thereof) (provided that any information in the Fee Letter relating to pricing, fees and expenses has been redacted), (iii) pursuant to your or your subsidiaries' bankruptcy cases (in which case, you agree, to the extent not prohibited by law, to inform the Lead Arrangers promptly thereof and to request to file the Fee Letter under seal), (iv) to the office of the U.S. Trustee, the bankruptcy court (subject to the preceding clause (iii)), and on a confidential and "professional eyes only" basis to advisors to any statutory committee appointed in your or your subsidiaries' bankruptcy cases and the Consenting Stakeholders, (v) to the extent reasonably necessary or advisable in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter and/or the Fee Letter, (vi) this Commitment Letter, including the existence and contents of this Commitment Letter (but not the Fee Letter or the contents thereof, other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses in marketing materials and other related disclosures) may be disclosed (A) in any syndication or other marketing materials in connection with the ABL Facility or (B) in any proxy statement or similar public filing in connection with any public filing requirement, (vii) the Term Sheet, including the existence and contents thereof (and the contents of the Fee Letter as part of projections, pro forma information and a generic disclosure of aggregate sources and uses) may be disclosed to any rating agency and (viii) after your acceptance hereof, the Term Sheet, including the existence and contents thereof (but not the Fee Letter) may be disclosed to any Lenders or participants or prospective Lenders or prospective participants and, in each case, their directors (or equivalent managers), officers, employees, affiliates, independent auditors or other experts and advisors.  The foregoing restrictions shall cease to apply in respect of the existence and contents of this Commitment Letter (but not in respect of the Fee Letter and its contents) on the earlier of the Closing Date and one year following the date on which you have accepted this Commitment Letter.  Notwithstanding the foregoing, it is agreed and understood that you and your subsidiaries shall be permitted to disclose this Commitment Letter and the Fee Letter and the contents thereof to the bankruptcy court (in the case of the Fee Letter, pursuant to a request to file under seal) to the extent disclosure thereof is necessary or advisable to consummate the transactions contemplated herein.

(b)      Each Commitment Party agrees to maintain in confidence any and all of your Information and Projections and not disclose such information; provided that nothing herein shall prevent any Commitment Party from disclosing any such information (i) to any Lenders or participants or prospective Lenders or participants, (ii) in any legal, judicial, administrative proceeding or other compulsory process or otherwise as required by applicable law or regulations (in which case, we agree, to the extent permitted by law and to the extent practicable, to inform you promptly in advance thereof), (iii) upon the request or demand of any regulatory authority having jurisdiction over any Commitment Party or any affiliate thereof (in which case such Commitment Party shall except with respect to any audit or examination conducted by bank accountants or any governmental authority exercising examination or regulatory authority, to the

extent permitted by law, notify you promptly in advance thereof), (iv) to the employees, legal counsel, independent auditors, professionals and other experts or agents of any Commitment Party or any affiliate thereof (collectively, the "**Representatives**") on a "need to know" basis who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (v) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party or any Representative thereof in breach of this Commitment Letter; provided, that such Commitment Party shall be responsible for its affiliates' and their Representatives' compliance with this paragraph, (vi) to the extent that such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or its or their respective Representatives in breach of this Commitment Letter or is received by a Commitment Party from a third party that is, to such Commitment Party's knowledge, not subject to confidentiality obligations to you, and (vii) with your prior written consent; provided that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of the Commitment Parties or customary market standards for dissemination of such type of information.  The provisions of this paragraph with respect to the Commitment Parties shall automatically terminate on the earlier of (i) one year following the date of this Commitment Letter and (ii) the Closing Date.

(c)     The Commitment Parties shall be permitted to use information related to the syndication and arrangement of the ABL Facility (including your name and company logo) in connection with obtaining a CUSIP number, marketing, press releases or other transactional announcements or updates provided to investor or trade publications, subject to confidentiality obligations or disclosure restrictions reasonably requested by you.  Prior to the Closing Date, the Commitment Parties shall have the right to review and approve any public announcement or public filing made by you or your representatives relating to the ABL Facility or to any of the Commitment Parties in connection therewith, before any such announcement or filing is made (such approval not to be unreasonably withheld, conditioned or delayed).

(d)     The Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**PATRIOT Act**"), each of them is required to obtain, verify and record information that identifies you and any additional borrowers or guarantors under the ABL Facility, which information includes your and their respective names, addresses, tax identification numbers and other information that will allow the Commitment Parties and the other Lenders to identify you and such other parties in accordance with the PATRIOT Act and the Beneficial Ownership Regulation (31 C.F.R. § 1010.230).  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for each of us and the Lenders.

10.     Other Services.

(a)     Nothing contained herein shall limit or preclude the Commitment Parties or any of their affiliates from carrying on any business with, providing banking or other financial services to, or from participating in any capacity, including as an equity investor, in any party

whatsoever, including, without limitation, any competitor, supplier or customer of you or any of your affiliates, or any other party that may have interests different than or adverse to such parties.

(b)     You acknowledge that the Commitment Parties and their respective affiliates (i) may be providing debt financing, equity capital or other services (including financial advisory services) to other entities and persons with whom you or your affiliates may have conflicting interests regarding the Transactions and otherwise, (ii) may act, without violation of its contractual obligations to you, as it deems appropriate with respect to such other entities or persons, and (iii) have no obligation in connection with the Transactions to use, or to furnish to you or your affiliates or subsidiaries, confidential information obtained from other entities or persons.

(c)     In connection with all aspects of the Transactions, you acknowledge and agree that: (i) the ABL Facility and any related arranging or other services contemplated in this Commitment Letter constitute an arm's-length commercial transaction between you and your affiliates, on the one hand, and the Commitment Parties and their respective affiliates, on the other hand, and you are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the Transactions, (ii) in connection with the process leading to the Transactions, each of Commitment Parties and their respective affiliates is and has been acting solely as a principal and not as a financial advisor, agent or fiduciary, for you or any of your management, affiliates, equity holders, directors, officers, employees, creditors or any other party, (iii) no Commitment Party and no affiliate thereof has assumed or will assume an advisory, agency or fiduciary responsibility in your or your affiliates' favor with respect to any of the Transactions or the process leading thereto (irrespective of whether any Commitment Party or any of its affiliates has advised or is currently advising you or your affiliates on other matters) and no Commitment Party and no any affiliate thereof has any obligation to you or your affiliates with respect to the Transactions except those obligations expressly set forth in the Commitment Documents, (iv) the Commitment Parties and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates and no Commitment Party shall have any obligation to disclose any of such interests, and (v) no Commitment Party and no affiliate thereof has provided any legal, accounting, regulatory or tax advice with respect to any of the Transactions and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate.  You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against any Commitment Party or any of their respective affiliates with respect to any breach or alleged breach of agency, fiduciary duty or conflict of interest.

11.     Acceptance/Expiration of Commitments.

(a)     This Commitment Letter and the Commitment of each Initial Lender and the undertakings of each Commitment Party set forth herein shall automatically terminate at 5:00 p.m. (New York City Time) on December 14, 2018 (the "**Acceptance Deadline**"), without further action or notice unless signed counterparts of this Commitment Letter and the Fee Letter shall have been delivered to the Lead Arrangers by such time to the attention of Terry McKinney (electronic mail: terry.mckinney@baml.com).

(b)    In the event this Commitment Letter is accepted by you as provided above, the Commitments and agreements of the Initial Lenders and the undertakings of each Commitment Party set forth herein will automatically terminate without further action or notice at 5:00 p.m. (New York City Time) on the fifth day after the Maturity Date as defined under the DIP Credit Agreement (the "**Termination Date**") if the Closing Date shall not have occurred by such time.

12.    <u>Survival</u>.  The sections of this Commitment Letter and the Fee Letter relating to Indemnification, Expenses, Confidentiality, Other Services, Survival and Governing Law shall survive any termination or expiration of this Commitment Letter, the Commitment of each Initial Lender or the undertakings of each Commitment Party set forth herein (regardless of whether the Financing Documentation is executed and delivered), and the sections relating to Syndication and Information shall survive until the Closing Date; <u>provided</u> that your obligations under this Commitment Letter (other than your obligations with respect to the sections of this Commitment Letter relating to Syndication, Information, Confidentiality, Other Services, Survival and Governing Law) shall be superseded by the provisions of the Financing Documentation upon the initial funding thereunder.

13.    <u>Governing Law</u>.  **THIS COMMITMENT LETTER AND THE FEE LETTER, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED THERETO (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF OR THEREOF), SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 AND SECTION 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REFERENCE TO ANY OTHER CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF. THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS COMMITMENT LETTER OR THE FEE LETTER.**  With respect to any suit, action or proceeding arising in respect of this Commitment Letter or the Fee Letter or any of the matters contemplated hereby or thereby, the parties hereto hereby irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court located in the Borough of Manhattan, and irrevocably and unconditionally waive any objection to the laying of venue of such suit, action or proceeding brought in such court and any claim that such suit, action or proceeding has been brought in an inconvenient forum.  The parties hereto hereby agree that service of any process, summons, notice or document by registered mail addressed to you or each of the Commitment Parties will be effective service of process against such party for any action or proceeding relating to any such dispute.  A final judgment in any such action or proceeding may be enforced in any other courts with jurisdiction over you or each of the Commitment Parties.

14.    <u>Miscellaneous</u>.  This Commitment Letter and the Fee Letter embody the entire agreement among the Commitment Parties and you and your affiliates with respect to the specific matters set forth herein and therein and supersede all prior agreements and understandings relating to the subject matter hereof.  No person has been authorized by any of the Commitment Parties to make any oral or written statements inconsistent with this Commitment Letter or the Fee Letter.  This Commitment Letter is not assignable by any party hereto without the prior written consent of the other parties hereto (and any purported assignment without such consent shall be null and void) and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties.  This

Commitment Letter and the Fee Letter are not intended to benefit or create any rights in favor of any person other than the parties hereto, the Lenders and, with respect to indemnification, each Indemnified Party. This Commitment Letter and the Fee Letter may be executed in separate counterparts and delivery of an executed signature page of this Commitment Letter and the Fee Letter by facsimile or electronic mail shall be effective as delivery of manually executed counterpart hereof; provided that, upon the request of any party hereto, such facsimile transmission or electronic mail transmission shall be promptly followed by the original thereof. This Commitment Letter and the Fee Letter may only be amended, modified or superseded by an agreement in writing signed by each of you and the Commitment Parties.

*[Signature Pages Follow]*

If you are in agreement with the foregoing, please indicate acceptance of the terms hereof by signing the enclosed counterpart of this Commitment Letter and returning it to the Lead Arrangers, together with executed counterparts of the Fee Letter, by no later than the Acceptance Deadline.

Sincerely,

BANK OF AMERICA, N.A., as a Lead Arranger

By: _____

Name: Terrance O. McKinney

Title:   Senior Vice President

DEUTSCHE BANK SECURITIES INC.,
as a Lead Arranger

By: _____

Name: _____
Stephen R. Lapidus
Director

Title: _____

By: _____

Name: _____
FRANK FAZIO
Managing Director

Title: _____

BANK OF AMERICA, N.A.,
as an Initial Lender

By: _____

Name: Terrance O. McKinney

Title:   Senior Vice President

DEUTSCHE BANK AG NEW YORK BRANCH,
as an Initial Lender

By: _____

Name: _____
          Stephen R. Lapidus
          Director

Title: _____


By: _____

Name: _____
          Frank Fazio
          Managing Director

Title: _____

*Signature Page to Commitment Letter (Parker Drilling Company)*

Agreed to and accepted as of the date first
above written:

PARKER DRILLING COMPANY

By: _Michael W Sumruld_
Name:   Michael W. Sumruld
Title:   Senior Vice President and
         Chief Financial Officer

## **Annex A**

## **Commitments**

| Initial Lender | Commitment Amount |
|---|---|
| Bank of America, N.A. | $25,000,000.00 |
| Deutsche Bank AG New York Branch | $25,000,000.00 |
| **Total:** | **$50,000,000.00** |

**Exhibit A**

**Term Sheet**

**[See attached.]**

## PARKER DRILLING COMPANY

### SENIOR SECURED ASSET-BASED REVOLVING FACILITY
### SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Borrowers** | Parker Drilling Company (the "**Parent Borrower**") and the other borrowers under the Existing Credit Agreement (as defined herein) (the "**Borrowers**"). |
| **Guarantors** | All obligations of any of the Loan Parties under the ABL Facility and, at the Parent Borrower's option, under any currency, interest rate protection or other hedging agreement and any cash management arrangement, in each case entered into with an ABL Lender (as defined below) or any person that is an affiliate of an ABL Lender at the time such transaction is entered into (collectively, the "**Obligations**") will be unconditionally guaranteed (the "**Guaranty**") by the Parent Borrower and each of the Parent Borrower's wholly-owned domestic subsidiaries other than (a) immaterial subsidiaries subject to thresholds set forth in the Existing Credit Agreement ("**Immaterial Subsidiaries**"), (b) any subsidiary that is prohibited by law, regulation or contractual obligation (provided that such contractual obligation existed at the time such subsidiary was acquired and was not entered into in contemplation of such acquisition) from providing such Guaranty or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such Guaranty or where the provision of such Guaranty would result in material adverse tax consequences as reasonably determined by the Parent Borrower, (c) any direct or indirect domestic subsidiary (i) substantially all of the assets of which consist of the equity of one or more Foreign Subsidiaries (as defined below), (ii) that is treated as a disregarded entity for U.S. federal income tax purposes that holds equity of one or more Foreign Subsidiaries, or (iii) substantially all of such domestic subsidiary's revenues for the fiscal year most recently ended were generated (or, in the case of a newly-formed or acquired subsidiary, are intended by the Parent Borrower to be generated in the current fiscal year) from assets, including rigs and equipment, located outside of the United States (including located outside the territorial waters of the United States) and/or contracts performed primarily outside of the United States (including performed outside of the territorial waters of the United States) (either of (i), (ii) or (iii), a "**Disregarded Domestic Person**"), (d) any domestic subsidiary that is a direct or indirect subsidiary of a Foreign Subsidiary or a Disregarded Domestic Person, (e) special purpose entities used for permitted securitization facilities or project financings (subject to conditions similar to those set forth in the Existing Credit Agreement), if any, (f) any subsidiary that is then designated as an "Unrestricted Subsidiary" under the Second Lien Credit Agreement subject to customary conditions and limitations to be applicable to any such designation which shall be set forth in the ABL Credit Agreement, and (g) any subsidiary to the extent that the burden or cost of providing a Guaranty outweighs the benefit afforded thereby as reasonably determined by the ABL Agent and |

1

the Parent Borrower (the "**Guarantors**", and collectively with the Borrowers, the "**Loan Parties**").

For purposes of the ABL Documentation (as defined below), "**Foreign Subsidiary**" means any direct or indirect subsidiary of the Parent Borrower organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia and "**Excluded Subsidiary**" means any direct or indirect subsidiary of the Parent Borrower described in any of <u>clauses (b)</u> through <u>(g)</u> of the preceding paragraph[1].

| | |
|---|---|
| **Prior Secured Facilities** | (a) That certain Second Amended and Restated Credit Agreement, dated as of January 26, 2015 (as amended by the First Amendment dated as of June 1, 2015, the Second Amendment dated as of September 29, 2015, the Third Amendment, dated May 27, 2016, the Fourth Amendment dated as of February 21, 2017, the Fifth Amendment dated as of February 14, 2018 and any other supplements, amendments, amendments and restatements or other modifications thereto, the "**Existing Credit Agreement**"), among the Parent Borrower, certain subsidiaries of the Parent Borrower from time to time as additional borrowers, Bank of America, N.A., as administrative agent and letter of credit issuer, the other agents party thereto and each lender from time to time party thereto; and |
| | (b) that certain Debtor-in-Possession Credit Agreement that shall be entered into in connection with the Chapter 11 Cases (as amended, amended and restated or otherwise modified from time to time, the "**DIP Credit Agreement**"), among the Parent Borrower, certain subsidiaries of the Parent Borrower from time to time as additional borrowers or guarantors, as the case may be, Bank of America, N.A., as administrative agent, the other agents party thereto and each lender from time to time party thereto (the "**DIP Lenders**"). |
| **Lead Arrangers and Bookrunners** | Bank of America, N.A. and Deutsche Bank Securities Inc. will act as joint lead arrangers and joint bookrunners for the ABL Facility (in such capacity, the "**ABL Lead Arrangers**") |
| **ABL Agent** | Bank of America, N.A. shall act as administrative agent and collateral agent for the ABL Facility (in such capacities, the "**ABL Agent**") on behalf of the ABL Lenders (as defined below). |
| **ABL Lenders** | A syndicate of banks, financial institutions and other entities, including the Initial Lenders, arranged by the ABL Lead Arrangers and mutually agreed by the Parent Borrower (collectively, the "**ABL Lenders**"). |
| **Secured Parties** | ABL Agent, ABL Lenders, Issuing Banks (as defined herein) and providers of cash management products or hedges provided to any Borrower or Guarantor by an ABL Lender or an affiliate of an ABL Lender (collectively, the "**ABL Secured Parties**"). |

---

[1] Notwithstanding the foregoing, it is agreed that the Loan Parties as of the Closing Date shall be the same Loan Parties as under the DIP Facility.

| | |
|---|---|
| **ABL Facility** | An asset-based revolving credit facility (the "**ABL Facility**") in an aggregate principal amount of $50 million, which amount may be increased by up to $50 million to an aggregate amount of $100 million in the event additional commitments under the ABL Facility are received from lenders other than the Initial Lenders (all such commitments, the "**ABL Commitments**", and loans made under the ABL Facility, the "**Revolving Loans**"), subject to the terms and conditions set forth in this Summary of Terms and Conditions (the "**ABL Term Sheet**"). |
| **Letters of Credit** | Letters of credit outstanding under the DIP Credit Agreement or otherwise previously issued by any of the ABL Lenders hereunder ("**Existing L/Cs**") may, at Parent Borrower's option, be rolled over and deemed outstanding under the ABL Facility ("**Converted L/Cs**") as part of the ABL Commitments.  If the Existing L/Cs are so converted, the ABL Lenders shall participate in the Converted L/Cs on a pro rata basis in proportion to their respective ABL Commitments.  For the avoidance of doubt, there shall be no cash collateralization requirement with respect to the Converted L/Cs on the Closing Date.  To the extent any Existing L/Cs are not so converted, at the Parent Borrower's option, L/Cs (as defined below) may be issued on the Closing Date (subject to the terms and conditions applicable to the issuance of L/Cs under the ABL Facility) to replace or provide credit support for any such Existing L/Cs that remain outstanding.  A portion of the ABL Facility in the amount of $30 million (the "**L/C Facility**") shall provide for the issuance of letters of credit, including standby and commercial letters of credit in U.S. dollars and other approved currencies (the "**L/Cs**"), by the ABL Agent and/or one or more ABL Lenders reasonably acceptable to the Parent Borrower (in such capacity, each an "**Issuing Bank**"); *provided* that DB shall have no obligation to issue commercial letters of credit. |
| | No L/C shall have an expiration date after the earlier of (a) twelve (12) months after the date of issuance and (b) five (5) business days prior to the ABL Maturity Date; provided that any L/C, with the consent of the applicable Issuing Bank, may provide for the renewal thereof (which shall in no event extend beyond the date referred to in clause (b) above). |
| | Drawings under any L/C shall be reimbursed by the relevant Borrower (whether with its own funds or with the proceeds of Revolving Loans) not later than 1:30 p.m. New York time on the business day the Parent Borrower receives notice of such drawing from the applicable Issuing Bank if such notice is received by the Parent Borrower prior to 11:00 a.m. New York time or, if such notice is received after 11:00 a.m. New York time, then not later than 1:30 p.m. New York time on the next business day following such notice.  To the extent that the Borrowers do not so reimburse the Issuing Bank, the ABL Lenders shall be irrevocably and unconditionally obligated to reimburse the Issuing Bank on a *pro rata* basis. |
| **Availability** | The aggregate amount of the Revolving Loans, together with any unreimbursed drawings and/or undrawn amounts under any L/Cs outstanding that have not been fully cash collateralized at any time under the ABL Facility (the "**Outstanding Amounts**") shall not exceed an amount equal to the lesser of (a) the ABL Commitments and (b) the then |

effective Borrowing Base (as defined herein) (such lesser amount, the "**Line Cap**"; and the amount by which the Line Cap at any time exceeds the Outstanding Amounts, the "**Availability**").

**Borrowing Base**

The borrowing base (the "**Borrowing Base**") shall be defined and determined in a manner substantially similar to the terms of the Existing Credit Agreement, other than to the extent set forth in this ABL Term Sheet, and subject to such modifications as agreed by the ABL Agent and the Parent Borrower; provided that (a) with respect to receivables, unbilled Eligible Domestic Accounts Receivable shall also be included in the Borrowing Base at an advance rate of 75% but subject to a cap of $5 million and (b) with respect to equipment, (i) the advance rate for the Net Equipment OLV of the Eligible Rental Equipment shall be reduced from 60% to 40% and (ii) the $50 million limit shall be eliminated. The initial Borrowing Base (after giving effect to any reserves) will be agreed prior to the Closing Date and shall be based on the Borrowing Base Certificate (as defined below) delivered to the ABL Agent prior to the Closing Date.

Following the Closing Date, the Borrowing Base will be computed monthly pursuant to a borrowing base certificate (the "**Borrowing Base Certificate**") to be delivered by the Parent Borrower to the ABL Agent within 25 days after the end of each such month; provided that the Borrowing Base may be required to be computed more frequently (but not more frequently than weekly, with the Borrowing Base Certificate to be delivered within 3 business days after the end of each week) as reasonably determined by the ABL Agent during any Increased Borrowing Base Reporting Period. "Increased Borrowing Base Reporting Period" means a period commencing on the date that Availability is less than $25 million and continuing until Availability shall have been equal to or greater than $25 million for each day during the preceding 30 consecutive day period.

The initial categories of reserves against the Borrowing Base shall be mutually agreed. After the Closing Date, the ABL Agent reserves the right to establish or modify reserves against the Borrowing Base, acting in its Permitted Discretion (as defined in the Existing Credit Agreement), upon, so long as no Event of Default exists, at least 2 business days' prior, written notice to the Parent Borrower (which notice shall include a reasonably detailed description of such reserve being established). During such 2 business day period, the ABL Agent shall, if requested, discuss any such reserve or change with the Parent Borrower and the Parent Borrower may take such action as may be required so that the event, condition or matter that is the basis for such reserve or change no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent reasonably satisfactory to the ABL Agent. Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change and (b) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria (including collection/advance rates).

| | |
|---|---|
| **ABL Maturity Date** | The fourth anniversary of the Closing Date (the "**ABL Maturity Date**"). |
| **Fees and Interest Rates** | As set forth in <u>Annex I</u> hereto. |
| **Collateral** | The Obligations with respect to the ABL Facility and the obligations of each other Loan Party under the Guaranty in respect of the ABL Facility shall be secured by a perfected, first-priority security interest (subject to certain permitted liens set forth in the ABL Documentation) in substantially all of the Loan Parties' tangible and intangible assets (collectively, the "**Collateral**"), including a pledge of the capital stock of each Loan Party's wholly-owned direct subsidiaries, subject in each case to the limitations and exceptions set forth in the Existing Credit Agreement and others to be agreed by the ABL Agent and Parent Borrower; provided that all real estate of the Loan Parties shall be excluded from the Collateral. |
| **Intercreditor Agreement** | The lien priority, relative rights and other creditors' rights in respect of the ABL Facility and the Second Lien Term Loan will be set forth in a customary intercreditor agreement (the "**Intercreditor Agreement**"), which shall be acceptable to the ABL Agent and the ABL Lenders in their sole discretion.  For the avoidance of doubt, the Intercreditor Agreement will allow for permitted refinancing indebtedness in respect of the ABL Facility and the Second Lien Term Loan. |
| **Documentation** | The ABL Credit Agreement and the other ABL Documentation, including the Intercreditor Agreement, shall be drafted by counsel to the ABL Agent and based upon the Existing Credit Agreement as modified to reflect this ABL Term Sheet and subject to the terms hereof and other adjustments as agreed to by the ABL Agent and the Parent Borrower. The ABL Credit Agreement shall include appropriate updates related to successor LIBOR provisions, FinCEN Beneficial Ownership provisions and Delaware LLC divisions. |
| **Conditions Precedent to Closing Date and Making of Initial Credit Extensions** | The initial availability of the ABL Facility, and the obligation of any ABL Lender or Issuing Bank to make any initial Revolving Loan and/or issue any L/C (each, a "**Credit Extension**") shall be conditioned upon satisfaction of the following list of conditions precedent, such list not to be supplemented other than in the ABL Agent's reasonable discretion based on facts and circumstances which ABL Agent was not aware of as of the date of the Commitment Letter (the date upon which all such conditions precedent shall be satisfied or waived, the "**Closing Date**"): |
| | (a)  The Borrowers and each Guarantor shall have executed and delivered a satisfactory credit agreement (the "**ABL Credit Agreement**") and other definitive financing documentation with respect to the ABL Facility (together with the ABL Credit Agreement, the "**ABL Documentation**"), including vessel mortgages, security agreements, pledge agreements, control agreements, stock powers executed in blank, and other documentation reasonably satisfactory for the creation and perfection of the liens and security interests contemplated hereby (subject to certain post-closing matters as may be mutually agreed). |

(b)  The ABL Lenders, the ABL Agent and the ABL Lead Arrangers shall have received all fees required to be paid, and all expenses for which invoices have been presented at least two (2) business days prior to the Closing Date (it being agreed and understood that this condition (b) may be satisfied concurrently with the initial funding under the ABL Facility).

(c)  All material governmental and third party approvals necessary in connection with the financing and transactions contemplated hereby shall have been obtained and be in full force and effect.

(d)  The ABL Lenders shall have received (i) to the extent then available, audited consolidated financial statements of Parent Borrower and its subsidiaries for the fiscal year ending December 31, 2018 and (ii) unaudited interim consolidated financial statements of the Parent Borrower and its subsidiaries for each calendar month period ended subsequent to December 31, 2018 as to which such financial statements are available, accompanied by a certificate of a financial officer of the Parent Borrower.

(e)  The ABL Lenders shall have received (i) a reasonably satisfactory opening balance sheet of the Parent Borrower giving pro forma effect to the debt (if any) to be incurred on the Closing Date and (ii) projections of the revenues, expenses, and cash flows of the Borrower covering the period from January 1, 2019 through the Maturity Date, prepared on a quarterly basis for the fiscal year ending December 31, 2019 and an annual basis for the fiscal years ending December 31, 2020, December 31 2021 and December 31, 2022.

(f)  The ABL Agent shall have received customary evidence of authorization, customary officer's certificates, good standing certificates in each Loan Party's jurisdiction of organization, customary UCC searches, customary funds flow memorandum, insurance certificates and a solvency certificate from the Parent Borrower's chief financial officer or treasurer (certifying that, after giving pro forma effect to the Transactions and after giving effect to each debtors' exit from the Chapter 11 Cases in accordance with the Plan of Reorganization, that the Loan Parties, on a consolidated basis, are solvent) in the form of Annex II hereto.

(g)  The ABL Lenders shall have received such legal opinions, including opinions of local counsel, as are customary for transactions of this type.

(h)  The Borrower's capital structure and financing plan shall be satisfactory to the ABL Agent (it being agreed and understood that the capital structure and financing plan as set forth in the RSA as in effect on the "RSA Effective Date" as defined in the RSA, and as amended by any amendments consented to in writing by the ABL Agent, is deemed satisfactory to the ABL Agent).

(i)  The ABL Agent and the ABL Lenders shall have received (at least five (5) business days prior to Closing Date to the extent requested at least ten (10) business days prior to the Closing Date) all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including but not restricted to the USA Patriot Act and the Beneficial Ownership Regulation (31 C.F.R. § 1010.230).

(j) The Bankruptcy Court shall have entered an Order, in form and substance acceptable to the ABL Agent and the ABL Lenders, approving the Commitment Letter and the Fee Letter within a certain period after the Petition Date, which period shall be agreed to between the Parent Borrower and the ABL Secured Parties.

(k) The Bankruptcy Court shall have entered the Confirmation Order (as defined in the RSA), in form and substance reasonably satisfactory to the ABL Agent, and all conditions to the effectiveness of the Plan shall have been satisfied or waived in accordance therewith.

(l) The ABL Agent shall have received satisfactory evidence of Parent Borrower's prior or substantially contemporaneous receipt of cash proceeds of not less than $95,000,000 from the Rights Offering (as defined in the RSA), as such amount may be reduced to provide for netting of fees and expenses.

(m) The Intercreditor Agreement shall have been executed and delivered by the parties thereto.

(n) The Loan Parties shall have unrestricted cash and cash equivalents and Availability in an aggregate amount of not less than $100,000,000 after giving effect to all payments to be made to unsecured creditors and other claimants on the effective date of the Plan.

(o) There shall be no Outstanding Amounts under the ABL Credit Facility other than in respect of L/Cs.

| | |
|---|---|
| **Conditions Precedent to Credit Extensions** | The availability of each Credit Extension on or after the Closing Date shall be subject to the following conditions:

- At the time of making any Credit Extension and after giving effect thereto, the representations and warranties of the Loan Parties contained in the Credit Documentation Documents shall be true and correct in all material respects.

- No default or Event of Default shall then exist or result therefrom.

- After giving effect to such Credit Extension, Availability shall not be less than $0.

- Delivery of a customary borrowing notice.

- In the case of a Credit Extension in the form of any Revolving Loan, after giving effect to the borrowing of such Revolving Loan (net of any concurrent use of the proceeds of such borrowing), the Consolidated Cash Balance (to be defined as mutually agreed) shall not exceed $30,000,000. |
| **Voluntary Prepayments** | The Borrowers may prepay in full or in part, the Revolving Loans, in minimum amounts to be agreed without any premium or penalty, subject to payment of any LIBOR breakage costs. |
| **Commitment Reductions** | Revolving Loan Commitments may be reduced by the Parent Borrower in minimum amounts to be agreed upon or terminated in whole without penalty |

(other than LIBOR breakage costs, if any).  No optional reduction in ABL Commitments shall result in Availability being less than $0.

**Mandatory Prepayments**

The ABL Credit Agreement shall include solely the following mandatory prepayment event:

- If at any time, the sum of Outstanding Amounts exceeds the Line Cap, then the Borrowers will be required to prepay/cash collateralize such excess on substantially the same terms as contained in the Existing Credit Agreement.

**Representations and Warranties:**

The ABL Credit Agreement shall contain representations and warranties substantially similar to those contained in the Existing Credit Agreement, subject to modifications to reflect the consummation of the Transactions and as otherwise agreed to by the ABL Agent and the Parent Borrower.

**Affirmative Covenants:**

The ABL Credit Agreement shall contain affirmative covenants substantially similar to those contained in the Existing Credit Agreement, subject to modifications to reflect the consummation of the Transactions and as otherwise agreed to by the ABL Agent and the Parent Borrower or set forth in this ABL Term Sheet, and other than to the extent set forth below:

(a) Monthly financial statements shall be required only during a Cash Dominion Period (as defined herein); and

(b) Absent an Event of Default, no more than two appraisals and two field examinations will be required each calendar year.

**Financial Covenants**

The ABL Credit Agreement will contain solely the following financial covenant:

- A minimum liquidity test substantially similar to that contained in the Existing Credit Agreement; provided that the required amount of Liquidity (to be defined as under the Existing Credit Agreement, except that no more than $10 million of which can consist of domestic unrestricted cash held in controlled accounts with Bank of America) shall be reduced from $30 million to $25 million.

**Cash Management/Cash Dominion**

Within 30 days after the Closing Date (or such longer period of time as the ABL Agent may reasonably agree, such consent not to be unreasonably withheld, delayed or conditioned), the Borrower will deliver account control agreements on the Loan Parties' collection and concentration accounts (to be mutually agreed).  During a Cash Dominion Period (as defined below) and upon delivery of a written notice thereof to the Borrower from the ABL Agent, the ABL Agent shall have the right to require that all amounts on deposit in such collection and concentration accounts be swept into a core concentration account maintained with or under the control of the ABL Agent.  The ABL Agent shall have the right during any Cash Dominion Period to cause all amounts on deposit in the core concentration account to be applied on a daily basis to reduce amounts outstanding under the ABL Facility and then to cash collateralize any outstanding L/C's (in each case,

subject to a cash release mechanic upon the termination of such Cash Dominion Period).

"**Cash Dominion Period**" means the period (a) commencing on the date that (i) Availability shall be less than $25 million, (ii) the aggregate principal amount of outstanding Revolving Loans equals or exceeds $20 million or (iii) an Event of Default shall have occurred, and (b) continuing until, during each of the preceding 30 consecutive days, (x) no Event of Default shall have existed, (y) Availability hall have been equal to or greater than $25 million and (z) the aggregate principal amount of outstanding Revolving Loans shall have been less than $20 million.

| | |
|---|---|
| **Negative Covenants** | The ABL Credit Agreement shall contain negative covenants pertaining to categories substantially similar to those contained in the Existing Credit Agreement, subject to modifications to reflect the consummation of the Transactions and as otherwise agreed to by the ABL Agent and the Parent Borrower or set forth in this ABL Term Sheet; provided that, for the avoidance of doubt, the ABL Credit Agreement shall include restrictions on investments, acquisitions and distributions and other restricted payments. |
| | For the avoidance of doubt, the ABL Documentation will permit the professional fee escrow (including payments therefrom) as contemplated under the Plan. |
| **Use of Proceeds** | The proceeds of the ABL Facility shall be used to, among other things, (a) pay fees, interest, payments and expenses associated with the Loan Parties' exit from chapter 11 and refinancing of certain debt in connection therewith, including the entry into the ABL Facility and the Second Lien Credit Agreement, (b) providing liquidity for capital expenditures and acquisitions, and (c) working capital and general corporate purposes of the Parent Borrower and its subsidiaries. |
| **Events of Defaults** | Substantially consistent with the Existing Credit Agreement and including the following: nonpayment of principal or failure to reimburse drawings under letters of credit, in each case, when due; nonpayment of interest, fees or other amounts after 3 business days; material inaccuracy of a representation or warranty when made or deemed made; violation of a covenant (subject, in the case of affirmative covenants, to certain grace periods to be substantially consistent with those in the Existing Credit Agreement and as otherwise mutually agreed); cross default to material indebtedness; bankruptcy events with respect to the Borrower or a material subsidiary (with a customary grace period for involuntary actions); ERISA events subject to material adverse effect; material unpaid, final judgments that have not been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; actual (or assertion by a Loan Party in writing of the) invalidity of any loan document under the ABL Facility; and a change of control (to be defined as under the Existing Credit Agreement); provided that the ownership or acquisition of equity interests of the Parent Borrower by Highbridge, Värde, Whitebox or Brigade (each as defined in the RSA), or their respective affiliates shall not constitute a change of control. |

9

| | |
|---|---|
| **Remedies** | Usual and customary with the ABL Agent, acting on behalf of the ABL Secured Parties and at the direction of the Required Lenders. |
| **Expenses and Indemnification** | The ABL Credit Agreement shall contain indemnification and expense reimbursement provisions substantially similar to those contained in the Existing Credit Agreement, subject to modifications to be agreed to by the ABL Agent and the Parent Borrower. |
| **Governing Law** | The ABL Documentation shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflict of law principles thereof. |
| **Required Lenders** | ABL Lenders holding greater than 50.0% of the aggregate amount of the Revolving Loans and participations under the L/Cs and unused ABL Commitments under the ABL Facility (the "**Required Lenders**"); provided that at any time there are two or fewer unaffiliated ABL Lenders, "Required Lenders" shall mean all ABL Lenders. |
| **Amendments** | All amendments, modifications and waivers of the ABL Documentation shall require the consent of the Required Lenders, except in the case of amendments, modifications, or waivers customarily requiring consent from all ABL Lenders, all affected ABL Lenders, an Issuing Bank or the ABL Agent, and <u>provided</u> that the consent of ABL Lenders holding at least 66.67% of the aggregate ABL Commitments and outstanding exposure under the ABL Facility will be required for amendments and waivers consummated to (a) increase advance rates and (b) change the definition of "**Borrowing Base**" and the component definitions thereof to the extent the effect of such amendment would increase Availability. |
| **Assignments and Participations** | Each ABL Lender may assign all or any part of the Revolving Loans and/or the ABL Commitments to one or more banks, financial institutions, or other entities; <u>provided</u> that, other than an assignment to a ABL Lender or an affiliate of a ABL Lender, assignments shall be subject to the prior written consent of (a) the Parent Borrower (which consent shall not be unreasonably withheld or delayed) so long as no Event of Default has occurred or is continuing and (b) each Issuing Bank.  Upon such assignment, such affiliate, bank, financial institution, or entity will become an ABL Lender for all purposes under the Loan Documents.  The ABL Lenders will also have the right to sell participations, subject to customary limitations on voting rights, in the Revolving Loans. |
| **Counsel to ABL Agent and ABL Lead Arrangers** | Vinson & Elkins LLP |

## ANNEX I

### Fees and Interest Rates

Interest Rate Option:

The Parent Borrower may elect that the Revolving Loans comprising each borrowing bear interest at a rate per annum equal to:

the Base Rate plus the Applicable Rate; or

the Eurodollar Rate plus the Applicable Rate.

As used herein:

"Applicable Rate" means, initially, (a) 2.25% in the case of Eurodollar Rate Loans and (b) 1.25% in the case of Base Rate Loans, and following delivery of financial statements for the first full fiscal quarter after the Closing Date, the applicable percentage per annum set forth below determined by reference to Availability:

| Pricing Level | Average Daily Availability | Eurodollar Rate Loans | Base Rate Loans |
|---|---|---|---|
| I | >66.67% | 2.25% | 1.25% |
| II | ≤66.67% but >33.33% | 2.50% | 1.50% |
| III | ≤33.33% | 2.75% | 1.75% |

"Base Rate" means for any day a fluctuating rate per annum equal to the higher of (a) the Federal Funds Rate plus 0.5%, (b) the rate of interest in effect for such day as publicly announced from time to time by the ABL Agent as its "prime rate", and (c) the Eurodollar Rate plus 1.00%. If the Base Rate shall be less than zero, such rate shall be deemed zero.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Eurodollar Rate" means for any Interest Period (as defined below) with respect to a Eurodollar Rate Loan, or a Base Rate Loan the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, a rate per annum determined by the ABL Agent pursuant to the following formula:

$$\text{Eurodollar Rate} = \frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

provided that, if the Eurodollar Rate shall be less than zero, such rate shall be deemed to be zero.

"Eurodollar Base Rate" means:

US 5974655v.7

(a) for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate ("**LIBOR**") or a comparable or successor rate, which rate is approved by the ABL Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the ABL Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period.  If such rate is not available at such time for any reason, then the "**Eurodollar Base Rate**" for such Interest Period shall be the rate per annum determined by the ABL Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by the ABL Agent and with a term equivalent to such Interest Period would be offered by the ABL Agent's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b) for any rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day;

*provided* that to the extent a comparable or successor rate is approved by the ABL Agent in connection with any rate set forth in this definition, the approved rate shall be applied in a manner consistent with market practice; *provided*, *further* that to the extent such market practice is not administratively feasible for the ABL Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the ABL Agent.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"**Eurodollar Reserve Percentage**" means, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the Federal Reserve Bank for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "**Eurocurrency liabilities**").   The Eurodollar Rate for each outstanding Eurodollar Rate Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

| | |
|---|---|
| Interest Payment Dates: | In the case of Base Rate Loans, quarterly in arrears. |
| | In the case of Eurodollar Rate Loans, on the last day of each relevant Interest Period and, in the case of any interest period longer than 3 months, on each successive date 3 months after the first day of such Interest Period. |

US 5974655v.7

|  | "Interest Period" means a period of one, two, three or six months or with the consent of all ABL Lenders, a longer or shorter period, as selected by the Parent Borrower. |
|---|---|
| Unused Line Commitment Fees: | The Parent Borrower shall pay to the ABL Agent for the account of each Lender in accordance with its applicable percentage, a commitment fee equal to the Applicable Fee Rate times the actual daily amount by which the ABL Commitments exceeds the total Outstanding Amounts.  The commitment fee described herein shall be due and payable quarterly in arrears on the first day of each January, April, July and October, commencing with the first such date to occur after the Closing Date.<br><br>"Applicable Fee Rate" means 0.50% per annum. |
| Letter of Credit Fees: | The Parent Borrower shall pay to the ABL Agent for the account of each Lender in accordance with its applicable percentage a Letter of Credit fee (the "Letter of Credit Fee") (a) for each commercial Letter of Credit equal to the Applicable Rate applicable to Eurodollar Rate Loans and (b) for each standby Letter of Credit equal to the Applicable Rate applicable to Eurodollar Rate Loans, in each case times the U.S. dollar equivalent of the daily amount available to be drawn under such Letter of Credit.  Letter of Credit Fees shall be payable quarterly in arrears.<br><br>A fronting fee in an amount to be agreed (but in any event not to exceed 0.125% per annum) on the then available face amount of each Letter of Credit shall be payable quarterly in arrears to the relevant L/C Issuer for its own account.  In addition, the Parent Borrower shall pay customary issuance and administration fees to the relevant L/C Issuer. |
| Default Rate: | 2.0% and to be applicable in a manner substantially consistent with the Existing Credit Agreement. |
| Rate and Fee Basis: | All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurodollar Rate) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.<br><br>All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed or, in the case of interest in respect of Loans denominated in alternative currencies as to which market practice differs from the foregoing, in accordance with such market practice. |

US 5974655v.7

**ANNEX II**

**SOLVENCY CERTIFICATE**

[●], 2018

This Solvency Certificate is furnished pursuant to Section [●] of the [●] Credit Agreement, dated as of [●], 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PARKER DRILLING COMPANY, a Delaware corporation (the "Parent Borrower"), the [Designated Borrowers] from time to time party thereto, [●], as Administrative Agent [and L/C Issuer], the Lenders from time to time party thereto, and the other Persons from time to time party thereto.  Unless the context clearly requires otherwise, all capitalized terms defined in the Credit Agreement are used herein with the same meanings.

I, the undersigned, being the Chief Financial Officer of the Parent Borrower, **DO HEREBY CERTIFY** to the Administrative Agent and the Lenders solely in my official capacity (and not in any individual capacity) that, as of the [Effective Date]:

1.      The undersigned is familiar with the business and financial position of the Parent Borrower and the other Loan Parties, and in reaching the conclusions set forth in this Solvency Certificate, the undersigned has made such other investigations and inquiries as the undersigned has deemed appropriate; and

2.      The Loan Parties, after giving pro forma effect to the Transactions and after giving effect to each debtors' exit from the Chapter 11 Cases in accordance with the Plan of Reorganization, on a consolidated basis, are solvent[2].

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[2]      To be defined per Existing Credit Agreement.

US 5974655v.7

IN WITNESS WHEREOF, I have hereunto set my hand as of the date first set out above.

**PARKER DRILLING COMPANY**, a
Delaware corporation


By:_____
Name:  [Mike W. Sumruld]
Title:    [Senior Vice President and
            Chief Financial Officer]

**Exhibit B**

**Additional Definitions**

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court administering the Chapter 11 Cases.

"**Chapter 11 Cases**" voluntary cases commenced by the Company Parties under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"**Company Parties**" means PKD, 2M-TEK, Inc., Anachoreta, Inc., Pardril, Inc., Parker Aviation Inc., Parker Drilling Arctic Operating, LLC, Parker Drilling Company of Niger, Parker Drilling Company North America, Inc., Parker Drilling Company of Oklahoma, Incorporated, Parker Drilling Company of South America, Inc., Parker Drilling Management Services, Ltd., Parker Drilling Offshore Company, LLC, Parker Drilling Offshore USA, L.L.C., Parker North America Operations, LLC, Parker Technology, Inc., Parker Technology, L.L.C., Parker Tools, LLC, Parker-VSE, LLC, Quail USA, LLC, and Quail Tools, L.P.

"**Consenting Stakeholders**" means the non-Affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, certain securities of PKD or other Company Parties, that are party to the RSA.

"**Debtors**" means the Company Parties.

"**Plan**" means the joint chapter 11 plan of reorganization filed by the Debtors in the Chapter 11 Cases to implement the Restructuring Transactions.

"**Plan of Reorganization**" means the joint chapter 11 plan of reorganization filed by the Debtors in the Chapter 11 Cases to implement the Restructuring Transactions.

"**Reorganized Parker**" means PKD, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

"**RSA**" means that certain restructuring support agreement (including all exhibits, annexes, and schedules thereto), made and entered into as of December 12, 2018, by and among the Company Parties and the Consenting Stakeholders.

"**Restructuring Transactions**" the restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in the RSA, and as specified in the restructuring term sheet attached as Exhibit A thereto and the exhibits thereto, the term sheet for new warrants attached as Exhibit B thereto, the backstop commitment agreement attached as Exhibit C thereto, the term sheet for the Second Lien Credit Agreement attached as Exhibit 2 to Exhibit A thereto, and the corporate governance term sheet attached as Exhibit 4 to Exhibit A

thereto, and such transactions as described in, and in accordance with, the RSA and the exhibits thereto.

"**<u>Second Lien Agent</u>**" means an entity to be selected, in its capacity as administrative agent under the Second Lien Credit Agreement.

"**<u>Second Lien Term Loan</u>**" means the $210 million new second lien secured term loan that Reorganized Parker will incur on the Closing Date under the Second Lien Credit Agreement.

"**<u>Second Lien Credit Agreement</u>**" means that certain credit agreement for the Second Lien Term Loan that Reorganized Parker will enter into in accordance with the RSA.

## **Annex 2**

**Fee Letter**

**\*\*TO BE FILED UNDER SEAL\*\***

**<u>Exhibit B</u>**

**Latif Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) Case No. 18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF BASSAM J. LATIF**
**IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER (I) AUTHORIZING THE DEBTORS TO (A) ASSUME CERTAIN**
**EXIT FINANCING AGREEMENTS AND (B) INCUR AND PAY RELATED**
**FEES, INDEMNITIES, AND EXPENSES, AND (II) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Bassam J. Latif, hereby declare as follows under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Moelis & Company LLC ("Moelis"), an investment banking firm which has its principal office at 399 Park Avenue, 5th Floor, New York, New York 10022.  The debtors and debtors in possession (collectively, the "Debtors") have proposed to retain Moelis as their investment banker and financial advisor in these chapter 11 cases.

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an  Order (I) Authorizing the Debtors to (A) Assume Certain Exit Financing Agreements*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

*and (B) Incur and Pay Related Fees, Indemnities, and Expenses, and (II) Granting Related Relief*
(the "Motion"), to which this Declaration is attached as **Exhibit B**.[2]

3.     Except where specifically noted, the statements in this Declaration are based on my
personal knowledge, belief, or opinion; information that I have received from the Debtors'
employees or advisors and/or employees of Moelis working directly with me or under my
supervision, direction, or control; or from the Debtors' books and records maintained in the
ordinary course of their business.  As a professional proposed to be retained by the Debtors, Moelis
is charging for services provided in this matter, including a fee for raising debtor-in-possession
financing, but I am not being compensated for providing this declaration or testimony.  If I were
called upon to testify, I could and would testify competently to the facts set forth herein.  I am
authorized to submit this Declaration on behalf of the Debtors.

## Qualifications

4.     Moelis is a leading international investment banking and financial advisory firm
(NYSE: MC) with nearly 600 investment bankers in 15 offices around the world.  Moelis provides
a broad range of financial advisory services including (a) mergers and acquisitions,
(b) recapitalization & restructuring, (c) capital markets advisory, and (d) private funds advisory.

5.     I am a Managing Director of Moelis and a resident in Moelis' Houston office,
located at Two Allen Center, 1200 Smith Street, Suite 1900, Houston, Texas 77002, where we
have a team of approximately 40 advisory and technical professionals focused primarily on the oil
& gas industry.  I have over sixteen years of experience in investment banking advisory, over
thirteen of which have been spent providing restructuring advice to companies, creditors, sponsors,
and other interested parties on restructuring transactions, both in chapter 11 and out-of-court.

---

2     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

4

Furthermore, I have substantial experience marketing, structuring and evaluating, as applicable, debtor-in-possession financings, secured debt, exit financing, unsecured debt, rights offerings, and preferred and common stock.  I received a Bachelor of Arts degree in Economics and Bachelor of Science degree in Mechanical Engineering from Rice University in Houston, Texas, and received a Master of Business Administration degree from Columbia University in New York, New York.

### Efforts to Obtain Exit Financing and the Marketing Process

6.      Moelis has worked with the Debtors, Alvarez & Marsal North America LLC, as the Debtors' restructuring advisor, and Kirkland & Ellis LLP, as their restructuring counsel, to identify and develop potential sources of exit financing.

7.      As further described below, the Debtors went through a marketing process before selecting exit and postpetition financing proposals.  At the outset of this marketing process, the Debtors had three stated objectives: (i) secure debtor-in-possession financing on the most favorable terms available to the Debtors in the current market environment; (ii) secure exit financing commitments at the outset of these chapter 11 cases, on the most favorable terms available to the Debtors in the current market environment and with a borrowing base as large as the Debtors' current assets will allow; and (iii) facilitate a holistic DIP-to-exit financing solution to ensure the longer-term stability of the ongoing enterprise.

8.      During the marketing process for potential financing, the Debtors and Moelis solicited indications of interest from eighteen financial institutions (including both banks and non-bank financial institutions).  Moelis, together with the Debtors, identified these eighteen parties based on a number of factors including, among other things, their ability to complete diligence in a timely manner, their experience providing debtor-in-possession and exit financing, and their familiarity with the oil & gas sector generally and the oilfield services sector in particular.  The marketing process undertaken by Moelis and the solicitation and development of proposals was

tailored to reflect the Debtors' particular situation, including that the Debtors' prepetition asset-based credit facility was undrawn and the Debtors had substantial unused first lien secured debt capacity.  This allowed the Debtors flexibility in their choice of potential postpetition lenders and, ultimately, exit lenders.  As part of this process, Moelis conducted multiple phone calls and in-person meetings with the interested parties and received preliminary indications of interest for postpetition and exit financing facilities.  I believe that this solicitation process provided a reasonable survey of potential financing alternatives.

9.      Thirteen of the parties contacted by Moelis either signed confidentiality agreements, or were already subject to a confidentially agreement, with the Debtors and were provided with access to an electronic data room containing customary due diligence information relating to the Debtors and their financing needs.  The data room provided detailed information with respect to the Debtors' businesses and financial condition, including the Debtors' (a) management presentation describing the business, (b) financial projections and liquidity forecast, (c) prior borrowing base certificates, (d) list of letters of credit, and (e) existing credit agreement for the ABL Facility and all related security agreements and loan documents.

10.     Prior to the Petition Date and during the full course of the marketing process, the Debtors received proposals for debtor-in-possession financing and exit financing facilities from six lending institutions in total.  Of the financial institutions that did not pursue the postpetition and exit financing opportunity, their reasoning frequently centered on an unwillingness to lend to, and increase their exposure to, the oil & gas sector in the current market environment.

**The Exit Facility Commitment**

11.     Following arm's-length negotiations, the Debtors were able to secure the proposed Exit Facility Commitment on the terms set forth in the Motion, which I believe are in the best interest of the Debtors.  The Commitment Letter and related Fee Letter agreed to with Bank of

6

America, N.A. ("Bank of America") and Deutsche Bank AG New York Branch ("Deutsche Bank" and, together with Bank of America, the "Exit Commitment Parties"), is the culmination of the marketing effort in which the Debtors were able to leverage numerous proposals to accomplish their stated objectives.  These agreements came after extensive arm's-length negotiation between the Debtors, the Exit Commitment Parties, and their respective advisors, and they are the result of several proposals and counterproposals.  Pairing Bank of America and Deutsche Bank provides the Debtors with a firm Exit Facility Commitment of $50 million on reasonable terms in this market, and facilitates the bank syndication process to upsize the Exit Facility from the initial Exit Facility Commitment of $50 million up to a maximum size of $100 million, by bringing together two lenders in the Debtors' pre-petition secured lending group as Joint Lead Arrangers.  All of these factors are important as the Debtors seek access to additional liquidity upon emergence from Chapter 11 so that the Debtors can continue to operate their business in the ordinary course and endeavor to meet their investment and financial goals, including the ability to invest in new opportunities as they arise.

12.     In short, based on the process run by Moelis, the Exit Facility Commitment represents a solution where the Debtors are able to obtain an exit financing package on reasonable terms in this market.   In addition, I believe the Exit Financing Fees and Exit Expense Reimbursement are reasonable, customary and market-based consideration for the Exit Facility Commitment.

13.     Accordingly, I believe that the Exit Facility Commitment provides, on balance, a more attractive post-emergence financing proposal than any alternative available to the Debtors at this time (including maintaining the status quo), and I believe that the Debtors' assumption of the Commitment Letter and Fee Letter is in the best interests of the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Houston, Texas
December 21, 2018

Bassam J. Latif
Managing Director
Moelis & Company LLC