**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/03/2019

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) Case No. 18-18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**FINAL ORDER AUTHORIZING LIMITED USE OF**
**CASH COLLATERAL, OBTAINING POST-PETITION**
**CREDIT SECURED BY SENIOR LIENS, GRANTING ADEQUATE PROTECTION,**
**SCHEDULING A FINAL HEARING, AND GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Limited Use of Cash Collateral, (II) Obtaining Post-Petition Credit Secured by Senior Liens, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion")[2], filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), seeking, *inter alia*, pursuant to Sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 503(b), and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the following:

(a)     authority for the Debtors to obtain post-petition loans and other extensions of credit from Bank of America, N.A. ("Bank of America") and Deutsche Bank AG New

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949), Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the DIP Motion.

York Branch (in their capacities as lenders under the DIP Credit Agreement, collectively, the "DIP Lenders") in an amount not to exceed $50,000,000 on a final basis, cumulative of any amounts advanced on an interim basis (the "DIP Loan Commitments"), and including, without limitation, incurring principal, other extensions of credit and financial accommodations, interest, fees, expenses, and other costs of the DIP Secured Parties (as defined below) in these bankruptcy cases (collectively, the "Cases"), in accordance with the terms and conditions set forth herein and in that certain Debtor in Possession Credit Agreement (the "DIP Credit Agreement"[3]), and all other related agreements and documents (collectively, the "DIP Credit Facility");

(b)    authority for the Debtors to execute, deliver, and perform under the DIP Credit Facility and DIP Documents, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to Bank of America, N.A., as agent for the DIP Lenders (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties") and the DIP Lenders on account of the DIP Credit Facility (all obligations and indebtedness of any of the Debtors to the DIP Secured Parties under the DIP Documents, collectively, the "DIP Obligations") or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Agent, for itself and for and on behalf of the DIP Lenders, on account of the DIP Credit Facility, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among any of the Debtors, the DIP Agent, and the DIP Lenders, the terms of which are referenced and incorporated herein as if set forth *in haec verba* (collectively, the "DIP Documents");

(c)    approval of the terms and conditions of the DIP Credit Facility and the DIP Documents;

(d)    authority for the Debtors to use Cash Collateral (as defined below) of the DIP Agent, for itself and on behalf of the DIP Lenders, under the DIP Credit Agreement in accordance with the terms and conditions set forth herein;

(e)    modification of the automatic stay of Bankruptcy Code § 362 (the "Automatic Stay") to the extent provided herein;

(f)    authority for the indefeasible transfer of Cash Collateral to and for the benefit of (i) the DIP Agent, for itself and for and on behalf of the DIP Lenders, and (ii) the Existing L/C Issuer, as set forth herein;

---

[3]    A copy of the DIP Credit Agreement is attached hereto as Exhibit 1, and incorporated herein as if set forth *in haec verba*.

(g)   granting of automatically perfected first priority priming liens and security interests to the DIP Agent, for itself and on behalf of the DIP Lenders, to secure the DIP Obligations in the Collateral (as defined below), and granting automatically perfected liens, security interests, and other adequate protection to (i) the Existing L/C Issuer (as defined below) with respect to its interest in the L/C Cash Collateral (as defined below), and (ii) Bank of America with respect to its interest in the P-Card Account (as defined below);

(h)   authority for the Debtors to maintain the Bank of America Credit Card Program (as defined below) subject to the terms and conditions thereof on a postpetition basis consistent with past practice; and

(i)   a waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Final DIP Order (as defined below) and providing for the immediate effectiveness of the Final DIP Order.

The Bankruptcy Court having considered the Motion, the terms of the DIP Credit Agreement and the DIP Documents, the *Declaration of Ryan Omohundro in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Limited Use of Cash Collateral, (II) Obtaining Post-Petition Credit Secured By Senior Liens, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, the *Declaration of Bassam J. Latif in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Limited Use of Cash Collateral, (II) Obtaining Post-Petition Credit Secured By Senior Liens, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, and the evidence submitted at the final hearing held before this Bankruptcy Court on January 3, 2019 (the "Final Hearing"), to consider entry of this *Final Order Authorizing Limited Use of Cash Collateral, Obtaining Post-Petition Credit Secured by Senior Liens, Granting Adequate Protection, and Granting Related Relief* (the "Final DIP Order"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the Local Bankruptcy Rules, due and proper notice of the DIP Motion and the Final Hearing having been given; and it appearing that approval of the final relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential

for the continued operation of the Debtors' businesses; and all objections, if any, to the entry of this Final DIP Order having been withdrawn, resolved or overruled by the Bankruptcy Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE BANKRUPTCY COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

1.      The Debtors and the DIP Agent have represented to this Bankruptcy Court that they have agreed in good faith to the terms and conditions of the DIP Credit Agreement and this Final DIP Order.

2.      The Debtors and the DIP Agent have stipulated and agreed as follows, and based upon the pleadings and evidence presented at the Final Hearing before this Bankruptcy Court, this Bankruptcy Court hereby acknowledges such stipulations, and grants the relief herein, on a final basis, pursuant to Bankruptcy Rule 4001.  Therefore, consistent with Bankruptcy Code §§ 361, 362, 363, 364, 503(b), and 507, this Bankruptcy Court hereby finds and orders:

<u>**OPPORTUNITY TO OBJECT**</u>

3.      Pursuant to the Interim DIP Order (as defined below), any party objecting to the entry of the Final DIP Order was required to file such objection in writing with the Clerk of the Bankruptcy Court on or before 4:00 p.m. Central Time on January 2, 2019 (the "<u>Objection Deadline</u>").

4.      The Debtors and the DIP Agent have represented to the Bankruptcy Court that they have negotiated at arm's length and have acted in good faith in the negotiation and preparation of the DIP Credit Agreement, the Interim DIP Order, and this Final DIP Order, have been represented by counsel, and intend to be and are bound by their respective terms.  The terms and conditions of this Final DIP Order and the DIP Documents reflect the Debtors' exercise of prudent business

judgment under exigent circumstances and are consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

## STATEMENT OF JURISDICTION

5.     This Bankruptcy Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (D), (G), (K), (M) and (O).

## NOTICE

6.     Sufficient and adequate notice of the DIP Motion and the Final Hearing has been given to prevent immediate and irreparable harm pursuant to Bankruptcy Rules 2002, 4001, 9006, and 9014 and the Local Bankruptcy Rules, and as required by Bankruptcy Code §§ 102, 105, 361, 362, 363, and 364.  Other than the notice provided for herein, no further notice of the final relief sought in the DIP Motion is necessary.

## FACTUAL AND PROCEDURAL BACKGROUND

7.     On December 12, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the management and possession of their business and property as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

8.     On December 13, 2018, the Bankruptcy Court conducted a hearing to consider interim approval of the DIP Motion (the "Interim Hearing") and pronounced such interim approval as set forth in the *Interim Order Authorizing Limited Use of Cash Collateral, Obtaining Post-Petition Credit Secured by Senior Liens, Granting Adequate Protection, Scheduling a Final Hearing, and Granting Related Relief* [Docket No. 80] (the "Interim DIP Order" and, together with the Final DIP Order, the "DIP Orders").

9.     An official committee of unsecured creditors has not been appointed in these Cases.

## PRE-PETITION ABL CREDIT AGREEMENT

### The Pre-Petition ABL Claim

10.    Without prejudice to the rights of any party in interest (subject to the limitations contained in paragraph 80 below), the Debtors admit, stipulate, and agree that:

(a)    Pursuant to the Pre-Petition ABL Claim Documents (as defined below) and applicable law, the Pre-Petition Agent and the Pre-Petition Lenders held valid, enforceable, and allowable claims against Debtor Parker Drilling Company ("Parker") and one or more of the Debtor subsidiaries for unused commitment fees and reimbursable expenses, plus any and all costs, expenses, charges, and other claims, debts or obligations of the Debtors to the Pre-Petition Agent and the Pre-Petition Lenders that accrued prior to the Petition Date under the Pre-Petition ABL Claim Documents and applicable law (collectively, the "Pre-Petition ABL Claim").  Prior to the Petition Date and pursuant to the Payoff Confirmation Letter dated December 11, 2018, the Debtors paid and satisfied in full all of the Pre-Petition ABL Claim other than contingent indemnification and other obligations arising pursuant to the Pre-Petition ABL Claim Documents which by their express terms survive such repayment and termination (the "Continuing ABL Obligations").

(b)    The Pre-Petition ABL Claim constituted a legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtors, and was not subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors, their estates, and any official committee appointed in these Cases do not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of the Pre-Petition ABL Claim.

(c)     The Continuing ABL Obligations constitute an allowed, legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtors, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors, their estates, and any official committee appointed in these Cases do not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of the Continuing ABL Obligations.

### The Pre-Petition ABL Claim Documents

11.     Without prejudice to the rights of any party in interest (subject to the limitations contained in paragraph 80 below), the Debtors admit, stipulate, and agree that:

(a)     The Pre-Petition ABL Claim has been evidenced by certain documents executed and delivered to the Pre-Petition Agent and the Pre-Petition Lenders by the Debtors, including, without limitation, the Pre-Petition Credit Agreement.[4]  The Pre-Petition Credit Agreement, and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto shall be referred to herein collectively as the "Pre-Petition ABL Claim Documents."  True and correct copies of certain of the Pre-Petition ABL Claim Documents are retained by the Debtors and will be made available to interested parties upon request.

---

[4] The "Pre-Petition Credit Agreement" means the Second Amended and Restated Credit Agreement, dated as of January 26, 2015 (as amended by the First Amendment dated as of June 1, 2015, the Second Amendment dated as of September 29, 2015, the Third Amendment, dated May 27, 2016, the Fourth Amendment dated as of February 21, 2017, the Fifth Amendment dated as of February 14, 2018, and any other supplements, amendments, amendments and restatements or other modifications prior to the date hereof), among certain of the Debtors, Bank of America, N.A., as administrative agent (in such capacity, the "Pre-Petition Agent"), the other agents party thereto and each lender from time to time party thereto (collectively, the "Pre-Petition Lenders").

(b)     The Pre-Petition ABL Claim Documents are genuine, valid, existing, legally enforceable, unavoidable, and admissible in the Cases for all purposes.

(c)     Pursuant to the Payoff Confirmation Letter dated December 11, 2018, the commitments of the Pre-Petition Lenders to make loans or otherwise extend credit to the Debtors under the Pre-Petition Credit Agreement automatically and irrevocably terminated prior to the Petition Date, and the Pre-Petition Credit Agreement and the other Pre-Petition ABL Claim Documents automatically terminated prior to the Petition Date.

### The Pre-Petition ABL Collateral

12.     Without prejudice to the rights of any party in interest (subject to the limitations contained in paragraph 80 below), the Debtors admit, stipulate, and agree that:

(a)     The Pre-Petition ABL Claim evidenced by the Pre-Petition ABL Claim Documents was secured by perfected first priority liens and security interests in certain personal property and vessels of the Debtors as covered by those certain mortgages, collateral and pledge agreements forming a component of the Security Instruments, as defined in the Pre-Petition ABL Claim Documents (collectively, the "Pre-Petition ABL Collateral"),  including, without limitation, the following personal property:  (a) accounts, (b) chattel paper, (c) commercial tort claims, (d) certain deposit accounts, (e) documents, (f) fixtures (g) general intangibles, (h) goods, (i) instruments, (j) intellectual property collateral, (k) investment property, (l) supporting obligations, (m) books, records, writings databases, information, and other property relating to, used or useful in connection with, evidencing, embodying, incorporating, or referring to, any of the foregoing, (n) all proceeds of the foregoing and, to the extent not otherwise included, all payments under insurance (whether or not the Pre-Petition Agent is the loss payee thereof), and (o) all other property and rights of every kind and description and interests therein but only to the extent that a security interest in such other personal property and rights may be perfected by filing a filing

statement with the relevant governmental authority.  The Pre-Petition Agent's and the Pre-Petition Lenders' liens and security interests in the Pre-Petition ABL Collateral were granted pursuant to, inter alia, the Pre-Petition ABL Claim Documents.

(b)     The Pre-Petition Agent and the Pre-Petition Lenders properly perfected their first-priority liens and security interests and other liens in the applicable Pre-Petition ABL Collateral as evidenced by, among other things, the Pre-Petition ABL Claim Documents, documents held in possession of the Pre-Petition Agent and the Pre-Petition Lenders, and documents filed with the appropriate state, county, and other offices.

## EXISTING LETTERS OF CREDIT

### The Existing L/Cs

13.     Without prejudice to the rights of any party in interest (subject to the limitations contained in paragraph 80 below), the Debtors admit, stipulate, and agree that:

(a)     As of the Petition Date, one or more of the Debtors were account debtors for certain letters of credit (the "Existing L/Cs") issued by of credit Bank of America, N.A. (in its capacity as issuer of the Existing L/Cs, the "Existing L/C Issuer"), which Existing L/Cs remain outstanding post-petition.  Pursuant to the Existing L/Cs and applicable law, as of the Petition Date, the Existing L/C Issuer holds a valid, enforceable, and allowable claim for reimbursement against one or more of the Debtors in an aggregate amount equal to at least $9,291,428.  The claim of the Existing L/C Issuer, together with all post-Petition Date interest, fees, costs, and charges allowed to the Existing L/C Issuer on such claim, shall collectively be referred to hereunder as the "Existing L/C Claim."

(b)     The Existing L/C Claim constitutes an allowed, legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtors, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination

pursuant to the Bankruptcy Code or any other applicable law, and the Debtors, their estates, and any official committee appointed in these Cases do not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of the Existing L/C Claim.

(c)     The Existing L/C Claim is evidenced by certain documents executed and delivered to the Existing L/C Issuer by certain of the Debtors in connection with the issuance of the Existing L/Cs (all such documents, collectively, the "Existing L/C Documents").  True and correct copies of certain of the Existing L/C Documents are retained by the Debtors and will be made available to interested parties upon request.

(d)     The Existing L/C Documents are genuine, valid, existing, legally enforceable, unavoidable, and admissible in the Cases for all purposes.

(e)     The Existing L/Cs are fully secured by genuine, valid, existing, legally enforceable, first priority, unavoidable liens in Cash Collateral in the amount of $9,753,862 (the "L/C Cash Collateral") pursuant to the Existing L/C Documents (the "Existing L/C Liens").

### BANK OF AMERICA CREDIT CARD PROGRAM

14.     Without prejudice to the rights of any party in interest (subject to the limitations contained in paragraph 80 below), the Debtors admit, stipulate, and agree that:

(a)     As of the Petition Date, the Debtors utilize a commercial credit card program (the "Bank of America Credit Card Program") to pay for everyday business expenses incurred by their employees in the ordinary course of business.  Consistent with industry practice, the Debtors provide their employees with purchase cards issued by Bank of America ("P-Cards") to use for approved, legitimate business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business.

(b)      As security for all indebtedness owed by the Debtors to Bank of America in connection with the Bank of America Credit Program, Parker entered into that certain Treasury Management Services Security and Control Agreement (Money Market Account) dated as of October 26, 2018 with Bank of America (the "P-Card Collateral Agreement").  Pursuant to the P-Card Collateral Agreement, Bank of America holds a genuine, valid, existing, legally enforceable, first-priority, unavoidable lien (the "P-Card Lien") in, and Parker assigned and transferred to Bank of America, that certain money market account no. 4451311755 (the "P-Card Account"), in which Parker is required to maintain funds of at least $250,000 at all times.

15.      The Debtors are authorized to continue to use the Bank of America Credit Card Program subject to the terms and conditions thereof and shall continue to maintain funds of at least $250,000 at all times in the P-Card Account.  With respect to the Bank of America Credit Card Program, Bank of America is authorized to extend credit and make advances from time to time on behalf of the Debtors with a maximum exposure to the Debtors of $200,000, and the Debtors are authorized to obtain such credit under the Bank of America Credit Card Program pursuant to section 364(c) of the Bankruptcy Code.  In accordance with the Bank of America Credit Card Program, Bank of America is authorized to exercise any of its remedies under the P-Card Collateral Agreement in the event of any default under the Bank of America Credit Card Program. Notwithstanding anything to the contrary in any document or order of this Court, no relief shall be requested or granted that would in any way interfere with the right of Bank of America to exercise remedies under the P-Card Collateral Agreement.

## CASH COLLATERAL

### DIP Lenders' Cash Collateral

16.      All cash of each of the Debtors' bankruptcy estates, wherever located, and all cash equivalents, whether in the form of negotiable instruments, documents of title, securities, deposit

accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Debtors' possession, custody or control (or persons in privity with any of the Debtors), or in which any of the Debtors will obtain an interest during the pendency of these Cases whether via advances under the DIP Credit Facility or otherwise, or which represent income, proceeds, products, rents, or profits of any of the Collateral (as defined below) shall constitute the cash collateral of (i) except for the L/C Cash Collateral, the DIP Agent, for itself and for and on behalf of the DIP Lenders, and (ii) in the case of the L/C Cash Collateral only, the Existing L/C Issuer (collectively, the "<u>Cash Collateral</u>").  The DIP Secured Parties and the Existing L/C Issuer have, subject to the Carve Out (as defined below), first-priority perfected liens and security interests in the Cash Collateral pursuant to the applicable provisions of the DIP Documents, Bankruptcy Code §§ 363(a) and 552(b), and the DIP Orders, and the "equities of the case" exception of Bankruptcy Code § 552(b) shall not apply.

17.    Each Debtor shall segregate and account to the DIP Secured Parties and the Existing L/C Issuer for all Cash Collateral that they now possess, that they have permitted to be transferred into the possession of others (if any), that is being held by those in privity with the Debtors, or that any Debtor might hereafter obtain or have any interest in.  Each Debtor shall account to the DIP Secured Parties for the receipt and use, if any, of the Cash Collateral received by the Debtors since the Petition Date and prior to the entry of this Final DIP Order.  Absent a further order of this Bankruptcy Court or the consent of the DIP Secured Parties and the Existing L/C Issuer, the Debtors are strictly prohibited from using the Cash Collateral except as expressly provided for herein.

<b><u>Need For and Consent to Limited Use of Cash Collateral</u></b>

18.    The DIP Secured Parties do not consent to the Debtors' use of Cash Collateral except in strict accordance with the terms and conditions contained in this Final DIP Order.

Without the use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, sell or otherwise liquidate their assets, provide financial information, and pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates. The Debtors require the use of Cash Collateral as provided herein.

19.     Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein. The use of Cash Collateral will benefit the Debtors and their estates. The ability of the Debtors to maximize the value of their estates depends upon the Debtors' ability to use the Cash Collateral of the DIP Secured Parties. Accordingly, the use of Cash Collateral by the Debtors is actual and necessary to preserving their estates.

### Authorization for Limited Use of Cash Collateral

20.     The Debtors are hereby authorized, on a limited basis, to use Cash Collateral of the DIP Secured Parties only in strict accordance with the terms and conditions provided in this Final DIP Order.

21.     Notwithstanding the foregoing or anything to the contrary herein, (i) the Debtors shall not use any L/C Cash Collateral without the prior written consent of the Existing L/C Issuer other than to indefeasibly pay in full the Existing L/C Claim, and (ii) the Debtors shall not use any funds from the P-Card Account without the prior written consent of Bank of America other than to indefeasibly pay in full any balance owed on the P-Cards.

### DIP CREDIT FACILITY

### Need for DIP Credit Facility

22.     Without the use of Cash Collateral and the DIP Credit Facility, the Debtors will not have the funds necessary to maintain their assets, operate their businesses, reorganize, provide financial information, or pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates and reorganize. The need for the use of

the Cash Collateral and obtaining the DIP Credit Facility is actual and necessary to preserving the Debtors and their estates.  The DIP Secured Parties are willing to provide the DIP Credit Facility to or for the benefit of the Debtors only in accordance with the terms of the DIP Credit Agreement and the DIP Orders.

23.     The Debtors have requested that the DIP Secured Parties permit use of Cash Collateral and the DIP Credit Facility in order to provide funds to be used for the purposes set forth in the Budget (as defined below), and such other purposes as permitted by the DIP Orders and to which the DIP Agent, for itself and on behalf of the DIP Lenders, consents in writing.

24.     The Debtors have sought to obtain financing from other sources and are unable to obtain credit allowable under Bankruptcy Code § 503(b)(1), or pursuant to Bankruptcy Code §§ 364(a) and (b), on terms more favorable to the Debtors than the terms of the DIP Credit Facility.

25.     The terms of the DIP Credit Facility and this Final DIP Order, including, without limitation, the related fees and priming liens granted in accordance therewith, are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Any credit extended under the terms of the DIP Orders and the DIP Credit Facility shall be deemed to have been extended in good faith by the DIP Secured Parties, as the term "good faith" is used in Bankruptcy Code § 364(e).

## Authorization to Obtain Credit

26.     The Debtors are hereby authorized to obtain credit only in accordance with the DIP Credit Agreement, the DIP Credit Facility, this Final DIP Order, and the Budget.

27.     The Debtors are hereby authorized to obtain post-petition loans and other extensions of credit in an amount not to exceed $50,000,000, pursuant to the terms of this Final

DIP Order and the terms of the DIP Credit Agreement, solely for the purposes set forth in the Budget or as otherwise provided in the DIP Credit Agreement.  Amounts borrowed and repaid under the DIP Credit Facility may be reborrowed.  Unless otherwise agreed, no borrowing shall be made more frequently than once per week.

28.     The Debtors are authorized to execute, deliver, and perform under the DIP Documents on the terms therein, including, without limitation, the fees, indemnification provisions (including, without limitation, the indemnification provisions of the DIP Credit Agreement), and priming lien provisions.  The Debtors, the DIP Agent, and the DIP Lenders stipulate that the DIP Documents are valid and binding.

### DIP Liens and Superpriority Administrative Claims

29.     Effective as of the Petition Date, the DIP Agent, for itself and for and on behalf of the DIP Lenders, is entitled to first-priority claims, liens, and security interests on any property not subject to a lien and priming liens and security interests in the Collateral (as defined below), and the protections of good faith credit providers to the fullest extent under Bankruptcy Code §§ 364(c)(1) and (c)(2), 364(d)(1), and 364(e), and thus such claims, liens, and security interests are hereby granted (a) pursuant to Bankruptcy Code § 364(c)(1), superpriority claims (the "DIP Superpriority Claims") with priority over all other administrative and other post-Petition Date claims against the Debtors' estates, including, without limitation, Bankruptcy Code §§ 105, 326, 327, 328, 330, 331, 365, 503(b), 507(b), 1113, and 1114, (b) pursuant to Bankruptcy Code § 364(c)(2), a first-priority lien on, and security interest in, Collateral that is not subject to any lien or security interest, if any; and (c) pursuant to Bankruptcy Code § 364(d)(1), a first-priority priming lien on and security interest in the Collateral, but excluding the Existing L/C Liens and the P-Card Lien (such liens and security interests granted in (b) and (c) of this paragraph, the "DIP Liens") (which DIP Liens do not secure any prepetition claim), and all of which claims, liens, and

security interests granted in (a) through (c) of this paragraph shall secure the DIP Credit Facility and DIP Obligations (including, without limitation, principal and any other extensions of credit, interest, fees, expenses, and any fees and expenses of the DIP Secured Parties in these Cases, however incurred), senior to all other liens, encumbrances, and security interests, including, without limitation, adequate protection and replacement liens granted pursuant to the terms of the DIP Orders, but subject only to the Carve Out; provided, however, that such claim, lien, and security interest shall not apply to in excess of 65% of the voting stock of (i) any "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended, (a "CFC") that is a first-tier CFC (i.e., a direct subsidiary of a domestic subsidiary), (ii) any entity that is a U.S. entity for U.S. federal income tax purposes that has no material assets other than (A) the equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in (x) one or more non-U.S. subsidiaries that are CFCs or (y) one or more other CFC Holding Companies and (B) cash and cash equivalents and other assets being held on a temporary basis incidental to the holding of assets described in clause (A) of this definition (a "CFC Holding Company"), and (iii) any direct or indirect domestic subsidiary of a CFC or CFC Holding Company.  Each of the Debtors shall be jointly and severally liable for the DIP Credit Facility, and the performance of all obligations under the terms of the DIP Credit Agreement, the DIP Orders, and the DIP Documents, and shall grant the DIP Liens as security for the same.

30.     All liens and security interests granted in the DIP Orders and under the DIP Documents securing the DIP Credit Facility, including the DIP Liens, are effective as of the Petition Date and are valid and automatically perfected first-priority priming liens and security interests, subject only to the Carve Out, in and upon, and hereby are granted in and attach to, any

and all assets and properties of the Debtors and the Debtors' bankruptcy estates, wherever located, including property subject to avoided liens, now owned or after acquired, real and personal, tangible and intangible, and all proceeds, substitutions, products, rents, or profits thereof, and for further description only without limitation, shall include (1) the following presently-owned and after-acquired personal property: (a) accounts, (b) accessions, (c) chattel paper (both tangible and electronic), (d) commercial tort claims and any other causes of actions but excluding Avoidance Actions except to the extent set forth below, (e) commodity accounts, (f) commodity contracts, (g) deposit accounts, (h) documents, (i) equipment, (j) financial assets, (k) fixtures, (l) general intangibles, (m) goods, (n) intellectual property, (o) instruments, (p) inventory, (q) investment property, (r) letters of credit, (s) letters of credit rights, (t) payment intangibles, (u) permits, (v) timber, (w) as-extracted collateral, (x) notes, (y) promissory notes, (z) securities (certificated and uncertificated), (aa) securities accounts, (ab) securities entitlements, (ac) software, (ad) supporting obligations, (ae) collateral records, (af) insurance, (ag) causes of action, (ah), and (ai) money (as each such term may be defined in the New York Uniform Commercial Code as of the date hereof (the "UCC")), (2) proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code, and (3) all presently owned or after acquired real property and improvements thereon and leases of real property, wherever located (collectively, and together with the Cash Collateral other than the L/C Cash Collateral, the "Collateral ; provided, however, that the term Collateral shall exclude (a) in excess of 65% of the voting stock of (i) any CFC, (ii) any CFC Holding Company, (iii) any direct or indirect domestic subsidiary of a CFC or CFC Holding Company; (b) any deposit accounts, trust accounts, escrow accounts or security deposits, and the funds therein, established pursuant to statutory obligations or for the payment of taxes or holding funds in trust for third parties; and (c) any Excluded Building as defined in the DIP Credit Agreement.  The Collateral shall secure all

obligations under the DIP Credit Facility and the DIP Orders as set forth in the DIP Documents and the DIP Orders.

<strong><u>Cash Collateral Accounts</u></strong>

31.     The Debtors shall immediately, and shall continue to, segregate, remit, and deposit all Cash Collateral in each of the Debtors' accounts, possession, custody or control and which any of the Debtors may receive in the future, in accordance with the applicable cash management orders entered by this Bankruptcy Court and as permitted by the DIP Credit Agreement.  The bank accounts of each of the Debtors that are maintained with the DIP Agent shall be in the name of the Debtors (individually or collectively, the "<u>Dominion Accounts</u>"), and the DIP Agent, for itself and for and on behalf of the DIP Lenders, shall have full dominion and control over each such account; <u>provided</u> that the Debtors may access the funds in the Dominion Accounts until such time as an Event of Default (as defined in the DIP Credit Agreement and for the purposes of this Final DIP Order shall include any breach, default, or event of default with the terms and provisions of the DIP Orders), shall have occurred and is continuing.  Subject to paragraph 70 hereof, during the continuance of an Event of Default, the DIP Agent shall have the right to send a written notice to the Debtors and to any person other than the DIP Agent maintaining a deposit account in the name of the Debtors containing Cash Collateral (a "<u>Non-DIP Agent Depository</u>") directing the Debtors and/or such Non-DIP Agent Depository to  immediately transfer, or cause the transfer of, all such funds to a Dominion Account, and the Debtors and such Non-DIP Agent Depository shall transfer all funds in such deposit account of the Debtors to a Dominion Account within 3 business days after the date of such notice and thereafter on a daily basis.

32.     The Debtors shall be prohibited from withdrawing funds from their deposit accounts except in strict compliance with the terms of this Final DIP Order and the DIP Credit Facility.

33.     Each of the Debtor's Banks (as defined below) is authorized to debit the applicable Debtor's accounts in the ordinary course of business without the need for further order of this Bankruptcy Court for: (i) all checks drawn on the Debtor's accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtor's accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Debtors' cash management system; and that any of the Debtor's Banks may rely on the representations of such Debtor with respect to whether any check or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored pursuant to this or any other order of this Bankruptcy Court, and such Bank shall not have any liability to any party for relying on such representations by the Debtor as provided for herein; and that (i) those certain existing deposit agreements between the Debtors and their existing depository and disbursement banks (collectively, the "Banks") shall continue to govern the postpetition cash management relationship between the Debtors and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect, (ii) the Debtors and the Banks may, without further Order of this Bankruptcy Court, agree to and implement changes to the cash management systems and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts.[5]

---

[5]     This paragraph is intended to be consistent with the cash management order in these Cases, to the extent of any inconsistency, this paragraph shall control.

34.     To the extent there exists or comes to exist any cash of the Debtors' estates that is not Cash Collateral, wherever located and however held, such cash shall be deemed to have been used first by the Debtors' estates, and such cash, to the extent applicable, shall be subject to the liens and security interests granted to the DIP Secured Parties hereunder.

35.     Reserved

## ADEQUATE PROTECTION OF THE DIP LENDERS

### Budgeted Cash Collateral Usage

36.     As adequate protection of the DIP Lenders' interest in the Collateral and for the Debtors' use of the DIP Secured Parties' Cash Collateral and only so long as an Event of Default (as defined below) shall not have occurred and continue to exist after the Default Notice Period (as defined below), the Debtors are authorized to and shall use the DIP Secured Parties' Cash Collateral (including, without limitation, the advances under the DIP Credit Facility) strictly in accordance with the 13-week budget attached hereto as Exhibit 2 (the "Budget"); provided, however, that, beginning on the Monday of the third week after the Petition Date, (i) the aggregate actual expenditures by the Debtors (before any debt service payments) for the immediately preceding period of four (or, in the case of the first testing period, three weeks covered by the Budget) consecutive weeks  (each, a "Testing Period") may not exceed the projected amount therefor set forth in the Budget by more than 10% and (ii) the aggregate actual receipts of the Debtors for the Test Period may not be less than the projected amount therefor by more than 20% (any variance not exceeding such maximum or less than such minimum, a "Permitted Variance"). For the purpose of calculating any Permitted Variance, the fees and expenses of any counsel, advisors or other professionals retained by the Debtors, DIP Agent or the DIP Lenders shall not be considered.  Unless otherwise agreed, no advances under the DIP Credit Facility shall be made more frequently than once per week.  Each advance under the DIP Credit Facility shall be

conditioned upon the Debtors' compliance with the Budget. Prior to any transfer or use of Cash Collateral by the Debtors, the Debtors' Chief Financial Officer shall review and verify the proposed transfer or use of Cash Collateral for strict compliance with the Budget and the DIP Credit Agreement.

37. Beginning on the first Thursday following the delivery of the initial Budget, and each Thursday thereafter (or, if such Thursday is not a Business Day, the immediately succeeding Business Day) until the repayment in full in cash of the obligations under the DIP Credit Facility, the Debtors shall deliver to the DIP Agent and, so long as the RSA remains in full force and effect, the legal and financial advisors to the Consenting Stakeholders[6] a weekly line-by-line variance report (a "Variance Report"), which Variance Report shall compare actual cash receipts and disbursements of the Debtors with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week period and the Testing Period (or such shorter period as may have elapsed from the date hereof), including written descriptions in reasonable detail explaining any material positive or negative variances, and shall otherwise be in form and substance reasonably acceptable to the DIP Secured Parties.

38. The DIP Lenders' consent to use of Cash Collateral and agreement to extend credit extends only to (i) amounts due under the DIP Credit Facility and (ii) amounts actually incurred in accordance with the Budget. Upon the occurrence of an Event of Default that continues to exist after the Default Notice Period (as defined below), the DIP Lenders' consent to use of Cash Collateral or agreement to extend credit shall automatically and immediately terminate and any

---

[6]     "Consenting Stakeholders" shall have the meaning ascribed to such term in that certain Restructuring Support Agreement, dated as of December 12, 2018, by and among the Debtors and certain holders of the Debtors' debt and equity securities that are party thereto, including any additional Support Agreement (as defined therein) (collectively, the "RSA").

consent for use of Cash Collateral or agreement to extend credit to satisfy projected, budgeted expenditures shall be immediately terminated and deemed withdrawn unless such Event of Default is waived by the DIP Agent, for itself and for and on behalf of the DIP Lenders, in its sole and absolute discretion.

39.     The Budget may be modified in writing only with the prior written consent of the DIP Secured Parties and, so long as the RSA remains in full force and effect, with notice to the legal and financial advisors to the Consenting Stakeholders.  The Budget may be updated every four weeks in form and substance acceptable to the DIP Secured Parties and with notice to the legal and financial advisors to the Consenting Stakeholders.

**Replacement and Adequate Protection Liens; Superpriority Administrative Claims**

40.     Taking into account all factors in these Cases, as adequate protection of (i) the Existing L/C Issuer's interest in the L/C Cash Collateral and any post-Petition Date interest, fees, costs, and charges allowed to the Existing L/C Issuer in connection with the Existing L/C Claim, and (ii) Bank of America's interest in the P-Card Account, and subject only to the Carve Out and the DIP Liens, the Existing L/C Issuer, and Bank of America are hereby granted, effective as of the Petition Date, valid and automatically perfected first-priority replacement liens and security interests in and upon the Collateral, in each case subject to the Carve Out, to secure any diminution in value of (x) the L/C Issuer's interest in the L/C Cash Collateral from and after the Petition Date (the "L/C Adequate Protection Liens"), and (y) Bank of America's interest in the P-Card Account from and after the Petition Date (the "P-Card Adequate Protection Liens" and, together with the L/C Adequate Protection Liens, the "Adequate Protection Liens"); provided, however, that the any such liens or securities interests shall exclude in excess of 65% of the voting stock of (i) any CFC, (ii) any CFC Holding Company. and (iii) any direct or indirect domestic subsidiary of a CFC or CFC Holding Company, but, for the avoidance of doubt, to the extent voting stock of any CFC,

any CFC Holding Company, or any direct or indirect domestic subsidiary of a CFC or CFC Holding Company is subject to an existing lien with respect to the Existing L/Cs or the P-Card Account, the Adequate Protection Lien shall apply to the same stock that was pledged in support of the Existing L/Cs.

41.     To the extent any adequate protection is insufficient to adequately protect (i) the Existing L/C Issuer's interest in the L/C Cash Collateral and any post-Petition Date interest, fees, costs, and charges allowed to the Existing L/C Issuer in connection with the Existing L/C Claim, and (ii) Bank of America's interest in the P-Card Account, the Existing L/C Issuer, and Bank of America are hereby granted superpriority administrative claims against the same entities that the DIP Superpriority Claims apply to and all of the other benefits and protections allowable under Bankruptcy Code § 507(b), junior only in right to the DIP Superpriority Claims and the Carve Out (the "L/C Superpriority Claim," and the "P-Card Superpriority Claim," respectively, and collectively, the "Adequate Protection Superpriority Claims").

## Automatic Perfection

42.     This Final DIP Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of the DIP Agent's and the DIP Lenders' security interests in and liens on the Collateral granted and created in the DIP Orders, and such security interests and liens shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities granted hereunder, effective as of the Petition Date, without the necessity of creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to the DIP Agent, for itself and for and on behalf of the DIP Lenders, by the DIP Orders.

43.     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the DIP Agent's and the DIP Lenders' liens and security interests granted and created by the DIP Orders or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court.

44.     By virtue of the terms of this Final DIP Order, to the extent that the DIP Agent has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors, such filings shall be deemed to properly perfect its liens and security interests granted under the DIP Orders without further action by the DIP Agent or by any of the DIP Lenders.

45.     If the DIP Agent shall, in its sole and absolute discretion, elect for any reason to file any Uniform Commercial Code financing statements, mortgages, deeds of trust, or other recordable documents to further evidence perfection of its interests in property of the estates, the DIP Agent, or, upon the request of the DIP Agent, the Debtors, are authorized and directed to execute, or cause to be executed, all such mortgages, deeds of trust, or other documents, and the filing, recording, or service (as the case may be) of such financing statements, mortgages, deeds of trust, or similar documents shall be deemed to have been made at the time of and on the Petition Date, and the signature(s) of any person(s) designated by the Debtors, whether by letter to the DIP Agent or by appearing on any one or more of the agreements or other documents respecting the security interests and liens of the DIP Agent, for itself and for and on behalf of the DIP Lenders, granted hereunder shall bind the Debtors and their estates.  The DIP Agent may, in its sole and absolute discretion, execute such documents on behalf of the Debtors as the Debtors' attorney-in-

fact, or file a certified copy of this Final DIP Order in any filing or recording office in any county or other jurisdiction in which any of the Debtors have real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or certified copy of this Final DIP Order.

### Authorization to Act

46.     The Debtors are hereby authorized and directed to perform all acts, take any action, and execute and comply with the terms of such other documents, instruments and agreements, as the DIP Agent may require as evidence of and for the protection of the Collateral, or that may be otherwise deemed necessary by the DIP Agent to effectuate the terms and conditions of this Final DIP Order and the DIP Credit Facility.

47.     Until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the DIP Documents, and without further order of the Bankruptcy Court: (a) the Debtors shall use the DIP Credit Facility proceeds and all Cash Collateral strictly in accordance with the terms of the Budget requirements and the other terms of this Final DIP Order; (b) the Debtors shall not, without prior order from the Bankruptcy Court (after notice to the DIP Agent and, so long as the RSA remains in full force and effect, counsel to the Consenting Stakeholders), engage in any transaction that is not in the ordinary course of the Debtors' business, and (c) the Debtors shall timely comply with all of the covenants set forth in the DIP Documents.

### No Subordination of Liens

48.     Subject to the Carve Out, the DIP Liens granted to the DIP Secured Parties pursuant to the DIP Orders shall not at any time be (a) made subject or subordinated to, or made pari passu with, any other lien or security interest existing on the Petition Date, or any claim, lien, or security interest created under Bankruptcy Code §§ 363 or 364(d) or otherwise, or (b) subject to any lien

or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code § 551.

## No Additional Liens

49.     Subject to the DIP Credit Agreement, until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the DIP Documents, the Debtors shall not be authorized to obtain credit secured by a lien or security interest in the Collateral, other than the DIP Credit Facility, without the prior written consent of the DIP Agent, for itself and for and on behalf of the DIP Lenders, or order of the Bankruptcy Court upon reasonable notice.

## No Liability

50.     No act committed or action taken by the DIP Agent, for itself and for and on behalf of the DIP Lenders, or the Existing L/C Issuer, as applicable, under the DIP Orders, the DIP Credit Facility, the Existing L/Cs, shall be used, construed, or deemed to hold the DIP Agent, the DIP Lenders, and or the Existing L/C Issuer to be in "control" of or participating in the governance, management, or operations of any of the Debtors for any purpose, without limitation, or to be acting as a "responsible person(s)" or "owner(s) or operator(s)" or a person(s) in "control" with respect to the governance, management, or operation of any of the Debtors or their respective businesses (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, Comprehensive Environmental Response, Compensation and Liability Act, or the Bankruptcy Code, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the DIP Secured Parties or the Existing L/C Issuer under the DIP Documents or the DIP Orders including, without limitation, such rights and remedies as may be exercisable by the DIP Secured Parties  or the Existing L/C Issuer in connection with the DIP Orders.

## Automatic Stay

51.     Subject to paragraph 70 hereof, the Automatic Stay is hereby vacated and modified to the extent necessary to permit (a) the Debtors, the DIP Agent, and the DIP Lenders to commit all acts and take all actions necessary to implement the DIP Credit Facility and this Final DIP Order, (b) all acts, actions, and transfers contemplated herein, including, without limitation, transfers of Cash Collateral and other funds to the DIP Agent, for itself and for and on behalf of the DIP Lenders, by the Debtors as provided herein, and (c) consistent with the terms of this Final DIP Order, to permit the DIP Agent and/or the DIP Lenders, at their option, to pursue their rights and remedies as to the Collateral in accordance with the DIP Documents and applicable law.  The automatic stay is not modified by this paragraph to allow any "self-help" remedies.

## Collateral Insurance, Maintenance, Taxes, and Deposits

52.     The Debtors shall maintain, with financially sound and reputable insurance companies, insurance of the kind covering the Collateral, and in accordance with the DIP Documents (covering such risks in amounts as shall be satisfactory to the DIP Agent and shall name the DIP Agent, for itself and for and on behalf of the DIP Lenders, as loss payee thereunder), including, without limitation, insurance covering the Collateral and such other collateral of the DIP Lenders, if any, as the DIP Agent may from time to time request; and, at the DIP Agent's request, the Debtors shall deliver to the DIP Agent evidence of the maintenance of such insurance.

53.     Upon receipt of notification (written or oral) that an insurance policy covering any Collateral will not be renewed by the respective carrier, the Debtors will promptly notify the DIP Agent in writing of such occurrence and thereafter provide the DIP Agent with the status of all negotiations, if any, regarding such policy on a weekly basis.

54.     To the extent permitted by the Budget, the Debtors shall make any and all payments necessary to keep the Collateral and their other property in good repair and condition and not

permit or commit any waste thereof.  The Debtors shall exercise their business judgment and, in so doing shall preserve, maintain, and continue all material leases, patents, licenses, privileges, franchises, certificates and the like necessary for the operation of their businesses.

55.     To the extent the Debtors have made or make any deposits for the benefit of utility companies or any other entity (and the Debtors shall not make any such deposits which are not included in the Budget without first obtaining prior written consent of the DIP Agent), such deposits shall be, and hereby are, upon any return of same to the Debtors, subject to the DIP Liens and the Debtors' use of Cash Collateral granted by the DIP Orders.

## Reporting Requirements

56.     The Debtors are authorized and directed to provide to the DIP Agent all of the documentation and reports required under the DIP Credit Agreement and the other DIP Documents, including, without limitation, the reports required by the DIP Credit Agreement, schedules, assignments, financial statements, insurance policies, and endorsements, unless the DIP Agent waives or modifies such requirements in writing (the "Reporting Information").

57.     The Reporting Information shall also include: (a) weekly reports of receipts and budgeted cash usage; (b) Variance Reports; (c) copies of all reports submitted or filed with the Office of the United States Trustee within two (2) days after such submission or filing; and (d) such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of any of the Debtors, or concerning any matter that may affect the administration of any of the Debtors' estates, as the DIP Agent may from time to time reasonably request.  All Reporting Information shall be in accordance with accounting principles and bookkeeping practices consistently applied with past accounting principles and bookkeeping practices and reporting of the Debtors to the DIP Agent.  So long as the RSA remains in full force and effect, the Debtors shall deliver copies all Reporting Information to the legal and

financial advisors to the Consenting Stakeholders at substantially the same time that the Debtors deliver such Reporting Information to the DIP Agent.

58.     Subject to any confidentiality requirements, the Debtors shall promptly deliver to the DIP Agent any and all material documentation that in any way relates to a solicitation, offer, or proposed sale or disposition of a material amount of property of any of the Debtors' estates, including, without limitation, letters of inquiry, solicitations, letters of intent, or asset purchase agreements.

59.     The DIP Agent, and its representatives, agents, consultants and other professionals, shall be permitted, in coordination with Debtors' counsel, to contact and communicate with the Debtors and their financial and restructuring advisors regarding potential transactions for the Debtors' reorganization and the sale or other disposition of material assets of any of the Debtors' estates.  The Debtors shall be responsive and employ their commercially reasonable efforts to cooperate in the coordination of all such contacts and communications, including, without limitation, by conducting update telephone conferences with the Debtors, their financial and restructuring advisors, and the DIP Secured Parties upon reasonable request regarding any potential restructuring transactions or transactions for the sale or other disposition of the assets of any of the Debtors' estates.

60.     The DIP Agent, and its representatives, agents and advisors, shall have reasonable access, upon reasonable notice during normal business hours, to the Debtors' business records, business premises, and to the Collateral to enable the DIP Agent or its representatives, agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral, (b) inspect and review the financial records and all other records of the Debtors concerning the operation of the Debtors' businesses, and (c) evaluate the Debtors' overall financial condition and all other

records relating to the operations of the Debtors.  The Debtors shall fully cooperate with the DIP Agent regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the DIP Agent and its representatives, agents and advisors, to conduct such reviews, evaluations, and inspections.

### Interest, Fees, Costs and Expenses of the DIP Secured Parties

61.     During the Cases, as additional adequate protection, all interest, fees, costs, and expenses, including, without limitation, attorneys' fees and expenses and financial advisors' fees and expenses, due at any time to the DIP Secured Parties under the DIP Documents that are incurred as a result of or in way related to the Debtors' Cases, or incurred prior to and unpaid on the Petition Date (collectively, the "DIP Lenders' Costs"), may be charged by the DIP Secured Parties and shall be paid by the Debtors out of the Cash Collateral or out of any DIP Credit Facility advances, up to the aggregate amount for such DIP Lenders' Costs set forth in the Budget or, if greater than such amount in the Budget, only if approved in writing by the DIP Agent.  The Debtors are hereby authorized to pay such DIP Lenders' Costs without the DIP Agent or the DIP Lenders, or the DIP Agent's or the DIP Lenders' counsel, having to file any further application with this Bankruptcy Court for approval or payment.  Any such DIP Lenders' Costs that constitute fees and expenses incurred by any professional retained by the DIP Agent shall be paid within ten (10) calendar days of delivery of a summary invoice to the Debtors, the U.S. Trustee, and, so long as the RSA remains in full force and effect, counsel to the Consenting Stakeholders, and which may be redacted for privilege as determined by the DIP Agent; provided, however, that (i) any redacted fee statements shall retain all privileges irrespective of any disclosure of any privileged matter, and any such disclosure shall be deemed inadvertent for all purposes and deemed stricken from any record in these Cases or otherwise, (ii) if the Debtors, U.S. Trustee, the Consenting Stakeholders, or any official committee objects to the reasonableness of such fees and expenses

and cannot resolve such objection within five (5) business days of service of such invoice(s), the Debtors, U.S. Trustee, the Consenting Stakeholders, or any official committee, as the case may be, shall file and serve upon such professional an objection with the Bankruptcy Court (a "Fee Objection") limited to the issue of the reasonableness of the disputed fees and expenses within ten (10) calendar days of the delivery of such invoice; (iii) if the Debtors, U.S. Trustee, the Consenting Stakeholders, or any official committee fails to object to the reasonableness of such fees and expenses within ten (10) calendar days, any objection of the Debtors, U.S. Trustee, or any official committee, as the case may be, shall be waived, (iv) the Debtors shall timely pay in accordance with this Final DIP Order the undisputed fees and expenses reflected on any invoice to which a Fee Objection has been timely filed, and (v) notwithstanding the foregoing (i), (ii), (iii), and (iv) of this sentence, the DIP Lenders' Costs incurred prior to and unpaid as of the Petition Date shall be paid indefeasibly upon the initial funding of the DIP Credit Facility.  Payments of DIP Lenders' Costs may be effectuated directly by the DIP Agent and all such payments shall constitute advances under the DIP Credit Facility.  All DIP Lenders' Costs owed to the DIP Agent and/or the DIP Lenders, regardless of whether or not such DIP Lenders' Costs are set forth in the Budget and including, without limitation, all fees referred to in the DIP Documents (including, without limitation, all attorneys' and other professionals' fees and expenses), shall constitute obligations under the DIP Credit Facility and shall be secured by the Collateral and afforded all priorities and protections afforded to the DIP Credit Facility under the DIP Orders and the DIP Documents. Except as provided in subparagraph (v) above this paragraph does not authorize the payment of any prepetition Claim.

## Carve Out

62.    <u>Priority of Carve Out</u>.  Notwithstanding anything to the contrary in the DIP Orders, any DIP Documents, or any other order of this Bankruptcy Court, all of the DIP Liens, the DIP

Superiority Claims, the Adequate Protection Liens, and the Adequate Protection Superiority Claims shall be subject and subordinate only to the payment of the Carve Out as and only to the extent set forth in the DIP Orders.  As used in this Final DIP Order, the term "Carve Out" means an amount necessary to pay (a) all fees required to be paid to (A) the Clerk of the Bankruptcy Court and (B) the Office of the United States Trustee under Section 1930(a) of Title 28 of the United States Code, plus interest required to be paid on any past due amount at the statutory rate (collectively, the "UST Carve Out"); (b) all reasonable fees and expenses, up to $50,000, incurred by a trustee under Section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (c) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") of persons or firms retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or by the creditors' committee pursuant to Section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") that are incurred or earned at any time before or on the first Business Day (as defined in the DIP Credit Agreement) following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined in this Paragraph 62 below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (which, for purposes of determining the amount of the Carve Out that may be charged against any DIP Collateral or that must be funded by DIP Loans pursuant to Paragraphs 64(a) and (b) below, shall be limited to an aggregate amount not to exceed the Professional Fee Carve Out Cap (as defined in Paragraph 63 below)); and (d) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise (the

amounts set forth in this clause (iv) being the "Post-Trigger Carve Out").[7]  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to lead restructuring counsel to the Debtors, the U.S. Trustee, and counsel to the creditors' committee, stating that the Post-Trigger Carve Out has been invoked, which notice may be delivered at any time following the occurrence and during the continuation of an Event of Default under (and as defined in) the DIP Credit Agreement, and acceleration of the DIP Obligations owed by the Borrower Debtors under the DIP Credit Agreement.

       63.   <u>Delivery of Weekly Fee Statements</u>.  Not later than 7:00 p.m. (prevailing Eastern Time) on the third Business Day of each week starting with the second week following the Petition Date, each Professional Person shall deliver to the Debtors and the DIP Agent a statement setting forth the amount of Professional Fees incurred during the preceding week by such Professional Person (through Saturday of such week, the "<u>Calculation Date</u>"), together with a cumulative total and a statement of the amount of Allowed Professional Fees that have been paid to date by the Debtors, and the cumulative total of the amount of Allowed Professional Fees of such Professional Person that remain unpaid (each such statement, a "<u>Weekly Statement</u>"); <u>provided</u> that within one (1) Business Day after the occurrence of the Termination Declaration Date (as defined in Paragraph 64(a) below), each Professional Person shall deliver an additional Weekly Statement (the "<u>Final Statement</u>") setting forth the amount and a description of the fees and expenses incurred during the period commencing on the calendar day after the prior Calculation Date and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within two (2) days after such Weekly Statement is due hereunder and such failure continues unremedied for a period of two (2) days, then such Professional Person's

---

[7]     Notwithstanding the foregoing, up to $500,000 of the Post-Trigger Carve Out may be used to pay Allowed Professional Fees of Professional Persons incurred prior to the delivery of a Carve Out Trigger Notice to the extent such Allowed Professional Fees exceed the Pre-Trigger Carve Out Amount (as defined in Paragraph 64(a) herein).

entitlement to any funds in the Carve Out Reserve Accounts (as defined in Paragraph 64(b)) with respect to the aggregate unpaid amount of Allowed Professional Fees of such Professional Person for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to any aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period to the extent allocated in the Budget to such Professional Person; provided that if the Pre-Trigger Notice Reserve Accounts (as defined in Paragraph 64(a) below) are not funded pursuant to the provisions of Paragraph 64(a) in an amount sufficient to pay all Allowed Professional Fees, including the full amount of Allowed Professional Fees of such Professional Person, then such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period, from the Pre-Trigger Notice Reserve Account to the extent funded from cash proceeds in accordance with Paragraphs 64(a) and (b) below.  In addition, not later than 7:00 p.m.(prevailing Eastern Time) on the third Business Day of each week starting with the second week following the Petition Date, the Debtors shall provide Weekly Statements to the DIP Agent reflecting (i) the actual aggregate cumulative amount of unpaid Allowed Professional Fees for all Professional Persons as of the end of the previous week, and (ii) the difference between that actual cumulative amount of unpaid Allowed Professional Fees for all Professional Persons as of the end of such week and the budgeted amount of such unpaid Allowed Professional Fees shown for such period in the most recent Budget delivered to the DIP Agent.  The amount of the Carve Out described in Paragraph 62 above that may be charged against any DIP Collateral or that must be funded by DIP Loans pursuant to Paragraphs 64(a) and (b) below, shall be limited to the greater of (x) the sum of (i) the aggregate unpaid amount of Allowed Professional Fees included in such Weekly Statements timely received by the DIP Agent prior to the Termination Declaration Date plus (without duplication) (ii) the aggregate unpaid amount of Allowed Professional Fees included in the Final Statement timely

received by the DIP Agent pertaining to the period through and including the Termination Declaration Date, and (y) the aggregate unpaid amount of Allowed Professional Fees to the extent included in the Budget for the period prior to the Termination Declaration Date (such amount, the "Professional Fee Carve Out Cap").  For the avoidance of doubt, the DIP Agent shall be entitled to maintain, as part of the Reserves (as defined in the DIP Credit Agreement), a Carve Out Reserve (as defined in the DIP Credit Agreement) against availability equal to the DIP Agent's estimate of the Carve Out on such date, which shall be calculated and may be adjusted from time to time as provided in the DIP Credit Agreement.

64.    Carve Out Reserve Accounts.

(a)    On the day on which a Carve Out Trigger Notice is given by the DIP Agent (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a Borrowing Request (as defined in the DIP Credit Agreement) by the Borrowers for DIP Loans in an amount equal to the sum (such sum being referred to as the "Pre-Trigger Carve Out Amount") of (x) the UST Carve Out (the funding of which shall be contingent upon the Debtors' provision to the DIP Agent of the Debtors' calculation thereof), plus (y) the Chapter 7 Trustee Carve Out, plus (z) the then unpaid amount of the Allowed Professional Fees (the funding of which shall be contingent upon the Debtor's provision to the DIP Agent in writing of the calculation and amount thereof) not to exceed the Professional Fee Carve Out Cap, which will be funded into one or more segregated accounts at the DIP Agent, in trust, exclusively to pay such unpaid Allowed Professional Fees (each such account, a "Pre-Trigger Notice Reserve Account"), subject to paragraph 65 below titled "Application of the Carve Out Reserve Account."  To the extent the Pre-Trigger Carve Out Amount is not funded as of the end of the second Business Day after the Termination Declaration Date (or such later date on which the Debtors provide the requisite confirmation and calculation) (the "Funding Deadline"), the Debtors are hereby authorized and

directed thereafter to utilize cash constituting DIP Collateral on hand as of such date, and any available cash constituting DIP Collateral thereafter held by any Debtor, to fund a Pre-Trigger Notice Reserve Account equal to the amount required to be funded pursuant to the preceding sentence (which cash amounts shall reduce, on a dollar for dollar basis, the Borrowing Request for DIP Loans pursuant to such sentence); provided, that notwithstanding any failure of the DIP Credit Parties to timely make DIP Loans as provided above, if the DIP Credit Parties subsequently make DIP Loans to fund the Pre-Trigger Notice Reserve Account up to the amount of the Pre-Trigger Carve Out, then the Debtors' authorization to use cash constituting DIP Collateral for such purpose shall immediately cease.

(b)     On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a Borrowing Request for funding of DIP Loans in an amount equal to the Post-Trigger Carve Out, the funding of which Borrowing Request shall be a several obligation of each DIP Lender to the extent of its Applicable Percentage (under, and as defined in, the DIP Loan Agreement) of such DIP Loans.  To the extent amounts under the preceding sentence are not funded on or before the Funding Deadline, the Debtors are hereby authorized and directed thereafter to utilize all cash constituting DIP Collateral on hand as of such date, and any available cash constituting DIP Collateral thereafter held by any Debtor to fund the Post-Trigger Notice Reserve Account (as defined below) in an amount equal to the amount required to be funded pursuant to such preceding sentence (which cash amounts shall reduce, on a dollar for dollar basis, the Borrowing Request pursuant to that preceding sentence).  The Debtors shall deposit and hold such amounts in one or more segregated accounts at the DIP Agent, in trust, exclusively to pay such Allowed Professional Fees benefiting from the Post-Trigger Carve Out (each, a "Post-Trigger Notice Reserve Account" and, together with the Pre-Trigger Notice Reserve Account, the "Carve

Out Reserve Accounts"), subject to paragraph 65 below titled "Application of the Carve Out Reserve Account"; provided, that notwithstanding any failure of the DIP Credit Parties to timely make DIP Loans as provided above, if the DIP Credit Parties subsequently make DIP Loans to fund the Post-Trigger Notice Reserve Account up to the amount of the Post-Trigger Carve Out, then the Debtors' authorization to use DIP Collateral for such purpose shall immediately cease.

(c)     Notwithstanding anything in the DIP Credit Agreement to the contrary, but subject to the amount of the DIP Loan Commitments, including with respect to (1) the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, (2) the failure of the Borrowers to satisfy any or all of the conditions precedent for the making of any DIP Loan, (3) any termination of the U.S. Commitments (as defined in the DIP Loan Agreement) following an Event of Default, or (4) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each DIP Lender with an outstanding Commitment shall be severally (and not jointly and severally) obligated to make available to the DIP Agent on or before the Funding Deadline such DIP Lender's pro rata share of the DIP Loans required by Paragraphs 64(a) and (b), and no DIP Lender shall be responsible for any other DIP Lender's failure or delay in doing so.

(d)     For the avoidance of doubt, the balances in the Carve Out Reserve Accounts shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, provided that if such balances are insufficient to pay the Carve Out in full, the priority of the Carve Out with respect to such shortfall shall remain unaffected (as described below).

65.     Application of Carve Out Reserve Account.

(a)     All funds in the Pre-Trigger Notice Reserve Accounts shall be used first to pay the Pre-Trigger Carve Out Amount (but not the Post-Trigger Carve Out) until paid in full.  If

the aggregate balances in the Pre-Trigger Notice Reserve Accounts have not been reduced to zero, subject to clause (iii) below, all remaining funds in the Pre-Trigger Notice Reserve Account funded by the DIP Lenders (or by use of DIP Collateral) shall be distributed to the DIP Agent on account of the DIP Outstanding Amounts in accordance with the DIP Credit Agreement until the DIP Outstanding Amounts are paid in full.

(b)     All funds in the Post-Trigger Notice Reserve Accounts (other than up to $500,000 which may be used to pay the Pre-Trigger Carve Out Amount to the extent the Allowed Professional Fees exceed the Professional Fee Carve Out Cap) shall be used first to pay the obligations constituting the Post-Trigger Carve Out.  If, after such application, the aggregate balances in the Post-Trigger Notice Reserve Accounts have not been reduced to zero, subject to clause (iii) below, all remaining funds in respect of the Post-Trigger Carve Out Reserve Accounts funded by the DIP Lenders (or by using DIP Collateral) shall be distributed to the DIP Agent on account of the DIP Outstanding Amounts until the DIP Outstanding Amounts are paid in full.

(c)     Notwithstanding anything to the contrary in the DIP Documents or the DIP Orders, if the DIP Lenders fail to fund DIP Loans for deposit into the applicable Carve Out Accounts in the amounts required in Paragraphs 64(a) and (b) with respect to either the Pre-Trigger Carve Out Amount or the Post-Trigger Carve Out, then any excess funds in either the Pre-Trigger Notice Reserve Accounts or Post-Trigger Reserve Accounts after the payment of the Pre-Trigger Carve Out Amount or the amount of the Post-Trigger Carve Out, as applicable (subject to the limits contained in the Pre-Trigger Carve Out Amount and the Post-Trigger Carve Out, respectively) shall be used to fund the other Carve Out Reserve Accounts to the extent of any Shortfall (as defined in Paragraph 65(e) below) in such accounts, prior to remitting any balances to the DIP Agent.

(d)      Notwithstanding anything to the contrary in the DIP Documents or the DIP Orders, following the end of the second Business Day after delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserve Accounts required to be funded by DIP Loans have been fully funded, but the DIP Agent shall have continuous DIP Liens on any remaining balances in the Carve Out Reserve Accounts, with any excess paid as provided in Paragraph 64(b) above.

(e)      Notwithstanding anything to the contrary in the DIP Orders, (i) if the aggregate amounts funded for deposit to the Carve Out Reserve Accounts from DIP Loans or cash constituting DIP Collateral are less than the Pre-Trigger Carve Out Amount or the Post-Trigger Carve Out, respectively, any insufficiency in the Carve Out Reserve Accounts to satisfy in full the Allowed Professional Fees up to the Pre-Trigger Carve Out Amount or the Post-Trigger Carve Out, respectively (such insufficiency, a "Shortfall"), shall not affect the priority of the Carve Out with respect to any Shortfall, and (ii) in no event shall any approved Budget, Carve Out, Post-Trigger Carve Out, or Carve Out Reserve Account be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors, provided that after the Termination Declaration Date, that such payment is made from sources other than cash constituting DIP Collateral or DIP Loans (until all DIP Outstanding Amounts are paid in full).  In no event shall the Carve Out, or the funding of any DIP Loans or use of any cash constituting DIP Collateral to satisfy the Carve Out, result in any reduction in (or operate as a credit against) the amount of any DIP Outstanding Amounts.  For the avoidance of doubt, the amount of any Shortfall shall continue to be deemed a part of the Carve Out and be entitled to the same priority as the Carve Out as specified in the first sentence of Paragraph 62.

(f)  No Direct Obligation to Pay Allowed Professional Fees.  The DIP Agent and DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the Bankruptcy Code or otherwise.  Nothing in either DIP Order or otherwise shall be construed to obligate any DIP Secured Party, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)  Payment of Allowed Professional Fees Prior to Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(h)  Payment of Carve Out on or after Termination Declaration Date.  Any payment or reimbursement to a Professional Person made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out with the proceeds of DIP Loans shall be added to, and made a part of, the DIP Outstanding Amounts, shall be secured by all of the DIP Collateral, and shall be entitled to all of the other protections granted in the DIP Orders, the DIP Documents, the Bankruptcy Code, and applicable law.  In no event shall the Carve Out, or the funding of any DIP Loans or use of DIP Collateral to satisfy the Carve Out, result in any reduction in the amount of any DIP Outstanding Amounts, the security therefor, or the obligations of the Debtors to pay same in accordance with the DIP Documents.

66.  Excluded Professional Fees.  Notwithstanding anything to the contrary in the DIP Orders, neither the Carve Out nor any proceeds of any DIP Loans, letters of credit issued under the DIP Facility, Cash Collateral, or DIP Collateral shall be used to pay any Professional Fees (including, without

limitation, expenses) in connection with any of the following (each a "Prohibited Purpose"): (a) objecting to, seeking subordination of, or contesting the validity, perfection, priority, or enforceability of, or asserting any defense, counterclaim or offset to, the DIP Orders, any DIP Outstanding Amounts, or the perfected status or priority of any of the DIP Liens or liens securing the Debtors obligations to Bank of America, N.A. on account of the Existing L/Cs; (b) asserting or prosecuting any claim, demand, or cause of action against any DIP Secured Party, including, without limitation, for lender liability, breach of contract, or tort, or pursuant to Section 105, 506, 510, 544, 547, 548, 549, 550, 552 or 553 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise (other than to enforce the terms of the DIP Documents or the DIP Orders); (c) seeking to modify any of the rights granted under the DIP Orders to any DIP Secured Party; (d) objecting to, contesting, or seeking to avoid or subordinate any DIP Lien or its priority; or (e) objecting to, contesting, delaying, preventing, or interfering in any way with the exercise of any rights and remedies by any DIP Secured Party with respect to any DIP Collateral after the occurrence and during the continuance of an Event of Default, provided that the Debtors or the creditors' committee may contest or dispute whether an Event of Default has occurred and shall be entitled to any notice provisions set forth in this Final DIP Order.

## No Surcharge

67.     No costs or expenses of administration which have or may at any time be incurred in these Cases (or in any successor chapter 7 case) shall be charged against the DIP Agent, the DIP Lenders, or the Existing L/C Issuer, their respective claims, the Collateral, or the Cash Collateral securing the Existing L/Cs pursuant to Bankruptcy Code § 506(c) without the prior written consent of the DIP Secured Parties or the Existing L/C Issuer, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Existing L/C Issuer, as applicable.  The DIP Secured Parties and the Existing L/C Issuer shall not be subject

in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or the Cash Collateral securing the Existing L/Cs.

## Proofs of Claim

68.     None of the Pre-Petition Agent, the Pre-Petition Lenders, the Existing L/C Issuer, or Bank of America (on account of the Bank of America Credit Card Program) shall be required to file proofs of claim in any of the Cases or subsequent cases of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' stipulations in this Final DIP Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s) (subject to the limitations contained in paragraph 80 below).  Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, any subsequent order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation, administrative expense claims and priority claims) in any of the Cases or subsequent cases, or any notice served by the Debtors in relation to any such bar date, no bar date shall apply to the Pre-Petition Agent, the Pre-Petition Lenders, the Existing L/C Issuer, Bank of America, the DIP Agent, or the DIP Lender with respect to the Pre-Petition ABL Claim, the Existing L/C Claim, the Bank of America Credit Card Program, or the DIP Obligations, as applicable.  Notwithstanding the foregoing, the Pre-Petition Agent (on behalf of itself and the Pre-Petition Lenders), the Existing L/C Issuer, and Bank of America are hereby authorized and entitled, in their discretion, but not required, to file (and amend and/or supplement, as applicable) a master proof of claim for any claims of any of (i) the Pre-Petition Lenders arising from the Pre-Petition ABL Claim Documents or in respect of the Pre-Petition Lenders' Pre-Petition ABL Claim, (ii) the Existing L/C Issuer arising from the Existing L/C Documents or in respect of the Existing L/C Claim, or (iii) Bank of America arising from the Bank of America Credit Card Program; provided, however, that nothing

in this Final DIP Order shall waive the right of any Pre-Petition Lender to file its own proof of claim against any of the Debtors.

### **REMEDIES**

69.     Reserved.

70.     Without requiring further order from the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, immediately upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Credit Agreement) upon written notice to the Debtors, (a) any and all obligations of the DIP Secured Parties in connection with the DIP Credit Facility or under the DIP Orders and the DIP Documents shall immediately terminate other than to fund the Carve Out Reserves as provided herein, (b) the DIP Agent, for itself and for and on behalf of the DIP Lenders, may declare all or any part of the DIP Credit Facility to be immediately accelerated and due and payable for all purposes, rights, and remedies, and (c) the Debtors' authority to use Cash Collateral shall immediately terminate other than to fund the Carve Out Reserves as provided herein; provided that in the five (5) days' period after such written notice to the Debtors (the "Default Notice Period"), the Debtors and any official committee appointed in these Cases may seek an emergency hearing before this Bankruptcy Court, and must provide prompt notice of such hearing to the DIP Secured Parties, to contest whether an Event of Default has occurred; and provided further that the DIP Lenders shall not be obligated to make any loans or advances under the DIP Credit Facility during any Default Notice Period other than to fund the Carve Out Reserves as provided herein.  Upon the occurrence and during the continuation of an Event of Default, the DIP Lenders or the DIP Agent in accordance with the DIP Documents are hereby authorized to file a motion on shortened notice of no less than 5 business days seeking relief from the automatic stay (the "Stay Relief Motion") in order to permit the DIP Lenders to exercise any or all of their other rights and remedies set forth in the DIP Orders or the

DIP Documents, pursuant to and subject to the terms and provisions of the DIP Orders and the DIP Documents. Notwithstanding the occurrence of an Event of Default, the Maturity Date, and/or termination of the commitments under the DIP Credit Agreement, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties under the DIP Documents and the DIP Orders shall survive. Notwithstanding the foregoing or anything herein to the contrary, the automatic stay of Bankruptcy Code § 362 is hereby vacated and modified (a) to authorize Bank of America to exercise any of its remedies under the P-Card Collateral Agreement against cash securing the P-Card obligation in the event of any default under the Bank of America Credit Card Program, (b) to authorize the Existing L/C Issuer to apply the L/C Cash Collateral to any draw on the Existing L/Cs or any other Existing L/C Claims, and (c) upon the occurrence of any Event of Default that continues to exist after the Default Notice Period identified in Sections 8.1(p), 8.1(q), 8.1(r) (other than relating to the appointment of an examiner or to any appointment that is sought or supported by the DIP Agent), or 8.1(v) of the DIP Credit Agreement, then without further act or action by the DIP Agent, or any further notice, hearing, or order of this Bankruptcy Court, the Automatic Stay shall be immediately modified and the DIP Agent shall be and is hereby authorized, in its sole and absolute discretion, to take any and all actions and remedies that the DIP Agent may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral, including, without limitation, to exercise any right or remedy set forth in the DIP Documents.

## **Right to Credit Bid**

71.     The DIP Agent, for itself and for and on behalf of the DIP Lenders, may credit bid, in its sole and absolute discretion, any portion and up to the entire amount of the DIP Agent's and the DIP Lenders' respective claims, including, without limitation, the DIP Obligations, at any time on any individual asset, portion of the assets, or all assets constituting their respective Collateral

in conjunction with any sale of the Debtors' assets pursuant to any plan of reorganization or sale transaction.

## **OTHER TERMS**

72.     The Debtors and the DIP Agent are authorized to implement, in accordance with the terms of the DIP Documents, any modifications or amendments to any DIP Document, except with respect to certain matters specified in the DIP Credit Agreement or the DIP Documents requiring the approval of all DIP Lenders that are not both material and adverse to the Debtors; provided that any material modifications that are adverse to the Debtors will be filed with the Bankruptcy Court and parties in interest shall have seven (7) days to object to such modification.

73.     Other than the Carve Out, no priority claims shall be allowed that are or will be prior to or on parity with the superpriority claims or secured claims of the DIP Secured Parties against the Debtors and their estates arising from the DIP Documents and the DIP Orders.

74.     No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the post-petition financing arrangements with the DIP Secured Parties shall be avoidable or recoverable from the DIP Secured Parties under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

75.     Except for the reasonable and necessary sale of inventory in the ordinary course of the Debtors' business and as may be provided for in the Budget and consistent with the terms of the DIP Credit Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Collateral, without the prior written consent of the DIP Agent.

76.     All post-petition advances under the DIP Credit Agreement are made in reliance on the DIP Orders and so long as the DIP Obligations remain unpaid, there shall not at any time be entered in the Debtors' Cases any other order that, except as consented to by the DIP Agent in writing, (a) authorizes the use of Cash Collateral or the sale, lease, or other disposition of the

Collateral unless the cash proceeds will indefeasibly pay the DIP Obligations in full, (b) authorizes the obtaining of credit or the incurring of indebtedness secured by a lien or security interest in property in which the DIP Agent or the DIP Lenders hold or assert liens or security interests, or (c) grants to any claim a priority administrative claim status that is equal or superior to the superpriority status granted to the DIP Secured Parties herein.  In furtherance of clause (a) of this paragraph 76, and notwithstanding anything to the contrary in any other existing or future order of the Bankruptcy Court, so long as the DIP Obligations shall not have been fully and finally paid and satisfied, the Debtors shall use the proceeds of the DIP Credit Facility and the Cash Collateral solely as provided in this Final Order and the DIP Credit Agreement.

77.     The terms hereunder and under the DIP Documents, the DIP Liens granted to the DIP Secured Parties under the DIP Orders, and the rights of the DIP Secured Parties pursuant to the DIP Orders with respect to the Collateral shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors without the prior written approval of the DIP Agent.

78.     The terms and provisions of this Final DIP Order and any actions taken pursuant hereto shall survive entry of any order that may be entered converting to chapter 7 or dismissing the Debtors' Cases, except for the Debtors' authority to use Cash Collateral and any obligations of the DIP Secured Parties under the DIP Documents (all of which shall immediately terminate upon entry of such an order).  The terms and provisions of the DIP Orders, as well as the priorities in payment, liens, and security interests granted pursuant to the DIP Orders and the DIP Documents, shall continue after any dismissal of the Debtors' Cases in this or any superseding case under the Bankruptcy Code of any of the Debtors, and such priorities in payment, liens, and security interests shall maintain their priority as provided by the DIP Orders until such time as the

DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the DIP Documents and the DIP Secured Parties shall have no further obligation or financial accommodation to any of the Debtors.

79.     The provisions of the DIP Orders shall inure to the benefit of the Debtors, the DIP Agent, and the DIP Lenders, and they shall be binding upon (a) the Debtors and their successors and assigns, including, without limitation, any trustee or other fiduciary hereafter appointed as legal representative of the Debtors or with respect to property of the estates of the Debtors, whether under chapter 11 of the Bankruptcy Code, any confirmed plan, any subsequent chapter 7 case, or after any dismissal of the Debtors' Cases and (b) all creditors of any of the Debtors and other parties in interest.

80.     The stipulations and admissions contained in this Final DIP Order, including, without limitation, in Paragraphs 10, 11, 12, 13, and 14 of this Final DIP Order, shall be binding on the Debtors' estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) and all parties in interest, including, without limitation, any statutory committee appointed in the Chapter 11 Cases, unless the Debtors, any statutory committee appointed in the Chapter 11 Cases, or any other party in interest has timely filed a motion seeking requisite standing and authority (a "Challenge") (a) challenging the amount, validity, or enforceability of the Existing L/C Claims, (b) challenging the perfection or priority of the priming liens, (c) challenging the existence of any Collateral, or (d) otherwise asserting any objections, claims, or causes of action (including, without limitation, any actions for preferences, fraudulent conveyances, or other avoidance power claims) relating to the priming liens or the Existing L/C Claims no later than the earlier of (i) forty (40) days after the Petition Date, (ii) thirty (30) days after the appointment of a creditors' committee, but in any event not later than 60 days

after the Petition Date, or (iii) the date of confirmation of a chapter 11 plan of reorganization in these chapter 11 cases.  If no such Challenge is timely commenced as of such dates then, without further order of the Bankruptcy Court, to the extent not theretofore indefeasibly repaid, satisfied, or discharged, as applicable, such claims, liens, and security interests shall, without further order of the Bankruptcy Court, be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount or otherwise.  Notwithstanding anything to the contrary herein (other than as set forth in Paragraph 10, 11, 12, 13, and 14), if no Challenge is timely commenced and sustained, the stipulations contained in Paragraph 10, 11, 12, 13, and 14 of this Final DIP Order shall be binding on the Debtors' estates, any statutory committee appointed in the Chapter 11 Cases, and all parties in interest.  If any such Challenge is timely commenced and/or sustained, the stipulations contained in Paragraph 10, 11, 12, 13, and 14 shall nonetheless remain binding on the Debtors' estates, any statutory committee appointed in the Chapter 11 Cases, and all parties in interest (other than as set forth in Paragraph 10, 11, 12, 13, and 14), except to the extent that such stipulations were expressly challenged in such Challenge.  Nothing in this Interim DIP Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory committee appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges.  It shall be an Event of Default under the DIP Credit Agreement and this Final DIP Order if: (a) any challenge to (i) any portion of the DIP Obligations, or the extent, validity, priority or unavoidability of the DIP Liens securing the DIP Obligations, or (ii) any portion of the prepetition claims pursuant to the Pre-Petition ABL Claim Documents, Existing L/C Documents, or Bank of America Credit Card Program, or the extent, validity, priority or unavoidability of the

liens securing such claims ((i) and (ii) collectively, the "<u>Total Credit</u>") is commenced by the Debtors, or (b) any court of competent jurisdiction enters an order sustaining any Challenge to the Total Credit by the Debtors.

81.    If any or all of the provisions of this Final DIP Order are hereafter modified, vacated, or stayed without the prior written agreement of the DIP Agent, such modification, vacation, or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the DIP Secured Parties before the effective date of such modification, vacation, or stay or (b) the validity or enforceability of any security interest, lien, priority or other protection authorized, granted, or created hereby or pursuant to any of the DIP Documents.  Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtors to the DIP Agent, for itself or for and on behalf of the DIP Lenders, before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Final DIP Order, and the DIP Agent, for itself and for and on behalf of the DIP Lenders, shall be entitled to all the liens, rights, remedies, privileges, and benefits granted herein and pursuant to the DIP Documents with respect to all such indebtedness, obligations, or liabilities.

82.    To the extent the terms and conditions of the DIP Documents are in express conflict (as opposed to being additive, limiting, or more specific than this Final DIP Order) with the terms and conditions of this Final DIP Order, the terms and conditions of this Final DIP Order shall control.

83.    No approval, agreement, or consent requested of the DIP Agent or the Existing L/C Issuer by the Debtors pursuant to the terms of this Final DIP Order or otherwise shall be inferred from any action, inaction, or acquiescence of the DIP Agent or the Existing L/C Issuer other than a writing acceptable to the DIP Agent or the Existing L/C Issuer that is signed by the DIP Agent

or the Existing L/C Issuer, as applicable, and expressly shows such approval, agreement or consent, without limitation.  Nothing herein shall in any way affect the rights of the DIP Agent, the DIP Lenders, or the Existing L/C Issuer as to any non-Debtor entity, without limitation.  Unless expressly required otherwise hereunder, any determination, agreement, decision, consent, election, approval, acceptance, waiver, designation, authorization, or other similar circumstance or matter of the DIP Agent, the DIP Lenders, or the Existing L/C Issuer hereunder or related hereto, shall be in the DIP Agent's, the DIP Lenders', and/or the Existing L/C Issuer's sole and absolute discretion.

84.     Nothing herein shall be deemed or construed to waive, limit, or modify the rights of the DIP Agent, for itself or for and on behalf of the DIP Lenders, to obtain further adequate protection and other statutory protections for the use of the Collateral and Cash Collateral, or to seek other relief in these Cases in accordance with any provision of the Bankruptcy Code or applicable law.

85.     Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify or prejudice the claims, rights, protections, privileges and defenses of the DIP Secured Parties afforded pursuant to the Bankruptcy Code.

86.     This Final DIP Order, and the findings of fact and conclusions of law contained herein, shall be effective upon signature by the Bankruptcy Court, and may be relied upon by the DIP Agent, the DIP Lenders, and the Debtors without the necessity of entry into the docket sheet of these Cases.  To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.

87.     This Bankruptcy Court hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted to the United States Bankruptcy Court under the

Bankruptcy Code, to enforce the terms of this Final DIP Order and to adjudicate any and all disputes in connection therewith by motion and without necessity of an adversary proceeding.

88.     All headings in this Final DIP Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

89.     The indemnification provisions in the DIP Credit Agreement are hereby approved in their entirety and are incorporated herein by reference as if fully set forth herein.

## **WAIVER OF CLAIMS**

90.     SUBJECT TO PARAGRAPH 80 HEREOF WITH RESPECT TO THE PRE-PETITION AGENT, THE PRE-PETITION LENDERS, THE EXISTING L/C ISSUER AND RELATED PARTIES, EACH OF THE DEBTORS (IN THEIR OWN RIGHT, ON BEHALF OF THEIR ESTATES, REPRESENTATIVES, DIRECTORS, OFFICERS, EMPLOYEES, INDEPENDENT CONTRACTORS, ATTORNEYS AND AGENTS, AND THEIR SUCCESSORS AND ASSIGNS, IN EACH CASE TO THE EXTENT PERMITTED BY APPLICABLE LAW AND SOLELY IN THEIR CAPACITY AS SUCH) (COLLECTIVELY, THE "RELEASING PARTIES"), HEREBY RELEASES, ACQUITS, FOREVER DISCHARGES AND COVENANTS NOT TO SUE THE DIP AGENT, THE DIP LENDERS, THE PRE-PETITION AGENT, THE PRE-PETITION LENDERS, THE EXISTING L/C ISSUER, THE ISSUER OF THE P-CARDS, AND THE DIP AGENT'S, THE DIP LENDERS', THE PRE-PETITION AGENT'S, THE PRE-PETITION LENDERS', THE EXISTING L/C ISSUER'S, AND THE P-CARD ISSUER'S REPRESENTATIVES, DIRECTORS, OFFICERS, EMPLOYEES, INDEPENDENT CONTRACTORS, ATTORNEYS AND AGENTS, AND THEIR SUCCESSORS AND ASSIGNS (THE "RELEASED PARTIES") FROM ANY AND ALL ACTS AND OMISSIONS OF THE RELEASED PARTIES, AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, AVOIDANCE ACTIONS, COUNTERCLAIMS, DEMANDS,

CONTROVERSIES, COSTS, DEBTS, SUMS OF MONEY, ACCOUNTS, RECKONINGS, BONDS, BILLS, DAMAGES, OBLIGATIONS, LIABILITIES, OBJECTIONS, LEGAL PROCEEDINGS, EQUITABLE PROCEEDINGS, AND EXECUTIONS OF ANY NATURE, TYPE, OR DESCRIPTION WHICH THE RELEASING PARTIES HAVE OR MAY COME TO HAVE AGAINST THE RELEASED PARTIES THROUGH THE DATE OF THIS FINAL DIP ORDER, AT LAW OR IN EQUITY, BY STATUTE OR COMMON LAW, IN CONTRACT, IN TORT, INCLUDING, WITHOUT LIMITATION, BANKRUPTCY CODE CHAPTER 5 CAUSES OF ACTION, WHETHER THE LAW OF THE UNITED STATES OR ANY OTHER COUNTRY, UNION, ORGANIZATION OF FOREIGN COUNTRIES OR OTHERWISE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, BUT EXCLUDING OBLIGATIONS UNDER THE DIP CREDIT FACILITY ARISING AFTER THE DATE OF THIS FINAL DIP ORDER (COLLECTIVELY, THE "<u>RELEASED CLAIMS</u>").     THE DEBTORS ON BEHALF OF THE RELEASING PARTIES FURTHER COVENANT NOT TO SUE THE RELEASED PARTIES ON ACCOUNT OF ANY RELEASED CLAIM.   THIS PARAGRAPH IS IN ADDITION TO AND SHALL NOT IN ANY WAY LIMIT ANY OTHER RELEASE, COVENANT NOT TO SUE, OR WAIVER BY THE RELEASING PARTIES IN FAVOR OF THE RELEASED PARTIES.   NOTWITHSTANDING THE RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES CONTAINED ABOVE IN THIS PARAGRAPH, SUCH RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES SHALL BE DEEMED ACKNOWLEDGED AND REAFFIRMED BY THE DEBTORS EACH TIME THERE IS AN ADVANCE OF FUNDS, EXTENSION OF CREDIT, OR FINANCIAL ACCOMMODATION UNDER THE DIP ORDERS AND THE DIP DOCUMENTS.

## NOTICE

91.     The Debtors' proposed counsel shall serve this Final DIP Order on all of the following parties: (a) the Office of the United States Trustee; (b) the attorneys for the DIP Agent and the DIP Lenders; (c) all creditors known to the Debtors who have or may assert liens against any of the Debtors' assets; (d) counsel to the Consenting Stakeholders; (e) the United States Internal Revenue Service; (f) the 50 largest unsecured creditors of the Debtors; and (g) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Bankruptcy Rules.  Any notice required hereunder to the Debtors or any official committee appointed in these Cases shall be deemed given when delivered by email, other electronic delivery, fax, or hard copy, to their respective counsel of record in these cases.

## EXPIRATION DATE/MATURITY

92.     The DIP Agent's consent and Debtors' authority to use Cash Collateral and the DIP Lenders' commitment to provide credit under the DIP Credit Agreement and the DIP Orders, subject to the funding and Budget limitations above, shall be effective upon entry of this Final DIP Order to and including, without limitation, the earlier of: (a) the continued existence of an Event of Default as set forth in paragraph 70 above, (b) the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of substantially all of the Debtors' assets, or (c) the effective date of any plan of reorganization, at which time all of the Debtors' authority to use Cash Collateral and to obtain credit under the DIP Credit Agreement and the DIP Orders shall terminate, as shall the DIP Agent's and the DIP Lenders' obligation to continue funding the DIP Credit Facility, unless extended by written agreement of the parties hereto, a copy of which, with an updated Budget, shall be promptly filed with this Bankruptcy Court by the Debtors (the "Expiration Date", and (b), (c), and (d) of this paragraph, the "Termination Date").

93.     This order is effective immediately.

Signed:

     January 03, 2019

                                                 Marvin Isgur
                           United States Bankruptcy Judge

# EXHIBIT 1

**DIP CREDIT AGREEMENT**

*Execution Version*

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of December [_], 2018

among

PARKER DRILLING COMPANY,
as the Parent Borrower,
the other Borrowers party hereto,
certain Subsidiaries of the Parent Borrower, as
Guarantors,

BANK OF AMERICA, N.A.,
as Administrative Agent and L/C Issuer,

and

THE OTHER LENDERS AND L/C ISSUERS
from time to time party hereto

_____

Bank of America, N.A.

and

Deutsche Bank Securities Inc.

as

Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................1

    Section 1.1    Defined Terms .................................................................1
    Section 1.2    Other Interpretive Provisions..............................................35
    Section 1.3    Accounting Terms...........................................................35
    Section 1.4    Rounding ...................................................................36
    Section 1.5    Exchange Rates; Currency Equivalents ....................................36
    Section 1.6    Alternative Currencies .....................................................36
    Section 1.7    Change of Currency ........................................................37
    Section 1.8    Times of Day...............................................................37
    Section 1.9    Letter of Credit Amounts...................................................37
    Section 1.10    Uniform Commercial Code.................................................38

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ..............................38

    Section 2.1    The Loans..................................................................38
    Section 2.2    Borrowings, Conversions and Continuations of Loans ......................38
    Section 2.3    Letters of Credit ...........................................................39
    Section 2.4    Borrowing Base Collateral Casualty Event .........................49
    Section 2.5    Prepayments...............................................................49
    Section 2.6    Termination or Reduction of Commitments ...........................50
    Section 2.7    Repayment of Loans .......................................................50
    Section 2.8    Interest....................................................................50
    Section 2.9    Fees.......................................................................51
    Section 2.10    Computation of Interest and Fees .........................................51
    Section 2.11    Evidence of Debt...........................................................52
    Section 2.12    Payments Generally; Administrative Agent's Clawback ................52
    Section 2.13    Sharing of Payments by Lenders .........................................54
    Section 2.14    [ ........................................................................55
    Section 2.15    LIBOR Successor Rate .....................................................55
    Section 2.16    Defaulting Lenders.........................................................56
    Section 2.17    Certain Bankruptcy Matters.................................................58

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY....................................59

    Section 3.1    Taxes.....................................................................59
    Section 3.2    Illegality ..................................................................64
    Section 3.3    Inability to Determine Rates ...............................................65
    Section 3.4    Increased Costs ............................................................65
    Section 3.5    Compensation for Losses...................................................66
    Section 3.6    Mitigation Obligations; Replacement of Lenders...............................67
    Section 3.7    Survival ...................................................................67
    Section 3.8    68

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ........................68

    Section 4.1    Conditions of Initial Credit Extension ....................................68
    Section 4.2    Conditions to all Credit Extensions .......................................70

ARTICLE V REPRESENTATIONS AND WARRANTIES................................................71

    Section 5.1    Existence; Compliance with Law .........................................71

i

Section 5.2     Power; Authorization; Enforceable Obligations ..................................72
Section 5.3     No Legal Bar......................................................................................72
Section 5.4     No Material Litigation .......................................................................72
Section 5.5     Financial Statements; No Material Adverse Effect ...........................72
Section 5.6     No Default..........................................................................................73
Section 5.7     Ownership of Property; Liens............................................................73
Section 5.8     Intellectual Property ..........................................................................73
Section 5.9     Taxes ..................................................................................................74
Section 5.10    Federal Regulations...........................................................................74
Section 5.11    Labor Matters.....................................................................................74
Section 5.12    ERISA Compliance ............................................................................74
Section 5.13    Investment Company Act; Other Regulations ...................................75
Section 5.14    Subsidiaries .......................................................................................75
Section 5.15    Use of Proceeds .................................................................................76
Section 5.16    Environmental Matters.......................................................................76
Section 5.17    Accuracy of Information, etc .............................................................77
Section 5.18    Insurance ...........................................................................................77
Section 5.19    OFAC/Sanctions ................................................................................77
Section 5.20    Anti-Corruption Laws ........................................................................77
Section 5.21    EEA Financial Institution ..................................................................77
Section 5.22    DIP Orders .........................................................................................77

ARTICLE VI AFFIRMATIVE COVENANTS ...........................................................78

Section 6.1     Financial Statements; Borrowing Base Certificate ............................78
Section 6.2     Certificates; Other Information..........................................................79
Section 6.3     Notices ...............................................................................................81
Section 6.4     Conduct of Business and Maintenance of Existence, etc ..................81
Section 6.5     Maintenance of Property; Insurance ..................................................81
Section 6.6     Inspection of Property; Books and Records; Discussions ..................82
Section 6.7     Environmental Laws ..........................................................................82
Section 6.8     Payment of Obligations......................................................................83
Section 6.9     Additional Collateral; Additional Guarantors....................................83
Section 6.10    [Reserved] ..........................................................................................83
Section 6.11    Cash Management Systems ................................................................83
Section 6.12    Inspection and Appraisal of Collateral ..............................................84
Section 6.13    Casualty and Condemnation; Disposition Outside the Ordinary
                Course of Business..............................................................................84
Section 6.14    Anti-Corruption Laws; Sanctions ......................................................84
Section 6.15    Further Assurances.............................................................................85
Section 6.16    Budget.................................................................................................85
Section 6.17    Additional Reports.............................................................................86
Section 6.18    Bankruptcy Related Affirmative Covenants.......................................86

ARTICLE VII NEGATIVE COVENANTS....................................................................87

Section 7.1     Liens...................................................................................................87
Section 7.2     Minimum Liquidity............................................................................89
Section 7.3     Indebtedness.......................................................................................89
Section 7.4     Fundamental Changes ........................................................................89
Section 7.5     Disposition of Property ......................................................................89
Section 7.6     Restricted Payments...........................................................................90

ii

Section 7.7    Modifications of Organizational Documents........................................91
Section 7.8    Transactions with Affiliates ...................................................................91
Section 7.9    Changes in Fiscal Periods .....................................................................91
Section 7.10   Negative Pledge Clauses .......................................................................91
Section 7.11   Restrictions on Subsidiary Distributions ..............................................92
Section 7.12   Lines of Business ..................................................................................92
Section 7.13   Swap Contracts .....................................................................................92
Section 7.14   Anti-Corruption Laws............................................................................92
Section 7.15   Sanctions ...............................................................................................93
Section 7.16   Prepayment, etc. of Indebtedness...........................................................93
Section 7.17   Chapter 11 Claims.................................................................................93
Section 7.18   Superpriority Claims..............................................................................93

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ...........................................93

Section 8.1    Events of Default ...................................................................................93
Section 8.2    Remedies Upon Event of Default ..........................................................96
Section 8.3    Application of Funds..............................................................................97

ARTICLE IX ADMINISTRATIVE AGENT.......................................................................98

Section 9.1    Appointment and Authority ...................................................................98
Section 9.2    Rights as a Lender .................................................................................98
Section 9.3    Exculpatory Provisions .........................................................................99
Section 9.4    Reliance by Administrative Agent..........................................................99
Section 9.5    Delegation of Duties ...........................................................................100
Section 9.6    Resignation of Administrative Agent ...................................................100
Section 9.7    Non-Reliance on Administrative Agent and Other Lenders..............102
Section 9.8    No Other Duties, Etc............................................................................102
Section 9.9    Administrative Agent May File Proofs of Claim; Credit Bidding
               ...............................................................................................................102
Section 9.10   Collateral and Guaranty Matters .........................................................103
Section 9.11   Secured Cash Management Agreements ..............................................104
Section 9.12   Lender ERISA Representation ..............................................................104

ARTICLE X MISCELLANEOUS ......................................................................................106

Section 10.1   Amendments, Etc .................................................................................106
Section 10.2   Notices; Effectiveness; Electronic Communication ...........................108
Section 10.3   No Waiver; Cumulative Remedies; Enforcement..............................110
Section 10.4   Expenses; Indemnity; Damage Waiver.................................................110
Section 10.5   Payments Set Aside..............................................................................113
Section 10.6   Successors and Assigns........................................................................113
Section 10.7   Treatment of Certain Information; Confidentiality............................117
Section 10.8   Right of Setoff......................................................................................118
Section 10.9   Interest Rate Limitation .......................................................................118
Section 10.10  Counterparts; Integration; Effectiveness..............................................119
Section 10.11  Survival of Representations and Warranties..........................................119
Section 10.12  Severability ...........................................................................................119
Section 10.13  Replacement of Lenders .......................................................................119
Section 10.14  Governing Law; Jurisdiction; Etc. .......................................................120
Section 10.15  Waiver of Jury Trial...............................................................................121
Section 10.16  No Advisory or Fiduciary Responsibility ............................................121

iii

Section 10.17 Electronic Execution of Assignments and Certain Other Documents .......................................................................... 122
Section 10.18 USA PATRIOT Act .......................................................... 122
Section 10.19 Judgment Currency .......................................................... 122
Section 10.20 ENTIRE AGREEMENT .................................................... 123
Section 10.21 Acknowledgment and Consent to Bail-In of EEA Financial Institutions ........................................................................... 123

ARTICLE XI THE PARENT BORROWER ....................................................... 124

Section 11.1   Appointment; Nature of Relationship ................................ 124
Section 11.2   Powers ............................................................................. 124
Section 11.3   Employment of Agents .................................................... 124
Section 11.4   No Successor Parent Borrower ........................................ 124
Section 11.5   Execution of Loan Documents ......................................... 124

**SCHEDULES**

1.1 (b)      Account Debtors
1.1 (c)      Included Buildings
1.1(d)       Subsidiary Guarantors
2.1          Commitments and Applicable Percentages
5.2          Consents, Authorizations, Filings and Notices
5.4          Litigation
5.14         Subsidiaries; Other Equity Investments
5.16         Environmental Matters
5.19         OFAC
6.11         Deposit Accounts
7.1(f)       Existing Liens
7.3(d)       Existing Indebtedness
10.2         Administrative Agent's Office; Certain Addresses for Notices

**EXHIBITS**

             *Form of*
A            Committed Loan Notice
B-1          U.S. Tax Compliance Certificate
B-2          U.S. Tax Compliance Certificate
B-3          U.S. Tax Compliance Certificate
B-4          U.S. Tax Compliance Certificate
C            Note
D            Compliance Certificate
E-1          Assignment and Assumption
E-2          Administrative Questionnaire
F            [Reserved]
G            Borrowing Base Certificate
H            Interim DIP Order

iv

v

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**") is entered into as of December [_], 2018, among PARKER DRILLING COMPANY, a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("**PKD**" and in its capacity as agent for the Borrowers hereunder, the "**Parent Borrower**" as set forth in Section 11.1), certain Subsidiaries of PKD, each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, party hereto as borrowers (together with the Parent Borrower, the "**Borrowers**"), each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**"), and BANK OF AMERICA, N.A., as the Administrative Agent and an L/C Issuer, and is acknowledged and agreed to by the Subsidiary Guarantors (as defined below).

### PRELIMINARY STATEMENTS:

On December 12, 2018 (the "**Petition Date**"), the Borrowers and each of the Subsidiary Guarantors (as defined below) filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**").

The Borrowers have requested that the Lenders extend credit to them in the form of a debtor-in-possession revolving credit facility pursuant to which the Lenders will make loans to the Borrowers, and the L/C Issuers will issue letters of credit for the account of the Loan Parties, in the maximum aggregate principal amount of $50,000,000. The Lenders are willing to make such Loans, and the L/C Issuers are willing to issue letters of credit, to the Borrowers, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

Section 1.1    Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"**Acceptable Replacement RSA**" means a restructuring support agreement entered into by the Loan Parties the terms of which, taken as a whole, are (i) more favorable to the Loan Parties than the terms of the RSA as in effect on the Closing Date and (ii) not adverse to the interests of the Lenders in any material respect.

"**Accounts**" means accounts receivable of PKD or any of its Subsidiaries, as applicable, arising out of the sales or leasing of goods or services made by PKD or any of its Subsidiaries, as applicable, in the ordinary course of business, to the extent constituting an "account" as defined in the Uniform Commercial Code.

"**Account Debtor**" means a Person obligated under an Account, chattel paper or general intangible.

"**Administrative Agent**" means Bank of America in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.2, or such other address or account as the Administrative Agent may from time to time notify to the Parent Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit E-2 or any other form approved by the Administrative Agent.

"**Advance Rate**" means at any time, the applicable percentage set forth in clause (i) or (ii) of the definition of "Borrowing Base" or such other percentage having similar effect as may become effective in lieu of or in addition to such applicable percentage in accordance with such definition.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agents**" means, collectively, the Administrative Agent and any other agent appointed in accordance with the terms of this Agreement, if any.

"**Aggregate Commitments**" means the Commitments of all the Lenders. As of the Closing Date, the Aggregate Commitments are $50,000,000.

"**Agreement**" has the meaning specified in the introductory paragraph hereto.

"**Alternative Currency**" means each currency (other than Dollars) that is approved in accordance with Section 1.6.

"**Alternative Currency Equivalent**" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or an L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"**Applicable Fee Rate**" means 0.50% per annum.

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time. If the Aggregate Commitments have been terminated or expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. As of the Closing Date, the Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.1 and thereafter in the Assignment and Assumption (or such other instrument) pursuant to which such Lender becomes a party hereto, as applicable.

"**Applicable Rate**" means (a) with respect to Eurodollar Rate Loans, 4.00%, and (b) with respect to Base Rate Loans, 3.00%.

"**Applicable Time**" means, with respect to any payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the applicable L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"**Appropriate Lender**" means, at any time, (a) a Lender that has a Commitment or holds a Loan at such time and (b) with respect to the Letter of Credit Sublimit, (i) the L/C Issuers and (ii) if any Letters of Credit have been issued pursuant to Section 2.3(a), the Lenders.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arrangers**" means each of Bank of America and Deutsche Bank Securities Inc. in its capacity as a joint lead arranger and joint bookrunner.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.6(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E-1 or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"**Attributable Indebtedness**" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"**Audited Financial Statements**" means the audited consolidated balance sheet of PKD and its Subsidiaries for the fiscal year ended on December 31, 2017, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the PKD and its Subsidiaries, including the notes thereto.

"**Auto-Extension Letter of Credit**" has the meaning specified in Section 2.3(b)(iii).

"**Availability**" means (a) the Line Cap minus (b) Total Outstandings.

"**Availability Period**" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Commitments pursuant to Section 2.6, and (c) the date of termination of the commitment of each Lender to make Loans and of the obligation of the L/C Issuers to make L/C Credit Extensions pursuant to Section 8.2.

"**Availability Reserve**" means the sum (without duplication) of (a) the Rent and Charges Reserve; (b) the Bank Product Reserve, (c) the Dilution Reserve, (d) the aggregate amount of liabilities secured by Liens upon Collateral that are senior to Administrative Agent's

Liens (but imposition of any such reserve shall not waive an Event of Default arising therefrom); (e) the Casualty Reserve; (f) the Carve-Out Reserve; and (g) such additional reserves, in such amounts and with respect to such matters, as Administrative Agent in its Permitted Discretion may elect to impose from time to time, provided that no additional reserves will be taken solely to account for the pendency of the Cases.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank of America**" means Bank of America, N.A. and its successors.

"**Bank Product Reserve**" means at any time, reserves in respect of Secured Cash Management Agreements then provided and outstanding.

"**Bankruptcy Code**" means 11 U.S.C. § 101 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas Houston Division or any other court having jurisdiction over the Cases from time to time and any Federal appellate court thereof.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the higher of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate", and (c) the Eurodollar Rate plus 1.00%; and if Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Borrowers**" has the meaning specified in the introductory paragraph hereto.

"**Borrower Materials**" has the meaning specified in Section 6.2.

"**Borrowing**" means a borrowing consisting of simultaneous Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Lenders pursuant to Section 2.1.

"**Borrowing Base**" means, at any time, the amount equal at such time to:

        (i)      eighty-five percent (85%) of the aggregate Net Amount of Eligible Domestic Accounts Receivable, plus

        (ii)      the least of (A) ninety percent (90%) of the Net Book Value of the Eligible Rental Equipment (B) sixty percent (60%) of the Net Equipment OLV of the Eligible Rental Equipment, and (C) $37,500,000; *provided* that prior to the inclusion of any new or additional Eligible Rental Equipment in the Borrowing Base, the Administrative Agent shall have obtained an appraisal thereof in accordance with Section 6.12, minus

        (iii)      the Availability Reserve,

in the case of (i) and (ii) above, as determined on the basis of the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.1(d). This definition of Borrowing Base will not be modified to increase the Advance Rates or dollar sublimits stated above or amend the definition of "Borrowing Base" (or any material defined terms used in such definition) such that more credit would be available to the Borrowers without the approval, as of any date of determination, of Lenders holding at least two-thirds of the sum of the Aggregate Commitments or, if the Aggregate Commitments have expired or terminated, Lenders holding in the aggregate more than two-thirds of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition); *provided* that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of these determinations.

"**Borrowing Base Certificate**" means a certificate duly executed by a Responsible Officer of the Parent Borrower substantially in the form of Exhibit G, or in such other form as is reasonably satisfactory to the Administrative Agent, by which Parent Borrower certifies to the calculation of the Borrowing Base.

"**Borrowing Base Collateral**" means the Accounts and Quail Rental Assets.

"**Budget**" means a written rolling 13-week budget setting forth on a line-item basis the Loan Parties' projected cash receipts and cash disbursements, on a weekly basis, which budget shall be in form and substance acceptable to the Administrative Agent and the Required Lenders and which budget may, at Parent Borrower's option, be updated not more frequently than once every four weeks in accordance with Section 6.16(d); *provided* that such updated Budget shall be in form and substance acceptable to the Administrative Agent and the Required Lenders.  To the extent that any updated Budget is not acceptable to the Administrative Agent and the Required Lenders, the then-existing approved budget will remain the "Budget" until replaced by an updated budget that is acceptable to the Administrative Agent and the Required Lenders.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York

US 5954263v9

or the state where the Administrative Agent's Office is located and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"**Carve-Out**" shall have the meaning given to such term in the Interim DIP Order or, when applicable, the Final DIP Order.

"**Carve-Out Reserve**" means, on any date, the estimated an amount of the Carve-Out as determined on a weekly basis by the Administrative Agent, but in no event shall the Carve-Out Reserve be less than $3,000,000.

"**Cases**" has the meaning specified in the introductory paragraph hereto.

"**Cash Collateral Agreement**" means that certain Cash Collateral Agreement dated as of October 30, 2018, by and between PKD and Bank of America.

"**Cash Collateralize**" has the meaning specified in Section 2.3(g).

"**Cash Equivalents**" means any of the following:

(a)        readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; *provided* that the full faith and credit of the United States of America is pledged in support thereof;

(b)        time deposits, Euro time deposits or overnight bank deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)        commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-2" (or the then equivalent grade) by Moody's or at least "A-2" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)        repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government;

(e)        securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political

6

subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's;

(f)     securities with maturities of 180 days or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of <u>clause (b)</u> of this definition;

(g)     Investments, classified in accordance with GAAP as current assets of PKD or any of its Subsidiaries, in money market investment programs which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in <u>clauses (a)</u> through <u>(f)</u> of this definition; and

(h)     shares of any money market fund for which an affiliate of Bank of America provides investment advisory services.

"**Cash Management Agreement**" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"**Cash Management Bank**" means (a) any Person that, at the time it enters into a Cash Management Agreement, is a Lender or an Affiliate of a Lender, in its capacity as a party to such Cash Management Agreement and (b) any Lender or Affiliate of a Lender that is party to a Cash Management Agreement with a Borrower or one of its Subsidiaries as of the Closing Date or the date that such Person or such Person's Affiliate becomes a Lender hereunder.

"**Cash Management Order**" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Required Lenders, (i) approving and authorizing the Loan Parties to use their existing cash management system, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code, (v) authorizing the Loan Parties to use existing bank accounts and existing business forms and (vi) approving and authorizing the continuation of cash management and credit card services and the payment of related fees pursuant to prepetition agreements.

"**Casualty Event**" means any loss, casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any Property or asset of the Parent Borrower, the other Borrowers or any of their respective Subsidiaries.

"**Casualty Reserve**" means any reserve in respect of any Significant Casualty Event affecting Borrowing Base Collateral established by the Administrative Agent in its Permitted Discretion.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and any successor statute.

"**CFC**" means a "controlled foreign corporation" as defined in Section 957 of the Code.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule,

7

guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Chapter 11 Plan**" means the joint chapter 11 plan of reorganization filed by the Loan Parties in the Cases to implement the Restructuring Transactions (as defined in the RSA) together with any amendments or supplements thereto, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"**Closing Date**" means the first date all of the conditions precedent in Section 4.1 are satisfied or waived in accordance with Section 10.1.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means all of the "Collateral" referred to in the Interim DIP Order or Final DIP Order, as applicable, and further described in the Collateral Documents, now owned or hereafter acquired by the Loan Parties, that is or is intended to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties (and excluding, for the avoidance of doubt, any Excluded Assets (as defined in the Security Agreement)). Notwithstanding the foregoing, in no event shall any Excluded Building be included in the definition of "Collateral"; *provided*, that the Loan Parties' interests in all lands situated under any Excluded Building shall be included in the definition of "Collateral".

"**Collateral Documents**" means, collectively, the Security Agreement, collateral assignments, Security Agreement Supplements, security agreements (including intellectual property security agreements), pledge agreements or other similar agreements, instruments, filings or recordings (and amendments to the foregoing, as applicable) delivered to the Administrative Agent pursuant to Section 6.9, and each of the other agreements, instruments, documents, filings or recordings that creates or purports to create (or continue) a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Commitment**" means, as to each Lender, its obligation to (a) make Loans to the Borrowers pursuant to Section 2.1, and (b) purchase participations in L/C Obligations, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.1 as of the Closing Date under the caption "Commitment" or opposite such caption in the Assignment and Assumption (or such other instrument) pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Committed Loan Notice**" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.2(a), which shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent (including any form of an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of PKD.

US 5954263v9

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" means a certificate duly executed by a Responsible Officer of the Parent Borrower substantially in the form of Exhibit D.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Chapter 11 Plan pursuant to Section 1129 of the Bankruptcy Code, which Confirmation Order shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Cash Balance**" means any unrestricted cash or Cash Equivalents of PKD and its Subsidiaries (other than any cash or Cash Equivalents held in a deposit account in any non-U.S. jurisdiction in the ordinary course of business with respect to amounts received from or anticipated to become due and owing in the near term to unaffiliated third parties).

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Cost**" means in respect of any Quail Rental Assets, the net cost of such Quail Rental Assets to Quail Tools after all cash and other discounts or other allowances which were allowed or taken by Quail Tools against the purchase price of such Quail Rental Assets.

"**Credit Extension**" means each of the following: (a) the making of a Loan and (b) an L/C Credit Extension.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means (a) when used with respect to Obligations other than Letter of Credit Fees, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Rate, if any, applicable to Base Rate Loans plus (iii) 2% per annum; *provided*, *however*, that with respect to a Eurodollar Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2% per annum, and (b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Rate plus 2% per annum.

9

"**Defaulting Lender**" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Parent Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the L/C Issuer or any Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within two Business Days of the date when due, (b) has notified the Parent Borrower, the Administrative Agent or the L/C Issuer in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Parent Borrower, to confirm in writing to the Administrative Agent and the Parent Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Parent Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) becomes the subject of a Bail-In Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Parent Borrower, any L/C Issuer, and each other Lender promptly following such determination.

"**Derivatives Counterparty**" has the meaning specified in Section 7.6.

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"**Dilution Percent**" means the percent, determined for the Borrowers most recent fiscal quarter, equal to (a) bad debt write-downs or write-offs, discounts, returns, promotions, credits, credit memos and other dilutive items with respect to Accounts, divided by (b) gross sales.

"**Dilution Reserve**" means the aggregate amount of reserves in an amount equal to the Value of the Eligible Domestic Accounts Receivable multiplied by 1.0% for each percentage point (or portion thereof) that the Dilution Percent exceeds 5.0%.

10

"**DIP Orders**" means, collectively, the Interim DIP Order and, upon entry thereof, the Final DIP Order, as applicable.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any Property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Dollar Equivalent**" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent or the applicable L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"**Dominion Account**" means a special account established by a Borrower at Bank of America or another bank acceptable to the Administrative Agent, over which the Administrative Agent will have exclusive dominion and control for withdrawal purposes at any time; provided that, the applicable Borrower may access the funds in the Dominion Account until such time as an Event of Default has occurred and is continuing.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.6(b)(iv), (v) and (vi) (subject to such consents, if any, as may be required under Section 10.6(b)(iii)).

"**Eligible Domestic Accounts Receivable**" means Accounts of the Borrowers, invoiced from operations in the United States, payable in Dollars and meeting the criteria specified below. In determining the amount to be so included, the face amount of such Accounts shall exclude any such Accounts that the Administrative Agent determines to be ineligible in its Permitted Discretion. Unless otherwise approved in writing by the Administrative Agent, no Account of a Borrower shall be deemed to be an Eligible Domestic Account Receivable if:

11

(a)      it arises out of a sale or rendition made by a Borrower to an Affiliate; or

(b)      (i) in the case of any Account due to any Borrower from an Account Debtor other than a Qualified Account Debtor, it is unpaid more than (A) 60 days after the original payment due date and/or (B) 90 days after the original invoice date and (ii) in the case of any Account due to any Borrower from an Account Debtor (or any Affiliate thereof) whose long-term unsecured debt obligations are rated at least A by Moody's or A2 by S&P (each, a "**Qualified Account Debtor**"), it is unpaid for more than (A) 90 days after the original payment due date and/or (B) 120 days after the original invoice date; or

(c)      it is from the same Account Debtor (or any Affiliate thereof) and fifty percent (50%) or more, in face amount, of all Accounts from such Account Debtor (and any Affiliate thereof) due to the Borrowers are ineligible pursuant to <u>clause (b)</u> above; or

(d)      the Account due to a Borrower, when aggregated with all other Eligible Domestic Accounts Receivable of such Account Debtor (and any Affiliate thereof) due to all of the Borrowers, exceeds fifteen percent (15%) in face value of all Eligible Domestic Accounts Receivable of the Borrowers combined then outstanding, to the extent of such excess; *provided*, to the extent that such Account is otherwise deemed to be an Eligible Domestic Account Receivable, that (i) if such Account is supported or secured by an irrevocable letter of credit in form and substance reasonably satisfactory to the Administrative Agent, issued or confirmed by a financial institution reasonably satisfactory to the Administrative Agent, and duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent), it shall be excluded to the extent of the face amount of such letter of credit for the purposes of such calculation; and (ii) with respect to the Account Debtors listed on Schedule 1.1(b) attached hereto (or any Affiliate thereof), the percentage referred to above shall be deemed to be the percentage set forth on such Schedule opposite the name of such Account Debtor; or

(e)      (i) the Account Debtor is also a creditor of the a Borrower, (ii) the Account Debtor has disputed its liability on, or the Account Debtor has made any claim with respect to, such Account or any other Account due from such Account Debtor to a Borrower, which has not been resolved or (iii) the Account otherwise is or may reasonably be expected to become subject to any right of setoff by the Account Debtor or with respect to which any other claim, counterclaim, chargeback, credit, defense, dispute, deduction, discount, recoupment, reserve, rebate, allowance or offset has been, or may reasonably be expected to be, asserted; *provided* that any Account deemed ineligible pursuant to this clause (e) shall only be ineligible to the extent of the amount owed by such Borrower to the Account Debtor, the amount of such dispute or claim, or the amount of such setoff, other claim, counterclaim, chargeback, credit, defense, dispute, deduction, discount, recoupment, reserve, rebate, allowance or offset, as applicable; *provided further*, that the portion of any Account that would otherwise be deemed ineligible pursuant to this underline{clause (e)} shall not be deemed ineligible pursuant to this underline{clause (e)} to the extent (i) supported or secured by an irrevocable letter of credit in form and substance reasonably satisfactory to the Administrative Agent, issued or confirmed by a financial institution reasonably satisfactory to the Administrative Agent, and duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent) or (ii) subject to a no-offset letter in form and substance reasonably satisfactory to the Administrative Agent; or

(f)      the Account Debtor has commenced a voluntary case under any Debtor Relief Law, as now constituted or hereafter amended, or made an assignment for the benefit of

US 5954263v9

creditors, or if a decree or order for relief has been entered by a court having jurisdiction over the Account Debtor in an involuntary case under any Debtor Relief Law, as now constituted or hereafter amended, or if any other petition or other application for relief under any Debtor Relief Law has been filed by or against the Account Debtor, or if the Account Debtor has filed a certificate of dissolution under applicable state law or shall be liquidated, dissolved or wound-up, or shall authorize or commence any action or proceeding for dissolution, winding-up or liquidation, or if the Account Debtor has failed, suspended business, is insolvent, has declared itself to be insolvent, is generally not paying its debts as they become due or has consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs (any such act or event an "**Act of Bankruptcy**") unless (i) (x) a court presiding and having primary jurisdiction over the applicable Act of Bankruptcy has entered an order or decree making the applicable Borrower a "critical vendor", and such order or decree is reasonably acceptable to the Administrative Agent and (y) such Account Debtor has obtained adequate post-petition financing to pay the Accounts of such Borrower in the sole discretion of the Administrative Agent and (ii) either (A) the payment of Accounts from such Account Debtor is secured by assets of, or guaranteed by, in either case in a manner satisfactory to the Administrative Agent, a Person with respect to which an Act of Bankruptcy has not occurred and that is acceptable to the Administrative Agent; (B) if the Account from such Account Debtor arises subsequent to a decree or order for relief with respect to such Account Debtor under any Debtor Relief Law, as now or hereafter in effect, the Administrative Agent shall have determined that the timely payment and collection of such Account will not be impaired; or (C) the payment of such Account is supported or secured by an irrevocable letter of credit in form and substance satisfactory to the Administrative Agent, issued or confirmed by a financial institution satisfactory to the Administrative Agent, and duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent); or

(g)     the sale is to an Account Debtor outside of the United States unless (i) such Account Debtor is a Qualified Account Debtor, (ii) such Account Debtor has supplied the applicable Borrower with an irrevocable letter of credit in form and substance satisfactory to the Administrative Agent, issued or confirmed by a financial institution satisfactory to the Administrative Agent and which has been duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent); or (iii) such Account is fully insured by credit insurance satisfactory to the Administrative Agent; *provided* that the maximum aggregate amount of Accounts eligible under (i), (ii) and (iii) above shall not exceed $2,500,000 at any time; or

(h)     the sale to the Account Debtor is on a bill-and-hold, cash-on-delivery, guarantied sale, sale-and-return, sale on approval or consignment basis or made pursuant to any other written agreement providing for repurchase or return or from a sale for personal, family or household purposes; or

(i)     the Administrative Agent determines in its Permitted Discretion that collection of such Account is insecure or that such Account may not be paid by reason of the Account Debtor's financial inability to pay; or

(j)     the Account Debtor is the United States of America, any State or any political subdivision, department, agency or instrumentality thereof, unless such Borrower duly assigns its rights to payment of such Account to the Administrative Agent pursuant to the Collateral Assignment of Claims Act of 1940 (31 U.S.C. § 3727 et seq.) or complies with any similar State or local law as the Administrative Agent shall require; or

13

(k)      the goods giving rise to such Account have not been delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been performed by such Borrower and accepted by the Account Debtor or the Account otherwise does not represent a final sale (except to the extent that such Account arises from a leasing transaction); or

(l)      any documentation relating to the Account fails to comply in any material respect with all applicable legal requirements, including, where applicable, the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board of Governors of the Federal Reserve System; or

(m)      the Administrative Agent does not have a valid and perfected first priority security interest in such Account or such Account is subject to any Lien (other than Permitted Liens) or the Account does not otherwise conform to the covenants, representations and warranties contained in the Credit Agreement, any Collateral Document or any of the other Loan Documents with respect to Accounts; or

(n)      it is subject to any adverse security deposit, progress payment, retainage (so long as such retainage is not then due and payable) or other similar advance made by or for the benefit of the applicable Account Debtor; *provided* that any Account deemed ineligible pursuant to this <u>clause (n)</u> shall only be ineligible to the extent of the amount of any such deposit, payment, retainage or other similar advance; or

(o)      it is evidenced by or arises under any instrument or chattel paper, or it has been reduced to judgment; or

(p)      the Account Debtor has a presence in a State requiring the filing of Notice of Business Activities Report or similar report in order to permit the applicable Borrower to seek judicial enforcement in such State of payment of such Account unless such Borrower has qualified to do business in such State or has filed a Notice of Business Activities Report or equivalent report for the then current year or such failure to file and inability to seek judicial enforcement is capable of being remedied without any material delay or material cost; or

(q)      it arises from progress billings or other billing arrangements such that the obligation of the Account Debtor with respect to such Account is conditioned upon such Borrower's satisfactory completion of any further performance under the agreement giving rise thereto; or

(r)      the Account Debtor is subject to Sanctions or any specially designated nationals list maintained by OFAC; or

(s)      it includes a billing for interest, fees or late charges, but only to the extent thereof; or

(t)      it is deemed by the Administrative Agent in its Permitted Discretion to be otherwise ineligible.

"**Eligible Rental Equipment**" means the appraised Quail Rental Assets. Unless otherwise approved in writing by the Administrative Agent, no Quail Rental Assets shall be Eligible Rental Equipment unless: (i) it is owned solely by Quail Tools and Quail Tools has

14

good, valid and marketable title thereto; (ii) it is at all times subject to the Administrative Agent's valid and duly perfected first priority security interest granted pursuant to the Interim DIP Order or Final DIP Order and no other Lien (other than (x) any Permitted Liens referred to in Section 7.1(a) or (y) any Lien of a landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possess any Quail Rental Assets unless a Lien Waiver or a Rent and Charges Reserve with respect thereto is required and exists, in each case in accordance with clause (ii) of the following sentence); (iii) Quail Tools shall at all times have title to such Quail Rental Assets and shall have the ability to direct the disposition thereof (subject only to the rights of any lessee under any lease in effect with respect to such Quail Rental Assets) and it is not located outside the continental United States, Alaska or the Gulf of Mexico waters subject to U.S. state or federal jurisdiction; (iv) it is not obsolete, unmerchantable, slow moving, in other than good working order and condition (ordinary wear and tear excepted), in each case, as determined by the Administrative Agent in its Permitted Discretion; (v) it conforms in all respects to the covenants, warranties and representations set forth in this Agreement or any other Collateral Document with respect to Quail Rental Assets; (vi) is not subject to any agreement that restricts the ability of Quail Tools to use, sell, transport or dispose of such Quail Rental Assets (other than this Agreement or any other Loan Document) or that restricts the Administrative Agent's ability to take possession of, sell or otherwise dispose of such Quail Rental Assets (subject only to the rights of any lessee under any lease in effect with respect to such Quail Rental Assets); or (vii) it does not constitutes "fixtures" under the applicable Laws of the jurisdiction in which such Quail Rental Assets is located. In no event shall Eligible Rental Equipment include (i) any Quail Rental Assets held under a Vendor Lease, (ii) any Quail Rental Assets held at a non-owned property (other than Quail Rental Assets on active lease located at customer locations in the ordinary course of business) unless the lessor or such Person in possession of the Quail Rental Assets has delivered a Lien Waiver (except if a Rent and Charges Reserve for amounts due or to become due with respect to such facility has been established by Administrative Agent in its Permitted Discretion); *provided* that a Lien Waiver shall not be required in connection with any Quail Rental Asset that is temporarily (A) located on leased premises, (B) held by a warehouseman, processor, shipper, broker or freight forwarder, or (C) held by a repairman, mechanic or bailee, in each case for a period of less than 60 days (it being understood that the Administrative Agent may still impose a Rent and Charges Reserve in such circumstances in its Permitted Discretion), (iii) any Quail Rental Asset that is being held for sale or is not used or held for use by Quail Tools in the Ordinary Course of Business, or (iv) any Quail Rental Assets otherwise deemed ineligible by the Administrative Agent in its Permitted Discretion.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Environmental Laws**" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, codes, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of PKD, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use,

handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with PKD within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 or 430 of the Code or Section 302 or 303 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by PKD or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by PKD or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon PKD or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Euro**" and "**EUR**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Eurodollar Base Rate**" means:

(a)     for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate ("**LIBOR**") or a comparable or successor rate, which rate is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such

US 5954263v9

quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "Eurodollar Base Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b)    for any rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day;

*provided* that to the extent a comparable or successor rate is approved by the Administrative Agent in connection with any rate set forth in this definition, the approved rate shall be applied in a manner consistent with market practice; *provided*, *further* that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

"**Eurodollar Rate**" means for any Interest Period with respect to a Eurodollar Rate Loan, or a Base Rate Loan the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, a rate per annum determined by the Administrative Agent pursuant to the following formula:

$$\text{Eurodollar Base Rate} \quad = \quad \frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

*provided* that, if the Eurodollar Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Eurodollar Reserve Percentage**" means, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency liabilities"). The Eurodollar Rate for each outstanding Eurodollar Rate Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"**Event of Default**" has the meaning specified in <u>Section 8.1</u>.

"**Excluded Building**" means any Building (as defined in the applicable Flood Insurance Regulations) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulations), now or hereafter owned or leased by the Loan Parties other than those

17

set forth on Schedule 1.1(c), as such schedule may be updated from time to time by the Administrative Agent by notice to Parent Borrower in connection with the Administrative Agent's completion of satisfactory flood due diligence and compliance.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Administrative Agent, any Lender, any L/C Issuer or any other recipient of any payment or required to be withheld or deducted from a payment to such recipient, (a) Taxes imposed on or measured by net income (however denominated), branch profits Taxes, and franchise Taxes, in each case, (i) imposed as a result of such recipient being organized under the Laws of, or having its principal office or, in the case of any Lender or L/C Issuer, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender or L/C Issuer, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender or L/C Issuer with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender or L/C Issuer acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Parent Borrower under Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.1(a)(ii) or (c), amounts with respect to such Taxes were payable either to such Lender or L/C Issuer's assignor immediately before such Lender or L/C Issuer became a party hereto or to such Lender or L/C Issuer immediately before it changed its Lending Office, (c) Taxes attributable to such recipient's failure to comply with Section 3.1(e), and (d) any Taxes imposed by FATCA.

"**Existing 6.75% Senior Notes**" means the $360,000,000 aggregate principal amount of senior unsecured notes of PKD issued pursuant to the Existing 6.75% Senior Notes Indenture.

"**Existing 7.50% Senior Notes**" means the $225,000,000 aggregate principal amount of senior unsecured notes of PKD issued pursuant to the Existing 7.50% Senior Notes Indenture.

"**Existing 6.75% Senior Notes Indenture**" means that certain Indenture, dated as of January 22, 2014, in respect of the Existing 6.75% Senior Notes, together with all instruments and other agreements entered into by PKD or its Subsidiaries in connection therewith.

"**Existing 7.50% Senior Notes Indenture**" means that certain Indenture, dated as of July 30, 2013, in respect of the Existing 7.50% Senior Notes, together with all instruments and other agreements entered into by PKD or its Subsidiaries in connection therewith.

"**Existing Credit Agreement**" means that certain Second Amended and Restated Credit Agreement dated as of January 26, 2015, by and among PKD and certain of its Subsidiaries party thereto as Borrowers, Bank of America, as administrative agent thereunder, the lenders party thereto and Bank of America, as an issuer of letters of credit thereunder, and the other parties thereto, as amended through July 12, 2018.

"**Existing Letters of Credit**" means each letter of credit described in Schedule 1.1(a) attached hereto.

"**Existing Senior Notes**" means (a) the Existing 6.75% Senior Notes and (b) the Existing 7.50% Senior Notes.

18

"**Exit Facility Commitment Letter**" means that certain Commitment Letter dated as of December [_], 2018, by and among Parent Borrower, Bank of America, Deutsche Bank AG New York Branch and Deutsche Bank Securities Inc.

"**Exit Facility Fee Letter**" means that certain Fee Letter dated as of December 12, 2018, by and among Parent Borrower, Bank of America, Deutsche Bank AG New York Branch and Deutsche Bank Securities Inc.

"**FASB ASC**" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" means the letter agreement, dated as of December [_], 2018, among PKD, the Administrative Agent and the Arrangers.

"**Final DIP Order**" means a Final Order of the Bankruptcy Court in substantially the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a Final Order and such other modifications as are satisfactory in form and substance to the Administrative Agent and Required Lenders in their discretion).

"**Final Order**" means an order or judgment of the Bankruptcy Court as entered on its docket that has not been reversed, stayed pursuant to any applicable bankruptcy rule or any other applicable rule of civil or appellate procedure, and as to which the time to appeal, petition for certiorari, or seek re-argument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari, or motion for re-argument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or a certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument has expired.

"**Flood Insurance Regulations**" means (a) the National Flood Insurance Act of 1968, as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection

US 5954263v9

Act of 1973, as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 U.S.C. § 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"**Foreign Benefit Event**" means, with respect to any Foreign Plan or Foreign Government Scheme or Arrangement, (i) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Plan or Foreign Government Scheme or Arrangement; (ii) the failure to register or loss of good standing (if applicable) with applicable regulatory authorities of any such Foreign Plan or Foreign Government Scheme or Arrangement required to be registered; or (iii) the failure of any Foreign Plan or Foreign Government Scheme or Arrangement to comply with any provisions of applicable law and regulations or with the terms of such Foreign Plan or Foreign Benefit Arrangement.

"**Foreign Government Scheme or Arrangement**" has the meaning specified in Section 5.12(e).

"**Foreign Lender**" means, with respect to a Borrower, any Lender that is organized under the Laws of a jurisdiction other than that in which a Borrower is resident for tax purposes (including such a Lender when acting in the capacity of an L/C Issuer). For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Plan**" has the meaning specified in Section 5.12(e).

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, with respect to the L/C Issuer, such Defaulting Lender's Applicable Percentage of the Outstanding Amount of all outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to

20

government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" means, as to any Person, any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided*, *however*, that the term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantors**" means the Parent Borrower, any other Borrower and the Subsidiary Guarantors.

"**Guaranty**" means that certain Guaranty Agreement dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time), together with each other guaranty and guaranty supplement delivered pursuant to Section 6.9.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to, or could give rise to liability under, any Environmental Law.

"**Honor Date**" has the meaning specified in Section 2.3(c)(i).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

        (a)      all obligations of such Person for borrowed money;

        (b)      all obligations of such Person for the deferred purchase price of Property or services (other than (i) trade payables incurred in the ordinary course of such Person's business, and (ii) any earn-out obligation until such obligation becomes a liability on the

balance sheet or such Person in accordance with GAAP and if not paid after becoming due and payable);

(c)     all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(d)     all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property);

(e)     all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(f)     the maximum amount of all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities;

(g)     all obligations of such Person, contingent or otherwise, to purchase, redeem, retire, defease or otherwise acquire for value (other than through the issuance of common stock of such Person) any Equity Interest in such Person or any other Person; *provided* that such obligations to acquire Equity Interests after 91 days after the Maturity Date shall not be Indebtedness for purposes of this clause (g);

(h)     all Guarantees of such Person in respect of any of the foregoing;

(i)     all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation; *provided*, *however*, if such Indebtedness is limited in recourse solely to such Property, then the amount of such Indebtedness for purposes of this Agreement will not exceed the fair market value of such Property; and

(j)     for purposes of Section 8.1(e) only, net obligations of such Person under any Swap Contract.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. Notwithstanding the foregoing, Indebtedness shall not include any indebtedness which has been defeased in accordance with GAAP or defeased pursuant to the deposit of cash or Cash Equivalents (in an amount sufficient to satisfy all such indebtedness obligations at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such indebtedness, and subject to no other Liens.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitees**" has the meaning specified in <u>Section 10.4(b)</u>.

"**Information**" has the meaning specified in <u>Section 10.7</u>.

"**Initial Budget**" means the Budget delivered by the Borrowers to the Administrative Agent on or prior to the Closing Date with respect to the 13-week period commencing with the week ending December 14, 2018, as approved by the Administrative Agent and the Required Lenders.

"**Intellectual Property**" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, trade dress, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Interest Payment Date**" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; and (b) as to any Base Rate Loan, the first day of each calendar month and the Maturity Date.

"**Interest Period**" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter; *provided* that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date.

"**Interim DIP Order**" means an interim order of the Bankruptcy Court authorizing and approving the financing contemplated by this Agreement on an interim basis, in the form of <u>Exhibit H</u> hereto, and as the same may be amended, supplemented or modified from time to time with the consent of the Administrative Agent and the Required Lenders.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person (including by way of Guarantee or otherwise), or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**ISP**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance of such Letter of Credit).

"**Issuer Documents**" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the applicable L/C Issuer and the Parent Borrower (or any Subsidiary) or in favor of such L/C Issuer and relating to any such Letter of Credit.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements or determination of an arbitration with, any Governmental Authority, in each case whether or not having the force of law.

"**L/C Advance**" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage. All L/C Advances shall be denominated in Dollars.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing. All L/C Borrowings shall be denominated in Dollars.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"**L/C Issuer Sublimit**" means, as of the Closing Date, (i) $10,000,000 in the case of Bank of America, and (ii) $10,000,000 in the case of Deutsche Bank AG New York Branch.

"**L/C Issuer**" means in respect of each Letter of Credit issued hereunder on or after the Closing Date, (a) Bank of America in its capacity as issuer of Letters of Credit hereunder, (b) Deutsche Bank AG New York Branch, or (c) any successor issuer of Letters of Credit hereunder.

"**L/C Obligations**" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.9. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**Lender**" has the meaning specified in the introductory paragraph hereto.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Parent Borrower and the Administrative Agent.

US 5954263v9

"**Letter of Credit**" means any letter of credit issued hereunder. All Letters of Credit issued hereunder shall be standby letters of credit. Letters of Credit may be issued in Dollars or in an Alternative Currency.

"**Letter of Credit Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant L/C Issuer.

"**Letter of Credit Expiration Date**" means the day that is seven days prior to the Maturity Date (or, if such day is not a Business Day, the next preceding Business Day).

"**Letter of Credit Fee**" has the meaning specified in <u>Section 2.3(i)</u>.

"**Letter of Credit Sublimit**" means an amount equal to $20,000,000. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments hereunder.

"**LIBOR Screen Rate**" means the LIBOR quote on the applicable screen page the Administrative Agent designates to determine LIBOR (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"**LIBOR Successor Rate**" has the meaning specified in <u>Section 2.15</u>.

"**LIBOR Successor Rate Conforming Changes**" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, as agreed between the Administrative Agent and the Parent Borrower, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent agrees with the Parent Borrower).

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Lien Waiver**" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, by which (a) for any material Quail Rental Assets located on leased premises, the lessor waives or subordinates any Lien it may have on such Quail Rental Assets, and agrees to permit the Administrative Agent to enter upon the premises and remove such Quail Rental Assets or to use the premises to store or dispose of such Quail Rental Assets; (b) for any Quail Rental Assets held by a warehouseman, processor, shipper, broker or freight forwarder, such Person waives or subordinates any Lien it may have on such Quail Rental Assets, agrees to hold any documents in its possession relating to such Quail Rental Assets as agent for the Administrative Agent, and agrees to deliver such Quail Rental Assets to the Administrative Agent upon request; (c) for any Quail Rental Assets held by a repairman,

mechanic or bailee, such Person acknowledges the Administrative Agent's Lien, waives or subordinates any Lien it may have on such Quail Rental Assets, and agrees to deliver such Quail Rental Assets to the Administrative Agent upon request or permit the Administrative Agent to take possession of such Quail Rental Assets and (d) for any Quail Rental Assets subject to a licensor's intellectual property rights, the licensor grants to the Administrative Agent the right, vis-à-vis such licensor, to enforce the Administrative Agent's Liens with respect to the Quail Rental Assets, including the right to dispose of it with the benefit of the Intellectual Property, whether or not a default exists under any applicable license. Notwithstanding the foregoing, a Lien Waiver shall not be required to be delivered in connection with any Quail Rental Assets that are temporarily (i) located on leased premises, (ii) held by a warehouseman, processor, shipper, broker or freight forwarder, or (iii) held by a repairman, mechanic or bailee, in each case for a period of less than 60 days.

"**Line Cap**" means, as of any date of determination, the lesser of (a) the Aggregate Commitments and (b) the Borrowing Base then in effect.

"**Liquidity**" means, as of any date of determination, the sum of (a) all domestic unrestricted cash of the Borrowers held in the Liquidity Account (*provided* that the amount of Liquidity contributed pursuant to this <u>clause (a)</u> shall not exceed $15,000,000) and (b) Availability.

"**Liquidity Account**" means the deposit account number 2863596694 maintained with Bank of America; *provided* that, such deposit account (i) is subject to no Liens other than the Administrative Agent's first priority security interest, and (ii) shall not be changed by the Parent Borrower without the prior written consent of the Administrative Agent.

"**Loan**" has the meaning specified in <u>Section 2.1</u>.

"**Loan Documents**" means, collectively, this Agreement, the Notes, the Guaranty, the Collateral Documents, the Fee Letter, and each Issuer Document, and, in each case, all other agreements and certificates executed by a Loan Party in connection with this Agreement (exclusive of commitment letters and term sheets pertaining to this Agreement as in effect on the Closing Date, and, for the avoidance of doubt, any Secured Cash Management Agreement).

"**Loan Parties**" means, collectively, Parent Borrower, any other Borrower and each Subsidiary Guarantor.

"**Material Adverse Effect**" means any event, development or circumstance that has had or could reasonably be expected to have (a) a material adverse effect upon the business, assets, properties or financial condition of PKD and its Subsidiaries taken as a whole (other than as a direct result of the commencement of the Cases and the continuation and prosecution thereof); (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity or enforceability against any Loan Party of any material provision of any Loan Document to which it is a party.

"**Maturity Date**" means the earliest of (a) four months after the Petition Date (provided that, subject only to (i) the absence of any Default or Event of Default and (ii) the then current effectiveness of either the RSA or an Acceptable Replacement RSA and upon payment of an extension fee in the amount separately agreed in the Fee Letter, such date shall be extended by

26

two additional months (such date, the "**Outside Maturity Date**")), (b) the date of acceleration of the Obligations in accordance with the terms hereof and/or the DIP Orders, as applicable, (c) the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of substantially all of the Loan Parties' assets, (d) the effective date of any Loan Party's plan of reorganization in the Cases that has been confirmed by an order of the Bankruptcy Court, (e) the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code and (f) dismissal of any of the Cases.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which PKD or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Amount**" means with respect to any Account at any time, the face amount of such Account on any date less (to the extent not otherwise deducted pursuant to the definition of "Eligible Domestic Accounts Receivable") any and all returns, rebates, discounts (which may, at the Administrative Agent's option, be calculated on shortest terms), credits, allowances or taxes (including any sales, excise or other taxes) at any time issued, owing, claimed by any Account Debtor, granted, outstanding or payable in connection with, or any interest accrued on the amount of, such Account at such time.

"**Net Book Value**" means (i) Cost minus (ii) accumulated depreciation calculated (A) in accordance with GAAP and (B) consistently with the Borrowers' accounting practices as of the Closing Date.

"**Net Cash Proceeds**" means, in connection with any issuance or sale of debt securities or instruments or the incurrence of loans, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"**Net Equipment OLV**" means, as reasonably determined by the Administrative Agent in good faith based on the most recent appraisal delivered in connection with the Existing Credit Agreement or the most recent appraisal conducted pursuant to Section 6.12, the appraised value of the Eligible Rental Equipment that is estimated to be recoverable in an orderly liquidation of such equipment (less applicable freight and duty charges, if any), net of liquidation expenses.

"**Net Loss Proceeds**" means, in connection with any Casualty Event, all insurance proceeds or other amounts actually received, less any deductibles applied or to be paid and any costs and expenses incurred in the collection thereof.

"**Non-Consenting Lender**" has the meaning set forth in Section 10.1.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-Extension Notice Date**" has the meaning specified in Section 2.3(b)(iii).

"**Note**" means a promissory note made by the Borrowers in favor of a Lender evidencing Loans made by such Lender to the Borrowers, substantially in the form of Exhibit C, or an amended, restated or replacement note otherwise reasonably satisfactory to the Administrative Agent.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, Letter of Credit or Secured Cash Management Agreement, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising; *provided*, *that* (a) obligations of the Parent Borrower or any other Loan Party under any Secured Cash Management Agreement shall constitute "Obligations" hereunder only until the Termination Date and (b) any release of Collateral or Loan Parties (other than the Parent Borrower) effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under the Secured Cash Management Agreements.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Ordinary Course of Business**" means with respect to any transaction involving any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, limited partnership, joint venture, trust or other form of business entity, the partnership, limited partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to any Lender or L/C Issuer, Taxes imposed as a result of a present or former connection between such Lender or L/C Issuer and the jurisdiction imposing such Tax (other than connections arising from such Lender or L/C Issuer having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment pursuant to Section 3.6).

"**Outstanding Amount**" means (a) with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date; (b) with respect to any L/C Obligations that are not Cash Collateralized on any date, the Dollar Equivalent of the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrowers of Unreimbursed Amounts or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date.

"**Parent Borrower**" has the meaning specified in Section 11.1.

"**Participant**" has the meaning specified in Section 10.6(d).

"**Participating Member State**" means any member state of the European Union that has the Euro as its lawful currency in accordance with any EMU Legislation.

"**Payment Items**" means each check, draft or other item payable to a Borrower, including those constituting proceeds of any collateral.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by PKD or any ERISA Affiliate or to which PKD or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Permitted Discretion**" means a determination made in the exercise, in good faith, of reasonable business judgment (from the perspective of a secured, asset-based lender).

"**Permitted Liens**" means (a) as used in the definition of Eligible Domestic Accounts Receivable, any Liens permitted by Sections 7.1(a) (only to the extent then inchoate) or (h) or (b) for other purposes, any Liens permitted by Section 7.1.

"**Permitted Variance**" has the meaning specified in Section 6.16(b).

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the recitals hereto.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by PKD or any of its Subsidiaries or, with respect to any such plan that is subject to Section 412 or 403 of the Code or Section 302 or 303 or Title IV of ERISA, any ERISA Affiliate.

"**Platform**" has the meaning specified in Section 6.2.

"**Pledged Equity Interests**" has the meaning specified in the Security Agreement.

"**Property**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Equity Interests.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" has the meaning specified in Section 6.2.

"**Quail Rental Assets**" means all inventory (as defined in the UCC) owned by Quail Tools which is of a type offered for lease in the Ordinary Course of Business as conducted on the Closing Date.

"**Quail Tools**" means Quail Tools, L.P. an Oklahoma limited partnership.

"**Register**" has the meaning specified in Section 10.6(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, advisors and representatives of such Person and of such Person's Affiliates.

"**Removal Effective Date**" has the meaning specified in Section 9.6.

"**Rent and Charges Reserve**" means the aggregate of (a) all past due rent and other amounts owing by a Borrower to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Eligible Rental Equipment or could assert a Lien on any Eligible Rental Equipment; and (b) a reserve as determined in the Administrative Agent in its Permitted Discretion in respect of rent and other charges that could be payable to any such Person, unless it has executed a Lien Waiver. Rent payable under Capitalized Leases will not be included in the Rent and Charges Reserve.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, (a) at any time there are two or fewer unaffiliated Lenders, all Lenders, and (b) at any time there are three or more unaffiliated Lenders, Lenders holding more than 50% of the Aggregate Commitments or, if the Aggregate Commitments have expired or terminated, Lenders holding in the aggregate more than 50% of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition); *provided* that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Requirement of Law**" means as to any Person, any Law applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Resignation Effective Date**" has the meaning specified in Section 9.6.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer, or controller of a Loan Party and (i) solely for purposes of delivery of incumbency certificates pursuant to Section 4.1 or any similar requirement under any Loan

30

Document, the secretary or any assistant secretary of such Loan Party, (ii) with respect to financial matters, the chief financial officer of such Loan Party, (iii) in the case of Compliance Certificates or Borrowing Base Certificates, the chief financial officer, controller or the treasurer of such Loan Party, and (iv) solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent (and, in each case, for any Loan Party that is a limited partnership, the foregoing individuals of its general partner). Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" has the meaning specified in Section 7.6.

"**Revaluation Date**" means with respect to any Letter of Credit, each of the following: (a) each date of issuance of a Letter of Credit denominated in an Alternative Currency, (b) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (c) each date of any payment by the applicable L/C Issuer under any Letter of Credit denominated in an Alternative Currency, (d) [reserved] and (e) such additional dates as the Administrative Agent or the applicable L/C Issuer shall determine or the Required Lenders shall require.

"**RSA**" means that certain Restructuring Support Agreement dated as of December 12, 2018, by and among the Loan Parties and the Consenting Stakeholders (as defined therein), as in effect on the Closing Date.

"**S&P**" means S&P Global Ratings, a division of S&P Global, Inc. and any successor thereto.

"**Sanction(s)**" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, or Her Majesty's Treasury ("**HMT**").

"**Scheduled Unavailability Date**" has the meaning specified in Section 2.15.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Cash Management Agreement**" means any Cash Management Agreement that is entered into by and between any Loan Party and any Cash Management Bank.

"**Secured Parties**" means, collectively, the Administrative Agent, each other Agent, the Lenders, the L/C Issuers, the Cash Management Banks, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.5, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"**Security Agreement**" means that certain Pledge and Security Agreement dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time) made by the Loan Parties from time to time party thereto in favor of the Administrative Agent.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**Significant Casualty Event**" means any Casualty Event where the fair market value of the resulting loss of Property shall be in excess of $5,000,000 (or its equivalent in other currencies), determined as of the date of the occurrence of an applicable Casualty Event; *provided* that if insurance or other recoveries in connection with such Casualty Event reduce the net loss therefrom to an amount less than $5,000,000, then such Significant Casualty Event shall be deemed not to have occurred and any Casualty Reserve established therefor shall be released.

"**Specified Personal Property**" means any Property of a type in which a Lien is purported to be granted pursuant to the Security Agreement.

"**Spot Rate**" for a currency means the rate determined by the Administrative Agent or the relevant L/C Issuer, as applicable, to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; *provided* that the Administrative Agent or the relevant L/C Issuer may obtain such spot rate from another financial institution designated by the Administrative Agent or the relevant L/C Issuer if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; and *provided further* that the relevant L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Letter of Credit denominated in an Alternative Currency.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of PKD.

"**Subsidiary Guarantors**" means, collectively, each Subsidiary of PKD listed on Schedule 1.1(d) hereto.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b)

32

any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Synthetic Debt**" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments or other charges in the nature of a tax imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" means such time as when (a) all Commitments have been terminated or expired, (b) all Obligations have been paid in full in cash (other than indemnification obligations and other contingent obligations not then due and payable and as to which no claim has been made as at the time of determination) and (c) all Letters of Credit have terminated or expired (other than Letters of Credit as to which cash collateral has been provided to the applicable L/C Issuer in an amount equal to the amount of such outstanding Letters of Credit or other arrangements satisfactory to the applicable L/C Issuer (in the sole discretion of such L/C Issuer) have been made).

"**Testing Period**" has the meaning specified in Section 6.16(b)(i).

"**Threshold Amount**" means $5,000,000.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" mean the United States of America.

"**Unreimbursed Amount**" has the meaning specified in Section 2.3(c)(i).

"**U.S. Tax Compliance Certificate**" has the meaning specified in Section 3.1(e)(ii)(B)(III).

"**Value**" means (a) for an Account, its face amount, net of any returns, rebates, discounts (calculated on the shortest terms then available to the applicable Account Debtor), credits, allowances or Taxes (including sales, excise or other taxes) that have been or could properly be claimed by the Account Debtor or any other Person and (b) with reference to the value of the Quail Rental Assets, value determined on the basis of the lower of cost or market of such Quail Rental Assets in accordance with GAAP, with the cost thereof calculated on a first-in, first-out basis determined in accordance with GAAP.

"**Vendor Lease**" means a lease pursuant to which Goods (as defined in the UCC) are leased from a Vendor Lessor, whether or not such lease constitutes an operating or a capital lease under GAAP and whether or not such lease constitutes a true lease or a secured transaction under the UCC or any other Requirement of Law.

"**Vendor Lessor**" means a Person who leases Goods (as defined in the UCC) to another Person pursuant to a Vendor Lease.

"**Weekly BBC Trigger Period**" means the period (a) commencing on the day that an Event of Default occurs or Availability is less than $30,000,000 (unless the Administrative Agent gives notice to the Parent Borrower that such period shall not commence on such date, in which case such period shall commence on any date during which such Event of Default exists, or Availability is less than $30,000,000, and in either case the Administrative Agent gives notice to the Parent Borrower that such period then commences) and (b) continuing until, during each of the preceding 60 consecutive days, no Event of Default has existed and Availability has been equal to or greater than $30,000,000.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

US 5954263v9

Section 1.2    <u>Other Interpretive Provisions</u>. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "<u>include</u>," "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "without limitation." The word "<u>will</u>" shall be construed to have the same meaning and effect as the word "<u>shall</u>." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including;</u>" the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding;</u>" and the word "<u>through</u>" means "<u>to and including.</u>"

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.3    <u>Accounting Terms</u>.

(a)    <u>Generally</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Parent Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Parent Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change

35

therein and (ii) the Parent Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the Audited Financial Statements for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

Section 1.4    Rounding. Any financial ratios required to be maintained by the Parent Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.5    Exchange Rates; Currency Equivalents. (a) The Administrative Agent or the relevant L/C Issuer, as applicable, shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of L/C Credit Extensions and Outstanding Amounts denominated in Alternative Currencies. Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur. Except for purposes of financial statements delivered by Loan Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as so determined by the Administrative Agent or the relevant L/C Issuer, as applicable.

(b)    Wherever in this Agreement in connection with the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent or the relevant L/C Issuer, as the case may be.

(c)    The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Eurodollar Rate" or with respect to any comparable or successor rate thereto.

Section 1.6    Alternative Currencies. (a) The Parent Borrower may from time to time request that Letters of Credit be issued in a currency other than Dollars; *provided* that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars. In the case of any such request with respect to the issuance of Letters of Credit, such request shall be subject to the approval of the Administrative Agent and the L/C Issuer that is to issue such Letter of Credit.

(b)      Any such request shall be made to the Administrative Agent not later than 10:00 a.m., 20 Business Days prior to the date of the desired L/C Credit Extension (or such other time or date as may be agreed by the Administrative Agent and the applicable L/C Issuer, in their sole discretion). In the case of any such request pertaining to Letters of Credit, the Administrative Agent shall promptly notify each L/C Issuer thereof. Each L/C Issuer shall notify the Administrative Agent, not later than 10:00 a.m., ten Business Days after receipt of such request whether it consents, in its sole discretion, to the issuance of Letters of Credit in such requested currency.

(c)      Any failure by an L/C Issuer to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by such L/C Issuer to permit Letters of Credit to be issued in such requested currency. If the Administrative Agent and any L/C Issuer consent to the issuance of Letters of Credit in such requested currency, the Administrative Agent shall so notify the Parent Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Letter of Credit issuances. If the Administrative Agent shall fail to obtain consent to any request for an additional currency under this Section 1.6, the Administrative Agent shall promptly so notify the Parent Borrower.

Section 1.7      Change of Currency. (a) Each obligation of the Borrowers to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euro at the time of such adoption (in accordance with the EMU Legislation). If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency.

(b)      Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

(c)      Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

Section 1.8      Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Central Time (daylight savings or standard, as applicable).

Section 1.9      Letter of Credit Amounts. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the Dollar Equivalent of the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the Dollar Equivalent of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

Section 1.10   Uniform Commercial Code. Terms relating to Collateral used and not otherwise defined herein that are defined in the UCC shall have the meanings set forth in the UCC, as applicable and as the context requires.

**ARTICLE II**

**THE COMMITMENTS AND CREDIT EXTENSIONS**

Section 2.1   The Loans.  Subject to the terms and conditions set forth herein and in the DIP Orders, each Lender severally agrees to make revolving loans (each such loan, a "**Loan**") to the Borrowers in Dollars from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Commitment; *provided*, *however*, that immediately after giving effect to any Borrowing, (i) the Total Outstandings shall not exceed the Line Cap and (ii) the aggregate Outstanding Amount of the Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such Lender's Commitment. Within the limits of the Line Cap, and subject to the other terms and conditions hereof and in the DIP Orders, the Borrowers may borrow under this Section 2.1, prepay under Section 2.5, and reborrow under this Section 2.1. Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein.

Section 2.2   Borrowings, Conversions and Continuations of Loans. (a) Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Parent Borrower's irrevocable notice to the Administrative Agent, which may be given by (A) telephone or (B) a Committed Loan Notice; *provided* that any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a written Committed Loan Notice. Each such Committed Loan Notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing (except with respect to a Borrowing of Eurodollar Rate Loans on the Closing Date, as provided in clause (ii) hereof) of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans and (ii) on the requested date of (x) any Borrowing of Base Rate Loans or (y) a Borrowing of Eurodollar Rate Loans on the Effective Date. Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof. Except as provided in Section 2.3(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each Committed Loan Notice shall specify (i) whether the Parent Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted and (v) the applicable Borrower. If the Parent Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)   Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of Loans, and if no timely notice of a conversion or continuation is provided by the Parent Borrower, the

38

Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans as described in the preceding subsection. In the case of a Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 2:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction or waiver pursuant to the terms of this Agreement of the applicable conditions set forth in Section 4.2 (and, if such Borrowing is the initial Credit Extension, Section 4.1), the Administrative Agent shall make all funds so received available to the Parent Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Parent Borrower on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Parent Borrower; *provided*, *however*, that if, on the date a Committed Loan Notice with respect to a Borrowing is given by the Parent Borrower, there are L/C Borrowings outstanding, then the proceeds of such Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and, second, shall be made available to the Parent Borrower as provided above.

(c)      Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan. During the existence of an Event of Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)      The Administrative Agent shall promptly notify the Parent Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.

(e)      After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than three Interest Periods in effect.

(f)      Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all of the portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Parent Borrower, the Administrative Agent, and such Lender.

Section 2.3      Letters of Credit.

(a)      The Letter of Credit Commitment. (i) (A) Subject to the terms and conditions set forth herein and in the DIP Orders, each L/C Issuer agrees, in reliance upon the agreements of the Lenders set forth in this Section 2.3, (x) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit denominated in Dollars or in one or more Alternative Currencies for the account of the Parent Borrower or its Subsidiaries, and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.3(b), and (y) to honor drawings under the Letters of Credit; and (B) the Lenders severally agree to participate in Letters of Credit issued for the account of the Parent Borrower or its Subsidiaries and any drawings thereunder; *provided* that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Line Cap, (y) the aggregate Outstanding Amount of the Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such Lender's Commitment and

(z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Parent Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Parent Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof and in the DIP Orders, the Parent Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Parent Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

    (ii)    No L/C Issuer shall issue any Letter of Credit if:

    (A)    subject to <u>Section 2.3(b)(iii)</u>, the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Required Lenders have approved such expiry date; or

    (B)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either (x) all the Lenders have approved such expiry date or (y) the Parent Borrower Cash Collateralizes such Letter of Credit in an amount equal to 105% of the stated amount of such Letter of Credit on the date such Letter of Credit is issued;

    (iii)    No L/C Issuer shall be under any obligation to issue any Letter of Credit if:

    (A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or request that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement not in effect on the Closing Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date (or, if different, the date on which such L/C Issuer became an L/C Issuer hereunder) and which such L/C Issuer in good faith deems material to it;

    (B)    the issuance of such Letter of Credit would violate one or more policies of such L/C Issuer applicable to letters of credit generally;

    (C)    except as otherwise agreed by the Administrative Agent and such L/C Issuer, such Letter of Credit is in an initial stated amount less than $25,000;

    (D)    except as otherwise agreed by the Administrative Agent and such L/C Issuer, such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency;

    (E)    such L/C Issuer does not as of the issuance date of such requested Letter of Credit issue Letters of Credit in the requested currency;

(F)     such Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder;

(G)     immediately after giving effect to such issuance, the outstanding L/C Obligations in respect of all Letters of Credit issued by such L/C Issuer would exceed such L/C Issuer's L/C Issuer Sublimit; or

(H)     a default of any Lender's obligations to fund under Section 2.3(c) exists or any Lender is at such time a Defaulting Lender hereunder, unless the applicable L/C Issuer has entered into arrangements satisfactory to the L/C Issuer with the Parent Borrower or such Lender to eliminate such L/C Issuer's risk with respect to such Lender.

(iv)     No L/C Issuer shall amend any Letter of Credit if such L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof.

(v)     No L/C Issuer shall be under any obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(vi)     Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article IX included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to each L/C Issuer.

(b)     Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

Subject to Section 1.6:

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Parent Borrower delivered to the applicable L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Parent Borrower. Such Letter of Credit Application must be received by the applicable L/C Issuer and the Administrative Agent not later than 10:00 a.m. at least two Business Days (or such later date and time as the Administrative Agent and such L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of

41

any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the applicable L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer (I) the Letter of Credit to be amended; (II) the proposed date of amendment thereof (which shall be a Business Day); (III) the nature of the proposed amendment; and (IV) such other matters as such L/C Issuer may reasonably require. Additionally, the Parent Borrower shall furnish to the applicable L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as such L/C Issuer or the Administrative Agent may reasonably require.

(ii)     Promptly after receipt of any Letter of Credit Application, the applicable L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Parent Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof. Unless such L/C Issuer has received written notice from any Lender, the Administrative Agent or any Loan Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in <u>Section 4.2</u> (and, if such L/C Credit Extension is to be made on the Closing Date, <u>Section 4.1</u> shall not then be satisfied), then, subject to the terms and conditions hereof and in the DIP Orders, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of a Borrower (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with such L/C Issuer's usual and customary business practices. Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the applicable L/C Issuer a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Applicable Percentage multiplied by the amount of such Letter of Credit.

(iii)     If the Parent Borrower so requests in any applicable Letter of Credit Application, the applicable L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "**<u>Auto-Extension Letter of Credit</u>**"); *provided* that any such Auto-Extension Letter of Credit must permit such L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "**<u>Non-Extension Notice Date</u>**") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the applicable L/C Issuer, the Parent Borrower shall not be required to make a specific request to such L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; *provided*, *however*, that the applicable L/C Issuer shall not permit any such extension if (A) such L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by

42

reason of the provisions of clause (ii) or (iii) of Section 2.3(a) or otherwise), or the DIP Orders, or (B) it has received notice (which may be by telephone or in writing) on or before the day that is seven Business Days before the Non-Extension Notice Date (I) from the Administrative Agent that the Required Lenders have elected not to permit such extension or (II) from the Administrative Agent, any Lender or the Parent Borrower that one or more of the applicable conditions specified in Section 4.2 is not then satisfied, and in each such case directing such L/C Issuer not to permit such extension.

(iv)     Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the Parent Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment. On a monthly basis, each L/C Issuer shall deliver to the Administrative Agent a complete list of all outstanding Letters of Credit issued by such L/C Issuer as provided in Section 2.3(f).

(c)     Drawings and Reimbursements; Funding of Participations.

(i)     Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the applicable L/C Issuer shall notify the Parent Borrower and the Administrative Agent thereof. In the case of a Letter of Credit denominated in an Alternative Currency, the Parent Borrower shall reimburse the applicable L/C Issuer in such Alternative Currency, unless (A) such L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (B) in the absence of any such requirement for reimbursement in Dollars, the Parent Borrower shall have notified such L/C Issuer promptly following receipt of the notice of drawing that the Parent Borrower will reimburse such L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing under a Letter of Credit denominated in an Alternative Currency, the applicable L/C Issuer shall notify the Parent Borrower of the Dollar Equivalent of the amount of the drawing promptly following the determination thereof. Not later than (x) 12:30 p.m. on the date of any payment by the applicable L/C Issuer under a Letter of Credit (each such date, an "**Honor Date**") if the Parent Borrower shall have received notice of such payment prior to 10:00 a.m. on such date or (y) if such notice has not been received by the Parent Borrower prior to such time on the Honor Date, then 12:30 p.m. on the Business Day immediately following the day that the Parent Borrower receives such notice, the Parent Borrower shall reimburse the applicable L/C Issuer in an amount equal to the amount of such drawing and in the applicable currency. If the Parent Borrower fails to so reimburse the applicable L/C Issuer by such time, such L/C Issuer shall promptly notify the Administrative Agent, who shall then promptly notify each Lender, of the Honor Date, the amount of the unreimbursed drawing (expressed in Dollars in the amount of the Dollar Equivalent thereof in the case of a Letter of Credit denominated in an Alternative Currency) (the "**Unreimbursed Amount**"), and the amount of such Lender's Applicable Percentage thereof. In such event, the Parent Borrower shall be deemed to have requested a Borrowing of Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.2 for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Commitments and the conditions set forth in Section 4.2 (other than the delivery of a Committed Loan Notice). Any

43

notice given by an L/C Issuer or the Administrative Agent pursuant to this Section 2.3(c)(i) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     Each Lender shall upon any notice pursuant to Section 2.3(c)(i) make funds available to the Administrative Agent for the account of the applicable L/C Issuer, in Dollars, at the Administrative Agent's Office in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 12:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.3(c)(iii), each Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Parent Borrower in such amount. The Administrative Agent shall remit the funds so received to the applicable L/C Issuer in Dollars.

(iii)     With respect to any Unreimbursed Amount that is not fully refinanced by a Borrowing of Base Rate Loans because the conditions set forth in Section 4.2 cannot be satisfied or for any other reason, the Parent Borrower shall be deemed to have incurred from the applicable L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate. In such event, each Lender's payment to the Administrative Agent for the account of the applicable L/C Issuer pursuant to Section 2.3(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.3.

(iv)     Until each Lender funds its Loan or L/C Advance pursuant to this Section 2.3(c) to reimburse the applicable L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Percentage of such amount shall be solely for the account of such L/C Issuer.

(v)     Each Lender's obligation to make Loans or L/C Advances to reimburse each L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.3(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against any L/C Issuer, the Parent Borrower, any Subsidiary or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided*, *however*, that each Lender's obligation to make Loans pursuant to this Section 2.3(c) is subject to the conditions set forth in Section 4.2 (other than delivery by the Parent Borrower of a Committed Loan Notice). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Parent Borrower to reimburse each L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Lender fails to make available to the Administrative Agent for the account of the applicable L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.3(c) by the time specified in Section 2.3(c)(ii), such L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest

44

thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by such L/C Issuer in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by such L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Loan included in the relevant Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be. A certificate of the relevant L/C Issuer submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.3(c)(vi) shall be conclusive absent manifest error.

(d)    Repayment of Participations.

(i)    At any time after any L/C Issuer has made a payment under any Letter of Credit and has received from any Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.3(c), if the Administrative Agent receives for the account of any L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from a Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Applicable Percentage thereof in Dollars and in the same funds as those received by the Administrative Agent.

(ii)    If any payment received by the Administrative Agent for the account of any L/C Issuer pursuant to Section 2.3(c)(i) is required to be returned under any of the circumstances described in Section 10.5 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each Lender shall pay to the Administrative Agent for the account of the applicable L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Obligations Absolute. The obligation of the Parent Borrower to reimburse each L/C Issuer for each drawing under each Letter of Credit issued by such L/C Issuer and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement and the DIP Orders under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that the Parent Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), any L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

45

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)     any payment by the applicable L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by such L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)     any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to the Parent Borrower or any Subsidiary or in the relevant currency markets generally; or

(vi)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Parent Borrower or any Subsidiary.

The Parent Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Parent Borrower's instructions or other irregularity, the Parent Borrower will promptly, but in an any event, within three (3) Business Days of receipt of such copy, notify the applicable L/C Issuer. The Parent Borrower shall be conclusively deemed to have waived any such claim against such L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)     Role of the L/C Issuers.  Each Lender and the Parent Borrower agree that, in paying any drawing under a Letter of Credit, the L/C Issuers shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuers, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Parent Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided*, *however*, that this assumption is not intended to, and shall not, preclude the Parent Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law, in equity or under any other agreement. None of the L/C Issuers, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.3(e); *provided*, *however*, that anything in such clauses to the contrary notwithstanding, the Parent Borrower may have a claim against the

46

applicable L/C Issuer, and the applicable L/C Issuer may be liable to the Parent Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Parent Borrower which the Parent Borrower proves were caused by such L/C Issuer's willful misconduct or gross negligence or such L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)    Cash Collateral.

(i)    Upon the request of the Administrative Agent, (A) if any L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing or (B) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Parent Borrower shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations.

(ii)    The Administrative Agent may, with respect to outstanding Letters of Credit issued in an Alternative Currency, at any time and from time to time after the initial deposit of Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations.

(iii)    Sections 2.5, 2.16 and Section 8.2(c) set forth certain additional requirements to deliver Cash Collateral hereunder. For purposes of this Section 2.3, Section 2.5, Section 2.16 and Section 8.2(c), "**Cash Collateralize**" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the L/C Issuers and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the L/C Issuers (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrowers hereby grant to the Administrative Agent, for the benefit of the L/C Issuers and the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in blocked deposit accounts at Bank of America. Reasonable interest shall accrue on any such cash deposit, which accrued interest shall be for the account of the applicable Borrower, subject to this Agreement and the DIP Orders. If at any time the Administrative Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Parent Borrower will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied,

to the extent permitted under applicable Laws and the DIP Orders, to reimburse the applicable L/C Issuer.

(h)     <u>Applicability of ISP</u>. Unless otherwise expressly agreed by the applicable L/C Issuer and the Parent Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each standby Letter of Credit.

(i)     <u>Letter of Credit Fees</u>. The Parent Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, in Dollars, a Letter of Credit fee (the "**Letter of Credit Fee**") for each Letter of Credit equal to the Applicable Rate for Eurodollar Rate Loans multiplied by the Dollar Equivalent of the daily amount available to be drawn under such Letter of Credit. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.9</u>. Letter of Credit Fees shall be (A) due and payable on the first day of each calendar month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand and (B) computed on a monthly basis in arrears. Notwithstanding anything to the contrary contained herein, while any Letter of Credit Fee is not paid when due, all such overdue Letter of Credit Fees shall accrue at the Default Rate.

(j)     <u>Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer</u>. The Parent Borrower shall pay directly to the applicable L/C Issuer for its own account, in Dollars, a fronting fee with respect to each standby Letter of Credit, at the rate per annum agreed upon from time to time in writing between the Parent Borrower and such L/C Issuer, but in any event not to exceed 0.125% per annum, computed on the Dollar Equivalent of the daily amount available to be drawn under such Letter of Credit on a monthly basis in arrears. Such fronting fee for each standby Letter of Credit shall be due and payable on the first day of each calendar month in respect of the most recently-ended monthly period (or portion thereof, in the case of the first payment), commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.9</u>. In addition, the Parent Borrower shall pay directly to each L/C Issuer for its own account, in Dollars, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k)     <u>Conflict with Issuer Documents</u>. In the event of any conflict or inconsistency between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(l)     <u>Letters of Credit Issued for Subsidiaries</u>. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Parent Borrower shall be obligated to reimburse the applicable L/C Issuer hereunder for any and all drawings under such Letter of Credit. The Parent Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Parent Borrower, and that the Parent Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

Section 2.4    <u>Borrowing Base Collateral Casualty Event</u>.  Upon the occurrence of a Significant Casualty Event related to any Borrowing Base Collateral, the Administrative Agent, in the exercise of its Permitted Discretion, may establish or increase the Casualty Reserve for purposes of calculating the Borrowing Base pursuant to the definition thereof set forth in <u>Section 1.1</u> as a result thereof.

Section 2.5    <u>Prepayments</u>.

(a)    <u>Optional</u>. Each Borrower may, upon notice from the Parent Borrower to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; *provided* that (i) such notice must be in a form reasonably acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; (ii) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if Eurodollar Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment. If such notice is given by the Parent Borrower, the applicable Borrower shall make such prepayment and the prepayment amount specified in such notice shall be due and payable on the date specified therein, *provided*, *however*, that notwithstanding anything to the contrary contained herein, any such prepayment notice may be conditioned upon the effectiveness of other credit facilities or the closing of one or more securities offerings or other transactions; *provided*, *further*, that, the Parent Borrower must affirmatively rescind any such prepayment notice by a subsequent written notice to the Administrative Agent, if the condition in an original prepayment notice shall fail to be satisfied by the proposed effective date of such prepayment, and upon the Administrative Agent's receipt of such rescinding notice, shall have no obligation to make any prepayment in respect of such earlier prepayment notice. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to <u>Section 3.5</u>.

(b)    <u>Mandatory</u>.

(i)    If for any reason the Total Outstandings at any time exceed the Line Cap at such time, the Borrowers shall immediately prepay Loans and/or the Parent Borrower shall Cash Collateralize the L/C Obligations (other than the L/C Borrowings) in an aggregate amount equal to such excess. The Administrative Agent may, at any time and from time to time after the initial deposit of such Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of further exchange rate fluctuations.

(ii)    Each prepayment of Loans pursuant to the foregoing <u>Section 2.5(b)(i)</u> shall be applied in the following manner: first, ratably to the L/C Borrowings, second, ratably to the outstanding Loans, and, third, to Cash Collateralize the remaining L/C Obligations. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any

49

further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the relevant L/C Issuer or the Lenders, as applicable.

Section 2.6    <u>Termination or Reduction of Commitments</u>.

(a)    <u>Optional</u>. The Parent Borrower may, upon notice to the Administrative Agent, terminate the Aggregate Commitments or Letter of Credit Sublimit, or from time to time permanently reduce the Aggregate Commitments or the Letter of Credit Sublimit; *provided* that (i) any such notice shall be received by the Administrative Agent not later than 10:00 a.m. three (3) Business Days prior to the date of any such termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Parent Borrower shall not terminate or reduce (A) the Aggregate Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Line Cap, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (iv) if, after giving effect to any reduction of the Aggregate Commitments, the Letter of Credit Sublimit exceeds the amount of the Aggregate Commitments, the Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(b)    <u>Application of Commitment Reductions; Payment of Fees</u>. The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit or the Commitments under this <u>Section 2.6</u>. Upon any reduction of the Aggregate Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees accrued hereunder until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

Section 2.7    <u>Repayment of Loans</u>.

(a)    Each Borrower shall repay to the Lenders on the Maturity Date the aggregate principal amount of all Loans outstanding on such date.

(b)    During the continuance of an Event of Default, all funds that flow into a Dominion Account shall immediately be applied to the Obligations, first to unpaid accrued interest on Base Rate Loans, second to the unpaid principal of Base Rate Loans, third to accrued interest on Eurodollar Loans and fourth, together with such amounts, to the unpaid principal of the Eurodollar Loans in such manner as to minimize amounts due under <u>Section 3.5(a)</u>. The Loan Parties may retain access to the funds in the Dominion Accounts until such time as an Event of Default has occurred and is continuing and the Administrative Agent has delivered notice that it is exercising exclusive control over such Dominion Account.

Section 2.8    <u>Interest</u>. (a) Subject to the provisions of <u>Section 2.8(b)</u>, (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    (i) Upon the occurrence and during the continuance of an Event of Default, all outstanding Loans and L/C Borrowings (whether or not overdue) shall thereafter

50

bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws until such amounts are paid in full (after as well as before judgment).

     (ii)  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

   (c)  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Notwithstanding anything else to the contrary contained herein, interest hereunder shall be due no less frequently than monthly. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

   Section 2.9  <u>Fees</u>. In addition to certain fees described in <u>Sections 2.3(i)</u> and <u>(j)</u>:

   (a)  <u>Commitment Fee</u>. The Parent Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, a commitment fee equal to the Applicable Fee Rate multiplied by the actual daily amount by which the Aggregate Commitments exceeds the Total Outstandings. The commitment fee described in this <u>Section 2.9(a)</u> shall accrue at all times during the relevant Availability Period, including at any time during which one or more of the conditions in <u>Article IV</u> is not met, and shall be due and payable monthly in arrears on the first day of each calendar month, commencing with the first such date to occur after the Closing Date, and, in the case of the commitment fee with respect to the Aggregate Commitments, on the last day of the Availability Period. The commitment fee described in this <u>Section 2.9(a)</u> shall be calculated monthly in arrears.

   (b)  <u>Other Fees</u>.

     (i)  The Parent Borrower shall pay to the Arrangers and the Administrative Agent for their own respective accounts, in Dollars, fees in the amounts and at the times specified in the Fee Letter or any other written agreement with respect to fees in connection with this Agreement. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

     (ii)  The Parent Borrower shall pay to the respective Lenders, in Dollars, fees in the amounts and at the times specified in the Fee Letter or any other written agreement with respect to fees in connection with this Agreement. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

   Section 2.10  <u>Computation of Interest and Fees</u>. All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurodollar Rate) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year) or, in the case of interest in respect of Loans denominated in Alternative Currencies as to which market practice differs from the foregoing, in accordance with such market practice. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, *provided* that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.12(a)</u>, bear interest for one day. Each

51

determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11   Evidence of Debt. (a) The Credit Extensions made by each Lender or L/C Issuer shall be evidenced by one or more accounts or records maintained by such Lender or such L/C Issuer, as applicable, and by the Administrative Agent in the ordinary course of business. Such accounts or records maintained by the Administrative Agent and each Lender or L/C Issuer, as applicable, shall be conclusive absent manifest error of the amount of the applicable Credit Extensions to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender or any L/C Issuer and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender to the Parent Borrower made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans to the Borrowers in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount, and maturity of its Loans and payments with respect thereto.

(b)   In addition to the accounts and records referred to in Section 2.11, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

Section 2.12   Payments Generally; Administrative Agent's Clawback.

(a)   General. All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. If, for any reason, any Borrower is prohibited by any Law from making any required payment hereunder in an Alternative Currency, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the Alternative Currency payment amount. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent (i) after 2:00 p.m., in the case of payments in Dollars, or (ii) after the Applicable Time specified by the Administrative Agent in the case of payments in an Alternative Currency, shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by any Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be. Each Borrower agrees that, during the continuance of an Event of Default, the Administrative Agent may (and, at the request of the Required Lenders, the Administrative Agent shall) (A) (x) cause each bank that maintains

US 5954263v9

any account subject to a control agreement or a lockbox agreement in favor of the Administrative Agent to transfer, on a daily basis, all collected funds in any such account to a Dominion Account, and/or (y) require the Loan Parties to instruct each bank at which a Loan Party maintains a deposit account that is not subject to a control agreement or lockbox agreement in favor of the Administrative Agent to transfer, on a daily basis, all collected funds in any such account to a Dominion Account, and (B) apply any amounts on deposit in a Dominion Account to repay Loans whenever any Loans are outstanding.

(b)     (i) <u>Funding by Lenders; Presumption by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurodollar Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 p.m. on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.2</u> (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.2</u>) and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the applicable Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by such Borrower, the interest rate applicable to Base Rate Loans. If the applicable Borrower and applicable Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to such Borrower the amount of such interest paid by such Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by a Borrower shall be without prejudice to any claim such Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)     <u>Payments by Borrowers; Presumptions by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuers hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Appropriate Lenders the amount due. In such event, if such Borrower has not in fact made such payment, then each of the Appropriate Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or such L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

53

A notice of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to any Borrower as provided in the foregoing provisions of this Article II, and such funds are not made available to such Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Section 4.2 (and, if such Credit Extension is to be made on the Closing Date, Section 4.1) are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and to make payments pursuant to Section 10.4(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 10.4(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.4(c).

(e)     Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, L/C Borrowings, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and L/C Borrowings then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and L/C Borrowings then due to such parties.

Section 2.13    Sharing of Payments by Lenders. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (A) notify the Administrative Agent of such fact, and (B) purchase (for cash at face value) participations in the Loans and subparticipations in L/C Obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of

54

all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, *provided* that:

> (i) if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

> (ii) the provisions of this Section shall not be construed to apply to (A) any payment made by or on behalf of any Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or subparticipations in L/C Obligations to any assignee or participant, other than to the Parent Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

Section 2.14   [Reserved].

Section 2.15   LIBOR Successor Rate. Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Parent Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to Parent Borrower) that the Parent Borrower or Required Lenders (as applicable) have determined, that:

> (i) adequate and reasonable means do not exist for ascertaining LIBOR for any requested Interest Period, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

> (ii) the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "**Scheduled Unavailability Date**"), or

> (iii) syndicated loans currently being executed, or that include language similar to that contained in this Section 2.15, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Parent Borrower may amend this Agreement to replace LIBOR with an alternate benchmark rate

(including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "**LIBOR Successor Rate**"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Parent Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders do not accept such amendment.

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Parent Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, (to the extent of the affected Eurodollar Rate Loans or Interest Periods), and (y) the Eurodollar Rate component shall no longer be utilized in determining the Base Rate. Upon receipt of such notice, the Parent Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for purposes of this Agreement.

Section 2.16    Defaulting Lenders.

(a)    Amendments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "**Required Lenders**" and Section 10.1.

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.8 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payments of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer hereunder; third, to Cash Collateralize the L/C Issuer's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.3(g), fourth, as the Parent Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the

Parent Borrower, to be held in a deposit account and released pro rata in order to (A) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (B) Cash Collateralize the L/C Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.3(g), sixth, to the payment of any amounts owing to the Lenders, or the L/C Issuer as a result of any final and nonappealable judgment of a court of competent jurisdiction obtained by any Lender or the L/C Issuer against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default exists, to the payment of any amounts owing to the Parent Borrower as a result of any final and nonappealable judgment of a court of competent jurisdiction obtained by the Parent Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.16(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.16(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.

(A)    No Defaulting Lender shall be entitled to receive any fee payable under Section 2.9(a) for any period during which that Lender is a Defaulting Lender (and the Parent Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    Each Defaulting Lender shall be entitled to receive Letter of Credit Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated face amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.3.

(C)    With respect to any fee payable under Section 2.9 or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Parent Borrower shall (I) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (II) pay to the L/C Issuer the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such L/C

Issuer's Fronting Exposure to such Defaulting Lender, and (III) not be required to pay the remaining amount of any such fee.

(iv)    <u>Reallocation of Applicable Percentages to Reduce Fronting Exposure</u>. All or any part of such Defaulting Lender's participation in L/C Obligations shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that such reallocation does not cause the aggregate Outstanding Amount of the Loans of such Non-Defaulting Lender, plus such Non-Defaulting Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations to exceed such Non-Defaulting Lender's Commitment. Subject to <u>Section 10.21</u>, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender's having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    <u>Cash Collateral</u>. If the reallocation described in <u>clause (a)(iv)</u> above cannot, or can only partially, be effected, the Parent Borrower shall, without prejudice to any right or remedy available to it hereunder or under applicable Law, Cash Collateralize the L/C Issuer's Fronting Exposure in accordance with the procedures set forth in <u>Section 2.3(g)</u>.

(b)    <u>Defaulting Lender Cure</u>. If the Parent Borrower, the Administrative Agent and the L/C Issuers agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Commitments (without giving effect to <u>Section 2.16(a)(iv)</u>), whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Parent Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.17    <u>Certain Bankruptcy Matters</u>.

(a)    Except to the extent expressly provided otherwise in a DIP Order, the Loan Parties hereby agree that, subject only to the Carve-Out, the Obligations shall (i) constitute superpriority claims over all administrative expense claims and claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the DIP Orders.

(b)       In the event of a conflict between, or inconsistency among, the Interim DIP Order or the Final DIP Order, on the one hand, and any other Loan Document, on the other hand, the Interim DIP Order or the Final DIP Order, as the case may be, shall control.

(c)       The Administrative Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Administrative Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, deeds of trust, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Administrative Agent's Liens under applicable non-bankruptcy law.

(d)       In connection with any Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Administrative Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower and each other Loan Party hereby gives the Administrative Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.1       <u>Taxes</u>.

(a)       <u>Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes</u>.

(i)       Any and all payments by or on account of any obligation of any Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes. If, however, applicable Laws require any Borrower or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined in the good faith discretion of such Borrower or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to <u>subsection (e)</u> below.

(ii)       If any Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to <u>subsection (e)</u> below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums

59

payable under this Section) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)     If any Borrower or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Borrower or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to <u>subsection (e)</u> below, (B) such Borrower or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount so withheld or deducted by it to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     <u>Payment of Other Taxes by the Borrowers</u>. Without limiting the provisions of <u>subsection (a)</u> above, each Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)     <u>Tax Indemnifications</u>.

(i)     Without limiting the provisions of <u>subsection (a)</u> or <u>(b)</u> above, each Borrower shall, and does hereby, jointly and severally indemnify the Administrative Agent, each Lender and each L/C Issuer, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Administrative Agent, such Lender or such L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Each Borrower shall also, and does hereby, indemnify the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which a Lender or L/C Issuer for any reason fails to pay indefeasibly to the Administrative Agent as required by <u>clause (ii)</u> of this subsection. A certificate as to the amount of any such payment or liability delivered to the Parent Borrower by a Lender or L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or L/C Issuer, shall be conclusive absent manifest error.

(ii)     Without limiting the provisions of <u>subsection (a)</u> or <u>(b)</u> above, each Lender and L/C Issuer shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, the Administrative Agent, against any and all Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the fees, charges and disbursements of any counsel) incurred by or asserted against the Administrative Agent by any Governmental Authority as a result of the failure by such Lender or such L/C Issuer, as the case may be, to deliver, or as a result of the inaccuracy, inadequacy or deficiency of, any

60

documentation required to be delivered by such Lender or such L/C Issuer, as the case may be, to the Administrative Agent pursuant to subsection (e). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender and each L/C Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or such L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii). The agreements in this clause (ii) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender or any L/C Issuer, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d)     Evidence of Payments. As soon as practicable after any payment of Taxes by any Borrower to a Governmental Authority as provided in this Section 3.1, a Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Status of Lenders; Tax Documentation.

(i)     Each Lender and L/C Issuer shall deliver to the Parent Borrower and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Parent Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Parent Borrower or the Administrative Agent, as the case may be, to determine

(A)     whether or not payments made by any Borrower hereunder or under any other Loan Document are subject to Taxes, withholding, or deduction and if applicable, the required rate of withholding or deduction,

(B)     whether or not such Lender or L/C Issuer is subject to information reporting requirements, and

(C)     such Lender's or L/C Issuer's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender or L/C Issuer by any Borrower pursuant to this Agreement or otherwise to establish such Lender's or L/C Issuer's status for withholding Tax purposes in the applicable jurisdictions.

Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.1(e)(ii)(A), (ii)(B) and (v) below) shall not be required if in the Lender's or L/C Issuer's reasonable judgment such completion, execution or submission would subject such Lender or L/C Issuer to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or L/C Issuer.

(ii)     Without limiting the generality of the foregoing, if a Borrower is a "United States person," within the meaning of Section 7701(a)(30) of the Code,

61

(A)     any Lender or L/C Issuer that is a "United States person," within the meaning of Section 7701(a)(30) of the Code, shall deliver to the Parent Borrower and the Administrative Agent on or prior to the date on which such Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon reasonable request of the Parent Borrower or the Administrative Agent) executed copies of IRS Form W-9 certifying that such Lender or L/C Issuer is exempt from United States federal backup withholding; and

(B)     each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Parent Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the request of the Parent Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming benefits of any income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of United States federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(II)    executed copies of IRS Form W-8ECI,

(III)   in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of a Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable),

(IV)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such

Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner, or

(V)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Parent Borrower and the Administrative on or prior to the date on which such Foreign Lender becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Parent Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Laws to permit the Parent Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)     Each Lender and L/C Issuer shall promptly update and deliver any such form or certificate it previously delivered that has expired or become obsolete or inaccurate in any respect or notify the Parent Borrower and the Administrative Agent in writing of its legal inability to do so.

(iv)     Each Borrower shall promptly deliver to the Administrative Agent, any Lender or any L/C Issuer, as the Administrative Agent, such Lender, or such L/C Issuer shall reasonably request, on or prior to the Closing Date, and in a timely fashion thereafter, such documents and forms required by any relevant taxing authorities under the Laws of any jurisdiction, duly executed and completed by such Borrower, as are required to be furnished by such Lender, such L/C Issuer or the Administrative Agent under such Laws in connection with any payment by the Administrative Agent or any Lender of Taxes or Other Taxes, or otherwise in connection with the Loan Documents, with respect to such jurisdiction.

(v)     If a payment made to any Lender or any L/C Issuer under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender or L/C Issuer were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or L/C Issuer shall deliver to the Parent Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Parent Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code), and such additional documentation reasonably requested by the Parent Borrower or the Administrative Agent, in each case, as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender or L/C Issuer has complied with such Lender's or L/C Issuer's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (v), "FATCA" shall include any amendments made to FATCA after the Closing Date. For purposes of determining withholding Taxes imposed under FATCA, from and after the Closing Date, the Parent Borrower and the Administrative Agent shall treat (and the Lenders and L/C Issuers hereby authorize the Administrative Agent to treat) the Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

US 5954263v9

(f)     Treatment of Certain Refunds. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or an L/C Issuer, or have any obligation to pay to any Lender or any L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or such L/C Issuer, as the case may be. If the Administrative Agent, any Lender or any L/C Issuer determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by any Borrower or with respect to which any Borrower has paid additional amounts pursuant to this Section, it shall pay to such Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses and net of any loss or gain realized in the conversion of such funds from or to another currency incurred by the Administrative Agent, such Lender or any L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that each Borrower, upon the request of the Administrative Agent, such Lender or such L/C Issuer, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or such L/C Issuer in the event the Administrative Agent, such Lender or such L/C Issuer is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection (f), in no event will the Administrative Agent, any Lender or any L/C Issuer be required to pay any amount to any Borrower pursuant to this subsection (f) the payment of which would place the Administrative Agent, such Lender or such L/C Issuer in a less favorable net after-Tax position than the Administrative Agent, such Lender or such L/C Issuer would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require the Administrative Agent, any Lender or any L/C Issuer to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower or any other Person.

(g)     Survival. Each party's obligations under this Section 3.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 3.2     Illegality. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to perform any of its obligations hereunder or make, maintain or fund or charge interest with respect to any Credit Extension, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Parent Borrower through the Administrative Agent, any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Credit Extension or to convert Base Rate Loans to Eurodollar Rate Loans, shall be suspended until such Lender notifies the Administrative Agent and the Parent Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Parent Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all such Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such

64

day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

Section 3.3     Inability to Determine Rates. If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Parent Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Parent Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.4     Increased Costs.

(a)     Increased Costs Generally. If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Eurodollar Rate) or any L/C Issuer;

(ii)     subject the Administrative Agent, any Lender or any L/C Issuer to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or any L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or such L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or such L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such L/C Issuer, the Parent Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If any Lender or any L/C Issuer determines that any Change in Law affecting such Lender or such L/C Issuer or any Lending Office of such Lender or such Lender's or such L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such L/C Issuer's capital or on the capital of such Lender's or such L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such L/C Issuer's policies and the policies of such Lender's or such L/C Issuer's holding company with respect to capital adequacy and liquidity), then from time to time the Parent Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of a Lender or L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or such L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Parent Borrower shall be conclusive absent manifest error. The Parent Borrower shall pay such Lender or such L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests. Failure or delay on the part of any Lender or any L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or such L/C Issuer's right to demand such compensation, *provided* that no Borrower shall be required to compensate a Lender or L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or such L/C Issuer, as the case may be, notifies the Parent Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.5    Compensation for Losses. Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Parent Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by any Borrower;

(c)    any failure by any Borrower to make payment of drawing under any Letter of Credit (or interest due thereon) denominated in an Alternative Currency on its scheduled due date or any payment thereof in a different currency; or

(d)     any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by any Borrower pursuant to Section 10.13;

excluding any loss of anticipated profits, but including any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan, from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract. The Parent Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Parent Borrower to the Lenders under this Section 3.5, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Base Rate used in determining the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.6     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.4, or any Borrower is required to pay any additional amount to any Lender, any L/C Issuer, or any Governmental Authority for the account of any Lender or any L/C Issuer pursuant to Section 3.1, or if any Lender gives a notice pursuant to Section 3.2, then, at the request of Parent Borrower, such Lender or such L/C Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or such L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or 3.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.2, as applicable, and (ii) in each case, would not subject such Lender or such L/C Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or such L/C Issuer, as the case may be. The Parent Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or any L/C Issuer in connection with any such designation or assignment.

(b)     Replacement of Lenders. If any Lender requests compensation under Section 3.4, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1, and in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with Section 3.6(a), or if any Lender is a Non-Consenting Lender or a Defaulting Lender or otherwise gives notice pursuant to Section 3.2, the Parent Borrower may replace such Lender in accordance with Section 10.13.

Section 3.7     Survival. All of each Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

67

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

Section 4.1    Conditions of Initial Credit Extension. The obligation of each L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction (or waiver in compliance with Section 10.1) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals, telecopies or electronic copies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Arranger, Administrative Agent and each of the Lenders:

(i)    executed counterparts of this Agreement, sufficient in number for distribution to the Administrative Agent, each Lender and each Loan Party;

(ii)    a Note executed by PKD in favor of each Lender requesting a Note;

(iii)    executed counterparts of the Security Agreement, sufficient in number for distribution to the Administrative Agent, each Lender and PKD, together with:

(A)    to the extent not previously delivered to the Administrative Agent prior to the Closing Date, certificates representing the Pledged Equity Interests accompanied by undated transfer powers executed in blank or, if any of the Pledged Equity Interests shall be uncertificated securities (as defined in Article 8 of the UCC), confirmation and evidence satisfactory to the Administrative Agent that the security interest in such uncertificated securities has been transferred to and perfected by the Administrative Agent for the benefit of the Secured Parties in accordance with Section 9-106 of the Uniform Commercial Code, and instruments evidencing the debt instruments pledged pursuant to the Collateral Documents, if any, indorsed in blank;

(B)    proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Administrative Agent may deem necessary or desirable in order to perfect the Liens created under the applicable DIP Order and the Security Agreement, covering the Collateral described therein; and

(C)    evidence that all other actions, recordings and filings that the Administrative Agent may deem necessary or desirable in order to perfect the Liens created under the applicable DIP Order have been taken or made or arrangements therefor satisfactory to the Administrative Agent shall have been made;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in

68

connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(v)     such documents, agreements and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of PKD and each Subsidiary Guarantor is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, in each case except to the extent that failure to be so could not reasonably be expected to have a Material Adverse Effect;

(vi)     a certificate of a Responsible Officer certifying that other than the Cases, there are no (1) actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Parent Borrower, threatened in writing or (2) ongoing, pending or threatened investigations known to PKD, in each case, in any court or conducted before or by any arbitrator or Governmental Authority, by or against PKD or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or the extensions of credit contemplated hereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect;

(vii)     a Borrowing Base Certificate prepared as of October 31, 2018 and accompanied by such supporting detail and documentation as is contemplated by the Borrowing Base Certificate and/or as shall be reasonably requested by the Administrative Agent (in a form and detail satisfactory to the Administrative Agent);

(viii)     a certificate signed by a Responsible Officer of PKD certifying (A) that the conditions specified in Sections 4.2(a) and (b) have been satisfied, and (B) that other than the filing of the Cases, there has been no event or circumstance since December 31, 2017 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect;

(ix)     all documentation and other information with respect to the Loan Parties required by regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act and the Beneficial Ownership Regulation at least three (3) Business Days prior to the Closing Date to the extent the same have been requested at least five (5) Business Days prior to the Closing Date;

(x)     [reserved];

(xi)     the Initial Budget; and

(xii)     such other assurances, certificates, documents, evidence of insurance or consents as the Administrative Agent, the L/C Issuers, or any Lender may reasonably require.

(b)     The Administrative Agent, Lenders and Arrangers shall have received all fees and other amounts due and payable on or prior to the Closing Date, and, to the extent invoiced prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket fees and expenses (including reasonable and documented out-of-

69

pocket fees and expenses of outside counsel and financial advisors) required to be paid to the Administrative Agent and the Lenders (to the extent invoiced at least two (2) business days prior to the Closing Date), provided that such amounts may be paid with proceeds of the initial Credit Extension to be made on the Closing Date at the Parent Borrower's option.

(c)     The Existing Credit Agreement shall have been terminated and all amounts owing thereunder, including all fees and expenses (including legal fees) required to be paid by the Loan Parties thereunder shall have been paid in full.

(d)     The RSA and the Backstop Commitment Agreement (as defined in the RSA) shall have been executed and be in full force and effect without any modification from the form distributed to the Lenders and their counsel by email at 8:43 a.m. Central Time on December 12, 2018 that has not been approved by the Administrative Agent and the Required Lenders, such approval not to be unreasonably withheld.

(e)     The Bankruptcy Court shall have entered the Interim DIP Order and the Cash Management Order.

(f)     Upon the entry of the Interim DIP Order, the Administrative Agent shall, for the benefit of the Secured Parties, have obtained valid and perfected liens on the Collateral with the priority required by, and subject to the exceptions contained in this Agreement and the Security Agreement, in each case to the extent approved in the Interim DIP Order, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.

(g)     Subject to entry of the Interim DIP Order, the representations and warranties of the Parent Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document shall be true and correct on and as of the Closing Date.

(h)     The Loan Parties shall have delivered to the Administrative Agent all information regarding real property owned or leased by the Loan Parties reasonably requested by the Administrative Agent prior to the Closing Date in connection with the Administrative Agent's and the Lenders' flood diligence and compliance requirements, including reasonable identifying information for all such properties.

Without limiting the generality of the provisions of the last paragraph of <u>Section 9.3</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.1</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document (a draft of which such Lender has reviewed) or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.2     <u>Conditions to all Credit Extensions</u>. The obligation of each Lender and of each L/C Issuer to make any Credit Extension is subject to the following conditions precedent:

(a)     The representations and warranties of the Parent Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document, shall be true and correct in all material respects (except for such representations and warranties that have a materiality or Material Adverse Effect qualification, which shall be true and correct in all respects) on and

70

as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (except for such representations and warranties that have a materiality or Material Adverse Effect qualification, which shall be true and correct in all respects) as of such earlier date, and except that for purposes of this <u>Section 4.2</u>, the representations and warranties contained in <u>Section 5.5(a)</u> and <u>(b)</u> shall be deemed to refer to the most recent statements furnished pursuant to <u>Section 6.1(a)</u> and <u>(b)</u>, respectively.

(b)    No Default then exists, or would result from such proposed Credit Extension or the application of the proceeds thereof.

(c)    In the case of any request for a Borrowing, the Administrative Agent shall have received a Committed Loan Notice, and in the case of any request for an L/C Credit Extension, the Administrative Agent and the applicable L/C Issuer shall have received a Letter of Credit Application, in each case, in accordance with the requirements hereof.

(d)    In the case of a Credit Extension in the form of any Letter of Credit to be denominated in an Alternative Currency, there shall not have occurred any change in national or international financial, political or economic conditions or currency exchange rates or exchange controls which in the reasonable opinion of the Administrative Agent or the applicable L/C Issuer would make it impracticable for such Credit Extension to be denominated in the relevant Alternative Currency.

(e)    In the case of a Credit Extension in the form of a Borrowing, at any time and immediately after giving effect to such Borrowing (net of any concurrent use of the proceeds of such Borrowing), the Consolidated Cash Balance shall not exceed $30,000,000.

(f)    After giving effect to such Credit Extension, Availability shall not be less than $0.

Each request for a Credit Extension submitted by any Borrower shall be deemed to be a representation and warranty that the conditions specified in <u>Sections 4.2(a)</u>, <u>(b)</u> and <u>(e)</u> have been satisfied on and as of the date of the applicable Credit Extension.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

The Borrowers represent and warrant to the Administrative Agent and the Lenders that:

Section 5.1    <u>Existence; Compliance with Law</u>. Each Loan Party (a) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of the jurisdiction of its organization or formation, (b) subject to entry of the DIP Orders, has the requisite power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified and licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.2     Power; Authorization; Enforceable Obligations. Subject to the entry of the DIP Orders, each Loan Party has the requisite power and authority to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrowers, to borrow hereunder and each Loan Party has taken all necessary corporate or other action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrowers, to authorize the borrowings on the terms and conditions of this Agreement. Subject to the entry of the DIP Orders, no consent or authorization of, filing with, notice to, approval or other act by or in respect of, any Governmental Authority or any other Person is required in connection with (a) the borrowings hereunder, (b) the execution, delivery, performance, validity or enforceability against any Loan Party of this Agreement or any of the other Loan Documents or (c) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except, in each case, (i) consents, authorizations, filings and notices described in Schedule 5.2, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect (except as noted on Schedule 5.2), (ii) [reserved], (iii) in the case of any authorization, approval, action, notice or filing from or with a Person other than a Governmental Authority, the failure to have could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (iv) for matters that may be required after the Closing Date in the ordinary course of conducting the business of PKD or any Subsidiary thereof. Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. Subject to entry of the DIP Orders, this Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable Debtor Relief Laws and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

Section 5.3     No Legal Bar. Subject to the entry of the DIP Orders, the execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law nor any material Contractual Obligation of the Loan Parties, including, without limitation, arising under any material debt instrument, and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Collateral Documents). No Requirement of Law or Contractual Obligation applicable to PKD or any of its Subsidiaries could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.4     No Material Litigation. Other than the Cases, no litigation, investigation, claim or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Parent Borrower after due and diligent investigation, threatened by or against PKD or any of its Subsidiaries or against any of their respective properties or revenues that (a) purport to directly affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby or thereby, or (b) except as specifically disclosed in Schedule 5.4, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and there has been no adverse change in the status, or financial effect on any Loan Party, of the matters described in Schedule 5.4.

Section 5.5     Financial Statements; No Material Adverse Effect.

(a)

US 5954263v9

(i)        The audited financial statements of PKD and its Subsidiaries for the fiscal year ending December 31, 2017, reported on by and accompanied by an unqualified report from an independent certified public accounting firm of national reputation, present fairly in all material respects the consolidated financial condition of PKD and its Subsidiaries as at December 31, 2017, and the consolidated results of its operations and its consolidated cash flows for the fiscal year then ended.

(ii)       The unaudited consolidated balance sheet of PKD and its Subsidiaries at September 30, 2018, and the related unaudited consolidated statements of income and cash flows for the period ended on such date, present fairly in all material respects the consolidated financial condition of PKD and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the quarterly period then ended (subject to the absence of footnotes and normal year-end audit adjustments).

(b)       As of the Closing Date, PKD and its Subsidiaries do not have any material Guarantees, contingent liabilities and liabilities for taxes (except for any such tax liabilities to taxing authorities outside of the United States which are not, in the aggregate, material to PKD and its Subsidiaries taken as a whole) or any long-term leases or unusual forward or long-term commitments, including, without limitation, any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the unaudited consolidated balance sheet of PKD and its Subsidiaries at September 30, 2018, and the related unaudited consolidated statements of income and cash flows for the period ended on such date, and which should be so reflected in accordance with GAAP.

(c)       Other than the filing of the Cases, since December 31, 2017 there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)       The most recent Budget to have been furnished to the Administrative Agent was prepared in good faith based upon reasonable assumptions at the time such Budget was prepared.

Section 5.6       No Default. No Loan Party is in default under or with respect to any of its Contractual Obligations in any respect that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.7       Ownership of Property; Liens. Each Loan Party has good record and marketable title in fee simple to, or a valid leasehold interest in, all its material real property, and good title to, or a valid leasehold interest in, all its other material Property, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and none of such Property is subject to any Lien except Liens permitted by Section 7.1.

Section 5.8       Intellectual Property. Each Loan Party owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted; no material claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does PKD know of any valid basis for any such claim; and the use of such

Intellectual Property by the Loan Parties does not infringe on the rights of any Person in any material respect.

Section 5.9    Taxes. Except to the extent excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court each of PKD and each of its Subsidiaries has filed or caused to be filed all material Federal, state and other Tax returns and reports that are required to be filed and has paid all Taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other material Taxes, fees or other charges imposed on it or any of its Property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings diligently conducted in each case, with respect to which adequate reserves in conformity with GAAP have been provided on the books of PKD or its Subsidiaries, as the case may be); and no tax Lien has been filed (except as permitted by Section 7.1(a)), and, to the knowledge of the Parent Borrower, no claim is being asserted, with respect to any such tax, fee or other charge (other than any such Liens and claims in favor of taxing authorities outside of the United States which are not, in the aggregate, material to PKD and its Subsidiaries taken as a whole). No Loan Party is party to any tax sharing agreement.

Section 5.10    Federal Regulations. No part of the proceeds of any Loans or drawings under any Letter of Credit will be used in violation of Regulation U issued by the FRB as now and from time to time hereafter in effect or for any purpose that violates the provisions of the regulations of the FRB. No Loan Party is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB).

Section 5.11    Labor Matters. There are no strikes or other labor disputes against PKD or any of its Subsidiaries pending or, to the knowledge of the Parent Borrower, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. Hours worked by and payment made to employees of PKD and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. All payments due from PKD or any of its Subsidiaries on account of employee health and welfare insurance that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect if not paid have been paid or accrued as a liability on the books of PKD or the relevant Subsidiary.

Section 5.12    ERISA Compliance. (a) Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws, except where such non-compliance has not had and could not reasonably be expected to have a Material Adverse Effect. The base prototype plan document which each Plan that is intended to qualify under Section 401(a) of the Code uses an opinion letter from the IRS, or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Parent Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. Except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, PKD and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)      There are no pending or, to the knowledge of the Parent Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect

US 5954263v9

to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     Except to the extent such event could not reasonably be expected to have a Material Adverse Effect: (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither PKD nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither PKD nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither PKD nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(d)     With respect to each scheme or arrangement mandated by a government other than the United States (a "**Foreign Government Scheme or Arrangement**") and with respect to each employee benefit plan maintained or contributed to by any Loan Party or any Subsidiary of any Loan Party that is not subject to United States law (a "**Foreign Plan**"), each Foreign Plan is in compliance in all material respects with the provisions of the applicable law or terms of the applicable Foreign Government Scheme or Arrangement and no Foreign Benefit Event has occurred or is reasonably expected to occur, except where such non-compliance or occurrence has not had and could not reasonably be expected to have a Material Adverse Effect.

(e)     The Parent Borrower represents and warrants as of the Closing Date that none of PKD, or its Subsidiaries is or will be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments.

Section 5.13    Investment Company Act; Other Regulations. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the FRB) which limits its ability to incur Indebtedness.

Section 5.14    Subsidiaries. (a) The Subsidiaries listed on Schedule 5.14 constitute all of the Subsidiaries of PKD as of the Closing Date. Schedule 5.14 sets forth as of the Closing Date the name and jurisdiction of incorporation and, in the case of each Loan Party, the U.S. taxpayer identification number of each such Subsidiary and, as to each, the percentage of each class of Equity Interest owned by each Loan Party. All of the outstanding Equity Interests in the Subsidiaries of PKD have been validly issued, and (to the extent applicable) fully paid and non-assessable. All of the outstanding Pledged Equity Interests that are Collateral are owned free and clear of all Liens except those created under the Collateral Documents. As of the Closing Date, PKD does not directly or indirectly own any Equity Interest in any corporation, limited partnership or limited liability company (or other business entity) other than those specifically disclosed in Schedule 5.14. Schedule 5.14 identifies as of the Closing Date each Subsidiary.

(b)     As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than Equity Interests granted

75

to employees and/or directors) of any nature relating to any Equity Interests of PKD or any Subsidiary, except as disclosed on Schedule 5.14.

Section 5.15    Use of Proceeds. The proceeds of the Loans, and the Letters of Credit, shall be used to (a) pay fees, interest, payments and expenses associated with this Agreement, (b) provide liquidity for the ongoing working capital and capital expenditure needs of the Loan Parties during the pendency of the Cases not in contravention of any Law, (c) fund the Carve-Out and (d) fund the costs of the administration of the Cases, including payment of professional fees, in each case, subject to the Budget and in accordance with the DIP Orders, as applicable.

Section 5.16    Environmental Matters. Other than as set forth on Schedule 5.16 and exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    The Loan Parties: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any property owned, leased, licensed or otherwise operated by any of them; (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits; and (iv) reasonably believe that: each of their Environmental Permits will be timely renewed and complied with, without material expense; any additional Environmental Permits that may be required of any of them will be timely obtained and complied with, without material expense; and compliance with any Environmental Law that is or is expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)    Hazardous Materials are not present at, on, under, in, or about any real property now or formerly owned, leased, licensed or operated by the Loan Parties, or at any other location (including, without limitation, any location to which Hazardous Materials have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of the Loan Parties under any applicable Environmental Law or otherwise result in costs to any Loan Party, or (ii) interfere with PKD's or any other Loan Party's continued operations, or (iii) impair the fair saleable value of any real property owned or leased by any Loan Party.

(c)    There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which any Loan Party is, or to the knowledge of any Loan Party will be, named as a party that is pending or, to the knowledge of any Loan Party, threatened in writing.

(d)    Neither PKD nor any other Loan Party has received any written request for information, or been notified that it is a potentially responsible party under or relating to the CERCLA or any similar Environmental Law, or with respect to any Hazardous Material.

(e)    Neither PKD nor any other Loan Party has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)    Neither PKD nor any other Loan Party has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown,

76

under any Environmental Law or with respect to any Hazardous Material other than indemnity obligations in the ordinary course of business.

Section 5.17   <u>Accuracy of Information, etc</u>. No written statement or information contained in this Agreement, any other Loan Document or any other document, certificate or written statement furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of any Loan Party for use in connection with the transactions contemplated hereby and the negotiation of this Agreement or the other Loan Documents or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished), contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, taken as a whole, not materially misleading in light of the circumstances under which made; *provided* that with respect to the Budget, the Parent Borrower only makes the representation and warranty set forth in <u>Section 5.5(d)</u>.

Section 5.18   <u>Insurance</u>. The properties of the Loan Parties are insured with financially sound and reputable insurance companies not Affiliates of PKD, in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where PKD or the applicable Loan Party operates, except to the extent that reasonable self-insurance meeting the same standards is maintained with respect to such risks.

Section 5.19   <u>OFAC/Sanctions</u>. Except as described on <u>Schedule 5.19</u>, no Loan Party, nor, to the knowledge of any Loan Party, any Related Party, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or (iii) located, organized or residing in any Designated Jurisdiction. Except as described on <u>Schedule 5.19</u>, no Loan or Letter of Credit, nor the proceeds from any Loan or Letter of Credit, has been used to lend, contribute, provide or has otherwise made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions, or in any other manner that will result in any violation by any Person (including any Lender, the Arranger, the Administrative Agent or the L/C Issuer) of Sanctions.

Section 5.20   <u>Anti-Corruption Laws</u>. Except as previously disclosed by Parent Borrower and its Subsidiaries in public filings, the Loan Parties have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar applicable anti-corruption legislation in other jurisdictions in all material respects and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

Section 5.21   <u>EEA Financial Institution</u>. No Loan Party is an EEA Financial Institution.

Section 5.22   <u>DIP Orders</u>.  The Loan Parties are in compliance with the terms and conditions of the DIP Orders. The Interim Order or the Final Order, as applicable, is in full force and effect and has not been vacated, reversed or rescinded or supplemented or modified in any respect without the prior written consent of the Administrative Agent and the Required Lenders.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Until the Termination Date, the Parent Borrower shall, and shall (except in the case of the covenants set forth in <u>Sections 6.1</u>, <u>6.2</u>, and <u>6.3</u>) cause each Loan Party to:

Section 6.1    <u>Financial Statements; Borrowing Base Certificate</u>. Deliver to the Administrative Agent (which shall promptly furnish to each Lender) on or before 5:00 p.m. Central Time on the requisite delivery date, in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of PKD, a copy of the audited consolidated balance sheet of PKD and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a qualification arising out of the scope of the audit, by independent certified public accountants of nationally recognized standing;

(b)    as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of PKD, the unaudited consolidated balance sheet of PKD and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer of the Parent Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes); and

(c)    as soon as available, but in any event not later than 30 days after the end of each month (commencing with the month ending November 30, 2018) or, in the case of the months ending on the last day of a fiscal quarter, within 45 days after the end of such months, the unaudited consolidated balance sheet of PKD and its consolidated Subsidiaries as at the end of such month and the related unaudited consolidated statement of income for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous fiscal year;

(d)    a Borrowing Base Certificate prepared as of the end of the applicable period and accompanied by such supporting detail and documentation as is contemplated by the Borrowing Base Certificate and/or as shall be reasonably requested by the Administrative Agent (in a form and detail satisfactory to the Administrative Agent), as soon as available, but in any event (i) not later than 25 days after the end of each month and (ii) when a Weekly BBC Trigger Period is in effect, not later than 3 Business Days after the end of each week. All calculations of Availability in any Borrowing Base Certificate shall originally be made by the Parent Borrower and certified by a Responsible Officer of the Parent Borrower, *provided* that the Administrative Agent may from time to time review and adjust any such calculation (A) to reflect its reasonable estimate of declines in value of any Collateral, due to collections received in the Dominion Accounts or otherwise; and (B) to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect the Availability Reserve;

(e)      all such financial statements to be complete and correct in all material respects and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein);

As to any information contained in materials furnished pursuant to Section 6.2(c), the Parent Borrower shall not be separately required to furnish such information under clause (a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Parent Borrower to furnish the information and materials described in Section 6.1(a) and (b) above at the times specified therein.

Section 6.2      Certificates; Other Information. Deliver to the Administrative Agent (which shall promptly furnish to each Lender), or, in the case of clause (e), to the relevant Lender (and/or Administrative Agent if making such request itself), in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

(a)      concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public accountants are permitted to cover in such certificates pursuant to their professional standards and customs of the profession);

(b)      concurrently with the delivery of any financial statements pursuant to Section 6.1, a duly completed and executed Compliance Certificate; *provided* that, it is understood such Compliance Certificate shall, among other provisions, contain certifications of a Responsible Officer of the Parent Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate.

(c)      within five days after the same are sent, copies of all financial statements and reports that PKD sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that PKD may make to, or file with, the SEC;

(d)      promptly, at the Parent Borrower's expense, to the Administrative Agent, such other reports, statements and reconciliations with respect to the Borrowing Base or the Collateral as the Administrative Agent shall from time to time reasonably request;

(e)      promptly, such additional financial and other information as any Lender through the Administrative Agent or the Administrative Agent itself may from time to time reasonably request, including without limitation, information for purposes of compliance with applicable Flood Insurance Regulations, applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and the Beneficial Ownership Regulation;

(f)      concurrently with the delivery of a Borrowing Base Certificate, detailed agings of Accounts and a detailed listing of the Quail Rental Assets (together with a reconciliation to its general ledger), prepared as of the end of the applicable period; and

79

(g)    promptly upon the Administrative Agent's request (A) copies of customer statements and credit memos, remittance advices and reports, and copies of deposit slips and bank statements, and (B) a statement of the outstanding loans and payments made, and Accounts owing to, Affiliates, in each case, as of the last day of the immediately preceding period.

Documents required to be delivered pursuant to <u>Section 6.1(a)</u> or <u>(b)</u> or <u>Section 6.2(c)</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Parent Borrower posts such documents, or provides a link thereto on PKD's website on the Internet at the website address listed on <u>Schedule 10.2</u>; or (ii) on which such documents are posted on the Parent Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (i) if so requested by the Administrative Agent or any Lender, the Parent Borrower shall deliver paper copies of such documents to the Administrative Agent or such Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Parent Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. If so requested by the Administrative Agent or any Lender, the Parent Borrower shall be required to provide paper copies of the Compliance Certificates required by <u>Section 6.2(b)</u> to the Administrative Agent. Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Parent Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Parent Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger will make available to the Lenders and the L/C Issuers materials, projections and/or information provided by or on behalf of the Parent Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on SyndTrak, ClearPar, IntraLinks or a substantially similar electronic transmission system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to any of the Parent Borrower or its respective Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Parent Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Parent Borrower shall be deemed to have authorized the Administrative Agent, the Arranger, the L/C Issuers and the Lenders to treat the Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Parent Borrower or their respective securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent the Borrower Materials constitute Information, they shall be treated as set forth in <u>Section 10.7</u>); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "<u>Public Side Information</u>;" and (iv) the Administrative Agent and the Arranger shall be entitled to treat the

80

Borrower Materials that are not marked "<u>PUBLIC</u>" as being suitable only for posting on a portion of the Platform not designated "<u>Public Side Information.</u>"

Section 6.3    <u>Notices</u>. Promptly notify the Administrative Agent (which shall promptly furnish such notice to each Lender) of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any Contractual Obligation of PKD or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect or (ii) litigation, investigation or proceeding which may exist at any time between PKD or any of its Subsidiaries and any Governmental Authority that, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation, investigation by a third-party (excluding, for the avoidance of doubt, any internal investigations) or proceeding, in each case other than the Cases, affecting PKD or any of its Subsidiaries (i) in which the amount involved is $5,000,000 or more and not covered by insurance or (ii) in which injunctive or similar relief is sought which, if granted, could reasonably be expected to have a Material Adverse Effect;

(d)    as soon as possible and in any event within 10 days after the Parent Borrower knows or has reason to know of the occurrence of any ERISA Event or Foreign Benefit Event that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)    any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this <u>Section 6.3</u> shall be accompanied by a statement of a Responsible Officer of the Parent Borrower setting forth details of the occurrence referred to therein and stating what action the Parent Borrower or relevant Subsidiary has taken and proposes to take with respect thereto. Each notice pursuant to <u>Section 6.3(a)</u> shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 6.4    <u>Conduct of Business and Maintenance of Existence, etc.</u> (a) (i) Preserve, renew and keep in full force and effect its legal existence (except as otherwise permitted under this Agreement) and (ii) take all reasonable action to maintain all rights, privileges and franchises useful and necessary in the normal conduct of its business, except, in each case, as otherwise permitted by <u>Section 7.4</u> and except, in the case of the foregoing <u>clause (ii)</u>, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) subject to any necessary Bankruptcy Court approvals comply with all Contractual Obligations and Requirements of Law, except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.5    <u>Maintenance of Property; Insurance</u>. (a) Keep all material Property and systems useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, and (b) subject to any necessary Bankruptcy Court approvals, maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and against at least such risks (but including in any event public liability and product liability) as are usually insured against in the same general area by companies

81

engaged in the same or a similar business; *provided*, that if any real property secures any Obligations, flood hazard diligence, documentation and insurance for such real property shall comply with applicable Flood Insurance Regulations or shall otherwise be satisfactory to all Lenders. The Parent Borrower shall furnish certificates, policies and endorsements to Administrative Agent as Administrative Agent shall reasonably require as proof of such insurance, and, if the Parent Borrower fails to do so, Administrative Agent is authorized, but not required, to obtain such insurance at the expense of the Parent Borrower. All policies shall provide for at least thirty (30) days prior written notice to Administrative Agent of any cancellation or reduction of coverage and that Administrative Agent may act as attorney-in-fact for the Parent Borrower in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending and canceling such insurance. The Parent Borrower shall cause Administrative Agent to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and the Parent Borrower shall obtain non-contributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Administrative Agent. Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Administrative Agent, for the ratable benefit of the Secured Parties, as its interests may appear and further specify that Administrative Agent shall be paid regardless of any act or omission by the Parent Borrower or any of its Affiliates. The Administrative Agent, at its option, may apply any insurance proceeds received by Administrative Agent at any time while any Event of Default shall have occurred and be continuing to the cost of repairs or replacement of Collateral and/or, to payment of the Obligations, whether or not then due, in any order and in such manner as Administrative Agent may determine or hold such proceeds as cash collateral for the Obligations.

Section 6.6    <u>Inspection of Property; Books and Records; Discussions</u>. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit the Administrative Agent and any Lender (accompanied by any other Lender that so elects) to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time, upon reasonable prior notice, and to discuss the business, operations, properties and financial and other condition of the Parent Borrower and its Subsidiaries with officers and employees of the Parent Borrower and its Subsidiaries and with its independent certified public accountants (it being understood that all such notices shall be given through the Administrative Agent and shall be coordinated with any other such notices to the extent reasonably possible), in each case no more often than twice in any calendar year in the aggregate for the Administrative Agent and all Lenders and, in the sole discretion of the Administrative Agent, an additional inspection for a total of three times in any calendar year unless an Event of Default shall have occurred and be continuing, in which case there shall be no limit on the number of such inspections by the Administrative Agent or Lenders.

Section 6.7    <u>Environmental Laws</u>. Comply in all respects with, and take all reasonable action to ensure compliance in all respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all respects with and maintain, and take all reasonable action to ensure that all tenants and subtenants obtain and comply in all respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except to the extent that any failures to so comply or maintain could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect.

82

Section 6.8    Payment of Obligations. Except to the extent excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all material tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by PKD or such other Loan Party and (b) all Indebtedness or other claims entered into after the Closing Date, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, in each case, where non-payment thereof could reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 6.9    Additional Collateral.  With respect to any Specified Personal Property acquired after the Closing Date, promptly following such acquisition (i) execute and deliver to the Administrative Agent such amendments or supplements to the Security Agreement or such other documents as the Administrative Agent reasonably deems necessary to confirm the Administrative Agent's Lien in such Property, and (ii) take all actions necessary or advisable to confirm the Administrative Agent's perfected first priority Lien in such Property, subject to Permitted Liens, including without limitation, the filing of UCC financing statements (or equivalent documentation) in such jurisdictions as may be required by the Security Agreement or by Law or as may be requested by the Administrative Agent.

Section 6.10    [Reserved].

Section 6.11    Cash Management Systems. In each case subject to the DIP Orders and the Cash Management Order:

(a) Schedule 6.11 sets forth all deposit accounts maintained by the Loan Parties as of the Closing Date, including all Dominion Accounts. From and after the Closing Date, the Loan Parties shall not open any new deposit account, securities account, lockbox account, concentration account, collection account or disbursement account.

(b)    Borrowers shall maintain Dominion Accounts pursuant to lockbox or other arrangements reasonably acceptable to Administrative Agent. During the continuance of an Event of Default, the Administrative Agent may require the immediate deposit of all remittances received in any lockbox or any account maintained by the Loan Parties to a Dominion Account. If a Dominion Account is not maintained with Bank of America, Administrative Agent may, during the continuance of an Event of Default, require immediate transfer of all funds in such account to a Dominion Account maintained with Bank of America. Administrative Agent and Lenders assume no responsibility to any Borrower for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any depositary bank.

(c)    Each Borrower shall (i) request in writing and otherwise take such reasonable steps to ensure that all Account Debtors forward payment directly to lockboxes and Dominion Accounts maintained pursuant to and in accordance with Section 6.11(b), and (ii) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all Collateral (whether or not otherwise delivered to a lockbox) into one or more Dominion Accounts. All Net Cash Proceeds

83

of the sale, Net Loss Proceeds relating to or other disposition of any Collateral shall be deposited directly into a Dominion Account.

Section 6.12    Inspection and Appraisal of Collateral.

(a)    At any time upon the Administrative Agent's request, permit the Administrative Agent (or its designee) to conduct two (2) field examinations in any calendar year to ensure the adequacy of Borrowing Base Collateral and related reporting and control systems, and prepared on a basis reasonably satisfactory to the Administrative Agent, such field examinations to include, without limitation, information required by applicable Laws; *provided* that, notwithstanding the foregoing, in the sole discretion of the Administrative Agent, the Parent Borrower (and the other Borrowers, as applicable) shall permit the Administrative Agent to conduct an additional field examination for a total of three (3) in any calendar year. The Parent Borrower shall reimburse the Administrative Agent for all reasonable charges, costs and expenses (including a per diem field examination charge and out of pocket expenses) related thereto with respect the field examinations during each calendar year made pursuant to the immediately preceding sentence; *provided*, *that* when an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of field examinations that shall be at the sole expense of the Parent Borrower; and

(b)    At any time upon the Administrative Agent's request, promptly provide the Administrative Agent with appraisals of the Quail Rental Assets not more frequently than two (2) times in any calendar year from an appraiser selected and engaged by the Administrative Agent, and prepared on a basis reasonably satisfactory to the Administrative Agent, such appraisals to include, without limitation, information required by applicable Laws; *provided* that, notwithstanding the foregoing, in the sole discretion of the Administrative Agent, the Parent Borrower (and the other Borrowers, as applicable) shall provide the Administrative Agent with an additional appraisal of the Quail Rental Assets for a total of three (3) in any calendar year. The Parent Borrower shall reimburse the Administrative Agent for all reasonable charges, costs and expenses related thereto with respect to the appraisals made during each calendar year pursuant to the immediately preceding sentence; *provided*, *that* when an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of appraisals that shall be at the sole expense of the Parent Borrower.

Section 6.13    Casualty and Condemnation; Disposition Outside the Ordinary Course of Business. (a) Furnish to the Administrative Agent written notice promptly, and in any event within five (5) Business Days of the occurrence, of any Casualty Event affecting Collateral other than Borrowing Base Collateral reasonably expected by the Parent Borrower to result in Net Loss Proceeds in excess of $5,000,000, (b) ensure that the Net Loss Proceeds of any such event (whether in the form of insurance proceeds or otherwise) are collected and applied in accordance with the applicable provisions of the Loan Documents, (c) furnish to the Administrative Agent written notice promptly, and in any event within five (5) Business Days of the occurrence, of any Significant Casualty Event involving Borrowing Base Collateral and (d) furnish to the Administrative Agent written notice promptly, and in any event within five (5) Business Days of the occurrence, of any Disposition outside the Ordinary Course of Business that relates to any Borrowing Base Collateral.

Section 6.14    Anti-Corruption Laws; Sanctions. Except as previously disclosed by PKD and its Subsidiaries in public filings, ensure that PKD and its Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar applicable anti-corruption legislation in other

84

jurisdictions in all material respects and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Laws.

Section 6.15    Further Assurances. (a) Deliver all of the Collateral Documents and (b) from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Loan Party which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement, the other Loan Documents or the DIP Orders which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Parent Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from the Parent Borrower or any of its Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

Section 6.16    Budget.

(a)     The Debtors shall use all proceeds of Loans, and shall operate, strictly in accordance with the Budget, as the Budget may be updated from time to time pursuant to Section 6.16(c) or modified from time to time pursuant to Section 6.16(d), and, in each case, subject to Permitted Variances.

(b)     (i) As of every Thursday (or, if such Thursday is not a Business Day, the immediately succeeding Business Day) commencing with the third week after the Petition Date, the aggregate actual expenditures by the Loan Parties (before any debt service payments) for the immediately preceding period of four (or, in the case of the first Testing Period, three weeks covered by the Budget) consecutive weeks (each, a "**Testing Period**") may not exceed the projected amount therefor set forth in the Budget by more than 10% and (ii) the aggregate actual receipts of the Loan Parties for the Testing Period may not be less than the projected amount therefor by more than 20% (any variance not exceeding such maximum or less than such minimum, a "**Permitted Variance**").  For the purpose of calculating any Permitted Variance, the fees and expenses of any counsel, advisors or other professionals retained by the Loan Parties, the unsecured creditors' committee, the Administrative Agent or the Lenders shall not be considered.

(c)     Not later than 5:00 p.m. Central Time on Thursday of each week (or, if such Thursday is not a Business Day, not later than 12:00 p.m. Central Time on the immediately succeeding Business Day), Parent Borrower will provide the Administrative Agent an extension of the current Budget (to include the rolling thirteenth week), which extension shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders.

(d)     Not later than 5:00 p.m. Central Time on Thursday of each week (or, if such Thursday is not a Business Day, not later than 12:00 p.m. Central Time on the immediately succeeding Business Day) of every fourth week commencing with the first such date after delivery of the Initial Budget, the Parent Borrower may, at its option, submit to the Administrative Agent and the Lenders a proposed Budget for the following rolling 13-week

85

period in form and substance satisfactory to the Administrative Agent and the Required Lenders, which proposed Budget shall replace and supersede the previously delivered Budget upon the approval thereof by the Administrative Agent and the Required Lenders; *provided* that if a Lender has not notified the Administrative Agent of its consent or objection to a proposed Budget within 5 Business Days of the Parent Borrower's delivery thereof, then such Lender shall be deemed to have approved such proposed Budget.

(e)     Not later than 5:00 p.m. Central Time on Thursday of each week (or, if such Thursday is not a Business Day, not later than 12:00 p.m. Central Time on the immediately succeeding Business Day), Parent Borrower will provide the Administrative Agent with a certificate which shall include a variance report certified by a Responsible Officer of Parent Borrower, which variance report shall compare actual cash receipts and disbursements of the Loan Parties with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week period and the Testing Period (or such shorter period as may have elapsed from the date hereof), including written descriptions in reasonable detail explaining any material positive or negative variances, and shall otherwise be in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders.

Section 6.17     Additional Reports.

(a)     As soon as reasonably practicable, but no less than two (2) Business Days prior to filing, Parent Borrower will provide the Administrative Agent drafts of all pleadings, motions, applications, judicial information, financial information and any other documents intended to be filed by or on behalf of the Borrowers or the Guarantors with the Bankruptcy Court or the Office of the United States Trustee, or to be distributed by or on behalf of the Borrowers or any Guarantor to any official committee in the Cases.

(b)     Upon reasonable prior written notice from the Administrative Agent, the Parent Borrower will provide or cause to be provided to the Administrative Agent and the Lenders telephonic weekly updates by the Borrowers and their advisors regarding the Cases and any matters related thereto.

Section 6.18     Bankruptcy Related Affirmative Covenants.

(a)     The Loan Parties shall comply with the DIP Orders and the Cash Management Order, as then in effect, in all material respects, and shall not seek any reversal, vacatur, stay, amendment or modification thereto without the prior written consent of the Administrative Agent and the Required Lenders.

(b)     Except to the extent any failure to comply therewith has been waived by the requisite number or percentage of the Backstop Commitment Parties (as defined in the RSA), the Loan Parties shall comply with the RSA (or, if applicable, the then existing Acceptable Replacement RSA) in all material respects.

(c)     Upon reasonable prior written notice from the Administrative Agent, the Loan Parties shall provide the Administrative Agent and the Lenders with reasonable access to any consultant, turnaround management, broker or financial advisory firm retained by the Loan Parties in any of the Cases. PKD hereby grants the Administrative Agent and the Lenders with such access.

86

# ARTICLE VII
# NEGATIVE COVENANTS

Until the Termination Date, the Parent Borrower shall not, nor shall it permit any Loan Party to, directly or indirectly:

Section 7.1     <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its Property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens for taxes, assessments or governmental charges or claims not yet due or which are being contested in good faith by appropriate proceedings diligently conducted, *provided* that adequate reserves with respect thereto are maintained on the books of PKD or its Subsidiaries, as the case may be, in conformity with GAAP;

(b)     Landlords', carriers', warehousemen's, mechanics', repairmen's, laborers', seamen's, preferred maritime and materialmen's liens or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days, that are being contested in good faith by appropriate proceedings or the payment of which is excused or prohibited by the Bankruptcy Code or is otherwise not authorized to be paid by the Bankruptcy Court;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     deposits to secure the payment or performance of bids, tenders, government contracts, trade contracts (other than for borrowed money), leases, statutory or regulatory obligations, surety and appeal bonds, performance bonds, insurance obligations and other obligations of a like nature incurred in the ordinary course of business;

(e)     easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and which do not in any case materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of PKD or any of its Subsidiaries;

(f)     Liens in existence on the date hereof listed on <u>Schedule 7.1(f)</u>, securing Indebtedness permitted by <u>Section 7.3(d)</u>, *provided* that no such Lien is spread to cover any additional Property after the Closing Date other than all or part of the same property or assets (plus improvements, accessions, proceeds or distributions and directly related general intangibles in respect thereof) that secured or, under the written arrangements under which the original Lien arose, could secure the Indebtedness;

(g)     Liens securing Indebtedness of PKD or any other Loan Party incurred pursuant to <u>Section 7.3(c)</u> incurred for the purpose of financing all or any part of the acquisition purchase price or cost of construction, design, repair, replacement, installation, or improvement of property, plant or equipment used in the business of PKD or such other Loan Party (whether through the direct purchase of such assets or the Equity Interests of the Person owning such assets (but no other material assets)), *provided* that (i) such Liens shall be created prior to or within 120 days after such acquisition, construction or other event, (ii) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness (plus

87

improvements, accessions, proceeds or distributions and directly related general intangibles in respect thereof) and (iii) the amount of Indebtedness secured thereby is not increased;

(h)      Liens created pursuant to the DIP Orders or the Collateral Documents;

(i)      any interest or title of a lessor under any lease entered into by PKD or any other Loan Party in the ordinary course of its business and covering only the assets so leased;

(j)      [reserved];

(k)      judgment Liens not giving rise to an Event of Default under Section 8.1(h);

(l)      Liens upon specific items of inventory or other goods of PKD or any other Loan Party securing such Person's obligations in respect of banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment, or storage of such inventory or other goods;

(m)      Liens securing reimbursement obligations with respect to commercial letters of credit that encumber documents and other property or assets relating to such letters of credit and products and proceeds thereof;

(n)      [reserved];

(o)      [reserved];

(p)      [reserved];

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      Liens on Property or assets under construction (and related rights) in favor of the contractor or developer;

(u)      [reserved];

(v)      bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by PKD or any other Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(w)      maritime liens for crew wages or for salvage and general average and similar liens, each of which is in respect of obligations that are not delinquent for a period of more than 30 days or are being contested in good faith by appropriate proceedings;

88

(x)      Liens on cash collateral and the collateral account in which such cash collateral is held, in each case, securing the Existing Letters of Credit; and

(y)      Liens arising under the Existing 6.75% Senior Notes Indenture or the Existing 7.50% Senior Notes Indenture in favor of the trustee for its own benefit in its capacity as such and not for the benefit of the holders of such Indebtedness;

*provided*, *however*, that nothing in this Section 7.1 shall in and of itself constitute or be deemed to constitute an agreement or acknowledgment by the Administrative Agent or any Lender that any Indebtedness subject to or secured by any Lien, right or other interest permitted under subsections (a) through (y) above ranks in priority to any Obligation.

Section 7.2      Minimum Liquidity. Permit Liquidity to be less than $30,000,000 at any time.

Section 7.3      Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness of any Loan Party pursuant to any Loan Document;

(b)      Indebtedness of PKD to any other Loan Party and of any Loan Party to PKD or any other Loan Party;

(c)      Indebtedness (including, without limitation, in respect of Capitalized Leases and Synthetic Lease Obligations) secured by Liens permitted by Section 7.1(g);

(d)      Indebtedness outstanding on the date hereof and listed on Schedule 7.3(d);

(e)      Guarantees of PKD or any Loan Party in respect of Indebtedness permitted under this Section 7.3 (excluding  Guarantees of Indebtedness permitted under Section 7.3(h));

(f)      the Existing Senior Notes;

(g)      Indebtedness in respect of Swap Contracts permitted under Section 7.13 and Cash Management Agreements.

Section 7.4      Fundamental Changes.   Enter into any merger, consolidation or amalgamation, or liquidate, divide, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all its Property or business or form or acquire any new Subsidiary except that any Loan Party (other than PKD) may be merged or consolidated with or into PKD (*provided* that PKD shall be the continuing or surviving Person), with or into any other Borrower (*provided* that a Borrower shall be the continuing or surviving Person) or with or into any other Loan Party (*provided* that (i) a Loan Party shall be the continuing or surviving Person or (ii) simultaneously with such transaction, the continuing or surviving Person shall become a Loan Party and the Parent Borrower shall comply with Section 6.9 in connection therewith).

Section 7.5      Disposition of Property. Dispose of any Property, whether now owned or hereafter acquired, or issue or Dispose of any Equity Interest of any Person that directly or indirectly owns any of the foregoing, except:

89

(a)     Dispositions permitted by Section 7.4;

(b)     the Disposition of obsolete or worn out property, or property that is no longer used or useful in such Person's business, in the ordinary course of business;

(c)     the Disposition of inventory or other assets in the ordinary course of business or consistent with past practice;

(d)     Dispositions of cash or Cash Equivalents in the ordinary course of business;

(e)     [reserved];

(f)     transfers of assets between or among the Parent Borrower and the other Loan Parties;

(g)     any Dispositions constituted by the granting of Liens permitted by Section 7.1;

(h)     any lease of drill pipe by Quail Tools to a customer located outside of the United States and any subsequent sale to such customer of any such drill pipe; and

(i)     any sale by PKD or any Loan Party to its customers of drill pipe, tools, and associated drilling equipment utilized in connection with a drilling contract for the employment of a drilling rig in the ordinary course of business and consistent with past practice;

*provided*, *that*, notwithstanding the foregoing, this Section 7.5 shall not permit PKD or any of its Subsidiaries to Dispose of a Loan Party.

Section 7.6     Restricted Payments. (i) Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests of PKD or any other Loan Party, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of PKD or any other Loan Party, or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "**Derivatives Counterparty**") obligating PKD or any other Loan Party to make payments to such Derivatives Counterparty as a result of any change in market value of any such Equity Interests or (ii) make any Investment in or to any Person, including any Subsidiary (collectively, "**Restricted Payments**"), except that:

(a)     any Loan Party (other than PKD) may make Restricted Payments to the holders of its Equity Interests on a pro rata basis, or a more favorable basis to any such holder which is a Loan Party;

(b)     any Loan Party may make Investments in or to its Subsidiaries that are also Loan Parties; and

(c)     any Loan Party may make Investments in or to its Subsidiaries that are not Loan Parties in the ordinary course of business and consistent with past practices and subject to the Cash Management Order.

90

Section 7.7    Modifications of Organizational Documents. Amend its Organization Documents in any manner adverse to the Administrative Agent or the Lenders.

Section 7.8    Transactions with Affiliates. Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Parent Borrower or any other Loan Party) unless such transaction is (a) otherwise permitted under this Agreement, and (b) upon fair and reasonable terms no less favorable to the Parent Borrower or such other Loan Party, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, except for transactions permitted by the following sentence. This Section 7.8 shall not apply to the following transactions: (i) any employment agreement entered into by PKD or any of the other Loan Parties in the ordinary course of business and consistent with past practices, (ii) payment of reasonable directors' fees to Persons who are not otherwise Affiliates of PKD, (iii) [reserved], (iv) any Restricted Payment otherwise permitted under Section 7.6 or any Investment in a Loan Party, (v) indemnification agreements with, and payments made, to officers, directors, and employees of PKD or any other Loan Party pursuant to charter, bylaw, statutory, or contractual provisions, (vi) the performance of obligations of PKD or any other Loan Party under the terms of any agreement to which PKD or any other Loan Party is a party as of the date of this Agreement that is disclosed on Schedule 7.8, and any amendments, modifications, supplements, extensions, or renewals of such agreements; provided that any such amendments, modifications, supplements, extensions, or renewals of such agreements are not materially more disadvantageous, taken as a whole, to PKD and/or any other Loan Party than the terms of such agreements as in effect on the date of this Agreement, (vii) transactions consummated in accordance with the RSA, (viii) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements or stock option or stock ownership plans approved by the board of directors of PKD prior to the Closing Date in an aggregate amount payable in cash not to exceed $1,000,000, (ix) loans or advances to employees in the ordinary course of business and consistent with past practices, but in any event not to exceed $1,000,000 in the aggregate outstanding at any one time, (x) dividends and distributions to PKD and its Subsidiaries by any Affiliate, and (xi) transactions between one or more Loan Parties and one or more Subsidiaries of PKD in the ordinary course of business and consistent with past practices.

Section 7.9    Changes in Fiscal Periods. Permit the fiscal year of PKD to end on a day other than December 31 or change PKD's method of determining fiscal quarters.

Section 7.10   Negative Pledge Clauses. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of the Parent Borrower or any other Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Guarantor, its obligations under the Guaranty, other than (a) this Agreement and the other Loan Documents, (b) the Existing 7.50% Senior Notes Indenture and the Existing 6.75% Senior Notes Indenture, (c) any agreements governing any purchase money Liens or Capitalized Leases or other secured Indebtedness otherwise permitted hereby existing on the Closing Date (in which case, any prohibition or limitation shall only be effective against the assets financed thereby or securing such Indebtedness), (d) customary non-assignment provisions in any contract or lease entered into in the ordinary course of business and consistent with past practices, (e) applicable law or any applicable rule, regulation, or order of any Governmental Authority, (f) provisions in effect on the Closing Date with respect to the

US 5954263v9

disposition or distribution of assets or property in joint venture agreements, asset sale agreements, stock sale agreements, and other similar agreements, (g) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business, and (h) any instrument governing Indebtedness assumed in connection with any acquisition of any Person or asset and not incurred in contemplation of such acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired.

Section 7.11    Restrictions on Subsidiary Distributions. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of PKD that is a Loan Party to (a) make Restricted Payments in respect of any Equity Interests of such Loan Party held by, or pay any Indebtedness owed to, the Parent Borrower or any other Loan Party (it being understood that (i) the priority of any preferred equity in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common equity shall not be deemed a restriction on the ability to make distributions on Equity Interests and (ii) the subordination of loans or advances made to PKD or any other Loan Party to other Indebtedness incurred by PKD or any other Loan Party shall not be deemed a restriction on the ability to pay loans or advances), (b) make Investments in PKD or any other Loan Party or (c) transfer any of its assets to PKD or any other Loan Party, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Loan Party imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Equity Interests or assets of such Loan Party, (iii) any restrictions imposed pursuant to agreements governing any purchase money Liens or Capitalized Leases or other secured Indebtedness otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective as to transfers of the assets financed thereby or securing such Indebtedness), (iv) customary non-assignment provisions in any contract or lease entered into in the ordinary course of business and consistent with past practices, (v) applicable law or any applicable rule, regulation, or order of any Governmental Authority, (vi) provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, stock sale agreements, and other similar agreements, *provided* that such provisions apply only to the assets subject to such agreements, and (vii) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business.

Section 7.12    Lines of Business. Enter into any material business except for those businesses directly relating to the oil services industry in which PKD and its Subsidiaries have previously engaged or are engaged on the Closing Date or that are incidental or reasonably related thereto or that are a reasonable extension thereof, as determined in good faith by the Parent Borrower or applicable Subsidiary.

Section 7.13    Swap Contracts. Enter into any Swap Contract other than Swap Contracts entered into in the ordinary course of business, and not for speculative purposes, to protect against changes in interest rates or foreign exchange rates.

Section 7.14    Anti-Corruption Laws. (a) Directly or indirectly use the proceeds of any Credit Extension for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable anti-corruption legislation in other jurisdictions in any material respects. (b) Cause or permit any of the funds of any Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Law.

Section 7.15    Sanctions. Directly or indirectly, use the proceeds of any Credit Extension, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other individual, entity or other Person, for the purpose of funding any activities of or business with any individual, entity or other Person, or in any country or territory, in a manner that will result in a violation of applicable Sanctions, or in any other manner that will result in a violation by any individual, entity or other Person (including any individual, entity or other Person participating in the transaction, whether as underwriter, advisor, investor, Lender, Arranger, Administrative Agent, L/C Issuer or otherwise) of applicable Sanctions.

Section 7.16    Prepayment, etc. of Indebtedness. Except as expressly permitted by the terms and conditions set forth in the DIP Orders and as set forth in the Budget, make any optional prepayment, repurchase, redemption, defeasance, exchange or any other voluntary payment or retirement in respect of any Indebtedness.

Section 7.17    Chapter 11 Claims.  Other than the Carve-Out, incur, create, assume, suffer to exist, or permit any claim or Lien in excess of $250,000 in the Cases (including without limitation any claim under Section 506(c) of the Bankruptcy Code and any deficiency claim remaining after the satisfaction of a Lien that secures a claim) to be on a parity with or senior to the claims of the Administrative Agent for the benefit of the Lenders against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority to do so unless such relief, if granted, would cause the Obligations to be satisfied in full.  The Loan Parties shall not pay fees and expenses to any Professional Person (as defined in the DIP Order) until such Professional Person is authorized to be paid pursuant to any fee procedure approved by the Bankruptcy Court.

Section 7.18    Superpriority Claims.  Create or permit to exist any superpriority claim (including any superpriority administrative claim and all other benefits and protections allowable under Sections 507(b) and 503(b)(1) of the Bankruptcy Code) in excess of $250,000 other than in favor of the Lenders with respect to the Obligations or as expressly permitted in writing by the Administrative Agent.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

Section 8.1    Events of Default. Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Parent Borrower or any other Loan Party fails to (i) pay when and as required to be paid herein, and in the currency required hereunder, any amount of principal of any Loan or any L/C Obligation or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) pay within three Business Days after the same becomes due, any interest on any Loan or on any L/C Obligation, any fee due hereunder or any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants. (i) Any Loan Party shall default in the observance or performance of any agreement contained in Section 6.4(a)(i) or (ii), Section 6.3(a), Section 6.11, Section 6.16, Section 6.17, Section 6.18 or Article VII, or in Article IV of the Security Agreement, (ii) any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1(d), and such default shall continue unremedied for a period of (A) during a Weekly BBC Trigger Period, 3 days or (B) at any other time, 5 days, (iii) any

US 5954263v9

Loan Party shall default in the observance or performance of any agreement contained in Section 6.1 (other than <u>Section 6.1(d)</u>) or <u>Section 6.9(a)(i)</u>, and such default shall continue unremedied for a period of 10 days or (iv)the Parent Borrower shall default in the observance or performance of the obligations under <u>Section 6.10</u>; or

(c)    <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Sections 8.1(a)</u> or <u>(b)</u> above or <u>(d)</u> below) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) written notice thereof from the Administrative Agent to the Parent Borrower (which notice may be given by the Administrative Agent and will be given at the request of the Required Lenders) or (ii) a Responsible Officer of the Parent Borrower or any other Loan Party otherwise becoming aware of such default or any "**Event of Default**" under any Loan Document (other than this Agreement) shall occur and continue to exist beyond any applicable grace period set forth in such Loan Document; or

(d)    <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Parent Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>. (i) Any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) entered into after the Closing Date having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee entered into after the Closing Date or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract entered into after the Closing Date an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which any Loan Party is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which any Loan Party is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by any Loan Party as a result thereof is greater than the Threshold Amount; or

(f)    [reserved]; or

(g)    [reserved]; or

(h)    <u>Judgments</u>. Other than as a result of the filing of the Cases, one or more judgments or decrees shall be entered against any Loan Party involving, for the Loan Parties taken as a whole, a liability (not paid or fully covered by independent third party insurance as

to which the relevant insurance company has acknowledged coverage) in an aggregate amount in excess of the Threshold Amount, and all such judgments or decrees shall not have been paid, vacated, discharged, stayed or bonded pending appeal by the earlier of (i) the date which 60 days from the entry thereof and (ii) the date on which the relevant judgment creditor(s) has begun to enforce such judgment(s) or decree(s); or

(i)       ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of PKD under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount that could reasonably be expected to have a Material Adverse Effect, (ii) PKD or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to have a Material Adverse Effect or (iii) a Foreign Benefit Event occurs which has resulted or could reasonably be expected to result in liability of PKD or one of the other Loan Parties in an aggregate amount that could reasonably be expected to have a Material Adverse Effect; or

(j)       Invalidity of Loan Documents. Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the occurrence of the Termination Date, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)       [Reserved]; or

(l)       [Reserved].

(m)       Milestones.  The failure to meet any of the following milestones; provided that each deadline set forth in clauses (ii), (iii) and (iv) below shall be automatically extended without any further action hereunder to any corresponding date of extension agreed to by the requisite number or percentage of the Backstop Commitment Parties under the RSA; provided, further, that in no event shall any deadline below be extended (x) to a date later than 14 days following the original date set forth herein or (y) to any date subsequent to the Outside Maturity Date:

(i)       obtain entry by the Bankruptcy Court of the Final DIP Order within 40 days after the Petition Date;

(ii)       obtain entry by the Bankruptcy Court of orders approving (i) the Disclosure Statement (as defined in the RSA), (ii) the Rights Offering Procedures (as defined in the RSA), and (iii) the Exit Facility Commitment Letter and Exit Facility Fee Letter, in each case within 45 days after the Petition Date;

(iii)       obtain entry by the Bankruptcy Court of the Confirmation Order by no later than 92 days after the Petition Date; and

(iv)       the Effective Date of the Chapter 11 Plan shall have occurred by no later than the later of (i) 107 days after the Petition Date and (ii) 15 days after the Confirmation Order is entered.

US 5954263v9

(n)     The entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order, as applicable, without the express written consent of the Administrative Agent and the Required Lenders.

(o)     Any Disposition of a material portion of the Collateral pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders or the approved plan of reorganization (or pursuant to a transaction that is permitted under the <u>Section 7.5</u>).

(p)     The conversion of, or the filing of any motion by a Loan Party to convert, any of the Cases to cases under Chapter 7 of the Bankruptcy Code.

(q)     The dismissal of, or the filing of any motion by a Loan Party to dismiss, any of the Cases.

(r)     The appointment of a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any Loan Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under sections 1104(d) and 1106(b) of the Bankruptcy Code.

(s)     The entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such Collateral having a fair market value in excess of $1,000,000.

(t)     The filing by any of the Loan Parties of or the entry of an order confirming, a plan of reorganization or liquidation that does not require indefeasible repayment in full of the Obligations as of the effective date of the plan.

(u)     The termination of the RSA without the prior written consent of the Required Lenders (such consent not to be unreasonably withheld) unless the RSA is replaced substantially contemporaneously with an Acceptable Replacement RSA.

(v)     The commencement of any challenge by a Loan Party with respect to the extent, validity, priority or unavoidability of the Administrative Agent's Liens securing the Obligations, or the entry of any order of any court of competent jurisdiction sustaining any such challenge by any Person, whether or not a Loan Party.

Section 8.2     <u>Remedies Upon Event of Default</u>. If any Event of Default occurs and is continuing, the Administrative Agent, subject to any notice requirement in the DIP Orders, and with the automatic stay provisions of Section 362 of the Bankruptcy Code being automatically vacated and modified as provided in the DIP Orders, including to the extent necessary to permit the Administrative Agent to exercise its rights and remedies without further order of the Bankruptcy Court, shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)     declare the commitment of each Lender to make Loans and any obligation of each L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any

other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Parent Borrower;

(c)     require that the Parent Borrower Cash Collateralize the L/C Obligations (in an amount equal to the then Outstanding Amount thereof; *provided*, *however*, that the Administrative Agent or applicable L/C Issuer may, at any time and from time to time after the initial deposit of Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations and the Parent Borrower shall deposit such additional Cash Collateral); and

(d)     exercise on behalf of itself, the Lenders and the L/C Issuers all rights and remedies available to it, the Lenders and the L/C Issuers under the Loan Documents.

Section 8.3     <u>Application of Funds</u>. After the exercise of remedies provided for in <u>Section 8.2</u> (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to <u>Section 8.2</u>), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under <u>Article III</u> but excluding any principal, interest and Letter of Credit Fees) payable to the Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders and the L/C Issuers (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuers (including fees and time charges for attorneys who may be employees of any Lender or any L/C Issuer) arising under the Loan Documents and amounts payable under <u>Article III</u>), ratably among them in proportion to the respective amounts described in this <u>clause Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees and interest on the Loans, L/C Borrowings and other Obligations arising under the Loan Documents, ratably among the Lenders and the L/C Issuers in proportion to the respective amounts described in this <u>clause Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans, L/C Borrowings and Obligations then owing under Secured Cash management Agreements, ratably among the Lenders, the L/C Issuers and the Cash Management Banks in proportion to the respective amounts described in this <u>clause Fourth</u> held by them;

<u>Fifth</u>, to the Administrative Agent for the account of the L/C Issuers, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn face amount of Letters of Credit;

<u>Sixth</u>, to payment of all other Obligations ratably among the Secured Parties; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Parent Borrower or as otherwise required by Law.

US 5954263v9

Subject to <u>Section 2.3(c)</u>, amounts used to Cash Collateralize the aggregate undrawn face amount of Letters of Credit pursuant to <u>clause Fifth</u> above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

**ARTICLE IX**
**ADMINISTRATIVE AGENT**

Section 9.1    <u>Appointment and Authority</u>. (a) Each of the Lenders and the L/C Issuers hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof (including, for the avoidance of doubt, the execution and delivery of the other Loan Documents), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article, other than the final sentence of <u>Section 9.10</u>, are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuers, and the Parent Borrower shall not have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents (including in its capacity as a potential Cash Management Bank and on behalf of each of its Affiliates that is or may be a Cash Management Bank), and each of the Lenders and each L/C Issuer hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and such L/C Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In connection with all of the foregoing, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to <u>Section 9.5</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this <u>Article IX</u> and <u>Article X</u> (including <u>Section 10.4(c)</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.2    <u>Rights as a Lender</u>. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with PKD or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

98

Section 9.3    Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and each Agent's duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to PKD or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.1 and 8.2) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Parent Borrower, a Lender or an L/C Issuer.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the DIP Orders or the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 9.4    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine

99

US 5954263v9

and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the applicable L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Parent Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.5    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.6    Resignation of Administrative Agent.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuers and the Parent Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Parent Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders and the L/C Issuers, appoint a successor Administrative Agent meeting the qualifications set forth above, *provided* that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed).

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Parent Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Parent Borrower,

100

appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed).

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in Section 3.1(g) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Parent Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Parent Borrower and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.4 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (a) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (b) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

(d)     Any resignation or removal by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as L/C Issuer. If Bank of America resigns as an L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto, including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.3(c). Upon the appointment by the Parent Borrower of a successor L/C Issuer hereunder (which successor shall in all cases be a Lender other than a Defaulting Lender) and the acceptance by such successor L/C Issuer of the rights,

duties and obligations of such capacity hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, (b) the retiring L/C Issuer shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

Section 9.7      Non-Reliance on Administrative Agent and Other Lenders. Each Lender and each L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and each L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.8      No Other Duties, Etc. Anything herein to the contrary notwithstanding, none of the "Bookrunners" or "Arrangers" or the Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or an L/C Issuer hereunder.

Section 9.9      Administrative Agent May File Proofs of Claim; Credit Bidding. In case of the pendency of any proceeding under any Debtor Relief Law, including the Cases, or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Parent Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise.

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers and the Administrative Agent under Section 2.3(i) and (j), 2.9 and 10.4) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses,

102

disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.9 and 10.4.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or any L/C Issuer or in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar Laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.1), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 9.10    Collateral and Guaranty Matters. Each of the Lenders (including in its capacities as a potential Cash Management Bank and for on behalf of each of its Affiliates that is or may be a Cash Management Bank) and each L/C Issuer irrevocably authorize the

103

Administrative Agent, at its option and in its discretion, to (a) [reserved], (b) release any and all Collateral from the Liens created by the Collateral Documents, subordinate any Lien on any and all such Collateral and/or release any and all Guarantors (other than any Borrower) from their respective obligations under the Guaranty at any time and from time to time in accordance with the provisions of the Collateral Documents and (c) execute and deliver, and take any action referred to in the Collateral Documents to evidence any such release or subordination.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Borrower (other than PKD) or Subsidiary Guarantor from its obligations under the Guaranty pursuant to Section 9.10. The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. In addition, the Administrative Agent will have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities of the Parent Borrower, or any other party, or opine or advise on any related solvency issues.

Section 9.11    Secured Cash Management Agreements.  No Cash Management Bank that obtains the benefits of Section 8.3, the Guaranty or any Collateral by virtue of the provisions hereof or of the Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank.

Section 9.12    Lender ERISA Representation.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate

104

accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that:

(i)     none of the Administrative Agent or the Arrangers or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

105

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or the Arrangers or any their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Commitments or this Agreement.

(c)    The Administrative Agent and the Arrangers hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

**ARTICLE X**
**MISCELLANEOUS**

Section 10.1    <u>Amendments, Etc</u>. Any provision of the Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by, (I) in the case of this Agreement, the Parent Borrower and the Required Lenders and acknowledged by the Administrative Agent, and (II) in the case of any other Loan Document, each party thereto and the Administrative Agent (with the consent of the Required Lenders, or otherwise in accordance with the express terms thereof or pursuant to any Loan Document), and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in <u>Section 4.1</u> (other than <u>Section 4.1(b)</u>), or, in the case of the initial Credit Extension, <u>Section 4.2</u>, without the written consent of each Lender;

(b)    without limiting the generality of <u>clause (a)</u> above, waive any condition set forth in <u>Section 4.2</u> as to any Credit Extension without the written consent of the Required Lenders;

(c)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.2</u>) without the written consent of such Lender;

106

(d)      postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(e)      reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or (subject to <u>clause (iii)</u> of the third proviso to this <u>Section 10.1</u> regarding the Fee Letter) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; *provided*, *however*, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Parent Borrower to pay interest or Letter of Credit Fees at the Default Rate even if the effect of such amendment would be to reduce the interest rate on any Loan or L/C Borrowing or to reduce any fee payable hereunder;

(f)      change the definition of "Applicable Percentage", <u>Section 2.12(a)</u>, <u>Section 2.12(f)</u>, <u>Section 2.13</u> or <u>Section 8.3</u> in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender affected thereby;

(g)      amend <u>Section 1.6</u> or the definition of "Alternative Currency" without the written consent of each L/C Issuer;

(h)      change (i) any provision of this <u>Section 10.1</u> or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder, without the written consent of each Lender;

(i)      release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender (except any such release in accordance with a transaction permitted under the Loan Documents);

(j)      release all or substantially all of the value of the Guaranty without the written consent of each Lender (except any such release in accordance with a transaction permitted under the Loan Documents); or

(k)      amend the penultimate paragraph of <u>Section 9.9</u> without the written consent of each Lender;

and, *provided further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by each L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuers under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it (and, notwithstanding anything to the contrary contained herein, any term of any Issuer Document may be amended, waived or otherwise modified with only the consent of only the applicable L/C Issuer and the Parent Borrower); (ii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (x) the Commitment of such Lender may not be increased or extended, nor the principal owed to such

107

Lender reduced or the final maturity thereof extended, without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders (a "**Non-Consenting Lender**"), the Parent Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; *provided* that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Parent Borrower to be made pursuant to this paragraph).

Section 10.2    Notices; Effectiveness; Electronic Communication.

(a)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Parent Borrower, the Administrative Agent, or Bank of America as an L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.2; and

(ii)    if to any other Lender or L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications. Notices and other communications to the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail, FpML messaging and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender or any L/C Issuer pursuant to Article II if such Lender or such L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent, any L/C Issuer or the Parent Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

108

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Parent Borrower, any Lender, any L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Parent Borrower's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to the Parent Borrower, any Lender, any L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc. Each of the Parent Borrower, the Administrative Agent and Bank of America as an L/C Issuer may change its address (including its address for electronic communications), telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender or L/C Issuer may change its address (including its address for electronic communications), telecopier or telephone number for notices and other communications hereunder by notice to the Parent Borrower, the Administrative Agent and the other L/C Issuers. In addition, each Lender and each L/C Issuer (other than Bank of America) agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side

109

Information" portion of the Platform and that may contain material non-public information with respect to PKD or its securities for purposes of United States Federal or state securities laws.

(e)     _Reliance by Administrative Agent, L/C Issuers and Lenders_. The Administrative Agent, the L/C Issuers and the Lenders shall be entitled to rely and act upon any notices (including telephonic or electronic notices, Committed Loan Notices or Letter of Credit Applications) purportedly given by or on behalf of the Parent Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Parent Borrower shall indemnify the Administrative Agent, each L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Parent Borrower. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.3   _No Waiver; Cumulative Remedies; Enforcement_. No failure by any Lender, any L/C Issuer or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.2 for the benefit of all the Secured Parties; _provided_, _however_, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) each L/C Issuer from exercising the rights and remedies that inure to its benefit (solely in its capacity as an L/C Issuer) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 10.8 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and _provided_, _further_, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.2 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.4   _Expenses; Indemnity; Damage Waiver_.

(a)     _Costs and Expenses_. The Borrowers shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arranger and

110

their Affiliates (but limited in the case of legal fees to the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, each L/C Issuer and each Lender, taken as a whole) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by each L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arranger, any Lender or any L/C Issuer (but limited in the case of legal fees to the fees, charges and disbursements of one primary counsel for the Administrative Agent, the Arranger, each Lender and each L/C Issuer, taken as a whole and, if necessary, of regulatory counsel and one local counsel in any relevant jurisdiction to such persons, taken as a whole), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made or Letters of Credit issued hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. Without limiting the foregoing, the Parent Borrower agrees to pay all costs, fees and expenses contemplated by Section 6.12.

(b)     Indemnification by the Borrowers. The Borrowers shall indemnify the Administrative Agent (and any sub-agent thereof), each other Agent, the Arranger, each Lender and each L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrowers or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.1), (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Parent Borrower or any other Loan Party or any of the Parent Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE**; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses,

111

claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Parent Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Parent Borrower or such other Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. This <u>Section 10.4(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, liabilities or related expenses arising from any non-Tax claim.

(c)    <u>Reimbursement by Lenders</u>. To the extent that any Borrower for any reason fails to indefeasibly pay any amount required under <u>subsection (a)</u> or <u>(b)</u> of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), each other Agent, any L/C Issuer or any Related Party of any of the foregoing (and without limiting any Borrower's obligation to do so), each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), such other Agent, such L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), any other Agent or any L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), any other Agent or any L/C Issuer in connection with such capacity; and *provided further* that the obligation to indemnify the L/C Issuers hereunder shall be limited solely to the Lenders. The obligations of the Lenders under this <u>subsection (c)</u> are subject to the provisions of <u>Section 2.12(d)</u>.

(d)    <u>Waiver of Consequential Damages, Etc</u>. To the fullest extent permitted by applicable law, no Borrower shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee referred to in <u>subsection (b)</u> above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    <u>Payments</u>. All amounts due under this Section shall be payable not later than thirty days after written demand therefor (or such later time as the applicable payee shall agree to in writing in its sole discretion).

(f)    <u>Survival</u>. The agreements in this Section shall survive the resignation of the Administrative Agent and each L/C Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

112

Section 10.5   <u>Payments Set Aside</u>. To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent, any L/C Issuer or any Lender, or the Administrative Agent, any L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect, in the applicable currency of such recovery or payment. The obligations of the Lenders and the L/C Issuers under <u>clause (b)</u> of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.6   <u>Successors and Assigns</u>.

(a)   <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>subsection (b)</u> of this Section, (ii) by way of participation in accordance with the provisions of <u>subsection (d)</u> of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>subsection (f)</u> of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>subsection (d)</u> of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the L/C Issuers and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   <u>Assignments by Lenders</u>. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this <u>subsection (b)</u>, participations in L/C Obligations) at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)   <u>Minimum Amounts</u>.

(A)   in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)   in any case not described in <u>subsection (b)(i)(A)</u> of this Section, the aggregate amount of the Commitment (which for this purpose

113

includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Parent Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)     Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)    Required Consents. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Parent Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender with a Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     the consent of each L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding).

(iv)     Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; *provided*, *however*, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)      No Assignment to Parent Borrower or Defaulting Lender. No such assignment shall be made to the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries or to any Defaulting Lender or any of a Defaulting Lender's Affiliates or Subsidiaries.

(vi)      No Assignment to Natural Persons. No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.1, 3.4, 3.5, and 10.4 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, each Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)      Register. The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy (or the equivalent thereof in electronic form) of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Parent Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)      Participations. Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person, or the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries or to any Defaulting Lender or any of a Defaulting Lender's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations) owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole

115

right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.1 that affects such Participant. Subject to subsection (e) of this Section, the Parent Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1 (subject to the requirements and limitations therein, including the requirements under Section 3.1(e) (it being understood that the documentation required under Section 3.1(e) shall be delivered to the participating Lender)), 3.4 and 3.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.8 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Parent Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.1 or 3.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Parent Borrower's prior written consent.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Resignation as L/C Issuer after Assignment. Notwithstanding anything to the contrary contained herein, if at any time Bank of America acting as an L/C Issuer or other Lender that has issued a then-outstanding Letter of Credit assigns all of its Commitment and Loans pursuant to subsection (b) above, Bank of America or such other Lender, as applicable, may, (i) upon 30 days' notice to the Parent Borrower and the Lenders, resign as an L/C Issuer. In the event of any such resignation as L/C Issuer, the Parent Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer hereunder; *provided*, *however*, that no failure by the Parent Borrower to appoint any such successor shall affect the resignation of Bank of America or such other assigning Lender as L/C Issuer, as the case may be. If Bank of America or such other assigning Lender resigns as an L/C Issuer, it shall retain all the rights, powers, privileges and duties of an L/C Issuer hereunder with respect to all Letters

of Credit outstanding as of the effective date of its resignation as an L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.3(c)). Upon the appointment of a successor L/C Issuer, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America or such other retiring L/C Issuer, as the case may be, to effectively assume the obligations of Bank of America or such other retiring L/C Issuer, as the case may be, with respect to such Letters of Credit.

Section 10.7   <u>Treatment of Certain Information; Confidentiality</u>.   Each of the Administrative Agent, the other Agents, the Lenders and the L/C Issuers agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors, independent auditors, legal counsel and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal or administrative process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any of the Borrowers or their obligations hereunder, (g) with the consent of the Parent Borrower, (h) for purposes of establishing a "due diligence" defense or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, (y) becomes available to the Administrative Agent, any other Agent, any Lender, any L/C Issuer or any of their respective Affiliates (and the successors and assigns of the foregoing) on a nonconfidential basis from a source other than the Parent Borrower or (z) is independently developed by the Administrative Agent, any other Agent, any Lender, any L/C Issuer or any of their respective Affiliates (and the successors and assigns of the foregoing). In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

For purposes of this Section, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or any of their respective businesses, other than any such information that is available to the Administrative Agent, any other Agent, any Lender or any L/C Issuer on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, *provided* that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to

117

have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the other Agents, the Lenders and the L/C Issuers acknowledges that (a) the Information may include material non-public information concerning the Parent Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 10.8   Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender, each L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, such L/C Issuer or any such Affiliate to or for the credit or the account of the Parent Borrower or any other Loan Party against any and all of the obligations of the Parent Borrower or any other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or such L/C Issuer, irrespective of whether or not such Lender or such L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Parent Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or such L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness; *provided*, *that* (x) in the event that any Defaulting Lender shall exercise any such right of setoff hereunder, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the L/C Issuer and the Lenders, and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff and (y) no Lender, L/C Issuer or any such Affiliate shall set off against a Dominion Account without the Administrative Agent's prior consent. The rights of each Lender, such L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, such L/C Issuer or their respective Affiliates may have. Each Lender and each L/C Issuer agrees to notify the Parent Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.9   Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Parent Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and

US 5954263v9

(c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.10 <u>Counterparts; Integration; Effectiveness</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in <u>Section 4.1</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (e.g., ".pdf" or ".tiff") shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.11 <u>Survival of Representations and Warranties</u>. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until the Termination Date.

Section 10.12 <u>Severability</u>. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.13 <u>Replacement of Lenders</u>. If any Lender requests compensation under <u>Section 3.4</u>, or if the Parent Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.1</u>, and in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with <u>Section 3.6(a)</u>, if any Lender is a Non-Consenting Lender or a Defaulting Lender, or if any other circumstance exists hereunder that gives the Parent Borrower the right to replace a Lender as a party hereto, then the Parent Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.6</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(a)     the Parent Borrower shall have paid (or caused another Borrower to pay) to the Administrative Agent the assignment fee specified in <u>Section 10.6(b)</u>;

US 5954263v9

(b)       such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Parent Borrower or applicable other Borrower (in the case of all other amounts);

(c)       in the case of any such assignment resulting from a claim for compensation under Section 3.4 or payments required to be made pursuant to Section 3.1, such assignment will result in a reduction in such compensation or payments thereafter;

(d)       such assignment does not conflict with applicable Laws; and

(e)       in connection with any such replacement, if any such Non-Consenting Lender or Defaulting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Non-Consenting Lender or Defaulting Lender, then such Non-Consenting Lender or Defaulting Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Non-Consenting Lender or Defaulting Lender.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Parent Borrower to require such assignment and delegation cease to apply.

Section 10.14  Governing Law; Jurisdiction; Etc.

(a)       GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

(b)       SUBMISSION TO JURISDICTION. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, THE L/C ISSUER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE

US 5954263v9

CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR ANY L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.15 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.16 No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Arranger are arm's-length commercial transactions between such Loan Party and its Affiliates, on the one hand, and the Administrative Agent and the Arranger, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each of the Arrangers is and has been acting

121

solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for such Loan Party or any of its Affiliates, or any other Person and (B) neither the Administrative Agent nor the Arranger has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Arrangers and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their Affiliates, and neither the Administrative Agent nor any Arranger has any obligation to disclose any of such interests to any Loan Party or its Affiliates. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Arrangers with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.17 <u>Electronic Execution of Assignments and Certain Other Documents</u>. The words "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation any Assignment and Assumption, any amendment or other modification hereof (including waivers and consents), amendments or other modifications, Committed Loan Notices, or Letter of Credit Applications) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided* that notwithstanding anything contained herein to the contrary neither the Administrative Agent, the L/C Issuer nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent, the L/C Issuer or such Lender pursuant to procedures approved by it and *provided further* without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

Section 10.18 <u>USA PATRIOT Act</u>. Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Parent Borrower and each other Loan Party that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies the Parent Borrower and each other Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act. The Parent Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "<u>know your customer</u>" and anti-money laundering rules and regulations, including the Act and the Beneficial Ownership Regulation.

Section 10.19 <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance

122

US 5954263v9

with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Parent Borrower in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or any Lender from the Parent Borrower in the Agreement Currency, the Parent Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or any Lender in such currency, the Administrative Agent or such Lender, as the case may be, agrees to return the amount of any excess to the Parent Borrower (or to any other Person who may be entitled thereto under applicable law).

Section 10.20  ENTIRE AGREEMENT.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

Section 10.21  Acknowledgment and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)  the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

123

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

## ARTICLE XI
## THE PARENT BORROWER

Section 11.1    <u>Appointment; Nature of Relationship</u>. PKD is hereby appointed by each of the Borrowers as its contractual representative (herein referred to as the "**Parent Borrower**") hereunder and under each other Loan Document, and each Borrower irrevocably authorizes the Parent Borrower to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents. The Parent Borrower agrees to act as such contractual representative upon the express conditions contained in this <u>Article XI</u>. Additionally, each Borrower hereby appoints the Parent Borrower as its agent to receive all of the proceeds of the Loans, at which time the Parent Borrower shall promptly disburse such Loans to the appropriate Borrower. The Administrative Agent and the Lenders, and their respective officers, directors, agents or employees, shall not be liable to the Parent Borrower or any Borrower for any action taken or omitted to be taken by the Parent Borrower or any Borrower pursuant to this <u>Section 11.1</u>. For the avoidance of doubt, each Loan Party hereby appoints the Parent Borrower to act as its agent for all purposes of this Agreement, the other Loan Documents and all other documents and electronic platforms entered into in connection herewith and agrees that (a) the Parent Borrower may execute such documents and provide such authorizations on behalf of such Loan Party as the Parent Borrower deems appropriate in its sole discretion and each Loan Party shall be obligated by all of the terms of any such document and/or authorization executed on its behalf, (b) any notice or communication delivered by the Administrative Agent, L/C Issuer or a Lender to the Parent Borrower shall be deemed delivered to each Loan Party and (c) the Administrative Agent, L/C Issuer or the Lenders may accept, and be permitted to rely on, any document, authorization, instrument or agreement executed by the Parent Borrower on behalf of each of the Loan Parties.

Section 11.2    <u>Powers</u>. The Parent Borrower shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Parent Borrower by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Parent Borrower shall have no implied duties to any Borrower, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Parent Borrower.

Section 11.3    <u>Employment of Agents</u>. The Parent Borrower may execute any of its duties as the Parent Borrower hereunder and under any other Loan Document by or through authorized officers.

Section 11.4    <u>No Successor Parent Borrower</u>. The Parent Borrower may not resign from its capacity as Parent Borrower under this Agreement.

Section 11.5    <u>Execution of Loan Documents</u>. Each Borrower hereby empowers and authorizes the Parent Borrower, on its behalf, to execute and deliver to the Administrative Agent and the Lenders the Loan Documents and all related agreements, certificates, notices, consents, documents or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including, without limitation, the Compliance Certificates. Each Borrower agrees that any action taken by the Parent Borrower or any other Borrower in accordance with the terms of this Agreement or the other Loan Documents, and the exercise

124

by the Parent Borrower of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

*(Signature pages begin on following page)*

US 5954263v9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWERS:**

**PARKER DRILLING COMPANY**

By: _____
Name: Michael W. Sumruld
Title:  Senior Vice President and
        Chief Financial Officer

**PARKER DRILLING ARCTIC OPERATING, LLC**

By: _____
Name: David W. Tucker
Title:  Vice President and Treasurer

**PARKER DRILLING OFFSHORE USA, L.L.C.**

By: _____
Name: David W. Tucker
Title:  Vice President and Treasurer

**QUAIL TOOLS L.P.**

By:  Quail USA, LLC, its General Partner

By: _____
Name: David W. Tucker
Title:  Vice President and Treasurer

**BANK OF AMERICA, N.A.,**
as Administrative Agent


By: _____
Name: Terrance O. McKinney
Title:   Senior Vice President

**BANK OF AMERICA, N.A.,**
as a Lender and an L/C Issuer


By:   _____
Name:  Terrance O. McKinney
Title:   Senior Vice President

**DEUTSCHE BANK AG NEW YORK BRANCH,**
as a Lender and an L/C Issuer

By: _____
Name:
Title:



By: _____
Name:
Title:

**Acknowledged and Agreed:**

ANACHORETA, INC.
PARDRIL, INC.
PARKER AVIATION INC.
PARKER DRILLING COMPANY NORTH AMERICA,
INC.
PARKER DRILLING COMPANY OF NIGER
PARKER DRILLING COMPANY OF OKLAHOMA,
INCORPORATED
PARKER DRILLING COMPANY OF SOUTH
AMERICA, INC.
PARKER DRILLING MANAGEMENT SERVICES,
LTD.
PARKER DRILLING OFFSHORE COMPANY, LLC
PARKER NORTH AMERICA OPERATIONS, LLC
PARKER TECHNOLOGY, INC.
PARKER TECHNOLOGY, L.L.C.
PARKER TOOLS, LLC
QUAIL USA, LLC
2M-TEK, INC.
PARKER-VSE, LLC


By: _____
Name: David W. Tucker
Title:  Vice President and Treasurer

**EXHIBIT 2**

**BUDGET**

Project Drake
*Debtors' DIP Budget*

| USD 000s | Forecast Wk-1 14-Dec | Forecast Wk-2 21-Dec | Forecast Wk-3 28-Dec | Forecast Wk-4 4-Jan | Forecast Wk-5 11-Jan | Forecast Wk-6 18-Jan | Forecast Wk-7 25-Jan | Forecast Wk-8 1-Feb | Forecast Wk-9 8-Feb | Forecast Wk-10 15-Feb | Forecast Wk-11 22-Feb | Forecast Wk-12 1-Mar | Forecast Wk-13 8-Mar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending (Friday)-->** | | | | | | | | | | | | | |
| **BEGINNING BOOK CASH (DEBTORS)** | $ 15,720 | $ 23,099 | $ 20,788 | $ 20,307 | $ 16,930 | $ 21,357 | $ 24,944 | $ 24,630 | $ 21,080 | $ 26,016 | $ 24,033 | $ 24,160 | $ 22,055 |
| **RECEIPTS** | | | | | | | | | | | | | |
| GOM / Alaska | 482 | 482 | 482 | 575 | 575 | 575 | 575 | 575 | 710 | 710 | 710 | 710 | 825 |
| Quail | 4,248 | 4,248 | 4,248 | 2,982 | 2,982 | 2,982 | 2,982 | 2,982 | 3,549 | 3,549 | 3,549 | 3,549 | 4,180 |
| International Drilling | - | - | - | - | 4,832 | - | - | - | 4,938 | - | - | 4,206 | - |
| **Total Receipts** | 4,730 | 4,730 | 4,730 | 3,557 | 8,389 | 3,557 | 3,557 | 3,557 | 9,198 | 4,259 | 4,259 | 8,466 | 5,005 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | |
| Global Procurement | (756) | (971) | (919) | (1,528) | (973) | (914) | (884) | (884) | (884) | (884) | (884) | (884) | (884) |
| GOM / Alaska Op Ex | (364) | (364) | (364) | (287) | (287) | (287) | (287) | (287) | (275) | (275) | (275) | (275) | (389) |
| Quail Op Ex | (3,200) | (800) | (1,300) | (1,040) | (1,040) | (1,040) | (540) | (1,040) | (1,300) | (1,300) | (800) | (1,300) | (1,300) |
| Payroll and Benefits | (213) | (2,452) | (765) | (2,536) | (791) | (2,513) | (791) | (2,536) | (791) | (2,513) | (791) | (2,536) | (791) |
| Cap Ex | (787) | (794) | (800) | (373) | (379) | (384) | (389) | (392) | (492) | (497) | (501) | (505) | (526) |
| Taxes | (9) | (951) | (273) | (0) | (9) | - | (640) | (14) | (9) | - | (500) | (0) | (9) |
| Corporate G&A | (436) | (709) | (790) | (1,139) | (482) | (757) | (339) | (1,356) | (511) | (774) | (381) | (1,345) | (518) |
| **Total Disbursements** | (5,764) | (7,040) | (5,211) | (6,904) | (3,962) | (5,895) | (3,871) | (6,509) | (4,261) | (6,243) | (4,133) | (6,845) | (4,417) |
| **OPERATING CASH FLOW** | (1,034) | (2,311) | (481) | (3,347) | 4,427 | (2,338) | (314) | (2,952) | 4,936 | (1,983) | 127 | 1,621 | 588 |
| Debtor Professionals | - | - | - | - | - | (2,765) | - | - | - | - | - | (2,784) | - |
| Other Professionals | - | - | - | - | - | (1,310) | - | - | - | - | - | (855) | - |
| UST Fees | - | - | - | - | - | - | - | (525) | - | - | - | - | - |
| Interest & Bank Fees Paid Pre-Petition | (488) | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest & Bank Fees Paid Post-Petition[1] | (1,100) | - | - | (30) | - | - | - | (74) | - | - | - | (86) | - |
| **TOTAL DISBURSEMENTS** | (7,351) | (7,040) | (5,211) | (6,934) | (3,962) | (9,970) | (3,871) | (7,108) | (4,261) | (6,243) | (4,133) | (10,570) | (4,417) |
| DIP Draw / (Paydown) | 10,000 | - | - | - | - | 10,000 | - | - | - | - | - | - | - |
| **NET CASH FLOW** | 7,378 | (2,311) | (481) | (3,377) | 4,427 | 3,587 | (314) | (3,551) | 4,936 | (1,983) | 127 | (2,104) | 588 |
| (+ / -) Voids / Reversals / Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **ENDING BOOK CASH** | $ 23,099 | $ 20,788 | $ 20,307 | $ 16,930 | $ 21,357 | $ 24,944 | $ 24,630 | $ 21,080 | $ 26,016 | $ 24,033 | $ 24,160 | $ 22,055 | $ 22,644 |
| Less: Restricted Cash | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) | (10,029) |
| **ENDING UNRESTRICTED BOOK CASH** | $ 13,070 | $ 10,759 | $ 10,278 | $ 6,901 | $ 11,328 | $ 14,915 | $ 14,601 | $ 11,051 | $ 15,987 | $ 14,004 | $ 14,131 | $ 12,026 | $ 12,615 |
| **ENDING DIP BALANCE** | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 |
| Ending Availability | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| **TOTAL LIQUIDITY** | $ 53,070 | $ 50,759 | $ 50,278 | $ 46,901 | $ 51,328 | $ 44,915 | $ 44,601 | $ 41,051 | $ 45,987 | $ 44,004 | $ 44,131 | $ 42,026 | $ 42,615 |

1. Bank fees not to exceed these budgeted amounts.