**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
01/23/2019

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) Case No. 18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 22** |

**ORDER (I) APPROVING THE
ADEQUACY OF THE DISCLOSURE STATEMENT,
(II) APPROVING THE SOLICITATION AND NOTICE
PROCEDURES WITH RESPECT TO CONFIRMATION OF THE
DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION,
(III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN
CONNECTION THEREWITH, (IV) APPROVING THE RIGHTS OFFERING
PROCEDURES AND RELATED MATERIALS, (V) SCHEDULING CERTAIN
DATES WITH RESPECT THERETO, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an (this "Order"), (a) approving the adequacy of the

*Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling*

*Company and Its Debtor Affiliates* (the "Disclosure Statement"), (b) approving the Solicitation and

Voting Procedures, (c) approving the Voting Record Date, (d) approving the manner and form of

the Solicitation Packages and the materials contained therein, (e) approving the Plan Supplement

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2] Capitalized terms used herein but not otherwise defined have the meanings ascribed in the Motion.

Notice, (f) approving the Non-Voting Status Notices, (g) approving the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan, (h) approving the Voting and Tabulation Procedures, (i) approving the Confirmation Hearing Notice, (j) scheduling certain dates and deadlines related thereto, (k) approving the Rights Offering Procedures, and (l) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

**I.      Approval of the Disclosure Statement.**

2.      The Disclosure Statement, attached hereto as Schedule 1, is hereby approved as providing Holders of Claims and Interests entitled to vote on the Plan with adequate information

to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

3.     The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims and Interests with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

## II.     Approval of the Solicitation and Voting Procedures.

4.     The Debtors shall solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures attached hereto as <u>Schedule 2</u>, which are hereby approved in their entirety.

## III.    Approval of the Materials and Timeline for Soliciting Votes and the Procedures for Confirming the Plan.

### A.     Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.

5.     The following dates are hereby established (subject to modification, as necessary) with respect to the solicitation of votes to accept, and voting on, the Plan and confirming the Plan (all times prevailing Central Time):

| Event | Date |
|---|---|
| Voting Record Date | January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) |
| Solicitation Distribution Deadline | January 25, 2019 |
| Publication Deadline | January 28, 2019 |
| Voting Deadline | February 22, 2019 |
| Confirmation Objection Deadline | February 22, 2019 |
| Deadline to File Confirmation Brief | February 28, 2019, at 4:00 p.m., prevailing Central Time |
| Deadline to File Voting Report | February 28, 2019, at 4:00 p.m., prevailing Central Time |

**B.     Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

6.      In addition to the Disclosure Statement and exhibits thereto, including the Plan and this Order (without exhibits, except the Solicitation Procedures), the Solicitation Packages to be transmitted on or before January 25, 2019 (the "Solicitation Deadline") to those Holders of Claims and Interests in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

a.      the Cover Letter attached hereto as Schedule 6;

b.      a copy of the Solicitation and Voting Procedures;

c.      the Confirmation Hearing Notice attached hereto as Schedule 7;

d.      an appropriate form of Ballot attached hereto as Schedules 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, 3I, and 3J respectively, for each Voting Class in which such Holder holds a Claim;[3]

e.      the Disclosure Statement (and exhibits thereto, including the Plan); and

f.      this Order (without exhibits, except the Solicitation and Voting Procedures, as set forth above).

7.      The Solicitation Packages provide the Holders of Claims and Interests entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Rules.

8.      The Debtors shall distribute Solicitation Packages to all Holders of Claims and Interests entitled to vote on the Plan on or before the Solicitation Deadline.  Such service shall

---

3       The Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicate Claims against the Debtors (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class, receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class.

satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and shall constitute appropriate and sufficient notice to the beneficial holders of Class 4 and Class 5 Claims.

9. The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to Holders of Claims and Interests entitled to vote on the Plan in electronic format (*i.e.*, on a CD-ROM or flash drive). The Ballots, the Cover Letter, and the Confirmation Hearing Notice will ***only*** be provided in paper form. On or before the Solicitation Deadline, the Debtors shall provide (a) complete Solicitation Packages to the U.S. Trustee and (b) the Order (in electronic format) and the Confirmation Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

10. Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Balloting Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense) at no additional cost.

11. The Balloting Agent is authorized to assist the Debtors in (a) distributing the Solicitation Package; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims and Interests; (c) responding to inquiries from Holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan; (d) soliciting votes on the Plan; and (e) if necessary, contacting creditors and equity holders regarding the Plan.

12.     The Balloting Agent is also authorized to accept Ballots via electronic online transmission through a customized online balloting portal on the Debtors' case website.  The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

**C.     Approval of the Confirmation Hearing Notice.**

13.     The Confirmation Hearing Notice, in the form attached hereto as <u>Schedule 7</u>, filed by the Debtors and served upon parties in interest in the chapter 11 cases, including without limitation the beneficial holders of Class 4 and Class 5 Claims, on or before January 25, 2019, constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The Debtors shall publish the Confirmation Hearing Notice (in a format modified for publication) one time, no later than January 25, 2019, in *USA Today* (national edition), the *Houston Chronicle,* and the *Wall Street Journal* (national edition).

14.     The Confirmation Hearing Notice provides Holders of Claims, including without limitation the beneficial holders of Class 4 and Class 5 Claims, Holders of Interests, and other parties in interest with sufficient notice of the release provisions contained in Article VIII of the Plan and the effect thereof.

**D.     Approval of Notice of Filing of the Plan Supplement.**

15.     The Debtors shall send notice of the filing of the Plan Supplement, which will be filed and served no later than 21 days prior to the Confirmation Hearing (or such later date as may be approved by this Court on notice to parties in interest in the chapter 11 cases), substantially in

the form attached hereto as <u>Schedule 8</u>, on the date the Plan Supplement is filed pursuant to the terms of the Plan.

**E.      Approval of the Form of Notices to Non-Voting Classes.**

16.      Except to the extent that the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in Non-Voting Classes, as such Holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation Deadline, the Balloting Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice and an opt out form in lieu of Solicitation Packages, the forms of which are hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2, and 6 | Unimpaired—Deemed to Accept | Will receive a notice, substantially in the form attached to the Order as <u>Schedule 4A</u>, and an opt out form, substantially in the form attached to the Order as <u>Schedule 4B</u>, in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims or Interests that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim or Interest.  As such, Holders of such Claims or Interests will receive a notice, substantially in the form attached to the Order as <u>Schedule 5</u> (which notice shall be served together with such objection). |

17.      The Debtors are not required to provide the Holders of Class 7 Intercompany Claims or Class 8 Intercompany Claims with a Solicitation Package, or any other type of notice in connection with solicitation.

18.      The Debtors are not required to mail Solicitation Packages or other solicitation materials to:  (a) Holders of Claims and Interests that have already been paid in full during the chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant

to an order previously entered by this Court; or (b) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

**F.    Approval of Notices to Contract and Lease Counterparties.**

19.    The Debtors shall mail a notice of assumption or rejection of any Executory Contracts or Unexpired Leases (and any corresponding Cure Claims), substantially in the forms attached hereto as <u>Schedule 9</u> and <u>Schedule 10</u>, to the applicable counterparties to the Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan (as the case may be), within the time periods specified in the Plan.

**G.    Approval of the Procedures for Filing Objections to the Plan.**

20.    Objections to the Plan will not be considered by this Court unless such objections are timely filed and properly served in accordance with this Order. Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with this Court (contemporaneously with a proof of service) and served upon the notice parties identified in the Confirmation Hearing Notice.

**H.    Approval of the Rights Offering Procedures and Rights Offering Materials.**

21.    The Rights Offering Procedures, substantially in the form annexed hereto as <u>Schedule 11</u>, are approved.

22.    The Debtors may modify the Rights Offering Procedures or adopt any additional detailed procedures, consistent with the provisions of the Rights Offering Procedures, to effectuate the Rights Offering and to issue the Rights Offering Shares.

## IV.     Miscellaneous.

23.     The automatic stay, pursuant to section 362 of the Bankruptcy Code, is hereby vacated and modified to the extent necessary to permit the Consenting Stakeholders (as defined in the RSA) and the Commitment Parties (as defined in the Backstop Commitment Agreement) to provide any notices, including notices of termination with respect to such agreements in accordance with and subject to the terms of the RSA and the Backstop Commitment Agreement, as applicable.

24.     The Debtors reserve the right to modify the Plan, in accordance with the terms thereof, without further order of this Court in accordance with Article X of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

25.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of Claim after the Voting Record Date.

26.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

27.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

28.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

29.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

30.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

31.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed:

January 23, 2019

_____
Marvin Isgur
United States Bankruptcy Judge

## SCHEDULE 1

**Disclosure Statement**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR
## THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES

Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:        (713) 836-3600
Facsimile:        (713) 836-3601
Email:        brian.schartz@kirkland.com
        anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        james.sprayregen@kirkland.com
        laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac* vice)
Matthew Fagen (admitted *pro hac* vice)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:        christopher.marcus@kirkland.com
        matthew.fagen@kirkland.com

Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh
(TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4284
Facsimile:        (713) 308-4184
Email:        ptomasco@jw.com
        mcavenaugh@jw.com

Dated: January 23, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *AMENDED JOINT CHAPTER 11 PLAN OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN HOLDERS OF CLAIMS AND INTERESTS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 81 PERCENT OF THE 2020 NOTES, APPROXIMATELY 76 PERCENT OF THE 2022 NOTES, APPROXIMATELY 62 PERCENT OF EXISTING PREFERRED STOCK, AND A MATERIAL AMOUNT OF THE DEBTORS' EXISTING COMMON STOCK. THE DEBTORS URGE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR INTERESTS OR OBJECTIONS TO CLAIMS OR INTERESTS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY

---

[2] Terms shall have the meaning ascribed to them, if any, elsewhere in this Disclosure Statement.

DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN, OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VI, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE 41, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL

NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING

THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION. ..................................................................................................................... 1

II. PRELIMINARY STATEMENT. ........................................................................................... 1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
    PLAN. ..................................................................................................................................... 6

    What is chapter 11? ............................................................................................................... 6
A.  Why are the Debtors sending me this Disclosure Statement? ............................................. 7
B.  Am I entitled to vote on the Plan? ........................................................................................ 7
C.  What will I receive from the Debtors if the Plan is consummated? ..................................... 7
D.  What will I receive from the Debtors if I hold an Allowed Administrative Claim,
E.  Professional Fee Claim, Priority Tax Claim, or DIP Claim? ............................................. 10
    Are any regulatory approvals required to consummate the Plan? ...................................... 12
F.  What happens to my recovery if the Plan is not confirmed or does not go effective? ....... 12
G.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
H.  Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
    "Consummation?" ............................................................................................................... 12
    Is there potential litigation related to the Plan? ................................................................. 12
I.  How will the preservation of the Causes of Action impact my recovery under the Plan? .............. 13
J.  Will there be releases and exculpation granted to parties in interest as part of the Plan? .............. 13
K.  How do I vote for or against the Plan? ............................................................................... 19
L.  What is the deadline to vote on the Plan? ........................................................................... 20
M.  When is the Confirmation Hearing set to occur? ............................................................... 20
N.  What is the purpose of the Confirmation Hearing? ........................................................... 20
O.  What is the Rights Offerings? ............................................................................................. 21
P.  Who do I contact if I have additional questions with respect to this Disclosure Statement
Q.  or the Plan? ......................................................................................................................... 21
    Do the Debtors recommend voting in favor of the Plan? .................................................... 21
R.  Who supports the Plan? ....................................................................................................... 21
S.

IV. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN. ............................ 22
A.  The Restructuring Support Agreement. .............................................................................. 22
B.  The Plan. .............................................................................................................................. 22

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW .......... 26
A.  The Company's Corporate History. .................................................................................... 26
B.  Scope of Operations. ........................................................................................................... 27
C.  Drilling Services. ................................................................................................................. 28
D.  Rental Tools Services. ......................................................................................................... 29
E.  The Debtors' Prepetition Capital Structure. ...................................................................... 30

VI. EVENTS LEADING TO THE CHAPTER 11 FILINGS ..................................................................... 33
A.  Market Decline and Industry-Specific Challenges. ........................................................... 33
B.  Exploration of Strategic Alternatives. ................................................................................ 33
C.  Restructuring Support Agreement, Proposed DIP Financing, and Committed Exit
    Facility. ................................................................................................................................ 36

VII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
     CASES. ................................................................................................................................. 38
A.  Corporate Structure upon Emergence. ............................................................................... 38

| | | | |
|---|---|---|---|
| | | Expected Timetable of the Chapter 11 Cases..................................................... | 38 |
| | | First Day Relief.................................................................................................. | 38 |
| B. | | Other Procedural and Administrative Motions .................................................. | 39 |
| C. | | Schedules and Statements................................................................................... | 40 |
| D. | | Establishment of a Claims Bar Date .................................................................. | 40 |
| E. | | Litigation Matters............................................................................................... | 40 |
| F. | | | |
| G. | | | |
| **VIII.** | **RISK FACTORS.** | ......................................................................................................... | **41** |
| | | Bankruptcy Law Considerations......................................................................... | 42 |
| | | Risks Related to Recoveries under the Plan........................................................ | 45 |
| A. | | Risks Related to the Debtors' and the Reorganized Debtors' Businesses........... | 47 |
| B. | | | |
| C. | | | |
| **IX.** | **SOLICITATION AND VOTING PROCEDURES.** | .......................................... | **53** |
| | | Holders of Claims and Interests Entitled to Vote on the Plan. .......................... | 54 |
| A. | | Voting Record Date............................................................................................ | 54 |
| B. | | Voting on the Plan.............................................................................................. | 54 |
| C. | | Ballots Not Counted........................................................................................... | 55 |
| D. | | | |
| **X.** | **RIGHTS OFFERING PROCEDURES.** | ....................................................... | **56** |
| **XI.** | **CONFIRMATION OF THE PLAN.** | ........................................................... | **56** |
| A. | | Requirements for Confirmation of the Plan. ...................................................... | 56 |
| B. | | Best Interests of Creditors/Liquidation Analysis. ............................................. | 56 |
| C. | | Feasibility........................................................................................................... | 57 |
| D. | | Acceptance by Impaired Classes........................................................................ | 57 |
| E. | | Confirmation without Acceptance by All Impaired Classes. .............................. | 58 |
| F. | | Valuation of the Debtors. ................................................................................... | 59 |
| **XII.** | **CERTAIN SECURITIES LAW MATTERS.** | ............................................... | **59** |
| A. | | New Common Stock; New Warrants; Rights Offering Shares; Backstop Commitment Shares. ............................................................................................ | 59 |
| B. | | Backstop Commitment Agreement. .................................................................... | 60 |
| C. | | Backstop Commitment Shares............................................................................. | 60 |
| D. | | Registration Rights Agreement. ......................................................................... | 60 |
| E. | | Issuance and Resale of New Common Stock and New Warrants Under the Plan. ........................ | 60 |
| **XIII.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.** | ................. | **64** |
| A. | | Introduction........................................................................................................ | 64 |
| B. | | Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors. .......... | 66 |
| C. | | Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Claims and Interests Entitled to Vote............................................... | 68 |
| D. | | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims and Interests Entitled to Vote............................................... | 75 |
| E. | | Information Reporting and Backup Withholding.................................................. | 80 |
| **XIV.** | **RECOMMENDATION.** | ............................................................................... | **81** |

**EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Corporate Organization Chart

EXHIBIT D    Disclosure Statement Order

EXHIBIT E    Liquidation Analysis

EXHIBIT F    Financial Projections

EXHIBIT G    Valuation Analysis

## I.  INTRODUCTION.

Parker Drilling Company ("Parker") and its debtor affiliates, as debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors"), and its non-debtor subsidiaries and certain affiliates (collectively, the "Non-Debtor Affiliates," and together with the Debtors, the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and its Debtor Affiliates* [Docket No. [●]] (the "Plan"), filed contemporaneously herewith.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 Plan for each of the Debtors.

**THE DEBTORS, AND CONSENTING STAKEHOLDERS HOLDING APPROXIMATELY 81 PERCENT OF THE 2020 NOTES, 76 PERCENT OF THE 2022 NOTES, 62 PERCENT OF EXISTING PREFERRED STOCK, AND A MATERIAL AMOUNT OF THE EXISTING COMMON STOCK, HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT AND SUPPORT CONFIRMATION OF THE PLAN.  THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THESE CHAPTER 11 CASES.  ACCORDINGLY, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.  PRELIMINARY STATEMENT.

Parker was founded in 1934 by G.C. Parker as a provider of contract drilling and drilling-related services.  The Company expanded into international markets in 1945, and continued to innovate and expand that business.  In 1975, the Company began trading its Existing Common Stock on the New York Stock Exchange ("NYSE") under the ticker symbol PKD.  In 1996, the Company purchased Quail Tools, Inc., one of the largest providers of rental tools and equipment to exploration, production, and service companies in the Gulf of Mexico ("GOM").  Since this acquisition, the Company has continued to operate and expand both its drilling services and rental tools businesses domestically and internationally.  Today, out of its Houston headquarters, the Company oversees international operations in approximately 19 countries worldwide.  The Debtors currently employ approximately 700 individuals on a full-time basis, of which approximately 380 are salaried and 300 are paid on an hourly basis.  All of the Debtors' employees are employed by the Debtor entities Parker Drilling Management Services, Ltd. ("PDMS") or Quail Tools, L.P. (together with its Debtor affiliates, "Quail").  The Non-Debtor Affiliates employ approximately 1,790 employees.  The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit C**.  As set forth therein, Parker is either the direct or indirect parent company of each of the other Debtors.

Unfortunately, the Company has fallen victim to adverse macro trends in the oil and gas industry.  Such macro trends are driven substantially by the sustained downturn in commodity prices that took place between 2015 and 2017 and the meaningful volatility in 2018 commodity prices.  For example, oil prices rose from approximately $48 per barrel in July 2017 to approximately $77 per barrel in October 2018 and then plunged below $51 per barrel in November 2018:

---

[1]  Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan will govern.**



The Company's success corresponds with the health of the upstream, exploration and production ("E&P") companies that comprise its customer base. Like the Company, the customer base has experienced detrimental impact caused by the oil-price downturn. As illustrated by the EBITDA chart below, in the past several years, the Company has experienced a sustained reduction in demand for its products and has been unable to sustain pricing and margins for its services.



Operating in this adverse macro-environment has negatively impacted the Company's liquidity. The Company's Cash position has declined steadily through 2017 and 2018, and the Company is currently projected to continue depleting its Cash below the minimum sustainable level through 2019. As of the Petition Date, the Debtors have a total of approximately $8.1 million in unrestricted Cash, with the Non-Debtor Affiliates having a total of approximately $32.0 million in Cash. The Debtors' Cash on hand will be used to fund operations during the chapter 11 cases.[2]

---

[2]   As described in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Limited Use of Cash Collateral, (II) Obtaining Post-Petition Credit Secured by Senior Liens, (III) Granting Adequate Protection, (IV) Scheduling*

On a prepetition basis, the Company also had access to an $80.0 million revolving credit facility (the "ABL Facility"). In recent years, a series of amendments reduced the ABL Facility's viability as a source for substantial liquidity. The ABL Facility's maximum availability was reduced from $200.0 million to $100.0 million in May 2016. In February 2018, the maximum availability thereunder was further reduced to $80.0 million, and the facility became an asset-based revolving facility. Moreover, this amendment replaced financial maintenance covenants previously in effect with a liquidity covenant, requiring the Company to maintain $30.0 million of liquidity, $15.0 million of which must be maintained in Cash on hand at all times.

Given its Cash constraints, the Company was expected to begin drawing on the ABL Facility in early 2019. The Company faced the risk that availability under the ABL Facility would be further restricted prior to that point, and that it would be left without viable options for refinancing this facility. As described herein, the superpriority, secured DIP Facility and anticipated, proposed post-Effective Date asset-based Exit Facility will address the Debtors' liquidity issues both during and after these Chapter 11 Cases.

In addition to liquidity concerns, the Debtors faced additional near-term maturities of their 2020 Notes[3] at a time when the Company's leverage is projected to be at or above approximately 5.0x on a last-12-months basis. Any attempt to re-finance these maturities would likely be extremely difficult in the current projected environment under the Debtors' existing capital structure, depicted below as of September 30, 2018.



**CURRENT STATUS QUO ($MM)**

Legend:
- 2020 Notes (maturing Aug. 2020)
- 2022 Notes (maturing July 2022)
- ABL Facility (availability) (maturing Jan. 2020)

---

*A Final Hearing, and (V) Granting Related Relief* [Docket No. 9], and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 7], the Debtors anticipate using cash on hand to fund their operations during the chapter 11 cases, consistent with ordinary practices.

[3] Parker has issued and outstanding $225.0 million aggregate principal amount of 7.50% senior notes due August 2020 (the "2020 Notes"), and $360.0 million aggregate principal amount of 6.75% senior notes due July 2022 (the "2022 Notes," and together with the 2020 Notes, the "Unsecured Notes").

The trading prices of the Debtors' publicly-traded securities reflect all of these circumstances. The following charts depict the Debtors' debt trading history and market capitalization as of December 12, 2018.

### DEBT TRADING HISTORY SINCE JANUARY 2017



### EQUITY TRADING HISTORY SINCE JANUARY 2017



As of the Petition Date, Parker's Existing Common Stock was trading at $1.11, with a total market capitalization of $10.4 million. As detailed herein, Parker struggled prepetition to maintain compliance with the NYSE's listing standards, despite having executed measures to maintain compliance that reduced

the number of Parker's outstanding common shares from approximately 140 million shares to approximately 9.4 million shares. As a result, Parker's average market capitalization for the 30 consecutive trading days prior to the Petition Date fell below the NYSE's minimum market capitalization threshold of $15 million over the previous 30 trading days, which caused the NYSE immediately delist Parker's Existing Common Stock. Following delisting, Parker's common stock now trades on over-the-counter markets under the ticker symbol "PKDSQ."

These circumstances have increased the urgency with which the Debtors enter these Chapter 11 Cases. To protect the inherent values in their businesses and to weather the existing macro-economic challenges, the Debtors have been proactive in developing strategies to maintain their competitive market position. Specifically, in the past several years the Debtors have substantially reduced total headcount, frozen merit-based salary increases for four years, and scaled back 401(k) matching programs significantly. In addition, the Company has undertaken substantial efforts to drive pricing discounts in its supply chain, resulting in an implied savings of approximately $6.0 million since 2017.

Despite the Debtors' efforts, the prolonged industry downturn requires the Debtors to do more to maximize the value of their businesses. Material investments are required to maintain market share and modernize the Debtors' fleet of assets in all of its business segments. The Debtors face obsolescence risk and technology changes while remaining capital constrained. A meaningful investment will be critical for the Debtors to continue to expertly and safely operate its rig assets and to maintain market share in the rental tools industry.

Recognizing these needs, the Debtors evaluated a series of out-of-court transactions, but determined that any such transaction would not adequately resolve the headwinds the Debtors were facing or were at risk of experiencing in the future. Rather than simply hope for a market recovery, or enter into inferior transactions without addressing the viability of the Debtors' capital structure and liquidity issues, the Debtors have negotiated a comprehensive financial reorganization pursuant to the Plan and Restructuring Support Agreement to reduce leverage, extend maturities, provide a recovery to all stakeholders, and increase liquidity.

The Debtors have a concentrated debtholder composition. This composition has provided the Debtors with a unique opportunity to negotiate and achieve a comprehensive restructuring transaction. The Consenting Stakeholders hold approximately 78.5% of the Debtors' Unsecured Notes, approximately 62% of the Debtors' Existing Preferred Stock, and a material amount of the Debtors' Existing Common Stock. After more than six months of diligence and negotiations with Holders throughout the Debtors' capital structure, the Debtors have reached agreement with the Consenting Stakeholders to support a restructuring that will maximize stakeholder recoveries and ensure a viable enterprise upon emergence. The following graphic compares the Debtors' current capital structure with the proposed capital structure contemplated by the Plan and the Restructuring Support Agreement.

| ($ in millions) | Maturity | Amount Committed | Amount Outstanding | Interest Rate | Interest Exp | Cum. Debt/ 2018E EBITDA |
|---|---|---|---|---|---|---|
| **Secured Debt** | | | | | | |
| Revolving Credit Facility | Jan-20 | $80 | $ -- | L + 250-400 | $ -- | -- |
| **Unsecured Debt** | | | | | | |
| Senior Unsecured Notes Due 2020 | Aug-20 | $225 | $225 | 7.50% | $17 | 3.0x |
| Senior Unsecured Notes Due 2022 | Jul-22 | 360 | 360 | 6.75% | 24 | 4.8x |
| **Total Debt** | | | **$585** | | **$41** | **7.7x** |
| Convertible Preferred Stock | Mar-20 | | $50 | 7.25% | N/A | N/A |
| **Pro Forma Capital Structure** | | | | | | |
| **Secured Debt** | | | | | | |
| Revolving Credit Facility | 2023 | [$50 - $100] | $ -- | L+225-275 | $ -- | -- |
| 2nd Lien Term Loan Credit Facility | 2024 | 210 | 210 | 13.00%[1] | 23 | 2.8x |
| **Total Debt** | | | **$210** | | **$23** | **2.8x** |

1. 11% Cash Interest and 2% PIK Interest

Put simply, with a pre-negotiated Plan and key stakeholder support in place pursuant to the Restructuring Support Agreement, the Debtors intend to emerge as a stronger, better-capitalized enterprise positioned to leverage their global platform and generate sustained success.

The formulation of the Restructuring Support Agreement and the Plan is a significant achievement for the Debtors. The level of consensus for this comprehensive reorganization reflects the efforts undertaken by the Debtors and the Consenting Stakeholders, but also the parties' belief in the Debtors' prospects as a reorganized enterprise. More importantly, the Plan leaves Holders of General Unsecured Claims unimpaired, minimizing any potential adverse effect to the Debtors' businesses and trade partners as a result of the restructuring and leaving the Debtors poised to swiftly emerge from bankruptcy. Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of their stakeholders. Given the Debtors' core strengths, including their experienced management team and strategic business plan going forward, the Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability and success. For these reasons, the Debtors strongly recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.

### A.

#### What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.

Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### Why are the Debtors sending me this Disclosure Statement?

**B.** The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### Am I entitled to vote on the Plan?

**C.**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Reserved | | |
| 4 | 2020 Notes Claims | Impaired | Entitled to Vote |
| 5 | 2022 Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Intercompany Claims | Unimpaired, or Impaired | Deemed to Accept, or Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 9 | Existing Preferred Interests | Impaired | Entitled to Vote |
| 10 | Existing Common Interests | Impaired | Entitled to Vote |

**D.**

### What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

Each Holder of an Allowed Claim or Existing Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Existing Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Existing Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Existing Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims ($MM) | Projected Recovery Under the Plan |
| Unclassified Non-Voting Claims Against the Debtors | | | | |
| N/A | Administrative Claims | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Claim, payment in full in Cash. | $44.9 | 100% |
| N/A | Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of its Claim, payments in Cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | $0 | 100% |
| N/A | DIP Claims | Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Holder shall receive payment in full in Cash. | $20.0 | 100% |
| Classified Claims Against and Interests In the Debtors | | | | |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld) either: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement | $9.8 | 100% |

---

[4]  The recoveries set forth below may change based upon changes in the amount of Claims or Interests that are Allowed, as well as other factors related to the Debtors' business operations and general economic conditions.

| | | | | |
|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims ($MM)** | **Projected Recovery Under the Plan** |
| | | of such Other Secured Claim; or (iv) such other treatment rendering such Other Secured Claim Unimpaired. | | |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either: (i) Cash in an amount equal to such Allowed Other Priority Claim; or (ii) such other treatment rendering such Other Priority Claim Unimpaired. | $0 | 100% |
| 3 | Reserved | | | |
| 4 | 2020 Notes Claims | In full and final satisfaction of each Allowed 2020 Notes Claim, each Holder of an Allowed 2020 Notes Claim shall receive its Pro Rata share of: (i) 34.3431% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (ii) $92,571,429.00 of the New Second Lien Term Loan; (iii) 38.4615% of the Noteholder Subscription Rights; and (iv) Cash sufficient to satisfy the Indenture Trustee Expenses, to the extent not otherwise paid by the Debtors. | $231.1[5] | 73% |
| 5 | 2022 Notes Claims | In full and final satisfaction of each Allowed 2022 Notes Claim, each Holder of an Allowed 2022 Notes Claim shall receive its Pro Rata share of: (i) 62.9069% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (ii) $117,428,571.00 of the New Second Lien Term Loan; and (iii) 61.5385% of the Noteholder Subscription Rights; and (iv) Cash sufficient to satisfy the Indenture Trustee Expenses, to the extent not otherwise paid by the Debtors. | $369.9[6] | 69% |
| 6 | General Unsecured Claims | In full and final satisfaction of each Allowed General Unsecured Claim, each Holder thereof shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later of: (i) the Effective Date; or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured | $14.5 | 100% |

---

[5]   Inclusive of accrued interest through December 11, 2018.

[6]   Inclusive of accrued interest through December 11, 2018.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims ($MM) | Projected Recovery Under the Plan |
| | | Claim. | | |
| 7 | Intercompany Claims | Unless otherwise provided for under the Plan, on the Effective Date, Intercompany Claims shall be reinstated, compromised, or canceled at the election of the Debtors (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld), such that Intercompany Claims are treated in a tax-efficient manner. | N/A | N/A |
| 8 | Intercompany Interests | On the Effective Date, Allowed Intercompany Interests shall receive no recovery or distribution and shall be Reinstated solely to maintain the Debtors' corporate structure. | N/A | N/A |
| 9 | Existing Preferred Interests | On the Effective Date, each Existing Preferred Interest in Parker shall be canceled and shall be of no further force and effect. Each Holder thereof shall receive its Pro Rata share of: (i) 1.1% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (ii) the Existing Preferred Stockholder Subscription Rights; and (iii) 40.0% of the New Warrants. | N/A | 28% |
| 10 | Existing Common Interests | On the Effective Date, each Existing Common Interest in Parker shall be canceled and shall be of no further force and effect. Each Holder thereof shall receive its Pro Rata share of: (i) 1.65% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (ii) the Existing Common Stockholder Subscription Rights; and (iii) 60.0% of the New Warrants. | N/A | 3% |

E.  **What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article II of the Plan.

1.  **Administrative Claims.**

Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is

10

Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 2. Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than 3 business days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of Holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### 4. DIP Claims.

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement. Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Holder shall receive payment in full in Cash. Upon the payment and final satisfaction of the Allowed DIP Claims in accordance with the Plan, on the Effective Date, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**F.**            **Are any regulatory approvals required to consummate the Plan?**

There are not expected to be any known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.**            **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 56, and the Liquidation Analysis attached hereto as **Exhibit E**.

**H.**            **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After the Plan is confirmed, there are conditions that need to be satisfied or waived so that the Plan can be Consummated and go effective. *See* Article X of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion on the confirmation procedures.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for such Allowed Claims and Interests in accordance with the applicable Class on the date the Plan becomes effective, *i.e.*, the "Effective Date," or as soon as reasonably practicable thereafter, unless otherwise the Plan provides otherwise.

**I.**            **Is there potential litigation related to the Plan?**

Parties in interest may object to the Plan being confirmed, which potentially gives rise to litigation. In the event that it becomes necessary to confirm the Plan over a Class's objection to or vote to reject the Plan, the Debtors may seek to confirm the Plan notwithstanding such objecting Class' dissent. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan that an impaired class has rejected, if it determines that the plan meets certain requirements for confirmation.

The Bankruptcy Court has established **February 22, 2019, at 4:00 p.m., prevailing Central Time**, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline"). All objections to the Plan's Confirmation must be filed with the Bankruptcy Court and served on the Debtors and certain other

parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan prior to a Confirmation Hearing.

**J.**     **How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following: (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**K.**     **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the other parties to the Restructuring Support Agreement in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement. The Consenting Stakeholders would not have agreed to the terms and conditions of the Restructuring Support Agreement and to support the Plan

pursuant thereto without the release and exculpation provisions, which provide assurances that the Released Parties will not be subject to post-emergence litigation or other disputes related to the restructuring.  The release and exculpation provisions not only benefit the non-Debtor Released Parties and the Exculpated Parties, but also the Debtors' post-emergence enterprise as a whole.

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  For example, each of the Consenting Stakeholders has agreed to, among other things, equitize certain valid debt and backstop a $95 million new equity capital raise.  In addition, many of the Released Parties and Exculpated Parties are entitled to indemnification by the Debtors, which indemnification obligations are expressly preserved under the Plan.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Plan embodies a global settlement of claims and causes of action between the Debtors and the Consenting Stakeholders.  Prior to the Petition Date, the Debtors negotiated a comprehensive Restructuring Support Agreement with the Consenting Stakeholders.  Such efforts culminated in the execution of the Restructuring Support Agreement that carries the support of the Consenting Stakeholders, holding approximately 81% of the 2020 Notes, 76% of the 2022 Notes, 62% of the Existing Preferred Interests, and a material amount of the Existing Common Interests.

To effectuate the global settlement embodied in the Plan, the Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.  These provisions comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good faith, arm's-length negotiations, were material inducements for the Consenting Stakeholders to enter into the Restructuring Support Agreement and the comprehensive settlement embodied in the Plan, and are supported by the Debtors and the Consenting Stakeholders.

       **1.**      **Debtor Release.**

The Debtor release is in the best interest of the Debtors' Estates and well within the Debtors' business judgment.  The Debtors would not be where they are today, on the verge of soliciting and preparing for confirmation of this highly consensual and value-maximizing transaction, without the participation of the Released Parties.  In particular, the Plan provides for releases by the Debtors and related parties of any and all Causes of Action, including any derivative claims, that the Debtors could assert against holders, agents, and trustees of the Debtors' prepetition funded debt and postpetition DIP Facility, the Debtors'

current and former directors and officers, and related parties. In addition to being fair and equitable, the Debtor release is in the best interest of the Debtors' Estates.

Prosecution of any potential Causes of Action released under the Debtor release would be complex and time consuming and could mire the Debtors and parties in interest in litigation rather than effectuation of a highly consensual restructuring. Simply put, as of this time, the Debtors do not believe that they have material Causes of Action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such Causes of Action. Importantly, the Debtor release provides finality and avoids significant delay, and therefore, the inclusion of the Debtor release is worthwhile and inures to the benefit of all of the Debtors' stakeholders.

Additionally, the Plan, including the Debtor release, was vigorously negotiated prepetition by sophisticated entities that were represented by able counsel and financial advisors, including the Consenting Stakeholders, and includes the settlement of Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The release provisions were a necessary element of consideration that these parties required before entering into the Restructuring Support Agreement and agreeing to support the Plan.

Notably, the Parties to the Restructuring Support Agreement (which has broad support of parties across the Debtors' capital structure) have agreed to equitize a significant portion of their Claims and backstop the Rights Offering in order to significantly deleverage the Debtors' prepetition capital structure and provide additional liquidity. With respect to the DIP Agent and Holders of DIP Claims, each provided valuable DIP financing to the Debtors' Estates that allowed the Debtors to finance their restructuring. Moreover, under the existing DIP Credit Agreement, the Debtors have agreed to indemnify the DIP Agent and each DIP Lender. Additionally, upon emergence, the Exit Facility will also include the indemnification provisions as agreed to in the Exit Facility Commitment Letter. In addition, the Indenture Trustee and the Existing ABL Agent are the relevant representatives of the Holders of the respective Notes Claims and Existing ABL Claims. The Indenture Trustee and the Existing ABL Agent may hold indemnification claims against the Debtors under the applicable indentures and/or credit agreement for all losses, damages, claims, liabilities, or expenses that they may incur, including defense costs for claims subject to the release provisions of the Plan. If the Indenture Trustee and Existing ABL Agent do not receive the benefit of the Plan's proposed release provision, they and their constituencies may not support Confirmation of the Plan. Accordingly, the Plan provides the various Released Parties the global closure for which they negotiated in exchange for, among other things, the various concessions and benefits provided to the Debtors' Estates under the Plan.

Further, many of the parties related to the Debtors, such as current and former directors, managers, officers, equity holders (in their capacities as such), and employees may have indemnification rights against the Debtors under applicable agreements for, among other things, all losses, damages, claims, liabilities, or expenses, including defense costs, for claims subject to the release provisions of the Plan against the Debtors' Estates. As such, those indemnifications claims could directly affect the Debtors' Estates. Including these parties in the Debtor release avoids the risk of alter ego and/or derivative liability. Moreover, there is no question that directors, managers, officers, and employees provided (and continue to provide) valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their prepetition responsibilities) to the Debtors' Estates and restructuring efforts throughout this chapter 11 process.

Accordingly, the Debtors submit that the Debtor release is consistent with applicable law, represents a valid settlement and release of claims the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, is a valid exercise of the Debtors' business judgment, and is in the best interests of their estates.

15

2.      **Third-Party Release.**

Similarly, the third-party release is integral to the Plan and is a condition of the settlements embodied therein. This provision of the Plan was heavily negotiated by sophisticated parties, each of whom are represented by competent counsel. The consensual third-party release (together with the Debtor release) are key components of the Debtors' restructuring. Put simply, the Debtors' key stakeholders were unwilling to support the Plan—including agreeing to equitize $375 million of the Debtors' Unsecured Notes and backstop a $95 million rights offering—without assurances that they would not be subject to post-emergence litigation or other disputes related to the restructuring. The third-party release therefore not only benefits the non-Debtor Released Parties, but also the Debtors' post-emergence enterprise as a whole.

Importantly, the third-party release is consensual because it provides Holders of Claims and Interests with the option to opt-out of the third-party release by filing an objection with the Bankruptcy Court. Each of the Disclosure Statement, ballots, notices of non-voting status, and Confirmation Hearing Notice states in bold-faced, conspicuous text that holders of Claims and Interests that ***do not object to the release in the Plan*** will be bound by the third-party release. Accordingly, upon filing an objection with the Bankruptcy Court, such Holders of Claims or Interests are not bound by the third-party releases and no longer have a basis to argue their rights are affected by such release. The third-party release is consensual because it complies with applicable law. ***First***, the third-party release is sufficiently specific to put the Releasing Parties on notice of the released claims. ***Second***, the third-party release is integral to the Plan and is a condition of the settlement embodied therein. These provisions of the Plan were heavily negotiated by sophisticated parties to the Restructuring Support Agreement, each of whom are represented by competent counsel and for which the third-party release was a material inducement to enter into the Restructuring Support Agreement. ***Third***, as described more fully above, each of the Released Parties under the third-party release gave consideration for the third-party release (and are also releasing parties themselves, thereby making the release mutual).

Ultimately, the restructuring contemplated by the Plan is value maximizing and would not be possible absent the support of the Released Parties, many of which (*i.e.*, the Consenting Stakeholders) will also be the Debtors' most significant post-emergence stakeholders. Thus, the third-party release operates to maximize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or costs associated with the continuation of disputes related to the Debtors' restructuring.

3.      **Exculpation.**

In addition to the Debtor and third-party releases, the exculpation clause in the Plan provides that the Exculpated Parties are exculpated from any Causes of Action arising out of acts or omissions related to these Chapter 11 Cases and certain related transactions as set forth therein—except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence. As such, the exculpation clause is reasonable, appropriate, and vital to these Chapter 11 Cases.

***First***, the Debtors and Reorganized Debtors are entitled to the benefits of the exculpation clause. Upon a "good faith" finding within the meaning of section 1125(e) of the Bankruptcy Code, such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation clause. Further, granting such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code.

***Second***, certain other Exculpated Parties owe fiduciary duties in favor of the Debtors' Estates, permitting them to receive the benefits of the exculpation clause. The directors, officers, and professionals that have acted on behalf of the Debtors' in connection with the Chapter 11 Cases owe the Debtors fiduciary duties similar to those the debtor in possession owes to the Estates. Further, the Debtors and their fiduciaries could not possibly have developed the Plan without the support and contributions of the Exculpated Parties.

Accordingly, the failure to approve the exculpation clause would undermine the purpose of the Plan and the settlements set forth in the Plan and the Restructuring Support Agreement by allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Plan when the Exculpated Parties participated in these chapter 11 cases in reliance upon the protections afforded to those constituents by the exculpation clause.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will be prepared to present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

      **4.**      **Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

      **(i)**      **the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;**

      **(ii)**      **any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;**

      **(iii)**      **the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or**

      **(iv)**      **any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud, (ii) the rights of any party under any employment agreement or plan, or (iii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

5.      **Releases by Holders of Claims and Interests.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(i)      the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

(ii)      any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

(iii)      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

(iv)      any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

6.      **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in

18

compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 7. Injunction.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

### 8. Release of Liens.

Except as otherwise specifically provided in the Plan, the New Second Lien Term Loan Agreement, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent(s) for the Exit Facility and the New Second Lien Term Loan to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

### How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan. Holders of Class 4 2020 Notes Claims, Class 5 2022 Notes Claims, and Holders of Class 9 Existing Preferred Interests and Class 10 Existing

Common Interests should return their ballot to their nominee, allowing enough time for the nominee to include the vote on a master ballot, and submit the master ballot by the Voting Deadline. Additional information on the voting process is contained in Article VII below, entitled "Solicitation and Voting Procedures."

| BALLOTS |
|---|
| The Solicitation Agent must **actually receive** ballots on or before the Voting Deadline, which is **February 22, 2019, at 4:00 p.m., prevailing Central Time**, either via the online portal, https://cases.primeclerk.com/parkerdrilling, or at the following address:<br><br>**Parker Ballot Processing,**<br>c/o Prime Clerk LLC,<br>830 3rd Ave, 3rd Floor<br>New York, NY 10022<br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors at:<br><br>(855) 631-5345 (toll free) or (347) 338-6451 (international) |

**M.      What is the deadline to vote on the Plan?**

The Voting Deadline is **February 22, 2019**, at 4:00 p.m. (prevailing Central Time).

**N.      When is the Confirmation Hearing set to occur?**

On December 12, 2018, the Bankruptcy Court entered the *Order Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Disclosure Statement and Plan Confirmation* [Docket No. 68] (the "Scheduling Order"). As part of the Scheduling Order, the Bankruptcy Court has scheduled the Confirmation Hearing for March 5, 2019, at 2:30 p.m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

In addition, pursuant to the Scheduling Order, objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than February 22, 2019 at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

**O.**

**What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**What is the Rights Offerings?**

**P.** The Rights Offering is an opportunity for Holders of 2020 Notes Claims, Holders of 2022 Notes Claims, Holders of Existing Preferred Stock, and Holders of Existing Common Stock to invest up to $95.0 million to acquire New Common Stock, in accordance with each Holder's Subscription Rights. The procedures for participating in the Rights Offering are set forth in the Rights Offering Procedures. The Rights Offering Procedures will be authorized pursuant to the Disclosure Statement Order, attached hereto as **Exhibit D**, and described in Article X of this Disclosure Statement, entitled "Rights Offering Procedures.," which begins on page 56.

**Q.** **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Parker Ballot Processing
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022

*By electronic mail at:*
parkerdrillingballots@primeclerk.com

*By telephone (toll free) at:*
(855) 631-5345 (U.S. and Canada)
(347) 338-6451 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at http://cases.primeclerk.com/parkerdrilling (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

**R.** **Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims and Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**S.** **Who supports the Plan?**

The Plan is supported by the Debtors and the Consenting Stakeholders, as set forth in the following chart:

21

| Support Parties | Support (expressed as an approximate percentage of the total principal amount of Claims or number of Interests outstanding, as applicable) |
| --- | --- |
| Debtors | N/A |
| Holders of 2020 Notes | 81% |
| Holders of 2022 Notes | 76% |
| Holders of Existing Preferred Stock | 62% |
| Holders of Existing Common Stock | A Material Amount |

## IV.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN.

### A.    The Restructuring Support Agreement.

On December 12, 2018, the Debtors and the Consenting Stakeholders holding approximately 81% of the 2020 Notes, 76% of the 2022 Notes, 62% of the Existing Preferred Interests, and a material amount of the Existing Common Interests entered into the Restructuring Support Agreement to implement a prearranged restructuring transaction pursuant to the Plan.  The Restructuring Transactions contemplated by the Plan will significantly reduce the Debtors' funded-debt obligations and result in a stronger balance sheet for the Debtors.

### B.    The Plan.

The Plan contemplates the following key terms, among others described herein and therein:

### 1.    Issuance and Distribution of New Common Stock.

All Existing Interests in Parker shall be canceled on the Effective Date and Reorganized Parker shall issue the New Common Stock to Holders of Claims and Interests entitled to receive New Common Stock pursuant to the Plan, the Rights Offering, and the Backstop Commitment Agreement.  The issuance of New Common Stock shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or by Holders of any Claims or Interests, as applicable.  All New Common Stock issued under the Plan (including the New Common Stock underlying the New Warrants) shall be duly authorized, validly issued, fully paid, and non-assessable.

### 2.    Issuance and Distribution of New Warrants.

On the Effective Date, Reorganized Parker shall issue the New Warrants to Holders of Existing Interests pursuant to the Plan and in accordance with the New Warrant Agreement.  The issuance of the New Warrants, including the underlying New Common Stock, shall be duly authorized without the need for any further corporate action.  The holders of New Warrants shall be deemed to be parties to, and bound by, the terms of the New Warrant Agreement (solely in their capacity as shareholders and warrant holders of Reorganized Parker) without further action or signature.  The New Warrant Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Warrants shall be bound thereby.

### 3.    The Rights Offering.

The Debtors shall distribute the Subscription Rights for the $95.0 million Rights Offering to the Rights Offering Offerees as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the

Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Rights Offering shall be open to all Rights Offering Participants.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Reorganized Debtors shall be authorized to issue the New Common Stock in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.

Pursuant to the Backstop Commitment Agreement, the Commitment Parties shall purchase any Rights Offering Shares not subscribed to by Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement. On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors.

In addition, on the Effective Date, New Common Stock in an amount equal to the Put Option Equity Premium shall be distributed to the Commitment Parties under and as set forth in the Backstop Commitment Agreement.

### 4.    The New Second Lien Term Loan.

On the Effective Date, the Reorganized Debtors shall enter into the New Second Lien Term Loan Agreement and any related documents to the extent a party thereto, including, without limitation, any documents required in connection with the creation or perfection of Liens in connection therewith. The Confirmation Order shall approve the New Second Lien Term Loan, the New Second Lien Term Loan Agreement and all related documents and agreements, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into and execute the New Second Lien Term Loan Agreement and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

The lenders under the New Second Lien Term Loan Agreement shall have valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the New Second Lien Term Loan Agreement and all related documents and agreements. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the New Second Lien Term Loan and all related documents and agreements are granted in good faith as an inducement to the lenders under the New Second Lien Term Loan Agreement to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the New Second Lien Term Loan Agreement and any relevant related documents and agreements.

### 5.    The Exit Facility.

On the Effective Date, the applicable Reorganized Debtors shall enter into the Exit Facility Documents to the extent a party thereto, including, without limitation, any documents required in connection with the creation or perfection of Liens in connection therewith. The Confirmation Order shall include approval of the Exit Facility and the Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under the Exit Facility Documents and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith. Notwithstanding anything in the Plan or Plan Supplement to the contrary, the Exit Facility Lenders shall not be obligated to enter into or fund the Exit Facility other than as set forth in the Exit Facility Commitment Letter and the Exit Facility Fee Letter.

23

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders under the Exit Facility shall have valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Exit Facility Documents. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the Exit Facility Documents are granted in good faith as an inducement to the lenders under the Exit Facility to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents. The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

### 6. Recovery to Holders of 2020 Notes.

In full and final satisfaction of each Allowed 2020 Notes Claim, each Holder of an Allowed 2020 Notes Claim shall receive its Pro Rata share of: (a) 34.3431% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (b) $92,571,429.00 of the New Second Lien Term Loan; (c) 38.4615% of the Noteholder Subscription Rights; and (d) Cash sufficient to satisfy the Indenture Trustee Expenses, to the extent not otherwise paid by the Debtors.

### 7. Recovery to Holders of 2022 Notes.

In full and final satisfaction of each Allowed 2022 Notes Claim, each Holder of an Allowed 2022 Notes Claim shall receive its Pro Rata share of: (a) 62.9069% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (b) $117,428,571.00 of the New Second Lien Term Loan; (c) 61.5385% of the Noteholder Subscription Rights; and (d) Cash sufficient to satisfy the Indenture Trustee Expenses, to the extent not otherwise paid by the Debtors.

### 8. Recovery of Holders of Existing Preferred Interests.

On the Effective Date, each Existing Preferred Interest in Parker shall be canceled and shall be of no further force and effect. Each Holder thereof shall receive its Pro Rata share of: (a) 1.1% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (b) the Existing Preferred Stockholder Subscription Rights; and (c) 40.0% of the New Warrants.

9.      **Recovery to Holders of Existing Common Interests.**

On the Effective Date, each Existing Common Interest in Parker shall be canceled and shall be of no further force and effect.  Each Holder thereof shall receive its Pro Rata share of:  (i) 1.65% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants; (ii) the Existing Common Stockholder Subscription Rights; and (iii) 60.0% of the New Warrants.

10.      **General Settlement of Claims and Causes of Action.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

11.      **Releases.**

The Plan contains certain releases (as described more fully in Article III.K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?," which begins on page 13), including releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders.  Additionally, all Holders of Claims or Interests that do not check the opt out box on the applicable Ballot or the opt-out form (the "Opt-Out Form") distributed to Holders of Claims receiving the Notice of Non-Voting Status and return such Ballot or Opt-Out Form in accordance with the procedures therein will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties.

12.      **Insurance Policies.**

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance).  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain tail coverage under the D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability

25

under, the existing D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

## V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.

### The Company's Corporate History.

**A.** The Company's operations date back to 1934, when G.C. Parker founded Parker's former parent company, "Parker Drilling," in Oklahoma.[7] Today, the Company's headquarters are located in Houston, Texas, where they have been since relocating from Oklahoma in 2001.[8] Parker's direct and indirect subsidiaries total approximately 117 (including the Non-Debtor Affiliates).

In 1945, the Company expanded to the international market with rigs in Venezuela and Canada. In the early 1960s in western Texas, the Company innovated new deep drilling technology that would eventually become the industry standard. In the 1960s and 1970s, the Company set several international depth records using its market-leading technology. During the 1970s and 1980s, the Company revolutionized deep drilling, helicopter-transportable rig technology, and arctic drilling by introducing and refining new technology, rig designs, and movement systems. Many of the Company's cutting-edge advances during these decades are now widely exhibited in drilling technology throughout the world.

During the 1970s and 1980s, the Company also took part in a dramatic expansion in the international drilling market. In 1980, the Company was awarded a drilling contract in the People's Republic of China to work in the Xinjiang province, becoming the first American land drilling company to work in that nation. In addition, the Company signed on to its first operation in New Zealand and its second in Papua New Guinea. Around the same time, the Company also began operations in Somalia, Tanzania, the Sudan, and South America.

In the late 1980s, the Soviet Union launched new oil and natural gas drilling outposts in the Caspian Sea. The Company and the Soviet Union entered into a contract making the Company the exclusive project manager in the planning, design, engineering, and implementation of deep well drilling in these remote locations. In 1991, the Company became the first Western drilling contractor to work in the Siberian Arctic upon its entry into a contract with the Soviet Union to provide state-of-the-art rigs and supervision of certain recovery and development programs. As the 1990s progressed, the Company continued to expand internationally.

In November 1996, the Company purchased Quail and Mallard Bay Drilling, Inc. ("Mallard"), the latter of which later merged into the Debtor entity Parker Drilling Offshore Company, LLC. At the time, Quail was one of the largest providers of tools and equipment to exploration, production, and service companies in the GOM, and this acquisition marked the Debtors' strategic expansion into the equipment rental industry. Mallard, on the other hand, was a leader in transition zone and offshore drilling in the Gulf of Mexico, and with this acquisition the Debtors became a leader in the offshore U.S. drilling market.

On April 22, 2013, the Company acquired International Tubular Services Limited and certain affiliates (collectively, "ITS"), a privately-held international rental tools and well-services company. The purchase of ITS continued the Company's expansion into the equipment rental industry and its offering of

---

[7]  G.C. Parker incorporated the parent company in Oklahoma in 1954, and later incorporated Parker, its wholly-owned subsidiary, in Delaware in 1970. In 1976, the Oklahoma parent company changed its state of incorporation to Delaware through a merger into Parker, a Delaware corporation.

[8]  Debtor PDMS is party to the Debtors' Houston office lease, and its principal place of business is Houston, Texas. Several other Debtors have their principal place of business in Houston as well.

integrated products and services. On April 17, 2015, the Company acquired Debtor entity 2M-TEK, Inc. ("2M-TEK"), a Louisiana-based manufacturer of equipment for tubular running and related well services. The acquisition of 2M-TEK complemented the Company's existing tubular running services ("TRS") business. It also secured the Debtors' access to a proprietary casing running tool while minimizing the total capital cost of TRS equipment.

### Scope of Operations.

**B.** Since beginning operations in 1934, the Company has operated in over 50 countries, and currently has operations in 19 countries. The Company's current geographical operations are highlighted below. The Debtors' Houston-based management team is responsible for overseeing the Company's worldwide operations in these locations.

## MAP OF OPERATIONS



★ Regional Headquarters
■ Country of Operation

The Company's customer base consists of major, independent, and national oil and natural gas E&P companies and integrated service providers. Each of the Company's segments depends on a limited number of key customers, and the loss of any one or more key customers could materially impair a segment. For example, in 2017, Exxon Neftegas Limited accounted for approximately 31.3% of total consolidated revenues of the Company, and BP Exploration Alaska, Inc. accounted for approximately 9.7% of total consolidated revenues.

Today, the Company operates in two distinct, but related, lines of business: (1) drilling services (*i.e.*, oil, natural gas, and geothermal wells) ("Drilling Services"); and (2) rental tools and well services to E&P companies, drilling contractors, and service companies ("Rental Tools Services").

Detailed descriptions of the Company's Drilling Services and Rental Tools Services business lines are provided below.

27

**Drilling Services.**

C. Through its Drilling Services business, the Company drills oil, natural gas, and geothermal wells for customers in both domestic and international markets. This business employs rigs owned by Debtors, Non-Debtor Affiliates, and customers. For drilling services using customer-owned rigs, customers own their own drilling rigs but choose either the Debtors or Non-Debtor Affiliates (depending on location) to operate and manage the rigs pursuant to operations and management service ("O&M") contracts. The nature and scope of activities involved in drilling an oil and natural gas well are the same for Debtor-owned rigs, Non-Debtor Affiliate-owned rigs (as part of a traditional contract) and customer-owned rigs (as part of an O&M contract). The Company separates its Drilling Services business line into two segments: (1) U.S. (Lower 48) Drilling ("U.S. Drilling"); and (2) International & Alaska Drilling ("International Drilling").[9]

## 1. U.S. Drilling.

The U.S. Drilling operations provides drilling services with the Debtors' GOM barge drilling rig fleet, and markets the Company's U.S.-based O&M services. The Debtors currently own 13 barge rigs that comprise its GOM barge drilling fleet. The GOM barge drilling fleet drills for oil and natural gas in shallow waters (*i.e.*, 6-12 feet deep) in and along the inland waterways and coasts of Louisiana, Alabama, and Texas. The barge-drilling industry in the GOM is characterized by cyclical activity where utilization and day rates are typically driven by oil and natural gas prices and customers' access to project financing. The average contract term for GOM barge drilling is 35 days for the year 2018 with a range of 14 to 87 days. As of December 2018, the Company had 3 of its 13 barge rigs working, and since 2015 has had a maximum of 5 working at any one time. The risk factors associated with an industry driven by oil and gas prices and deteriorating market conditions have contributed to the Debtors' decision to commence these chapter 11 proceedings.

In addition, Debtor Parker Drilling Arctic Operating, LLC maintains two land rigs based on the North Slope of Alaska. Here, the Debtors' rigs are used in remote locations with limited infrastructure and harsh environments that present operating challenges, including high pressures, hazardous weather, and geologically challenging terrain. Drilling in such environments requires specialized equipment, considerable drilling experience, a large inventory of spare parts and ancillary equipment, and self-supported service capabilities.

Finally, the Debtors' U.S. Drilling operations currently includes one Debtor-operated O&M contract in California. The typical length of such O&M contracts is one year or more.

For the quarter ended September 30, 2018, the U.S. Drilling operations' revenues decreased from $15.6 million to $6.1 million (or 61%), compared with the quarter ended September 30, 2017. The revenues generated by the U.S. Drilling business during the third quarter of 2018 accounted for approximately 5% of the Company's total aggregate revenues for the quarter.

## 2. International Drilling.

The Company's International Drilling operations are operated through certain of the Non-Debtor Affiliates, with the support and oversight of the Debtors' management team. The International Drilling operations provides drilling and project-related services with both Company-owned rigs and pursuant to

---

[9] The Debtors' operating segments for purposes of Securities Exchange Act reporting do not perfectly align with the distinction between Debtors (which have operations in the United States) and Non-Debtor Affiliates (which have operations outside of the U.S.). For purposes of this Disclosure Statement, the Alaska drilling operations are included in the discussion of U.S. Drilling.

O&M contracts. Currently, the International Drilling fleet is made up of 17 Non-Debtor Affiliate-owned land rigs on Russia's Sakhalin Island, and in Kazakhstan, the Kurdistan Region of Iraq, Tunisia, Colombia, Mexico, and Guatemala. In most cases, International Drilling rigs operate in remote and/or harsh environments, and, as a result, require extensive drilling experience and resources. In addition, Non-Debtor Affiliates provide O&M and ongoing project-related services for customer-owned rigs in Indonesia, Mexico, Kuwait, Canada, and on Sakhalin Island, Russia.

For the quarter ended September 30, 2018, the International Drilling operations' revenues decreased from $51.7 million to $46.2 million (or 11%), compared with the quarter ended September 30, 2017. The revenue generated by the International Drilling operations during the third quarter of 2018 accounted for approximately 37% of the Company's total aggregate revenue for the quarter.

**D.** **Rental Tools Services.**

The Company's Rental Tools Services business provides rental equipment and services to E&P companies, drilling contractors, and service companies on land and offshore in both domestic and select international markets. The Company provides standard and heavy-weight drill pipe (all of which are available with standard or high-torque connections), tubing, pressure control equipment (including blow-out preventers) and drill collars. The Company also provides well construction services such as tubular running services and downhole tools, and well intervention services such as whipstock, fishing and related services, and inspection and machine shop support. Customers use rental tools during drilling programs, which can be cyclical. They may also request tools as needed, which requires the Company to keep a broad inventory of rental tools in stock. Rental tools are usually rented on a daily or monthly basis. The Company's Rental Tools Services business, like its Drilling Services business, is reported as two distinct segments: (1) U.S. rental tools ("U.S. Rental Tools"); and (2) international rental tools ("International Rental Tools").

**1.** **U.S. Rental Tools.**

The U.S. Rental Tools business is operated by the Debtor entities Quail, Parker Tools, LLC, and Quail Tools, L.P., and is based in New Iberia, Louisiana. To support their U.S. Rental Tools business, the Debtors maintain an inventory of rental tools for deepwater, drilling, completion, workover, and production applications at facilities located in Louisiana, Texas, Oklahoma, Wyoming, North Dakota, and West Virginia. The largest single market for rental tools is the U.S. land drilling market, which is a cyclical market driven primarily by oil and natural gas prices and customers' access to financing. A portion of the Debtors' U.S. Rental Tools business involves the supply of tubular goods and other equipment to offshore GOM customers.

The U.S. Rental Tools segment has provided a significant percentage of the Company's revenues. For the quarter ended September 30, 2018 the U.S. Rental Tools business revenues increased from $35.7 million to $50.9 million (or 40.5%), compared with the quarter ended September 30, 2017. The revenues generated by the U.S. Rental Tools business during the third quarter of 2018 accounted for approximately 41% of the Company's total aggregate revenue for the quarter.

**2.** **International Rental Tools.**

The Company's management team also oversees the operations of the International Rental Tools segment, which is based in Dubai, UAE. The Company maintains an inventory of rental tools and provides well construction, well intervention, and surface and tubular services for the Company's customers in the Middle East, Latin America, United Kingdom, Europe, and the Asia-Pacific regions.

For the quarter ended September 30, 2018, revenue generated by the International Rental Tools segment increased from $15.3 million to $20.1 million (or 31.5%), compared with the quarter ended September 30, 2017. The revenue generated by the International Rental Tools segment during the third quarter of 2018 accounted for approximately 16% of the Company's total aggregate revenue for the quarter.

### The Debtors' Prepetition Capital Structure.

**E.** As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $585.0 million. Prior to the Petition Date, Parker issued 500,000 shares of outstanding Existing Preferred Stock with a liquidation preference of $100 per share and 9.4 million shares of outstanding Existing Common Stock. The Debtors' common stock is currently trading on the over-the-counter markets under ticker symbol "PKDSQ." The primary components of the Debtors' consolidated funded debt obligations outstanding and equity interests as of the Petition Date are as follows:

| Funded Debt Obligations | Maturity | Outstanding Principal Amount |
|---|---|---|
| ABL Facility | January 2020 | $0[10] |
| 2020 Notes | August 2020 | $225.0 million |
| 2022 Notes | July 2022 | $360.0 million |
| **Total Outstanding Debt** | | **$585.0 million** |
| **Equity Interests** | **Liquidation Preference / Share Price** | **Liquidation Preference/Market Capitalization** |
| Existing Preferred Stock | $100 per share | $50.0 million liquidation preference |
| Existing Common Stock | $1.11 per share | $10.4 million Total Market Cap |

### 1.  ABL Facility.

In 2008, Parker entered into a secured lending facility, by and among Parker as borrower, certain of the Debtors as guarantors, Bank of America, N.A. ("BofA") as Administrative Agent and L/C Issuer. Following several amendments and reductions, prior to the Petition Date, this facility was an $80.0 million ABL Facility. The Debtors' obligations under the ABL Facility were secured by first-priority liens on the Debtors' accounts receivable, certain rigs (including barge rigs in and along the inland waterways and coast of the continental U.S and the GOM, and land rigs in Alaska), certain U.S.-based rental equipment, and the equity interests of certain of Parker's subsidiaries. The ABL Facility was set to mature on January 26, 2020.

In addition to the reduction of the borrowing capacity and the transition to an asset-based lending facility, the February 2018 ABL Facility amendment also: (a) replaced the financial maintenance covenants previously in effect with a liquidity covenant that requires the Debtors to maintain a minimum of

---

[10]  The Debtors believe that as of the Petition Date, there were no obligations outstanding under the ABL Facility. As of the Petition Date, the ABL Facility was canceled. On January 3, 2019, the Court entered the *Final Order Authorizing Limited Use of Cash Collateral, Obtaining Post-Petition Credit Secured by Senior Liens, Granting Adequate Protection, Scheduling a Final Hearing, and Granting Related Relief* [Docket No. 174] (the "Final DIP Order") approving the DIP Facility on a final basis. The DIP Facility effectively replaced the ABL Facility as the Debtors' principal secured financing.

$30.0 million of liquidity, $15.0 million of which must be maintained in Cash on hand; (b) added a monthly borrowing base calculation based on eligible rental equipment and eligible domestic accounts receivable; and (c) removed the Debtors' ability to make certain restricted payments.

The ABL Facility was available for general corporate purposes and could be used to support the letters of credit issued by Parker and its subsidiaries (collectively, the "LCs"). As of October 31, 2018, the borrowing base under the ABL Facility was $79.4 million, which was further reduced by $15.0 million of restricted liquidity. Prior to the Petition Date, $64.4 million was available to the Debtors under the ABL Facility. Prior to the Petition Date, all outstanding LCs were collateralized with Cash.

The ABL Facility was cancelled upon the Debtors' chapter 11 filing. On, January 3, 2019, the Court entered the Final DIP Order, which approved the DIP Facility on a final basis. Upon approval of the DIP Facility, the DIP Facility effectively replaced the ABL Facility as the Debtors' principal source of secured credit. The DIP Facility is funding the Debtors during these Chapter 11 Cases and will provide bridge financing through the Debtors' entry into the Exit Facility.

### 2. The 2020 Notes.

On July 30, 2013, Parker issued the 2020 Notes pursuant to an indenture between Parker, as issuer, certain of the other Debtors, as guarantors, and The Bank of New York Mellon Trust Company, N.A. ("BoNY"), as trustee. The 2020 Notes are unsecured obligations of the Debtors and rank equal in right of payment with all of the Debtors' existing and future senior unsecured indebtedness. The 2020 Notes require semi-annual coupon payments on February 1 and August 1 of each year. As of the Petition Date, $225.0 million of the 2020 Notes is outstanding.

### 3. The 2022 Notes.

On January 22, 2014, Parker issued its 2022 Notes pursuant to an indenture between Parker, as issuer, certain of the other Debtor entities, as guarantors, and BoNY, as trustee. The 2022 Notes are unsecured obligations of the Debtors and rank equal in right of payment with all of the Debtors' existing and future senior unsecured indebtedness. The 2022 Notes require semi-annual coupon payments on January 15 and July 15 of each year. As of the Petition Date, $360.0 million of the 2022 Notes is outstanding.

### 4. The Debtors' Equity Interests.

#### (i) Preferred Stock.

In February 2017, Parker issued 500,000 shares of its Existing Preferred Stock. The Existing Preferred Stock was issued at a par value of $1.00 per share with a liquidation preference of $100 per share. At any time prior to March 31, 2020, each holder of the Company's Existing Preferred Stock may convert such ownership into shares of Parker's Existing Common Stock at the rate of 2.7605 shares of Existing Common Stock per share of Existing Preferred Stock. Though available on the over-the-counter market, Parker's Existing Preferred Stock is illiquid.

#### (ii) Common Stock.

Prior to the Petition Date, Parker's Existing Common Stock was publicly-traded, and began trading on the NYSE under the ticker symbol PKD in 1975. Prior to that, in 1969, Parker executed its first public offering and traded on the over-the-counter market until listed on the NYSE. After reaching its highest

trading price at $126.15 per share on November 8, 2013, the share price of Parker's Existing Common Stock has steadily declined over the past several years.[11]

In January 2018, the NYSE notified Parker that its Existing Common Stock could soon be delisted because its average closing price was below $1.00 per share over a prior 30 consecutive day trading period. Soon after, Parker regained compliance through a temporary increase in share price. On March 15, 2018, the Debtors announced that the NYSE had notified Parker of its non-compliance with the minimum closing price standard for continued listing. To cure this deficiency, on July 12, 2018, Parker implemented a reverse stock split of its Existing Common Stock, effective as of July 27, 2018, at a ratio of one-for-fifteen common shares. The reverse stock split increased the market price per share of Parker's Existing Common Stock and brought the stock into compliance with the listing requirements of the NYSE. However, the reverse stock split reduced the number of Parker's outstanding common shares from approximately 140 million shares to approximately 9.4 million shares.

Simultaneously with the reverse stock split, Parker adopted a shareholder rights plan (the "Rights Plan") designed to prevent any Holder or group of Holders from obtaining effective control in Parker and effectively blocking strategic actions that may be beneficial to all shareholders without paying a fair control premium. Pursuant to the Rights Plan, Parker's Board of Directors (the "Board") declared a dividend of one right (each, a "Right") for each outstanding share of Existing Common Stock to stockholders of record as of the close of business on July 27, 2018. The Rights issued under the Rights Plan would have become exercisable only if a person or group of persons (such person or persons, an "Acquiring Person") acquired beneficial ownership of 10% or more of Parker's Existing Common Stock, subject to certain grandfathering provisions and other exceptions.

On August 23, 2018, the Board unanimously voted to amend the Rights Plan to reduce the triggering threshold to 4.9%, which was again subject to certain grandfathering provisions and other exceptions intended to protect the potential future value of the Debtors' net operating losses ("NOLs"), foreign tax credits, and other tax attributes (collectively, the "Tax Attributes"). As of December 31, 2017 the Debtors had approximately $460.0 million of federal NOLs and $37.0 million of foreign tax credits.

Subject to certain exceptions, the Rights will expire at the close of business on July 12, 2019. If the Rights Plan is triggered, each holder of a Right (other than the Acquiring Person) will be entitled to acquire shares of Parker's Existing Common Stock at a 50% discount. Parker may also exchange each Right held for two shares of Parker's Existing Common Stock. Prior to the Petition Date, the Board passed a resolution to exempt the restructuring contemplated by the Restructuring Support Agreement and the Plan from the Rights Plan.[12]

Despite these efforts to preserve equity value, on December 12, 2018, the NYSE delisted Parker's Existing Common Stock because the Debtors' average market capitalization over the prior 30 consecutive trading day period fell below the NYSE's minimum $15 million threshold. Parker's common stock now trades exclusively on over-the-counter markets under the ticker symbol "PKDSQ."

---

[11]   All stock prices in this Disclosure Statement reflect post-July 27, 2018, reverse stock split prices.

[12]   The Restructuring Support Agreement and Plan contemplate that as of the Effective Date of the Plan, the Rights Plan will be terminated.

## VI.      EVENTS LEADING TO THE CHAPTER 11 FILINGS.

### Market Decline and Industry-Specific Challenges.

**A.** Oil and natural gas prices have declined substantially since 2014.  This sustained market decline has had a severe and adverse effect on the Debtors' financial performance given that demand for the majority of the Debtors' services is dependent on the levels of capital expenditures by the oil and gas industry.

Specifically, this environment has created downward pricing and margin pressure for the Debtors' services, in addition to delays or cancellations in projects, general business disruptions, and delays in or nonpayment of amounts that are owed to the Debtors.  Critically, a decline in drilling activity has also resulted in an oversupply and underutilization of drilling rigs.  For example, for the three months ended September 30, 2018, the rig utilization rate of the Debtors' U.S. Drilling business declined from 75% to 15%, as compared with the identical three month period from 2014.  Furthermore, operators implemented significant reductions in capital spending, and the Debtors expect operators to continue to operate under reduced budgets for the foreseeable future.  In addition, a movement toward land-based unconventional oil and gas assets has resulted in less GOM investment, and therefore decreased utilization of the Debtors' U.S. Drilling barges.  While the Debtors' U.S. Rental Tools business has generally performed well, pricing remains significantly reduced from previous years.

### B.      Exploration of Strategic Alternatives.

In response to these operating and financial challenges, the Debtors instituted measures to ensure frugality and the preservation of capital.  To maximize liquidity and protect the Debtors' ability to continue ordinary course business operations amidst market challenges, the Debtors reduced their employment-related expenses through headcount reduction, salary freezes, and benefit reductions.  However, it became clear to the Debtors that such measures alone would not be sufficient to meet future capital requirements and satisfy financial obligations.

In late 2017 and into early 2018, the Debtors began to consider whether they could address their liquidity and upcoming maturity issues through a more comprehensive restructuring.  In February 2018, the Debtors retained Moelis & Company ("Moelis") as investment banker to assist the Debtors in their strategic review.  The Debtors performed detailed and iterative reviews of their financial performance and forecasts, which culminated in a detailed, bottoms-up analysis of each of their businesses.  Concurrently with these analyses, independent equity analysts were consistently forecasting oil prices to remain relatively flat for the 2018 to 2021 period, ranging from approximately $61 per barrel to approximately $63 per barrel.  In addition, the oil futures strip, which forms the basis for billions of dollars in oil futures trading (the "Oil Strip"), was forecasting a downside scenario with oil dropping from approximately $67 per barrel in 2018 to approximately $54 per barrel in 2021.  Each of these scenarios was expected to drive the Debtors' customers to meaningfully different budgeting decisions, and hence lead to a meaningfully divergent financial performance for the Debtors.

Using these forecasts, the Debtors explored and stress tested the impact to their projected financial performance and flexibility in a variety of potential restructuring transactions including (a) a potential up-tier exchange of all or a portion of its 2020 and 2022 Notes (the "Uptier Exchange"); (b) raising additional first lien debt in conjunction with an uptier exchange (the "New Money Led Exchange"); and (c) a new money senior secured financing (the "First Lien Transaction," and together with the Uptier Exchange and New Money Led Exchange, collectively, the "Out-Of-Court Transactions").  The Debtors considered these options because in total, the Debtors had $280.0 million in availability to incur first lien debt, inclusive of any availability under the ABL Facility.  In the event that the Company drew under the ABL Facility, first lien capacity would have been reduced by a corresponding amount.

33

When evaluating the above Out-of-Court Transactions, the Debtors focused on certain goals they hoped to achieve through a potential restructuring, including: (1) achieving at least $100.0 million to $150.0 million of liquidity at exit; (2) deleveraging their balance sheet and maximize strategic flexibility; (3) extending debt maturity runway; (4) preserving current equity value; (5) obtaining future capital structure flexibility; and (6) maximizing the stability of the Company's employee and customer base.

The Debtors retained Kirkland & Ellis LLP ("Kirkland") as legal advisors in May 2018, and Alvarez and Marsal North America, LLC ("Alvarez") as restructuring and financial advisors in July 2018 (Moelis, Kirkland, and Alvarez, collectively, the "Advisors"), to work with the Debtors and Moelis in their continued exploration of strategic alternatives to maximize value well ahead of debt maturities and while they still had liquidity runway. Together, the Debtors and their Advisors continued to analyze the Debtors' capital structure, potential sources of liquidity, and runway. This analysis resulted in a preliminary view that a more comprehensive transaction—which not only provided liquidity and runway but more broadly optimized the Debtors' overall capital structure—could help the Debtors weather future potential volatility in the oil & gas industry and maximize value for all stakeholders.

The Debtors were concerned that each of the Out-Of-Court Transactions did not sufficiently achieve the Debtors' above listed goals. Each of the Out-Of-Court Transactions would have: (1) left the Debtors substantially over-levered (and in most cases, more levered than they currently are); (2) made refinancing the 2020 Notes challenging, especially in a downside oil-price scenario as was forecast by the Oil Strip; and/or (3) made employee and customer retention significantly challenging and further jeopardized the health of the Debtors. As depicted below, the Debtors determined that an Out-Of-Court Transaction represented a "band-aid" approach.

| | $100-$150 million Liquidity | Deleveraging / Increase Strategic Flexibility | Extend Debt Maturity Runway | Maintain Future Capital Structure Flexibility | Employee / Customer Stability |
|---|---|---|---|---|---|
| Status Quo | ✗ | ✗ | ✗ | ✓ | ✗ |
| Uptier Exchange | ✗ | ✗ | ✓ | ✗ | - |
| New Money Led Exchange | ✓ | ✗ | ✗ | ✗ | ✗ |
| First Lien Transaction | ✓ | ✗ | ✗ | ✗ | ✗ |

As noted above, the primary components of Parker's capital structure are the Unsecured Notes and Parker's Existing Preferred and Existing Common Stock. Around the time the Advisors were analyzing the viability of a potential First Lien Transaction, the four initial Consenting Stakeholders—Brigade, Highbridge, Värde, and Whitebox (the "Initial Consenting Stakeholders")—began engaging with the Company's management team. The Initial Consenting Stakeholders retained Akin Gump Strauss Hauer & Feld LLP ("Akin") and Houlihan Lokey Capital, Inc. ("Houlihan," and together with Akin, the "Initial Consenting Stakeholders' Advisors") as their legal and financial advisors, respectively. These discussions presented the Debtors with the unique opportunity to engage with just four stakeholders who hold disparate portions individually, but together own a substantial amount of the capital structure.

In pursuit of a potential comprehensive solution, beginning in May 2018, the Debtors commenced negotiations with the four Initial Consenting Stakeholders and the Initial Consenting Stakeholders' Advisors. In July 2018, each Initial Consenting Stakeholder signed a non-disclosure agreement with the Debtors and the Debtors provided them with access to certain of the Debtors' confidential information to facilitate consideration of a potential restructuring transaction. Since the Initial Consenting Stakeholders became restricted, the Debtors and their Advisors have engaged in numerous substantive meetings and telephone conferences with the Initial Consenting Stakeholders and the Initial Consenting Stakeholders' Advisors regarding comprehensive restructuring alternatives that would strengthen the Debtors' balance

sheet and provide necessary liquidity. The Debtors, through their Advisors, provided the Initial Consenting Stakeholders' Advisors with substantial diligence regarding the Debtors' operations. Over the course of the past several months, the Debtors have held multiple in-person and telephonic conferences with the Initial Consenting Stakeholders Advisors and the Initial Consenting Stakeholders, and otherwise regularly corresponded to develop a value-maximizing transaction for all constituents. The wide breadth of the Initial Consenting Stakeholders' holdings throughout the capital structure contributed to a negotiation that accounted for the interests of the entire capital structure, and eventually resulted in a consensual Plan that holds wide-ranging support.

Following these exchanges and negotiations, in mid-September, 2018, the Debtors and the Initial Consenting Stakeholders discussed the terms of a comprehensive restructuring proposal that the Debtors viewed as value maximizing and beneficial to all parties. This proposal contemplated $117.0 million of the 2020 Notes and $223.0 million of the 2022 Notes to be converted to equity in the reorganized Parker, a $245.0 million issuance of new second lien notes, and a $35.0 million Rights Offering. Shortly thereafter, the Debtors and the Initial Consenting Stakeholders agreed to begin documentation of a transaction based on these terms and to finalize certain other open deal terms.

In connection with that discussion, the Debtors, through Moelis, began to market exit financing facilities contemplated under that framework. During that process, it became clear that there were significant financing obstacles for that prospective capital structure. Additionally, as negotiations with the Initial Consenting Stakeholders on definitive documentation progressed during the latter part of 2018, volatility in the financial markets, plus the decline and increased volatility in oil prices that the Debtors had feared earlier in the year began to occur. In other words, the concerns that had dissuaded the Debtors from executing a restructuring strategy reliant on Out-of-Court Transactions earlier in 2018 had started to come to pass.

Indeed, the changing landscape required modifications to the restructuring framework under discussion, including an increase in the new capital that would be raised pursuant to the Rights Offering from $35.0 million to $95.0 million with the full amount being applied to the balance sheet. With a committed $95.0 million equity Rights Offering, the Debtors were able to secure a $50.0 million exit financing commitment that included the option to obtain an additional $50.0 million in financing via a syndication process. After continued negotiations, the Debtors and the Initial Consenting Stakeholders agreed on the terms and details of a transaction that the Debtors believe maximizes value to all stakeholders, while providing an opportunity for significant recovery to prepetition Holders of Existing Interests.

In the weeks leading up to the Petition Date, uncertainty in the commodity and capital markets drove the Debtors to move with all haste to finalize their negotiations and lock in a deal that they believe will maximize value. Accordingly, on December 12, 2018 the Debtors and the Initial Consenting Stakeholders executed the Restructuring Support Agreement and an agreement, filed as an exhibit to this Disclosure Statement, and pursuant to which the Initial Consenting Stakeholders (as the "Commitment Parties") agreed to backstop the Rights Offering (the "Backstop Commitment Agreement").[13]

Throughout these discussions, the Debtors also engaged in conversations and negotiations with Saba, the largest Holder of Parker's Existing Common Stock and a Holder of Unsecured Notes. In August 2018, the Debtors entered into a confidentiality agreement with Saba and agreed to publicly disclose after

---

[13]   The Backstop Commitment Agreement contemplates that the Debtors, contemporaneously with the signing of the Backstop Commitment Agreement, would pay $7.6 million of the premium that is to be paid to the Commitment Parties under the Backstop Commitment Agreement (such amount, the "Put Option Cash Premium"). The Backstop Commitment Agreement provides that, under certain circumstances, the Commitment Parties will refund the Put Option Cash Premium. In connection with the closing of the proposed Restructuring Transactions, the Commitment Parties will pay the Debtors the Put Option Cash Premium in exchange for the Put Option Equity Premium (as defined in the Backstop Commitment Agreement).

a specific period of time all material non-public information provided thereto. While Saba made certain financing and/or restructuring proposals to the Debtors, the Debtors determined that pursuing such transactions would not maximize value for the Debtors' stakeholders. Contrary to Saba's assertion that its proposed transaction provided "significant flexibility" to the Debtors, the Debtors and their Advisors determined that Saba's proposals would have increased the Debtors' leverage and the amount of secured debt, thereby decreasing go-forward flexibility. The Debtors' attempts to continue a dialogue through an extension of the confidentiality agreement with Saba were initially unsuccessful, and as a result, on November 5, 2018, the Debtors filed a Form 8-K to satisfy their public disclosure obligations to Saba.[14]

The Debtors received an additional alternative transaction proposal from Saba on January 12, 2019 (the "Alternative Proposal"). The Debtors adjourned the hearing on the Disclosure Statement originally scheduled for January 15, 2019 to January 22, 2019 to allow the Debtors additional time to evaluate and consider the Alternative Proposal. The Debtors determined that the Alternative Proposal was not superior to the existing transaction, particularly because the Alternative Proposal would not increase recoveries to each class of Claims and Interests that is Impaired under the Plan. At this time, the Debtors, the Consenting Stakeholders, and Saba are in the midst of discussions regarding a potential comprehensive settlement that would result in Saba's support of the Plan.[15]

**C.**    **Restructuring Support Agreement, Proposed DIP Financing, and Committed Exit Facility.**

**1.**    **Restructuring Support Agreement and Plan.**

The Restructuring Support Agreement contemplates a comprehensive reorganization achieved through the Plan, that will result in a substantial deleveraging of the Debtors' balance sheet by approximately $375.0 million and provide the Debtors with $95.0 million of fully-committed new equity capital, all while paying in full all non-funded debt claims against the Debtors and providing a meaningful recovery to existing shareholders that they would not otherwise have been entitled to receive. The key financial components and commitments of the restructuring are as follows:

- access to the DIP Facility, in an aggregate principal amount of $50.0 million, which shall bear interest at a rate of 1-month LIBOR plus 400 bps (payable monthly, in Cash) and mature four months after the Petition Date, subject to a two month extension;

- access to a commitment for the post-Effective Date Exit Facility in an aggregate principal amount of $50.0 million, with an ability for an additional commitment of up to $50.0 million, which will bear interest at a rate of LIBOR + 2.25% to 2.75% and shall have a term of four years;

- access to a commitment $95.0 million in New Common Stock by way of the Rights Offering fully-backstopped by the Commitment Parties;

---

[14]    Parker Drilling Company, Form 8-K (Nov. 5, 2018).

[15]    At present, it is uncertain whether the Debtors, the Consenting Stakeholders, and Saba will agree on such a comprehensive settlement. In the event that the Debtors, the Consenting Stakeholders, and Saba agree on such a comprehensive settlement in advance of commencement of solicitation of votes on the Plan, the Debtors intend to incorporate such terms into this Disclosure Statement.

- $210.0 million of the New Second Lien Term Loan at an interest rate of 11% Cash interest plus 2% PIK interest; and

- all Holders of the Unsecured Notes (the "<u>Noteholders</u>") and Parker's Existing Preferred Stock and Existing Common Stock will be afforded the opportunity to participate in the Rights Offering.

The level of consensus for this comprehensive reorganization reflects the efforts undertaken by the Debtors and the Consenting Stakeholders, and the parties' belief in the Debtors' prospects as a reorganized enterprise. More importantly, the Plan proposes to pay in full all non-funded debt. In so doing, the Plan is intended to minimize any potential adverse effects to the Debtors' businesses, customers, and trade partners as a result of the restructuring, and thus positioning the Debtors for a prompt emergence from bankruptcy.

Significantly, the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement. Specifically, section 7.01 of the Restructuring Support Agreement provides, in part, that nothing will require the Debtors "to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law." Moreover, section 7.02 of the Restructuring Support Agreement permits the Debtors to, among other things, participate in, consider, respond to, and facilitate discussions of potential alternative restructuring proposals.

The Debtors' flexibility under the Restructuring Support Agreement works hand-in-hand with the Debtors' DIP Credit Agreement. Specifically, the DIP Credit Agreement permits the Debtors to enter into an "Acceptable Replacement RSA," which means a restructuring support agreement that is more favorable to the Debtors than the current Restructuring Support Agreement and not adverse to the interests of DIP Facility Lenders in any material respect.

## 2. DIP Financing.

To fund the administration of these Chapter 11 Cases, BofA and Deutsche Bank AG, New York Branch ("<u>DB</u>," and together with BofA, the "<u>DIP Lenders</u>") have agreed to provide the form of the $50.0 million DIP Facility, subject to availability under the Company's borrowing base thereunder, $20.0 million of which is available for the issuance of standby letters of credit. BofA is also acting as administrative and collateral agent for the DIP Credit Facility. Pursuant to the agreement evidencing the DIP Credit Facility (the "<u>DIP Credit Agreement</u>"), the Debtors have agreed to pay certain fees in connection with the extension of credit under the DIP Facility (collectively, the "<u>DIP Fees</u>"), which fees are included in the budget pertaining to the DIP Facility.

As of the commencement of the chapter 11 cases, the Debtors had approximately $8.1 million of unrestricted Cash. The DIP Facility provides liquidity that is essential to fund the administrative cost of these Chapter 11 Cases. The DIP Facility allows the Debtors to pay suppliers and other participants in the Debtors' supply chain in the ordinary course to ensure the continuing and uninterrupted flow of inputs to the Debtors' businesses.

The Debtors believe that the DIP Facility gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases as the Debtors seek to implement the restructuring contemplated by the Plan.

## 3. Committed Exit Facility.

To fund the Debtors' operations upon emergence from these Chapter 11 Cases, the Debtors will enter into the Exit Facility. Specifically, BofA in its capacity as administrative agent and letter of credit

issuer, and DB in its capacity as joint lead arranger and joint bookrunner for the Exit Facility, have committed to provide the Exit Facility in an aggregate principal amount of $50.0 million, with the option to increase the aggregate principal amount of up to $100.0 million. Under the Exit Facility, $30.0 million will be available for the issuance of standby and commercial letters of credit.

The Debtors believe the Exit Financing will allow them to operate with stability, and successfully fund a go-forward business plan that fully harnesses the benefits of the Plan.

## VII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A. Corporate Structure upon Emergence.

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B. Expected Timetable of the Chapter 11 Cases.

As described therein, the Restructuring Support Agreement contains a 91 day milestone to secure Confirmation of a chapter 11 plan and a 106 day milestone to emerge from chapter 11. Thus, to ensure that the Debtors and their stakeholders will benefit from the Restructuring Support Agreement, the Debtors intend to move at a steady—but reasonable, prudent, and statutorily compliant—pace. On the Petition Date, the Bankruptcy Court entered the Scheduling Order, which scheduled certain dates and deadlines in connection with the approval of this Disclosure Statement and Confirmation of the Plan. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within approximately three months after the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C. First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (collectively, the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of John Edward Menger, Chief Restructuring Officer of Parker Drilling Company, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"). At a hearing on December 13, 2018, the Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions.

On January 3, 2019, the Debtors held their "second day" hearing before the Bankruptcy Court. At the second day hearing, the Bankruptcy Court granted certain of the first day relief on a final basis, including: (i) notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to stock; (ii) authority to continue to pay employee wages and benefits; (iii) authority to provide

adequate assurance for future utility services; (iv) authority to continue prepetition insurance coverage and renew or enter into new insurance policies; (v) authority to pay certain taxes and fees; (vi) authority to pay certain prepetition claims; (vii) authority to continue using the Debtors' cash management system and maintain existing bank accounts; and (viii) authority to use cash collateral and obtain access to the DIP Facility.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/parkerdrilling.

### D. Other Procedural and Administrative Motions

The Debtors filed several procedural and administrative motions subsequent to the Petition Date to facilitate further the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- OCP Motion. On December 21, 2018, the Debtors filed the Debtors' *Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 151] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of their businesses. On January 15, 2019, the Bankruptcy Court entered an order granting the relief requested in the OCP Motion [Docket No. 272].

- Interim Compensation Motion. On December 21, 2018, the Debtors filed the Debtors' *Motion for Interim Compensation and Reimbursement of Expenses for Professionals* (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code. On January 15, 2019, the Bankruptcy Court entered an order granting the relief requested in the Interim Compensation Motion [Docket No. 271].

- Retention Applications. The Debtors have filed applications that seek to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including A&M as restructuring and financial advisor, Moelis as investment banker, K&E and Kirkland & Ellis International LLP as legal co-counsel, and Jackson Walker L.L.P. as legal co-counsel (collectively, the "Retention Applications").[16] On January 15, 2019, the Bankruptcy Court approved the the Retention Applications for A&M [Docket No. 269], Moelis [Docket No. 266], and K&E and Kirkland & Ellis International LLP [Docket No. 270]. The Jackson Walker L.L.P. application will be heard at a later hearing. The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to section 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

---

[16] Prior to confirmation of the Plan, the Debtors may file additional applications seeking to retain certain additional professionals pursuant to sections 327 and 328 of the Bankruptcy Code. Such retention applications, once filed, will be subject to approval of the Bankruptcy Court.

- Exit Facility Motion. On December 21, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Assume Certain Exit Financing Agreements and (B) Incur and Pay Related Fees, Indemnities, and Expenses, and (II) Granting Related Relief* [Docket No. 163] (the "Exit Facility Motion"). The Exit Facility Motion sought to assume certain exit financing agreements. Prior to the Petition Date, Moelis and the Debtors engaged in a good faith, arm's-length marketing and negotiation process to procure a committed exit financing facility. These efforts resulted in the Exit Facility, pursuant to which BofA and DB will underwrite a $50.0 million fully-committed asset-based revolver with a four year maturity, and which allows additional commitments from lenders other than BofA and DB to fund up to an additional $50.0 million. In exchange for the Exit Facility, the Debtors agreed to pay certain fees to BofA and DB. The Debtors believe the Exit Facility will pave the way for the Debtors to successfully emerge from these Chapter 11 Cases with additional and necessary liquidity. On January 15, 2019, the Bankruptcy Court entered an order granting the Exit Facility Motion and authorizing the assumption of such Exit Facility Agreements and payment of related fees, indemnities, and expenses [Docket No. 264].

E. **Schedules and Statements.**

On January 8, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "SOFAs and Schedules").

F. **Establishment of a Claims Bar Date.**

On December 21, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 153] (the "Bar Date Motion"). By the Bar Date Motion, the Debtors sought entry of an order by the Bankruptcy Court that establishes February 15, 2019 as the general claims bar date and June 10, 2019 as the governmental claims bar date, before which any party that is required, but that fails, to file a proof of claim in accordance with the procedures set forth in the Bar Date Motion and order shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors and their property shall be forever discharged from any indebtedness or liability with respect to or arising from such claim. Such party will be prohibited from voting to accept or reject the Plan or any chapter 11 plan filed in these Chapter 11 Cases, participating in any distribution in the Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim. On January 15, 2019, the Bankruptcy Court entered an order granting the relief requested in the Bar Date Motion and establishing the bar dates therein.

G. **Litigation Matters.**

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11

Cases.  Significantly, the Debtors are engaged in a lawsuit initiated by a former employee, as discussed further below.

### 1.    Employment Litigation.

On February 17, 2015, Brian Newton (the "Plaintiff") filed a putative class action complaint (as amended, the "Complaint") against Debtor PDMS, alleging improper employment practices on certain oil platforms located off the California coast.  The suit was brought in the Superior Court for the State of California, Santa Barbara County.

On March 23, 2015, the Plaintiff, on behalf of the putative class, filed an amended version of the Complaint asserting:  (a) minimum wage violations; (b) pay stub violations; (c) unfair competition; (d) failure to timely pay final wages; (e) failure to provide lawful meal periods; (f) failure to pay overtime and double-time premium wages; and (g) civil penalties under the Private Attorneys General Act of 2004 (the "PAGA").  Specifically, the Complaint alleged that PDMS employed the Plaintiff and others as hourly workers on oil platforms in the Santa Barbara Channel for 14-day periods.  Among other relief, the Plaintiff and the putative class sought under California labor codes minimum, overtime, double-time, and meal premium wages owed with prejudgment interest, waiting-time penalties, and civil penalties.

On April 6, 2015, PDMS removed the case to the United States District Court for the Central District of California (the "District Court").  Thereafter, the Plaintiff filed a motion for class certification, and PDMS filed a motion for judgment on the pleadings on the grounds that its oil platforms are located on the Outer Continental Shelf and thus under the Outer Continental Shelf Lands Act ("OSCLA"), 43 U.S.C. §1333(a)(2)(A), California state law is not applicable to the Plaintiff's claims.  Before the District Court decided the motion for class certification, but after discovery and motion practice on the class certification issue, the District Court granted PDMS's motion for judgment on the pleadings on the ground that the California state laws on which Plaintiff's claims are based do not apply on the Outer Continental Shelf.

Following the District Court decision, the Plaintiff filed a notice of appeal to the United States Circuit Court of Appeals for the Ninth Circuit (the "Ninth Circuit").  On appeal, the Ninth Circuit vacated the District Court's ruling and remanded the case to the District Court for further proceedings.  In particular, the Ninth Circuit held that the California state laws on which Plaintiff's claims are based are applicable on the Outer Continental Shelf.  PDMS subsequently filed a petition for en banc review of the Ninth Circuit's decision.  However, the Ninth Circuit denied PDMS's petition.

The Debtors retained K&E and its appellate litigation team to draft and file a petition for writ of certiorari regarding the Ninth Circuit's decision to the United States Supreme Court.  K&E filed the petition for writ of certiorari on September 24, 2018.  On November 26, 2018, the Plaintiff filed a response in opposition of the Debtors' petition.  On January 12, 2019, the Debtors' petition for writ of certiorari was granted.

## VIII.    RISK FACTORS.

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.  For additional risk factors that may affect the Debtors' restructuring, please refer to the Debtors' publicly available filings with the SEC.

**THE  DEBTORS  HAVE  PROVIDED  THE  FOLLOWING  RISK  FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE  BANKRUPTCY  CODE.  DISCLOSURE  AND  DISCUSSION  OF  ADDITIONAL  RISK**

**FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICALLY AVAILABLE SECURITIES FILINGS.**

### Bankruptcy Law Considerations.

A. The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements

of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

###### 5. Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

###### 6. Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 47. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization as reflected in the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

7. **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8. **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9. **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims or Existing Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Existing Interests to be subordinated to other Allowed Claims or Existing Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Interests may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims and Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

11. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their Claims against or Interests in the Debtors' estates and facilitating a critical source of post-emergence liquidity by backstopping Rights Offering, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

B. **Risks Related to Recoveries under the Plan.**

1. **The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results.**

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular (the "Financial Projections"). The Financial Projections are attached hereto as **Exhibit F**. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2. **A Liquid Trading Market for the New Common Stock May Not Develop.**

Under the Restructuring Support Agreement, the Debtors are required to use their reasonable best efforts to maintain their NYSE Listing, and, if such listing is not maintained, to obtain a listing of the New Common Stock on the NYSE or Nasdaq market at emergence. The Debtors make no assurance that they will be able to obtain a listing on a national securities exchange or, even if the Debtors do, that liquid trading markets for shares of New Common Stock will develop. The liquidity of any market for shares of New Common Stock will depend upon, among other things, the number of Holders of shares of New Common Stock, Reorganized Debtors financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

3.      **The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date.**

Assuming that the Effective Date occurs, shares of New Common Stock will be issued to Holders of certain Classes of Claims or Interests (as applicable). Following the Effective Date of the Plan, shares of New Common Stock may be sold to satisfy withholding tax requirements. In addition, Holders of Claims or Interests (as applicable) that receive shares of New Common Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Stock available for trading could cause the trading price for the shares of New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

4.      **Certain Holders of New Common Stock May Be Restricted in their Ability to Transfer or Sell their Securities.**

To the extent that shares of the New Common Stock issued under the Plan is covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims or Interests (as applicable) who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell the New Common Stock (including, as applicable, shares issuable upon exercise of the Subscription Rights) (as applicable). *See* Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 59.

5.      **Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies.**

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. While the Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of the restricted securities will qualify for an exemption from registration under Rule 144. In any event,

holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Holders of New Common Stock who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 59.

### 6. Certain Tax Implications of the Plan.

Holders of Allowed Claims and Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 59, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims and Interests entitled to vote on the Plan.

### 7. The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses.

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness.

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility upon emergence.

#### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain

contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends.

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of

reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit F** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 5. The Debtors' Substantial Liquidity Needs May Impact Revenue.

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

In addition to the Cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and conditions of the Final DIP Order; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6. Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition.

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on the willingness of their customer base to make operating and capital expenditures to explore and drill for, develop, and produce oil and natural gas. Operators' willingness to conduct such activities are in turn dependent on prevailing oil and natural gas prices. Further, since operators are reluctant to increase drilling activities in a high-volatility commodities pricing environment, demand for the Debtors' services is affected as much by oil and natural gas price expectations as actual pricing. In short, the Debtors face a high level of exposure to oil and natural gas price swings. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The

Debtors expect such volatility to continue in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- worldwide production and demand for oil and gas and geographical dislocations in supply and demand;

- the cost of exploring for, developing, producing and delivering oil and gas;

- expectations regarding future energy prices and production;

- advances in exploration, development and production technology;

- the ability of the Organization of Petroleum Exporting Countries ("OPEC"), to set and maintain levels and pricing;

- the adoption or repeal of laws and government regulations, both in the United States and other countries;

- the number of ongoing and recently completed rig construction projects which may create overcapacity;

- the imposition or lifting of economic sanctions against certain regions, persons, and other entities;

- the policies of various governments regarding exploration and development of their oil and natural gas reserves;

- local and international political, economic and weather conditions;

- domestic and foreign tax policies;

- increased demand for alternative energy sources and electric vehicles, including government initiatives to promote the use of renewable energy sources and the growing public sentiment around alternatives to oil and gas;

- expansion or contraction of worldwide economic activity, which affects levels of consumer and industrial demand;

- the policies of various governments regarding exploration and development of their oil and gas reserves, accidents, severe weather;

- natural disasters and other similar incidents relating to the oil and gas industry; and

- local and worldwide military, political, and economic events, including events in the oil producing regions of Africa, the Middle East, Russia, Central Asia, Southeast Asia, and Latin America.

7.    **Contracted Revenues May Not Be Fully Realized and May Reduce Significantly in the Future, Which May Have a Material Adverse Effect on the Debtors' Financial Position, Results of Operations, or Cash Flows.**

The Debtors' expected revenues under existing contracts may not be fully realized due to a number of factors, including rig or equipment downtime or suspensions of operations. Several factors could cause downtime or a suspension of operations, many of which are beyond the Debtors' control, including:

- breakdowns of the Debtors' equipment or the equipment of others necessary for continuation of operations;

- work stoppages, including labor strikes;

- shortages of material and skilled labor;

- severe weather or harsh operating conditions;

- the occurrence or threat of epidemic or pandemic diseases or any government response to such occurrence or threat;

- the early termination of contracts; and

- force majeure events.

Liquidity issues could lead the Debtors' customers to go into bankruptcy or could encourage the Debtors' customers to seek to repudiate, cancel, or renegotiate the Debtors' contracts for various reasons. Some of the Debtors' contracts permit early termination of the contract by the customer for convenience (without cause), generally exercisable upon advance notice to the Debtors and in some cases without making an early termination payment to the Debtors. There can be no assurance that the Debtors' customers will be able or willing to fulfill their contractual commitments.

Significant declines in oil prices, the perceived risk of low oil prices for an extended period, and the resulting downward pressure on utilization may cause some customers to consider early termination of select contracts despite having to pay early termination fees in some cases. In addition, customers may request to re-negotiate the terms of existing contracts. Furthermore, as the Debtors' existing contracts roll off, the Debtors may be unable to secure replacement contracts for the Debtors' rigs, equipment or services. The Debtors' have been in discussions with some of their customers regarding these issues. Therefore, revenues recorded in future periods could differ materially from current contracted revenues, which could have a material adverse effect on the Debtors' financial position, results of operations or cash flows.

8.    **The Debtors' Business Is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.**

The Debtors' operations are subject to numerous U.S. federal, state, and local laws and regulations, as well as the laws and regulations of other jurisdictions in which they operate, pertaining to the environment or otherwise relating to environmental protection. Numerous governmental agencies, such as the U.S. Environmental Protection Agency ("EPA"), issue regulations to implement and enforce laws pertaining to the environment, which often require difficult and costly compliance measures that carry substantial administrative, civil and criminal penalties or may result in injunctive relief for failure to comply. Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent and costly compliance could adversely affect the Debtors' operations and financial position, as well as those of similarly situated entities operating in the same markets.

51

In addition, the Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of oil, gas or other pollutants into the air or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

9.    **The Debtors' Operations Are Subject to Hazards Inherent in the Energy Services Industry.**

Risks are inherent in the drilling industry, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could result in a variety of claims, losses and remedial obligations that could have an adverse effect on the Debtors' business and results of operations. The existence, frequency and severity of such incidents will affect operating costs, insurability and relationships with customers, employees and regulators. In particular, the Debtors' customers may elect not to purchase the Debtors' services if they view the Debtors' safety record as unacceptable, which could cause us to lose customers and substantial revenue.

10.    **The Debtors Operate in a Highly Competitive Industry with Significant Potential for Excess Capacity.**

Demand for the majority of the Debtors services depends substantially on the level of expenditures for the exploration, development, and production of oil or natural gas reserves by the major, independent, and national oil and natural gas E&P companies and large integrated service companies that comprise the Debtors' customer base. These expenditures are generally dependent on the industry's view of future oil and natural gas prices and are sensitive to the industry's view of future economic growth and the resulting impact on demand for oil and natural gas. Declines in oil and natural gas prices have and may continue to result in project modifications, delays or cancellations, general business disruptions, and delays in payment of, or nonpayment of, amounts that are owed to us, any of which could continue to have a material adverse effect on the Debtors' financial condition, results of operations, and cash flows. Historically, when drilling activity and spending decline, utilization and dayrates also decline and drilling may be reduced or discontinued, resulting in an oversupply of drilling rigs. Sustained low oil prices have in turn caused a significant decline in the demand for drilling services over the last several years. The rig utilization rate of the Company's International Drilling segment fell to 36% for the year ended December 31, 2017 from 40% for the year ended December 31, 2016. Furthermore, operators implemented significant reductions in capital spending in their budgets, including the cancellation or deferral of existing programs, and are expected to continue to operate under reduced budgets for the foreseeable future.

Competitive pressures and other factors may result in significant price competition, particularly during industry downturns, which could have a material adverse effect on the Debtors' results of operations and financial condition.

11.     **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

12.     **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the drilling industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

13.     **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## IX.     SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

**Holders of Claims and Interests Entitled to Vote on the Plan.**

A. Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 7, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan from Holders of Claims and Interests in Class 4, Class 5, Class 9, and Class 10 (collectively, the "Voting Classes"). The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 6, 7, and 8. Additionally, the Disclosure Statement Order provides that certain Holders of Claims or Interests in the Voting Classes, such as those Holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B. **Voting Record Date.**

**The Voting Record Date is January 22, 2019**. The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C. **Voting on the Plan.**

**The Voting Deadline is February 22, 2019 at 4:00 p.m. (prevailing Central Time)**. Holders of Class 4 2020 Notes Claims, Class 5 2022 Notes Claims, Class 9 Existing Common Interests, and Class 10 Existing Preferred Interests should return their ballot to their nominee, allowing enough time for the nominee to include the vote on a master ballot, and submit the master ballot by the Voting Deadline. In order to be counted as votes to accept or reject the Plan, all ballots must be (1) electronically submitted utilizing the online balloting portal maintained by the Solicitation Agent on or before the Voting Deadline; or (2) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Solicitation Agent on or before the Voting Deadline at the following address:

<table>
<tr><td>

**DELIVERY OF BALLOTS**

1.  All Master Ballots (except Beneficial Holders' Ballots)[17] should be sent to:

    (a)  if by mail, courier, or personal delivery, to:

**Parker Ballot Processing,**
**c/o Prime Clerk LLC,**
**830 Third Avenue, 3rd Floor,**
**New York, NY 10022**

    (b)  if via electronic mail, parkerdrillingballots@primeclerk.com.

2.  If necessary, ballots can also be delivered via the e-ballot system at (cases.primeclerk.com/parkerdrilling). To have their votes to accept or reject the Plan counted, Beneficial Holders must properly execute, complete, and deliver their ballots to their appropriate broker, bank, or other nominee (a "Nominee"), in sufficient time so that such nominee can verify, tabulate, and include such Ballots in a Master Ballot and timely return such Master Ballot, so that it is actually received no later than the Voting Deadline by Prime Clerk LLC.[18]

</td></tr>
</table>

     IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (855) 631-5345. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL **NOT** BE COUNTED.

     **D.**      **Ballots Not Counted.**

     **No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim or Interest listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim or Interest that is subject to an objection other than a "reduce and allow" objection pending as of the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

[17]  A "Beneficial Holder" means a beneficial owner of publicly traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees (as defined herein) holding through the respective indenture trustee.

[18]  For any Master Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (*i.e.*, industry-standard PDF file) and the received date and time in Prime Clerk LLC's inbox will be used as the timestamp for receipt

## X.      RIGHTS OFFERING PROCEDURES.[19]

The procedures and instructions for exercising Subscription Rights, as applicable, are set forth in the Rights Offering Procedures.  The Rights Offering Procedures will be authorized pursuant to the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit D**.  The Rights Offering Procedures are incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to exercise Subscription Rights.  *The discussion of the Rights Offering Procedures set forth in this Disclosure Statement is only a summary.  Please refer to the Rights Offering Procedures attached hereto for a more comprehensive description.*

**IN ORDER TO PARTICIPATE IN THE RIGHTS OFFERING, EACH ELIGIBLE HOLDER MUST COMPLETE ALL THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES.   IF ALL OF THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE SUBSCRIPTION EXPIRATION DEADLINE OR THE BACKSTOP FUNDING DEADLINE, AS APPLICABLE, THE ELIGIBLE HOLDER SHALL BE DEEMED TO HAVE <u>FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED</u> ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING.**

## XI.     CONFIRMATION OF THE PLAN.

### A.      Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.      Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently,

---

[19]   Terms used in this Article X but not otherwise defined in this Disclosure Statement or the Plan have the meanings, if any, given to them in the Rights Offering Procedures.

the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**C.**      **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their Advisors, have analyzed their ability to meet their respective obligations under the Plan. Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 41, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections attached hereto as **Exhibit F** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

**D.**      **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[20]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interest as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims or interests in that class, counting only those claims or interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims or Interests will have voted to accept the Plan

---

[20]   A class of claims or equity interests is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

only if two-thirds in amount and a majority in number of the Allowed Claims or Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Existing Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### Confirmation without Acceptance by All Impaired Classes.

**E.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is Impaired under, and has not accepted, the plan.

If any impaired class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100% of the amount of the allowed claims or interests in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the

Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### Valuation of the Debtors.

**F.** In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit G** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XII.   CERTAIN SECURITIES LAW MATTERS.

**A.**    **New Common Stock; New Warrants; Rights Offering Shares; Backstop Commitment Shares.**

As discussed herein, the Plan provides for Reorganized Parker to distribute: (1) New Common Stock to Holders of Existing Common Interests, Holders of Allowed 2020 Notes Claims and Allowed 2022 Notes Claims (together, the "Allowed Notes Claims"), and Holders of Existing Preferred Interests, on account of their respective Interests and Claims and in connection with the Rights Offering; (2) New Warrants to Holders of Existing Common Interests and Holders of Existing Preferred Interests, on account of their respective Interests; (3) New Common Stock under the Management Incentive Plan; (4) New Common Stock consisting of Unsubscribed Shares issued to the Commitment Parties pursuant to the Backstop Commitment Agreement (the "Backstop Commitment Shares"); and (5) New Common Stock issued to the Commitment Parties on account of the Put Option Equity Premium.

The Debtors believe that the New Common Stock and the New Warrants will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer and sale of the New Common Stock and/or the New Warrants, as applicable, pursuant to the Plan is, and subsequent transfers of the New Common Stock and/or New Warrants by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below. **The New Common Stock underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.**

**RECIPIENTS OF NEW COMMON STOCK AND NEW WARRANTS ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

**Backstop Commitment Agreement.**

**B.** The Commitment Parties and the Debtors have entered into a Backstop Commitment Agreement, pursuant to which the Commitment Parties, severally and not jointly, have agreed to backstop the Rights Offering to be conducted in accordance with the Plan. Under the Backstop Commitment Agreement, the Commitment Parties, severally and not jointly, have agreed to purchase the Rights Offering Shares that are not duly subscribed for pursuant to the Rights Offering.

The Debtors paid the Commitment Parties in connection with execution of the Backstop Commitment Agreement a Put Option Equity Premium equal to 8.0% of the $95.0 million committed amount. The Put Option Equity Premium was fully earned as of the date of the execution of the Backstop Commitment Agreement. The Put Option Equity Premium will be paid in accordance with the Backstop Commitment Agreement in the form of New Common Stock, if the Plan is consummated as contemplated in the Restructuring Support Agreement.

**Backstop Commitment Shares.**

**C.**

All New Common Stock issued to the Commitment Parties pursuant to the Backstop Commitment Agreement in respect of their backstop commitment will be issued in reliance upon the exemption from registration under the Securities Act provided by Section 4(a)(2) thereof and/or Regulation D thereunder. As a condition to the closing of the transactions contemplated by the Backstop Commitment Agreement, the Debtors will enter into the Registration Rights Agreement (as defined below). The Commitment Parties will not be entitled to transfer all or any portion of their backstop commitments except as expressly provided in the Backstop Commitment Agreement.

**D.      Registration Rights Agreement.**

The Plan provides that from and after the Effective Date, each Consenting Stakeholder that receives New Common Stock pursuant to the Plan, including in connection with the Rights Offering and exercise of the New Warrants, will be entitled to registration rights pursuant to a registration rights agreement to be entered into as of the Effective Date (the "Registration Rights Agreement"), which will provide for customary demand, shelf and piggyback registration rights with respect to all New Common Stock beneficially owned by the Consenting Stakeholders or their successors in interest and will provide for a shelf registration statement to be filed by the Debtors for the benefit of the Consenting Stakeholders (and, in any event, no later than 15 days after the Effective Date, unless extended after the Effective Date (i) by the board of directors of Reorganized Parker, which extension may be for a period of no more than an additional 15 days or (ii) in accordance with the terms of the Registration Rights Agreement) and shall consult with Akin and include Akin in all respects of the process to finalize such registration statement.

**E.**

**Issuance and Resale of New Common Stock and New Warrants Under the Plan.**

**1.      Issuance under Section 1145 of the Bankruptcy Code, Private Placement Exemptions.**

Except as expressly provided herein, all New Warrants and shares of New Common Stock issued under the Plan, including the Rights Offering Shares, the Backstop Commitment Shares and the New Common Stock issued on account of the Put Option Equity Premium, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon either (a) section 1145 of the Bankruptcy Code or (b) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. All shares of New Common Stock, including the Backstop Commitment Shares, issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated

thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act, including a registration statement pursuant to the Registration Right Agreement, or an available exemption therefrom.

Persons who purchase the New Common Stock, including the Backstop Commitment Shares, pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A (to the extent applicable) or any other registration exemption under the Securities Act, or if resales of such securities are registered with the SEC, including under a registration statement pursuant to the Registration Right Agreement as described above.

All shares of New Common Stock and New Warrants (and the New Common Stock issuable upon exercise of the New Warrants) issued to Holders of Existing Common Interests, Existing Preferred Interests and Allowed Notes Claims on account of their respective Claims and Interests, all shares of New Common Stock issued in connection with the Rights Offering (other than the Backstop Commitment Shares), and all New Common Stock issued on account of the Put Option Equity Premium are expected to be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code. The Backstop Commitment Shares are expected to be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

**RECIPIENTS OF THE NEW COMMON STOCK AND THE NEW WARRANTS ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

## 2. Resale of New Common Stock and New Warrant; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting

securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock and/or the New Warrants by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock and/or New Warrants who are deemed to be "underwriters" may be entitled to resell their New Common Stock and/or New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act. Generally, Rule 144 promulgated under the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock and/or the New Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and/or New Warrants and, in turn, whether any Person may freely resell New Common Stock and/or New Warrants.

Unlike the securities that will be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, any shares of New Common Stock, including the Backstop Commitment Shares, issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, including a registration statement pursuant to the Registration Right Agreement as described above, or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period (or a 12-month holding period if the issuer is not a reporting issuer) if at the time of the sale there is available certain current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors currently expect that Reorganized Parker will continue to be a reporting issuer and file all such required periodic reports and that current public information will be available to allow resales by non-affiliates when the six-month holding period expires (approximately six months after the emergence date).

An affiliate may resell restricted securities after the applicable holding period if at the time of the sale certain current public information regarding the issuer is available. As noted above, the Debtors

currently expect that this information requirement will be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale involves more than 5,000 restricted securities or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any New Common Stock issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of such New Common Stock will be required to hold such New Common Stock for at least six months and, thereafter, to sell New Common Stock only in accordance with the applicable requirements of Rule 144, unless such New Common Stock is registered under the Securities Act, including under a registration statement pursuant to the Registration Right Agreement as described above (or is otherwise resold pursuant to an exemption from registration under the Securities Act).

The Backstop Commitment Shares, if any, will be issued in certificated or book-entry form and will bear a restrictive legend. Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale or assignment of, any Backstop Commitment Shares shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

Reorganized Parker will reserve the right to require certification or other evidence of compliance with Rule 144 or another available exemption as a condition to the removal of such legend or to any resale of the Backstop Commitment Shares. Reorganized Parker will also reserve the right to stop the transfer of any such Backstop Commitment Shares if such transfer is not in compliance with Rule 144 or another available exemption. Any Person who receives such Backstop Commitment Shares will be required to acknowledge and agree not to resell such securities except in accordance with Rule 144, when available, or another available exemption and that the securities will be subject to the other restrictions described above.

**ANY PERSONS RECEIVING "RESTRICTED SECURITIES" UNDER THE PLAN ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM**

REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW COMMON STOCK AND/OR THE NEW WARRANTS ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.

### 3. New Common Stock and the Management Incentive Plan.

The Confirmation Order shall authorize the Reorganized Parker Board to adopt and enter into the Management Incentive Plan in accordance with the terms and conditions set forth in Exhibit 5 to Exhibit A of the Restructuring Support Agreement (itself attached hereto as **Exhibit B**). The issuance of New Common Stock, if any, under the Management Incentive Plan would dilute all of the New Common Stock issued pursuant to the Restructuring Transactions. The New Common Stock, including New Common Stock issued under the Management Incentive Plan, is also subject to dilution in connection with the exercise of the New Warrants and the conversion of any other options, warrants, convertible securities, or other securities that may be issued post-emergence.

## XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

### A. Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims and Interests entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "IRS"), and any other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein. The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign

64

investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims or Interests who will hold the New Common Stock and/or New Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds such Claims or Interests only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims and Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest (including a beneficial owner of Claims or Interests) that, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities for U.S. federal income tax purposes) that are Holders of Claims or Interests are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES.

**B.** Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors.

**1.** Effects of Restructuring on the Debtors.

As of December 31, 2017, the Debtors estimate that they have approximately $460.0 million of federal NOL carryforwards, at least $37.0 million of foreign tax credit carryforwards. They may generate additional tax attributes in 2018 and prior to the Effective Date in 2019, potentially including interest deductions deferred under section 163(j) of the Tax Code (the "163(j) Deductions"). Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. NOLs arising before 2018 may offset 100% of future taxable income, and NOLs arising in taxable years starting with 2018 may be used to offset 80% of taxable income in a given year. Further, the 163(j) Deductions may remain available for use following the implementation of the Plan, subject to the discussion below regarding section 382 of the Tax Code. As discussed below, however, the Debtors' NOLs are expected to be reduced upon implementation of the Plan.

In addition to the discussion below, the Debtors may, in connection with the Plan, implement certain Restructuring Transactions designed to result in a step-in the tax basis in some or all of their assets. In the event such transactions are undertaken, some or all of the Debtors' tax attributes may be utilized.[21]

**(i)** Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, the Debtors will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of the New Second Lien Term Loan, and (iii) the fair market value of the New Common Stock, New Warrants, or other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, the Debtors will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, the Debtors must reduce their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the Debtors may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Tax Code. Although not free from doubt, in the absence of contrary guidance, it appears to be the case that the 163(j) Deductions

---

[21] Furthermore, the Debtors are evaluating whether the Plan should be consummated pursuant to a taxable disposition of all of their assets in a so-called "Bruno's transaction" (a "Taxable Transaction"). The discussion below regarding the consequences of the Plan to Holders of Claims and Interest presumes that a Taxable Transaction is not utilized. In general, the Debtors anticipate that if a Bruno's transaction is utilized, the treatment described with respect to section 1001 of the Tax Code would be applicable to all Holders of Claims against and Interests in the Debtors, and the Reorganized Debtors would not succeed to any of the tax attributes of the Debtors. In the event the Debtors determine to consummate a Taxable Transaction, such transaction will be described in a supplemental memorandum.

are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize COD Income; however, the exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Regardless of the implemented structure, however, the Debtors expect that the amount of such COD Income will reduce some of their NOLs and tax credits allocable to taxable periods prior to the Effective Date pursuant to section 108 of the Tax Code. Depending on the amount of COD Income, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

(ii)      <b>Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.</b>

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, net unrealized built-in losses, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods prior to the Effective Date (collectively, "<u>Pre-Change Losses</u>") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10.0 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

(a)      <b>General Section 382 Annual Limitation.</b>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 2.51 percent for December 2018). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable

67

year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)      Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

### C.      Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Claims and Interests Entitled to Vote.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of a Debtor for U.S. federal income tax purposes.  Neither the Tax Code nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.

There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Class 4 2020 Notes Claims and Class 5 2022 Notes Claims as "securities" for U.S. federal income tax purposes.

### 1. U.S. Federal Income Tax Consequences to the Holders of Class 4 2020 Notes Claims and Class 5 2022 Notes Claim.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 4 2020 Notes Claims and/or Class 5 2022 Notes Claims, each Holder thereof will receive its Pro Rata share of the (a) New Common Stock, (b) New Second Lien Term Loan, and (c) Cash.

If Class 4 2020 Notes Claims and/or Class 5 2022 Notes Claims qualifies as a "security" of the Company, then the Holders of Class 4 2020 Notes Claims and Class 5 2022 Notes Claims, as applicable, should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes. Subject to the rules regarding accrued but untaxed interest, discussed below, a Holder of such Claim should recognize gain, but not loss, with the amount of recognized gain equal to the lesser of (i) the sum of (1) Cash and (2) the fair market value (or issue price, in the case of debt instruments) of property not entitled to be received tax-free under section 354 of the Tax Code; and (ii) the difference between (1) the sum of (A) Cash and (B) the fair market value (or issue price, in the case of debt instruments) of non-Cash consideration received pursuant to the Plan and (2) such Holder's adjusted basis, if any, in such Allowed Claim. The Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the non-Cash consideration received equal to (a) the tax basis of the Allowed Claim surrendered by such Holder increased by (b) gain recognized (if any) by such Holder, decreased by (c) the amount of Cash received, allocated between the non-Cash consideration received in accordance with the respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the non-Cash consideration received should include the holding period for the exchanged Allowed Claim. The holding period for any other property received (if any) should begin on the day following the receipt of such property.

If the Class 4 2020 Notes Claims and/or Class 5 2022 Notes Claims do not qualify as a "security" of the Debtors, then the Holders of the Class 4 2020 Notes Claims and/or Class 5 2022 Notes Claims, as applicable, will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of (1) Cash and (2) the fair market value (or issue price, in the case of debt instruments) of non-Cash consideration received, and (b) the Holder's adjusted tax basis in its Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding "market discount," as discussed below and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The holding period for debt received should begin on the day following the Effective Date. Subject to the rules regarding accrued but untaxed interest, the Holder should obtain a tax basis in the non-Cash consideration received equal to the fair market value (or issue price, in the case of debt instruments) of such property.

2. **U.S. Federal Income Tax Consequences to the Holders of Class 9 Existing Preferred Interests and Class 10 Existing Common Interests.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 9 Existing Preferred Interests and Class 10 Existing Common Interests, each Holder thereof will receive its Pro Rata share of the (a) New Common Stock, (b) New Warrants, and (c) either (i) Existing Preferred Stockholder Subscription Rights for Holders of the Existing Preferred Interests or (ii) Existing Common Stockholder Subscription Rights for Holders of the Existing Common Interests.

A U.S. Holder of a Class 9 Interest or Class 10 Interest is generally expected to be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes. Such Holders should not recognize any gain or loss in the exchange, subject to the discussion below regarding the exercise of the relevant subscription rights. Such Holder's tax basis in the non-Cash consideration should equal the tax basis of the Interest exchanged, allocated among the non-Cash consideration received based upon their respective fair market values. Such Holder's holding period for the non-Cash consideration received should include the holding period for the exchanged Interest.

(i) **Existing Preferred Stockholder Subscription Rights and Existing Common Stockholder Subscription Rights.**

As noted above, Holders of certain Interests will receive the Existing Preferred Stockholder Subscription Rights or Existing Common Stockholder Subscription Rights, as applicable (the "Subscription Rights").

A U.S. Holder that exercises its Subscription Rights should be treated as purchasing, in exchange for its Subscription Right and the amount of Cash funded by the U.S. Holder to exercise such Subscription Rights, the Rights Offering Shares. Such a purchase should generally be treated as the exercise of an option under general tax principles, and accordingly such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes upon such exercise. A U.S. Holder's aggregate tax basis in the Rights Offering Shares should equal the sum of (1) the amount of Cash paid by the U.S. Holder to exercise its Subscription Rights and (2) such U.S. Holder's tax basis in the Subscription Rights immediately before exercise, determined as set forth above. A U.S. Holder's holding period for the Rights Offering Shares received should begin on the day following the exercise.

A U.S. Holder that elects not to receive its Subscription Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to the Subscription Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses.

3. **Accrued Interest.**

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims

in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Claims are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

### 4. Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID (as defined below), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

U.S. federal income tax laws enacted in December 2017 added section 451 of the Tax Code. This new provision generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed Treasury Regulations confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 5. Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

6.        **Limitation on Use of Capital Losses.**

A U.S. Holder of an Allowed Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

7.        **U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Shares of New Common Stock, New Warrants and New Second Lien Term Loan.**

(i)        **Ownership and Disposition of Shares of New Common Stock.**

(a)        **Dividends on New Common Stock.**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

(ii)        **Sale, Redemption, or Repurchase of New Common Stock and New Warrants.**

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock or New Warrants.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock or New Warrants for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above under Section ("Limitation on Use of Capital Losses").

8. **Ownership, Exercise, and Disposition of New Warrants.**

A U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of Cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants. A U.S. Holder's aggregate tax basis in the New Common Stock will equal the sum of (a) the amount of Cash paid by the U.S. Holder to exercise its New Warrants plus (b) such U.S. Holder's tax basis in its New Warrants immediately before the New Warrants are exercised.

Under section 305 of the Tax Code, certain transactions that affect an increase in the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the Holder in connection with such distribution.

A U.S. Holder that elects not to exercise the New Warrants may be entitled to claim a capital loss equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants.

In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the U.S. Holder if such stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held his or her New Warrants.

9. **Ownership and Disposition of New Second Lien Term Loan.**

(i) **Ownership, Interest and Original Issue Discount on New Second Lien Term Loan.**

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the New Second Lien Term Loan received by U.S. Holders exceeds the "issue price" of the New Second Lien Term Loan by an amount equal to or greater than a statutorily defined *de minimis* amount, the New Second Lien Term Loan will be considered to be issued with original issue discount ("OID") for U.S. federal income tax purposes. The stated redemption price at maturity of the New Second Lien Term Loan is the total of all payments due on the New Second Lien Term Loan other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

Where, as here, Holders of Class 4 2020 Notes Claims and Class 5 2022 Notes Claims receiving debt instruments are also receiving other property in exchange for their Claims (*i.e.*, New Common Stock and Cash), the "investment unit" rules also apply to the determination of the "issue price" for any debt instrument received in exchange for their Claims. In general, if all of the components (other than Cash) of the "investment unit" are publicly traded (as described above), then the issue price of the investment unit, as a whole, is determined by summing the fair market value of each of the components of the "investment unit," and then allocating the issue price of the investment unit to each of the investment unit's components on the basis of the investment unit's fair market value. In the event that some, but not all, of the property composing the "investment unit" is publicly traded, then the application of the investment unit rules is somewhat unclear. If the Claims being exchanged for the investment unit are publicly traded prior to the exchange, the trading value of such Claims may set the issue price for the investment unit, with such issue price being allocated among the components of the investment unit. Alternatively, some practitioners take the view that under such circumstances, if the new debt instrument is publicly traded, the trading price of the new debt instrument controls the issue price of the new debt instrument, without regard to the potential application of the investment unit rules.

In general, Holders of Claims must follow the Debtors' determination of issue price under the investment unit rules, unless such Holder specifically discloses its disagreement with such determination in connection with the Holder's filing of its tax return. The Debtors will publish their determination of the issue price in accordance with applicable Treasury Regulations.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to 0.25% of the principal amount of the New Second Lien Term Loan multiplied by the number of complete years to maturity from their original issue date, or if the New Second Lien Term Loan provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the New Second Lien Term Loan are issued with OID, a U.S. Holder generally (a) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Second Lien Term Loan, in advance of the receipt of the Cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes but (b) will not be required to recognize additional income upon the receipt of any Cash payment on the New Second Lien Term Loan that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the New Second Lien Term Loan is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the New Second Lien Term Loan, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Second Lien Term Loan.

Under section 451 of the Tax Code (as described above), accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) generally would be required to include certain items of income such as OID (but not market discount, as described above) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. U.S. Holders are urged to consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and any non-Cash consideration received therefor.

(ii)      **Sale, Redemption, or Repurchase of Interests in the New Second Lien Term Loan.**

Upon the sale, exchange or other taxable disposition of New Second Lien Term Loan, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be

taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the New Second Lien Term Loan. A U.S. Holder's adjusted tax basis in their interest in the New Second Lien Term Loan will depend on whether, as described above, the New Second Lien Term Loan is considered a "security" for tax purposes and whether the U.S. Holder receives the New Second Lien Term Loan (if any) as part of a transaction that is treated as a recapitalization for U.S. federal income tax purposes. A U.S. Holder's initial tax basis in the New Second Lien Term Loan will be increased by any previously accrued OID and decreased by any payments on the New Second Lien Term Loan other than qualified stated interest. Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the New Second Lien Term Loan has been held for more than one year at the time of its sale, exchange, or other taxable disposition. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital losses is subject to limitations as discussed above under Section 6 ("Limitation on Use of Capital Losses").

**D.**      **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims and Interests Entitled to Vote.**

         **1.**      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims or Interests.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock, New Warrants, and New Second Lien Term Loan, as applicable.

         **2.**      **Gain Recognition.**

Any gain realized by a Non-U.S. Holder on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 3. Accrued but Untaxed Interest.

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 4. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock, New Warrants, and New Second Lien Term Loan.

#### (i) Dividends on New Common Stock.

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Parker's current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to

such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### (ii) Sale, Redemption, or Repurchase of New Common Stock.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless: (1) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (3) Reorganized Parker is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.[22]

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). Based on Reorganized Parker's current business plans and operations, the Debtors do not anticipate that the Company is or was, or that Reorganized Parker will be, a "U.S. real property holding corporation" for U.S. federal income tax purposes.

### (iii) Ownership, Exercise, and Disposition of the New Warrants.

A Non-U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of Cash funded by the Non-U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a Non-U.S. Holder (to the extent such Non-U.S. Holder is subject to U.S. federal income tax, as described above) should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants. A Non-U.S. Holder's aggregate tax basis in the New Common Stock will equal the sum of (1) the amount of Cash paid by the Non-U.S. Holder to exercise its New Warrants plus (2) such Non-U.S. Holder's tax basis in its New Warrants immediately before the New Warrants are exercised.

Any deemed distribution under section 305 of the Tax Code (as discussed above), will be taxed and reported to the IRS in the same manner as an actual distribution on stock and will be subject to the rules described above under subsection (i), ("Dividends on New Common Stock") with respect to such Non-U.S. Holder.

In the event that a Non-U.S. Holder sells its New Warrants in a taxable transaction, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition unless as described above under "Sale, Redemption, or Repurchase of New Common Stock." If a Non-U.S. Holder is subject to U.S. federal income tax, any such gain or loss will be

---

[22]   In the case of Holders of Interests, it is unclear whether the specified testing period will also include periods prior to the Effective Date with respect to the Debtors.

treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the Non-U.S. Holder if such stock had been acquired by the Non-U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the Non-U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such Non-U.S. Holder has held his or her New Warrants.

Under Treasury Regulations issued pursuant to section 871(m) of the Tax Code, withholding at a rate of 30 percent (subject to certain treaty considerations) would apply to certain "dividend equivalent" payments made or deemed made to Non-U.S. Holders in respect of financial instruments that reference U.S. stocks. The Treasury Regulations promulgated under section 871(m) do not apply to a payment to the extent that the payment is already treated as a deemed dividend under the rules described above, and therefore generally would not apply in respect of adjustments to the conversion rate of the New Warrants. However, because the section 871(m) rules are complex, it is possible that they will apply in certain circumstances in which the deemed dividend rules described below do not apply, in which case the section 871(m) rules might require withholding at a different time or amount than the deemed dividend. Importantly, in Notice 2018-72, the IRS extended certain transition relief that makes section 871(m) of the Tax Code inapplicable to instruments that are not so-called "delta one" instruments. The Debtors will make a determination regarding the applicable of section 871(m) of the Tax Code to the New Warrants prior to the Effective Date.

### (iv) Payments on New Second Lien Term Loan.

Subject to the discussion below regarding FATCA, (as defined below) payments to a Non-U.S. Holder with respect to the New Second Lien Term Loan that are treated as interest, including payment attributable to any OID (see discussion above) generally will not be subject to U.S. federal income tax or withholding tax, *provided* that (1) such Non-U.S. Holder is not a bank, (2) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of Reorganized Parker, (3) such Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to any of the Debtors (each, within the meaning of the Tax Code), and (4) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or such successor form as the IRS designates) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding FATCA, a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(v)     **Sale, Exchange or Other Disposition of New Second Lien Term Loan.**

Subject to the discussion below regarding FATCA, any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of New Second Lien Term Loan (other than an amount representing accrued but untaxed interest on the New Second Lien Term Loan, which is subject to the rules discussed above under subsection (iv) ("Payments on New Second Lien Term Loan") generally will not be subject to U.S. federal income taxation unless (1) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or (2) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  Subject to the discussion below regarding FATCA, in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

    5.      **FATCA.**

Under the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock and U.S.-source interest (including OID) paid in respect of instruments such as the New Second Lien Term Loan), and also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Common Stock and loans provided under the New Second Lien Term Loan).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source interest or dividends and under current law will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source income or dividends that occurs after December 31, 2018.

    **BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS OR INTERESTS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF LOANS PROVIDED UNDER THE NEW SECOND LIEN TERM LOAN.**

**Information Reporting and Backup Withholding.**

**E.** The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 24 percent.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., NON-INCOME, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

*[Remainder of page intentionally left blank.]*

## XIV. RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  January 23, 2019                        PARKER DRILLING COMPANY
                                                on behalf of itself and all other Debtors

                                                _____
                                                Michael W. Sumruld
                                                Senior Vice President and Chief Financial Officer
                                                Parker Drilling Company

**Exhibit A**

**Plan of Reorganization**

**Exhibit B**

**Restructuring Support Agreement**

**Exhibit C**

**Corporate Organization Chart**

**Exhibit D**

**Disclosure Statement Order**

**Exhibit E**

**Liquidation Analysis**

**Exhibit F**

**Financial Projections**

**<u>Exhibit G</u>**

**Valuation Analysis**

## SCHEDULE 2

**Form of Solicitation and Voting Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SOLICITATION AND VOTING PROCEDURES

**PLEASE TAKE NOTICE THAT**, on January 23, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) approving the Rights Offering Procedures.

### A. The Voting Record Date.

The Court has established __January 22, 2019__ as the record date for purposes of determining which Holders of Claims and Interests in Class 4 (2020 Notes Claims), Class 5 (2022 Notes Claims), Class 9 (Existing Preferred Interests), and Class 10 (Existing Common Interests) are entitled to vote on the Plan (the "Voting Record Date").

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]  Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

**B.      The Voting Deadline.**

The Court has established **February 22, 2019, at 4:00 p.m.** (prevailing Central Time) as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Court.  To be counted as votes to accept or reject the Plan, all ballots (collectively, the "Ballots") must be properly executed, completed, and delivered by:  (1) first-class mail (using the reply envelope provided in the Solicitation Package or otherwise); (2) overnight courier; (3) personal delivery; or (4) electronic mail (in PDF or other standard format), so that they are *actually received*, in any case, no later than the Voting Deadline by Prime Clerk, LLC (the "Balloting Agent").  All Master Ballots (except Beneficial Holders' Ballots)[3] should be sent to:  (a) if by mail, courier, or personal delivery, Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; *provided, however*, that the reply envelope provided in the Solicitation Package may indicate a different zip code; or (b) if via electronic mail, parkerdrillingballots@primeclerk.com.  If necessary, ballots can also be delivered via the e-ballot system at Prime Clerk (cases.primeclerk.com/parkerdrilling).  Delivery of a Ballot to the Balloting Agent by facsimile, electronic mail or other non-approved electronic means shall not be valid.  To have their votes to accept or reject the Plan counted, Beneficial Holders must properly execute, complete, and deliver their Ballots to their appropriate broker, bank, or other nominee (a "Nominee"), in sufficient time so that such nominee can verify, tabulate, and include such Ballots in a Master Ballot and timely return such Master Ballot, so that it is actually received no later than the Voting Deadline by the Balloting Agent.[4]  In the case of the Beneficial Holders who hold their position through a Nominee, such Beneficial Holders will be instructed to comply with the return instructions provided by such Nominee.

**C.      Form, Content, and Manner of Notices.**

**1.      The Solicitation Package.**

The      following      materials      shall      constitute      the      solicitation      package (the "Solicitation Package"):

   a.      a copy of these Solicitation and Voting Procedures;

   b.      the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Procedures*, in substantially the form annexed as Schedule 7 to the Disclosure Statement Order (the "Confirmation Hearing Notice");

---

[3]    A "Beneficial Holder" means a beneficial owner of publicly traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees (as defined herein) holding through the respective indenture trustee.

[4]    For any Master Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (*i.e.*, industry-standard PDF file) and the received date and time in the Balloting Agent's inbox will be used as the timestamp for receipt

      c.      a cover letter, in substantially the form annexed as <u>Schedule 6</u> to the Disclosure Statement Order, describing the contents of the Solicitation Package and urging the Holders of Claims and Interests in each of the Voting Classes to vote to accept the Plan;

      d.      the applicable form of Ballot for each Voting Class in which such Holder holds a Claim or Interest, in substantially the form of the Ballots annexed as <u>Schedule 3</u> to the Disclosure Statement Order, as applicable;

      e.      the approved Disclosure Statement annexed as <u>Schedule 1</u> to the Disclosure Statement Order (and exhibits thereto, including the Plan);

      f.      a pre-addressed, postage pre-paid reply envelope; and

      g.      any additional documents that the Court has ordered to be made available.

**2.**      <u>**Distribution of the Solicitation Package.**</u>

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits except the Solicitation Procedures) in electronic format (*i.e.*, CD-ROM or flash drive format), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any party that receives the materials in electronic format but would prefer paper format may contact Balloting Agent by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ParkerDrilling; (b) writing to Parker Drilling Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerdrillingballots@primeclerk.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense); (d) calling the Debtors' restructuring hotline at the following number:

**US/Canada Toll Free: (855) 631-5345**

**International: (347) 338-6451**

The Debtors shall serve, or cause to be served, (a) all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and (b) the Disclosure Statement Order (in electronic format) and the Confirmation Hearing Notice to all parties required to be notified under Bankruptcy Rule 2002 and Bankruptcy Local Rule 2002-1 (the "<u>2002 List</u>") as of the Voting Record Date. In addition, the Debtors shall mail, or cause to be mailed, the Solicitation Package to all Holders of Claims and Interests in the Voting Classes on or before January 25, 2019, who are entitled to vote, as described in section D below.

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

3. **Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

    a.    Absent a further order of the Court, the Holder of a Claim or Interest in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

    b.    If a Claim in a Voting Class is subject to an objection by the Debtors other than a "reduce and allow" objection that is filed with the Court on or prior to seven days before the Voting Deadline:  (i) the Debtors shall cause the applicable Holder to be served with a Disputed Claim Notice substantially in the form annexed as Schedule 5 to the Disclosure Statement Order (which notice shall be served together with such objection); and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

    c.    If a Claim in a Voting Class is subject to an objection by the Debtors other than a "reduce and allow" objection that is filed with the Court less than seven days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

    d.    A "Resolution Event" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

        i.    an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

        ii.    an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

        iii.    a stipulation or other agreement is executed between the Holder and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

        iv.    the pending objection is voluntarily withdrawn by the objecting party.

    e.    No later than one business day following the occurrence of a Resolution Event, the Debtors shall cause the Balloting Agent to distribute via electronic mail, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder to the extent such holder has not already received a Solicitation Package.

4. **Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan.**

Certain Holders of Claims or Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code, or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, will receive the *Non-Voting Status Notice for Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as Schedule 4A to the Disclosure Statement Order. Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots). Additionally, these Holders will receive an opt-out form, substantially in the form annexed as Schedule 4B to the Disclosure Statement Order (the "Opt-Out Form"). The Opt-Out Form will instruct these Holders as to how to opt out of the releases set forth in Article VIII.C of the Plan.

5. **Notices in Respect of Executory Contracts and Unexpired Leases.**

Counterparties to Executory Contracts and Unexpired Leases that receive an *Assumption Notice* or a *Rejection Notice*, substantially in the forms attached as Schedule 9 and Schedule 10 to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, rejection, and/or cure amount, as applicable. Such objections must be filed with the Court (contemporaneously with a proof of service) and served upon the applicable notice parties (as set forth in the *Assumption Notice* and *Rejection Notice*) so as to be ***actually received*** by **February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

D. **Voting and Tabulation Procedures.**

1. **Holders of Claims and Interests entitled to Vote.**

Only the following Holders of Claims and Interests in the Voting Classes shall be entitled to vote with regard to such Claims and Interests:

    a.    Holders of Claims and Interests who, on or before the Voting Record Date, have timely filed a Proof of Claim that; (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least 7 days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

    b.    Holders of Claims and Interests that are listed in the Schedules; *provided* that if the applicable Claims Bar Date has not expired prior to the Voting Record Deadline, a Claim listed on the Schedules as contingent, disputed, or unliquidated shall be allowed to vote only in the amount of $1.00;

c.   Holders of Claims and Interests that arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

d.   Holders of Disputed Claims that have been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

e.   the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

2.   <u>Establishing Claim Amounts for Voting Purposes</u>.

<u>Classes 4, 5, 9 and 10 Claims/ Interests</u>.  The Claims amount of Class 4-2020 Notes Claims, Class 5-2022 Notes Claims, Class 9-Existing Preferred Interests, and Class 10-Existing Common Interests of directly registered and Beneficial Holders[5] as well as the number for voting purposes only will be established through the indenture trustee, transfer agent or applicable Nominees, as the case may be, in the amount of the applicable positions held as of the Voting Record Date, (i) by such registered Holder as evidenced by the records of the indenture trustee, or (ii) by the applicable Nominees in Classes 4, 5, 9 and 10 as evidenced by the securities position report(s) from the Depository Trust Company or other applicable depository firm.

<u>Filed and Scheduled Claims</u>.  The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Balloting Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.   the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b.   the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under these Solicitation and Voting Procedures;

c.   the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court

---

5   A "<u>Beneficial Holder</u>" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the applicable broker, bank, or other nominee holding through the respective indenture trustee.

under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided*, that any Ballot cast by a Holder of a Claim who timely files a Proof of Claim in respect of (a) a contingent Claim or a Claim in a wholly unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Balloting Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (11) a partially liquidated and partially unliquidated Claim, such Claim will be Allowed for voting purposes only in the liquidated amount; *provided, further*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

d.      the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided, further*, that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall be allowed to vote in the amount of $1.00; and

e.      in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes unless otherwise ordered by the Court.

**3.      <u>Voting and Ballot Tabulation Procedures</u>.**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

a.      except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors, in their sole discretion, shall be entitled to reject such Ballot as invalid and, therefore, not count it in connection with Confirmation of the Plan;

b.      the Debtors will file with the Court by no later than February 28, 2019, a voting report (the "<u>Voting Report</u>"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part)

illegible, unidentifiable, lacking signatures, or lacking necessary information, received via facsimile, or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot;

c. the method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each Holder. Except as otherwise provided, a Ballot will be deemed delivered only when the Balloting Agent actually receives the properly executed Ballot;

d. an executed Ballot is required to be submitted by the party submitting such Ballot. Subject to the other procedures and requirements herein, completed, executed Master Ballots may be submitted via electronic mail, in PDF format (or in another format at the request of the Balloting Agent), to the Balloting Agent via electronic mail at parkerdrillingballots@primeclerk.com. However, Ballots submitted by facsimile will not be valid;

e. Registered Holders of Claims and Interests in Classes 4, 5, 9, and 10 may not submit their Ballot by any electronic means other than the Balloting Agent's e-ballot platform;[6]

f. no Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent), the Debtors' financial or legal advisors, and if so sent, will not be counted;

g. if multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

h. Holders must vote all of their Claims or Interests within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot (other than a Master Ballot) that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

i. Holders of Claims and Interests that may be asserted against multiple Debtors must vote such Claims and Interests either to accept or reject the Plan at each such Debtor and may not vote any such Claim and Interests to accept and one Debtor and reject at another Debtor. Accordingly, a Ballot (other than a Master Ballot) that rejects the Plan for a Claim or Interest at

---

[6] If it is later determined that direct Holders of Claims or Interests in other Classes are entitled to vote, the only electronic means allowed to return Ballots will be the Balloting Agent's e-ballot platform.

one Debtor and accepts the Plan for the same Claim or Interest at another Debtor will not be counted;

j.      a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

k.      the Debtors, subject to any contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

l.      neither the Debtors, nor any other Party, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

m.      unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline, or such Ballots will not be counted;

n.      in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

o.      subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

p.      if a Claim has been estimated or a Claim has otherwise been Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

q.      if an objection to a Claim or Interest is filed, such Claim or Interest shall be treated in accordance with the procedures set forth herein;

r.      the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any party that does not hold a Claim or Interest in a Voting Class; (iii) any Ballot cast for a Claim or Interest scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the

Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

s.    after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors;

t.    the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes;

u.    where any portion of a single Claim or Interest has been transferred to a transferee, all Holders of any portion of such single Claim or Interest will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim or Interest collectively to accept or reject the Plan. In the event that (x) a Ballot, (y) a group of Ballots within a Voting Class received from a single creditor, or (z) a group of Ballots received from the various holders of multiple portions of a single Claim or Interest partially reject and partially accept the Plan, such Ballots shall not be counted; and

v.    for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim or Interest in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities hold Claims in a particular Class, these Claims or Interests will not be aggregated and will not be treated as if such creditor held one Claim or Interest in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

### 4. Procedures for Beneficial Holders of Class 4, Class 5, Class 9, and Class 10 Claims and Interests Who Hold Their Position through a Nominee.

The following additional procedures shall apply to Claims or Interests of Beneficial Holders of Class 4, Class 5, Class 9, and Class 10 Claims and Interests who hold their position through a Nominee:

a.    January 22, 2019 (or the first date that is the first day of the Disclosure Statement Hearing), is the record date for determining the identity of Beneficial Holders eligible to vote on the Plan;

b.    the Balloting Agent shall distribute or cause to be distributed the appropriate number of copies of Ballots to Nominees identified by the Balloting Agent

as Entities through which Beneficial Holders hold Class 4, Class 5, Class 9, and Class 10 Claims and Interests as of the Voting Record Date;

c.     any Nominee that is a Holder of record with respect to Class 4, Class 5, Class 9, and Class 10 Claims and Interests shall solicit votes from Beneficial Holders by: (i) immediately distributing the Solicitation Package, including Ballots, it receives from the Balloting Agent to all such Beneficial Holders; (ii) providing such Beneficial Holders with a return address and envelope to send Ballots; (iii) promptly collecting Ballots from such Beneficial Holders that cast votes on the Plan; (iv) compiling and validating the votes and other relevant information of all such Beneficial Holders on the applicable master ballot; and (v) transmitting the applicable master ballot to the Balloting Agent by the Voting Deadline;

d.     any Beneficial Holder holding the Class 4, Class 5, Class 9, and Class 10 Claims and Interests as a record holder in its own name shall vote on the Plan by completing and signing a Ballot and returning it directly to the Balloting Agent on or before the Voting Deadline;

e.     any Beneficial Holder holding Notes or Interests in "street name" through a Nominee must vote on the Plan through such Nominee by completing and signing the applicable Ballot and returning such Ballot to the appropriate Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return the applicable master ballot to the Balloting Agent prior to the Voting Deadline. Any Beneficial Holder holding Notes or Interests in "street name" that submits a Ballot to the Debtors, the Debtors' agents, or the Debtors' financial or legal advisors will not have such Ballot counted for purposes of accepting or rejecting the Plan;

f.     any Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Balloting Agent the applicable master ballot that reflects the vote of such Beneficial Holders by the Voting Deadline or otherwise validates the Ballot in a manner acceptable to the Balloting Agent. Nominees shall retain all Ballots returned by Beneficial Holders for a period of one (1) year after the Effective Date of the Plan;

g.     if a Beneficial Holder holds Notes or Interests through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Ballot and each such Beneficial Holder should execute a separate Ballot for each block of Notes or Interests that it holds through any Nominee and must return each such Ballot to the appropriate Nominee;

h.     if a Beneficial Holder holds a portion of its Notes or Interests through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described

herein to vote the portion held in its own name and the procedures described in the rest of this section to vote the portion held by the Nominee(s); and

i.      Beneficial Holders holding Notes or Interests through a Nominee must return their paper ballot to their Nominee, unless, at the option of the Nominee, the Nominee instructs their Beneficial Holders that they may relay votes or voting instructions electronically to the Nominee or the entity preparing the master ballot on such Nominee's behalf, and Nominees may use their customary procedures for obtaining such votes electronically.

**5.      <u>Master Ballot Voting Procedures</u>.**

These rules will apply with respect to the tabulation of master ballots cast by Nominees for beneficial Holders of Class 4-2020 Notes Claims, Class 5-2022 Notes Claims, Class 9-Existing Preferred Interests, and Class 10-Existing Common Interests (the "<u>Master Ballots</u>"):

a.      votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees in Class 4 and Class 5, as applicable, as of the Voting Record Date, as evidenced by the applicable records.  Votes submitted by a Nominee, whether pursuant to a Master Ballot, will not be counted in excess of the amount of such Interests held by such Nominee as of the Voting Record Date;

b.      if conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominees;

c.      if over-votes on a Master Ballot are not reconciled prior to the preparation of the vote certification, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position in the relevant Class; and

d.      a single Nominee may complete and deliver to the Balloting Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot.

**E.      Amendments to the Plan and Solicitation and Voting Procedures.**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan (including, for the avoidance of doubt, the Plan Supplement), Ballots, Confirmation Hearing Notice, Rights Offering Procedures, Rights Offering Materials, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their

distribution; *provided* that all such modifications shall be made in accordance with the terms of the document being modified, the Plan and the consent requirements contained in the Restructuring Support Agreement.

[*Remainder of page intentionally left blank.*]

## SCHEDULE 3A

**Form of Class 4 Master Ballot**

[CUSIP]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) Case No. 18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 4 BALLOT FOR HOLDERS OF 2020 NOTES CLAIMS**

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED*
BY THE BALLOTING AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME
(THE "VOTING DEADLINE") IN ACCORDANCE WITH THIS DOCUMENT.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[CUSIP]

You are receiving this master ballot (this "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 4 2020 Notes Claims, as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders' 2020 Notes Claims in Class 4 (the "Class 4 2020 Notes Claims"), to transmit to the Balloting Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 4 2020 Notes Claims to accept or reject the Plan.** This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii) emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

**US/ Canada Toll Free: (855) 631-5345**

**International: (347) 338-6451**

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF 2020 NOTES CLAIMS IN CLASS 4 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 4 2020 NOTES CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Balloting Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

**Item 1. Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

---

[2] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

[CUSIP]

☐ Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 4 2020 Notes Claims listed in Item 2 below, and is the record Holder of such notes, or

☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the aggregate principal amount of Class 4 2020 Notes Claims listed in Item 2 below, or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a Beneficial Holder, that is the registered Holder of the aggregate principal amount of Class 4 2020 Notes Claims listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 4 2020 Notes Claims described in Item 2.

**Item 2. Class 4 2020 Notes Claims Vote on Plan**

The undersigned transmits the following votes, and releases of Beneficial Holders of Class 4 2020 Notes Claims and certifies that the following Beneficial Holders of Class 4 2020 Notes Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "<u>Ballots</u>") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table. Please note that each Holder must vote all such Beneficial Holder's Class 4 2020 Notes Claims to accept or reject the Plan and may not split such vote. Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both such an acceptance and a rejection of the Plan will not be counted.

| Your Customer Account Number for Each Beneficial Holder of Class 4 2020 Notes Claims | Principal Amount Held as of Voting Record Date | **Item 2** Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | **Item 3** If the box in Item 3 of the Beneficial Holder Ballot was completed, check the box in the column below OPT OUT of the Third Party Release |
|---|---|---|---|---|---|
| | | **Accept the Plan** | or | **Reject the Plan** | |
| 1 | $ | ☐ | | ☐ | |
| 2 | $ | ☐ | | ☐ | |
| 3 | $ | ☐ | | ☐ | |
| 4 | $ | ☐ | | ☐ | |
| 5 | $ | ☐ | | ☐ | |
| 6 | $ | ☐ | | ☐ | |
| **TOTALS** | $ | | | | |

[CUSIP]

**Item 3. Other Class 4 Ballots Submitted by Beneficial Holders.** The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 5 of the Beneficial Holder Ballot:

| YOUR customer account number and/or Customer Name for each Beneficial Holder who completed Item 5 of the Beneficial Holder Ballot. | Transcribe from Item 5 of the Beneficial Holder Ballot | | | |
|---|---|---|---|---|
| | Account Number | Name of Registered Holder or Nominee | Principal Amount of other Class 4 2020 Notes Claims | CUSIP of other Class 4 2020 Notes Claims Voted |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

**Item 4. Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following provision:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*  \*  \*

[CUSIP]

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

<u>Item 5</u>. **Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

a) it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 4 2020 Notes Claims listed in Item 2 above;

b) it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

c) it is the registered Holder of all Class 4 2020 Notes Claims listed in Item 2 above being voted;

d) it has been authorized by each Beneficial Holder of Class 4 2020 Notes Claims listed in Item 2 above to vote on the Plan;

e) no other Master Ballots with respect to the same Class 4 2020 Notes Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

[CUSIP]

f)  it has properly disclosed:  (i) the number of Beneficial Holder of Class 4 2020 Notes Claims who completed the Beneficial Holder Ballots; (ii) the respective amounts of the Class 4 2020 Notes Claims owned, as the case may be, by each Beneficial Holder of Class 4 2020 Notes Claims who completed a Beneficial Holder Ballot; (iii) each such Beneficial Holder of Class 4 2020 Notes Claims' respective vote concerning the Plan; (iv) each such Beneficial Holder of Class 4 2020 Notes Claims' certification as to other Class 4 2020 Notes Claims voted; and (v) the customer account or other identification number for each such Beneficial Holder of Class 4 2020 Notes Claims; and

g)  it will maintain Ballots and evidence of separate transactions returned by Beneficial Holders of Class 4 2020 Notes Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

[*Remainder of page intentionally left blank.*]

[CUSIP]

Name of Nominee: _____
_____(Print or Type)

Participant Number:

_____

Name of Proxy Holder or Agent for Nominee (if applicable):

_____
_____(Print or Type)
_____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____
_____
_____

Date Completed: _____

Email Address: _____

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA
FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL
SERVICE TO:**

**Parker Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022
parkerdrillingballots@primeclerk.com**

| |
|---|
| **IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 4 MASTER BALLOT ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED BY THIS CLASS 4 MASTER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.** |

[CUSIP]

| Class 4 —2020 Notes Claims |
|:---:|

**INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT**

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the BankruptcyCourt and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims and Interests in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 4 2020 Notes Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 4 2020 Notes Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Balloting Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **February 22, 2019, at 4:00 p.m.**, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Balloting Agent.

4. If you are transmitting the votes of any Beneficial Holder of Class 4 2020 Notes Claims other than yourself, you may either:

   (a) **"Pre-validate" the individual Class 4 Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 4 2020 Notes Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Balloting Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 4 2020 Notes Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Balloting Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date; or**

   (b) **Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 4 2020 Notes Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Balloting Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Balloting Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot**

[CUSIP]

**to the Balloting Agent so that the Master Ballot is actually received by the Balloting Agent on or before the Voting Deadline.**

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Balloting Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

6. The Master Ballot *must* be returned to the Balloting Agent so as to be ***actually received*** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

7. If a Master Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following Master Ballots will *not* be counted**:

    (a) **any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest;**

    (b) **any Master Ballot cast by a Party that does not hold a Claim or Interest in a Class that is entitled to vote on the Plan;**

    (c) **any Master Ballot sent by facsimile or any electronic means other than electronic mail;**

    (d) **any unsigned Master Ballot;**

    (e) **any Master Ballot that does not contain an original signature; *provided, however*, that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;**

    (f) **any Master Ballot not marked to accept or reject the Plan; and/or**

    (g) **any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.**

8. The method of delivery of Master Ballots to the Balloting Agent is at the election and risk of each Nominee of Class 4 2020 Notes Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent *actually receives* the originally executed Master Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9. If a Beneficial Holder or Nominee holds a Claim or Interest in a Voting Class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim, as applicable, in that Voting Class.

10. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim or Interest prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11. The Master Ballot does *not* constitute, and shall not be deemed to be (a) a Proof of Claim, or (b) an assertion or admission of a Claim or Interest.

12. **Please be sure to sign and date the Master Ballot**. You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

[CUSIP]

13. If you are both the Nominee and the Beneficial Holder of any of the Class 4 2020 Notes Claims and you wish to vote such Class 4 2020 Notes Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Class 4 2020 Notes Claims and you must vote your entire Class 4 2020 Notes Claims to either to accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, which partially rejects and partially accepts the Plan will not be counted.

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim or Interest in such Class, and all votes related to such Claim or Interest will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities hold Claims or Interests in a particular Class, these Claims or Interests will not be aggregated and will not be treated as if such creditor held one Claim or Interest in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

   (a) votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Class 4 2020 Notes Claims as of the Record Voting Date, as evidenced by the record and depository listings;

   (b) votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated holder Ballots, will not be counted in excess of the record amount of the Class 4 2020 Notes Claims held by such Nominee;

   (c) to the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated holder Beneficial Holder Ballots, the Balloting Agent will attempt to reconcile discrepancies with the Nominee;

   (d) to the extent that over-votes on a Master Ballot or pre-validated holder Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 4 2020 Notes Claims; and

   (e) for purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Balloting Agent may be asked to adjust such principal amount to reflect the Claim or Interest amount.

**PLEASE MAIL YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:**

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

**OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.**

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

[CUSIP]

## SCHEDULE 3B

**Form of Class 4 Beneficial Holder Ballot**

[CUSIP]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 4 BALLOT FOR BENEFICIAL HOLDERS OF 2020 NOTES CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
> CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED,
> EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT
> BY FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").
> IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU
> MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW
> SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE
> ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE BALLOTING
> AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect
to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as
may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter
11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to
time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court")
has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy
Code, by entry of an order on January 23, 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of
the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but
not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc.
(4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of
Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma
Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management
Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C.
(1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology,
L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools,
L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

You are receiving this Class 4 ballot for Beneficial Holders[2] (the "Class 4 Beneficial Holder Ballot") because you are a Beneficial Holder of a 2020 Notes Claim in Class 4 (the "Class 4 2020 Notes Claims") as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Class 4 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 4 2020 Notes Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 4 Beneficial Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii) emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

This Class 4 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 4 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 4, 2020 Notes Claims, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 4 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Balloting Agent on or before the Voting Deadline, which is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1. Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of 2020 Notes Claims in Class 4 in the following aggregate unpaid principal amount (insert amount in box below, unless otherwise completed by your Nominee):

$_____

---

[2] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

[CUSIP]

**Item 2. Vote on Plan.**

The Beneficial Holder of the Class 4 2020 Notes Claim against the Debtor(s) set forth in Item 1 votes to (please check <u>one</u>):

| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |

<u>**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**</u>

---

**Item 3. Important information regarding the Third Party Release.**

**<u>Article VIII.C of the Plan contains the following provision</u>:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*     \*     \*

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH

[CUSIP]

ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**The Beneficial Holder of the Class 4 2020 Notes Claim set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 4. Other Class 4 Beneficial Holder Ballots Submitted.** By returning this Beneficial Holder Ballot, the Holder of the Class 4 2020 Notes Claims identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for 2020 Notes Claims owned by such Holder, except as identified in the following table, and (b) *all* Beneficial Holder Ballots submitted by the Holder indicate the same vote to accept or reject the Plan that the Holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u> CLASS 4 2020 NOTES CLAIMS ON OTHER BENEFICIAL HOLDER BALLOTS**

| Account Number | Name of Registered Holder or Nominee | Principal Amount of Other Class 4 2020 Notes Claims | CUSIP of Other Class 4 2020 Notes Claims Voted |
|---|---|---|---|
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |

**Item 5. Certifications.**

By signing this Class 4 Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) that, as of the Voting Record Date, either: (i) the Entity is the Holder of the 2020 Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the 2020 Notes Claims being voted;

(b) that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

[CUSIP]

(c)    that the Entity has cast the same vote with respect to all 2020 Notes Claims in a single Class; and

(d)    that no other Class 4 Beneficial Holder Ballots with respect to the amount of the 2020 Notes Claims identified in Item 1 have been cast or, if any other Class 4 Beneficial Holder Ballots have been cast with respect to such 2020 Notes Claims, then any such earlier Class 4 Beneficial Holder Ballots are hereby revoked.

[*Remainder of page intentionally left blank.*]

[CUSIP]

Case 18-36958 Document 312 Filed in TXSB on 01/23/19 Page 140 of 296

| Name of Holder: | |
| --- | --- |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THE CLASS 4 MASTER BALLOT SUBMITTED ON YOUR BEHALF WHICH REFLECTS YOUR VOTE ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 4 BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

[CUSIP]

| Class 4 — 2020 Notes Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS CLASS 4 BENEFICIAL HOLDER BALLOT**

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 4 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 4 Beneficial Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for Confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your vote is counted, you must submit your Class 4 Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Balloting Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Class 4 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 4 Beneficial Holder Ballot; and (c) sign and return the Class 4 Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. The Voting Deadline for the receipt of Master Ballots by the Balloting Agent is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Your completed Class 4 Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Balloting Agent on or before the Voting Deadline.

4. **The following Class 4 Beneficial Holder Ballots submitted to your Nominee will *not* be counted:**

   (a) any Class 4 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;
   (b) Class 4 Beneficial Holder Ballot sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;
   (c) Class 4 Beneficial Holder Ballots sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee;
   (d) any Class 4 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;
   (e) any Class 4 Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 4;
   (f) any unsigned Class 4 Beneficial Holder Ballot;
   (g) any Class 4 Beneficial Holder Ballot submitted by a Holder not entitled to vote pursuant to the Plan.
   (h) any non-original Class 4 Beneficial Holder Ballot; and/or
   (i) any Class 4 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 4 Beneficial Holder Ballot marked both to accept and reject the Plan.

5. If your Class 4 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 4 Beneficial Holder Ballot to your Nominee. No Class 4 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6. If you deliver multiple Class 4 Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Class 4 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 4 Beneficial Holder Ballots.

[CUSIP]

7.  You must vote all of your Claims within Class 4 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple Claims within Class 4, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Claims within Class 4 for the purpose of counting votes.

8.  This Class 4 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date your Class 4 Beneficial Holder Ballot**.  If you are signing a Class 4 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 4 Beneficial Holder Ballot.

10. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 4 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, Holders of Claims and Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, and neither the Debtors nor the Balloting Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

### PLEASE MAIL YOUR CLASS 4 BENEFICIAL HOLDER BALLOT PROMPTLY.

### IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4 BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:

### US/CANADA TOLL FREE: (855) 631-5345

### INTERNATIONAL: (347) 338-6451

### EMAIL: PARKERDRILLINGBALLOTS@PRIMECLERK.COM

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT ON OR BEFORE FEBRUARY 22 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS CLASS 4 BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

[CUSIP]

## SCHEDULE 3C

**Form of Class 5 Master Ballot**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 5 BALLOT FOR HOLDERS OF 2022 NOTES CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THIS DOCUMENT.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019, (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

You are receiving this master ballot (this "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 5 2022 Notes Claims, as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders' 2022 Notes Claims in Class 5 (the "Class 5 2022 Notes Claims"), to transmit to the Balloting Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 5 2022 Notes Claims to accept or reject the Plan.** This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by, (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii) emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF 2022 NOTES CLAIMS IN CLASS 5 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 5 2022 NOTES CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Balloting Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

**Item 1.** Certification of Authority to Vote.

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐ Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 5 2022 Notes Claims listed in Item 2 below, and is the record Holder of such bonds, or

---

2   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

2

☐    Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the aggregate principal amount of Class 5 2022 Notes Claims listed in Item 2 below, or

☐    Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a Beneficial Holder, that is the registered Holder of the aggregate principal amount of Class 5 2022 Notes Claims listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 5 2022 Notes Claims described in Item 2.

**Item 2.  Class 5 2022 Notes Claims Vote on Plan**

The undersigned transmits the following votes, and releases of Beneficial Holders of Class 5 2022 Notes Claims and certifies that the following Beneficial Holders of Class 5 2022 Notes Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each Holder must vote all such Beneficial Holder's Class 5 2022 Notes Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

| Your Customer Account Number for Each Beneficial Holder of Class 5 2022 Notes Claims | Principal Amount Held as of Voting Record Date | Item 2<br><br>Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | Item 3<br><br>If the box in Item 3 of the Beneficial Holder Ballot was completed, check the box in the column below<br><br>OPT OUT of the Third Party Release |
|---|---|---|---|---|---|
| | | **Accept the Plan** | **or** | **Reject the Plan** | |
| 1 | $ | ☐ | | ☐ | |
| 2 | $ | ☐ | | ☐ | |
| 3 | $ | ☐ | | ☐ | |
| 4 | $ | ☐ | | ☐ | |
| 5 | $ | ☐ | | ☐ | |
| 6 | $ | ☐ | | ☐ | |
| **TOTALS** | $ | | | | |

**Item 3.  Other Class 5 Ballots Submitted by Beneficial Holders.**  The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 5 of the Beneficial Holder Ballot:

3

| YOUR customer account number and/or Customer Name for each Beneficial Holder who completed Item 5 of the Beneficial Holder Ballot. | Transcribe from Item 5 of the Beneficial Holder Ballot | | | |
|---|---|---|---|---|
| | Account Number | Name of Registered Holder or Nominee | Principal Amount of other Class 5 2022 Notes Claims | CUSIP of other Class 5 2022 Notes Claims Voted |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

**Item 4.** **Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following provision:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*       \*       \*

4

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

<u>Item 5</u>. **Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

a) it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 5 2022 Notes Claims listed in Item 2 above;

b) it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

c) it is the registered Holder of all Class 5 2022 Notes Claims listed in Item 2 above being voted, or

d) it has been authorized by each Beneficial Holder of Class 5 2022 Notes Claims listed in Item 2 above to vote on the Plan;

e) no other Master Ballots with respect to the same Class 5 2022 Notes Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

5

f)   it has properly disclosed:  (i) the number of Beneficial Holder of Class 5 2022 Notes Claims who completed the Beneficial Holder Ballots; (ii) the respective amounts of the Class 5 2022 Notes Claims owned, as the case may be, by each Beneficial Holder of Class 5 2022 Notes Claims who completed a Beneficial Holder Ballot; (iii) each such Beneficial Holder of Class 5 2022 Notes Claims' respective vote concerning the Plan; (iv) each such Beneficial Holder of Class 5 2022 Notes Claims' certification as to other Class 5 2022 Notes Claims voted; and (v) the customer account or other identification number for each such Beneficial Holder of Class 5 2022 Notes Claims; and

g)   it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Class 5 2022 Notes Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

[*Remainder of page intentionally left blank.*]

6

Name of Nominee: _____

(Print or Type)

Participant Number:

_____

Name of Proxy Holder or Agent for Nominee (if applicable):

_____

(Print or Type)

_____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

_____

_____

Date Completed: _____

Email Address: _____


**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA
FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL
SERVICE TO:**

**Parker Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022
parkerdrillingballots@primeclerk.com**

| |
|---|
| **IF THE BALLOTING AGENT DOES NOT<br>*ACTUALLY RECEIVE* THIS CLASS 5 MASTER BALLOT<br>ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M.,<br>PREVAILING CENTRAL TIME (AND IF THE VOTING<br>DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED<br>BY THIS CLASS 5 MASTER BALLOT MAY BE COUNTED TOWARD<br>CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.** |

| Class 5 — 2022 Notes Claims |
|:---:|

**INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT**

1.  The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3.  You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 5 2022 Notes Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 5 2022 Notes Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Balloting Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **February 22, 2019, at 4:00 p.m.,** prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Balloting Agent.

4.  If you are transmitting the votes of any Beneficial Holder of Class 5 2022 Notes Claims other than yourself, you may either:

    **(a)  "Pre-validate" the individual Class 5 Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 5 2022 Notes Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Balloting Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 5 2022 Notes Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Balloting Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date; or**

    **(b)  Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 5 2022 Notes Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Balloting Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Balloting Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot**

to the Balloting Agent so that the Master Ballot is actually received by the Balloting Agent on or before the Voting Deadline.

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Balloting Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

6. The Master Ballot *must* be returned to the Balloting Agent so as to be ***actually received*** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

7. If a Master Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following Master Ballots will *not* be counted**:

    (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest;
    (b) any Master Ballot cast by a Party that does not hold a Claim or Interest in a Class that is entitled to vote on the Plan;
    (c) any Master Ballot sent by facsimile or any electronic means other than electronic mail;
    (d) any unsigned Master Ballot;
    (e) any Master Ballot that does not contain an original signature; *provided, however,* that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;
    (f) any Master Ballot not marked to accept or reject the Plan; and
    (g) any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

8. The method of delivery of Master Ballots to the Balloting Agent is at the election and risk of each Nominee of Class 5 2022 Notes Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent *actually receives* the originally executed Master Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9. If a Beneficial Holder or Nominee holds a Claim or Interest in a Voting Class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim or Interest, as applicable, in that Voting Class.

10. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim or Interest prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11. The Master Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim or Interest.

12. **Please be sure to sign and date the Master Ballot**. You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

13. If you are both the Nominee and the Beneficial Holder of any of the Class 5 2022 Notes Claims and you wish to vote such Class 5 2022 Notes Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Class 5 2022 Notes Claims and you must vote your entire Class 5 2022 Notes Claims to either to accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, which partially rejects and partially accepts the Plan will not be counted.

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim or Interest in such Class, and all votes related to such Claim or Interest will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities hold Claims or Interests in a particular Class, these Claims or Interests will not be aggregated and will not be treated as if such creditor held one Claim or Interest in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

    (a) votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Class 5 2022 Notes Claims as of the Record Voting Date, as evidenced by the record and depository listings;

    (b) votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Ballots, will not be counted in excess of the record amount of the Class 5 2022 Notes Claims held by such Nominee;

    (c) to the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Balloting Agent will attempt to reconcile discrepancies with the Nominee;

    (d) to the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 5 2022 Notes Claims; and

    (e) for purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Balloting Agent may be asked to adjust such principal amount to reflect the Claim or Interest amount.

**PLEASE MAIL YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:**

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

**OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.**

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## <u>SCHEDULE 3D</u>

**Form of Class 5 Beneficial Holder Ballot**

[CUSIP]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) Case No. 18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 5 BALLOT FOR BENEFICIAL HOLDERS OF 2022 NOTES CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"). IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE BALLOTING AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[CUSIP]

You are receiving this Class 5 ballot for Beneficial Holders[2] (the "Class 5 Beneficial Holder Ballot") because you are a Beneficial Holder of a 2022 Notes Claim in Class 5 (the "Class 5 2022 Notes Claims") as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Class 5 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 5 2022 Notes Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 5 Beneficial Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them: (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) at no charge from Prime Clerk LLC (the "Balloting Agent") by, (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii) emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

### US/CANADA TOLL FREE: (855) 631-5345

### INTERNATIONAL: (347) 338-6451

This Class 5 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 5 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 5, 2022 Notes Claims, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 5 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Balloting Agent on or before the Voting Deadline, which is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of 2022 Note Claims in Class 5 in the following aggregate unpaid principal amount (insert amount in box below, unless otherwise completed by your Nominee):

$\boxed{\$_____}$

---

2  A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

[CUSIP]

**Item 2. Vote on Plan.**

The Beneficial Holder of the Class 5 2022 Notes Claim against the Debtor(s) set forth in Item 1 votes to (please check <u>one</u>):

| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |

<u>**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**</u>

---

**Item 3. Important information regarding the Third Party Release.**

<u>**Article VIII.C of the Plan contains the following provision:**</u>

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

**1. the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;**

**2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;**

**3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or**

**4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

\*   \*   \*

**UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH**

[CUSIP]

**ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).**

<u>**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**</u>

<u>**The Beneficial Holder of the Class 5 2022 Notes Claim set forth in Item 1 elects to:**</u>

☐ **OPT OUT** of the Third Party Release

---

**Item 4.  Other Class 5 Beneficial Holder Ballots Submitted.**  By returning this Beneficial Holder Ballot, the Holder of the Class 5 2022 Notes Claims identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for Notes Claims owned by such Holder, except as identified in the following table, and (b) *all* Beneficial Holder Ballots submitted by the Holder indicate the same vote to accept or reject the Plan that the Holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u>
CLASS 5 2022 NOTES CLAIMS ON OTHER BENEFICIAL HOLDER BALLOTS**

| Account Number | Name of Registered Holder or Nominee | Principal Amount of Other Class 5 2022 Notes Claims | CUSIP of Other Class 5 2022 Notes Claims Voted |
|---|---|---|---|
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |

**Item 5.  Certifications.**

By signing this Class 5 Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a)   that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the 2022 Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the 2022 Notes Claims being voted;

[CUSIP]

(b) that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the Entity has cast the same vote with respect to all 2022 Notes Claims in a single Class; and

(d) that no other Class 5 Beneficial Holder Ballots with respect to the amount of the 2022 Notes Claims identified in Item 1 have been cast or, if any other Class 5 Beneficial Holder Ballots have been cast with respect to such 2022 Notes Claims, then any such earlier Class 5 Beneficial Holder Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THE CLASS 5 MASTER BALLOT SUBMITTED ON YOUR BEHALF WHICH REFLECTS YOUR VOTE ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 5 MASTER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

[CUSIP]

| Class 5 — 2022 Notes Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS CLASS 5 BENEFICIAL HOLDER BALLOT**

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 5 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 5 Beneficial Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your vote is counted, you must submit your Class 5 Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Balloting Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Class 5 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 5 Beneficial Holder Ballot; and (c) sign and return the Class 5 Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. The Voting Deadline for the receipt of Master Ballots by the Balloting Agent is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Your completed Class 5 Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Balloting Agent on or before the Voting Deadline.

4. **The following Class 5 Beneficial Holder Ballots submitted to your Nominee will *not* be counted**:

   **(a)** any Class 5 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;
   **(b)** Class 5 Beneficial Holder Ballots sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;
   **(c)** Class 5 Beneficial Holder Ballots sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee;
   **(d)** any Class 5 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;
   **(e)** any Class 5 Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 5;
   **(f)** any unsigned Class 5 Beneficial Holder Ballot;
   **(g)** any Class 5 Beneficial Holder Ballot submitted by a Holder not entitled to vote pursuant to the Plan;
   **(h)** any non-original Class 5 Beneficial Holder Ballot; and/or
   **(i)** any Class 5 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 5 Beneficial Holder Ballot marked both to accept and reject the Plan.

5. If your Class 5 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 5 Beneficial Holder Ballot to your Nominee. No Class 5 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6. If you deliver multiple Class 5 Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Class 5 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 5 Beneficial Holder Ballots.

[CUSIP]

7.  You must vote all of your Claims within Class 5 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple Claims within Class 5, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Claims within Class 5 for the purpose of counting votes.

8.  This Class 5 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date your Class 5 Beneficial Holder Ballot**.  If you are signing a Class 5 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 5 Beneficial Holder Ballot.

10. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 5 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, Holders of Claims and Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, and neither the Debtors nor the Balloting Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

### PLEASE MAIL YOUR CLASS 5 BENEFICIAL HOLDER BALLOT PROMPTLY.

### IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 5 BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:

### US/CANADA TOLL FREE: (855) 631-5345

### INTERNATIONAL: (347) 338-6451

### OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS CLASS 5 BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

[CUSIP]

## <u>SCHEDULE 3E</u>

**Form of Class 9 Master Ballot**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

### CLASS 9 EXISTING PREFERRED INTERESTS

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "<u>VOTING DEADLINE</u>") IN ACCORDANCE WITH THIS DOCUMENT.**

---

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "<u>Plan</u>") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "<u>Disclosure Statement</u>"). The Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "<u>Disclosure Statement Order</u>"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

You are receiving this master ballot (this "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 9 Existing Preferred Interests, as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders' of Existing Preferred Interests in Class 9 (the "Class 9 Existing Preferred Interests"), to transmit to the Balloting Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 9 Existing Preferred Interests to accept or reject the Plan.** This Ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them: (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii) emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF EXISTING PREFERRED INTERESTS IN CLASS 9 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 9 EXISTING PREFERRED INTEREST.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Balloting Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

**Item 1. Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐ Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 9 Existing Preferred Interests listed in Item 2 below, and is the record Holder of such Interests, or

---

[2] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

2

☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the aggregate principal amount of Class 9 Existing Preferred Interests listed in Item 2 below, or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a Beneficial Holder, that is the registered Holder of the aggregate principal amount of Class 9 Existing Preferred Interests listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 9 Existing Preferred Interests described in Item 2.

**Item 2. Class 9 Existing Preferred Interests Vote on Plan.**

The undersigned transmits the following votes, and releases of Beneficial Holders of Class 9 Existing Preferred Interests and certifies that the following Beneficial Holders of Class 9 Existing Preferred Interests, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Interests as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table. Please note that each Holder must vote all such Beneficial Holder's Class 9 Existing Preferred Interests to accept or reject the Plan and may not split such vote. Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

| Your Customer Account Number for Each Beneficial Holder of Class 9 Existing Preferred Interests | Interests Held as of Voting Record Date | Item 2<br><br>Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | Item 3<br><br>If the box in Item 3 of the Beneficial Holder Ballot was completed, check the box in the column below<br><br>OPT OUT of the Third Party Release |
|---|---|---|---|---|---|
| | | Accept the Plan | or | Reject the Plan | |
| 1 | | ☐ | | ☐ | |
| 2 | | ☐ | | ☐ | |
| 3 | | ☐ | | ☐ | |
| 4 | | ☐ | | ☐ | |
| 5 | | ☐ | | ☐ | |
| 6 | | ☐ | | ☐ | |
| **TOTALS** | | | | | |

3

**Item 3.** Important information regarding the Third Party Release.

**Article VIII.C of the Plan contains the following provision:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

     1.     the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

     2.     any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

     3.     the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

     4.     any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

*       *       *

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED**

**"OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

**Item 5.  Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

a)  it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 9 Existing Preferred Interests listed in Item 2 above;

b)  it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

c)  it is the registered Holder of all Class 9 Existing Preferred Interests listed in Item 2 above being voted;

d)  it has been authorized by each Beneficial Holder of Class 9 Existing Preferred Interests listed in Item 2 above to vote on the Plan;

e)  no other Master Ballots with respect to the same Class 9 Existing Preferred Interests identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Interests, then any such earlier Master Ballots are hereby revoked;

f)  it has properly disclosed:  (i) the number of Beneficial Holder of Class 9 Existing Preferred Interests who completed the Beneficial Holder Ballots; (ii) the respective amounts of the Class 9 Existing Preferred Interests owned, as the case may be, by each Beneficial Holder of Class 9 Existing Preferred Interests who completed a Beneficial Holder Ballot; (iii) each such Beneficial Holder of Class 9 Existing Preferred Interests' respective vote concerning the Plan; (iv) each such Beneficial Holder of Class 9 Existing Preferred Interests' certification as to other Class 9 Existing Preferred Interests voted; and (v) the customer account or other identification number for each such Beneficial Holder of Class 9 Existing Preferred Interests; and

g)  it will maintain Ballots and evidence of separate transactions returned by Beneficial Holder of Class 9 Existing Preferred Interests (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

Name of Nominee: _____
(Print or Type)

Participant Number:

_____

Name of Proxy Holder or Agent for Nominee (if applicable):

_____
(Print or Type)

_____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

_____

_____

Date Completed: _____

Email Address: _____

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND**
**RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA**
**FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL**
**SERVICE TO:**

**Parker Ballot Processing**
**c/o Prime Clerk LLC**
**830 Third Avenue, 3rd Floor**
**New York, NY 10022**
**parkerdrillingballots@primeclerk.com**

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE***
**THIS CLASS 9 MASTER BALLOT ON OR BEFORE**
**FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (AND IF THE**
**VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED**
**BY THIS CLASS 9 MASTER BALLOT MAY BE COUNTED TOWARD**
**CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

> **Class 9 — Existing Preferred Interests**

**INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT**

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one Class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for Confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 9 Existing Preferred Interests and take any action required to enable each such Beneficial Holder to vote timely the Interests that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Interests through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 9 Existing Preferred Interests shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Balloting Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **February 22, 2019, at 4:00 p.m.**, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Balloting Agent.

4. If you are transmitting the votes of any Beneficial Holder of Class 9 Existing Preferred Interests, other than yourself, you may either:

   (a) **"Pre-validate" the individual Class 9 Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 9 Existing Preferred Interests for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Balloting Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 9 Existing Preferred Interests held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Balloting Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date; or**

   (b) **Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 9 Existing Preferred Interests for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Balloting Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Balloting Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the**

**Master Ballot to the Balloting Agent so that the Master Ballot is actually received by the Balloting Agent on or before the Voting Deadline.**

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Balloting Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one (1) year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

6. The Master Ballot *must* be returned to the Balloting Agent so as to be ***actually received*** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

7. If a Master Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following Master Ballots will *not* be counted**:

    (a) **any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest;**

    (b) **any Master Ballot cast by a Party that does not hold a Claim or Interest in a Class that is entitled to vote on the Plan;**

    (c) **any Master Ballot sent by facsimile or any electronic means other than electronic mail;**

    (d) **any unsigned Master Ballot;**

    (e) **any Master Ballot that does not contain an original signature; *provided, however,* that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;**

    (f) **any Master Ballot not marked to accept or reject the Plan; and**

    (g) **any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.**

8. The method of delivery of Master Ballots to the Balloting Agent is at the election and risk of each Nominee of Class 9 Existing Preferred Interests. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent ***actually receives*** the originally executed Master Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9. If a Beneficial Holder or Nominee holds a Claim or Interest in a Voting Class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim or Interest, as applicable, in that Voting Class.

10. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim or Interest prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11. The Master Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or Interest or (b) an assertion or admission of a Claim or Interest.

12. **Please be sure to sign and date the Master Ballot**. You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

13. If you are both the Nominee and the Beneficial Holder of any of the Class 9 Existing Preferred Interests and you wish to vote such Class 9 Existing Preferred Interests, you may return a Beneficial Holder Ballot or Master Ballot for such Class 9 Existing Preferred Interests and you must vote your entire Class 9 Existing Preferred Interests to either to accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, which partially rejects and partially accepts the Plan will not be counted.

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim or Interest in such Class, and all votes related to such Claim or Interest will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities hold Claims or Interest in a particular Class, these Claims or Interests will not be aggregated and will not be treated as if such creditor held one Claim or Interest in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

    (a) votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in Class 9 Existing Preferred Interests as of the Record Voting Date, as evidenced by the record and depository listings;

    (b) votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, will not be counted in excess of the record amount of the Class 9 Existing Preferred Interests held by such Nominee;

    (c) to the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Balloting Agent will attempt to reconcile discrepancies with the Nominee;

    (d) to the extent that over-votes on a Master Ballot or pre-validated holder Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 9 Existing Preferred Interests; and

    (e) for purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Balloting Agent may be asked to adjust such principal amount to reflect the Interst amount.

**PLEASE MAIL YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:**

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

**OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.**

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR
BEFORE THE VOTING DEADLINE, WHICH IS FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING
CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES
TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

# SCHEDULE 3F

## Form of Class 9 Beneficial Holder Ballot

[CUSIP]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

CLASS 9 BALLOT FOR BENEFICIAL HOLDERS OF EXISTING PREFERRED INTERESTS

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED,
EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT
BY FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").
IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU
MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW
SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE
ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE BALLOTING
AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

You are receiving this Class 9 ballot for Beneficial Holders[2] (the "Class 9 Beneficial Holder Ballot") because you are a Beneficial Holder of Existing Common Interests in Class 9 (the "Class 9 Existing Preferred Interests") as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Class 9 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 9 Existing Preferred Interests.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 9 Beneficial Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them: (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii) emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

This Class 9 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 9 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Interest. Your Interest has been placed in Class 9, Existing Preferred Interests, under the Plan. If you hold Claims or Interests in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 9 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Balloting Agent on or before the Voting Deadline, which is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1. Amount of Interest.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of Existing Preferred Interests in Class 9 in the following aggregate amount (insert amount in box below, unless otherwise completed by your Nominee):

Amount of Interest:_____

---

[2]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

**Item 2. Vote on Plan.**

The Beneficial Holder of the Class 9 Existing Preferred Interests against the Debtor(s) set forth in Item 1 votes to (please check <u>one</u>):

| | |
|---|---|
| ☐   **ACCEPT** (vote FOR) the Plan | ☐   **REJECT** (vote AGAINST) the Plan |

> **Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

---

**Item 3. Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following provision:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1.     the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2.     any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.     the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.     any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

*     *     *

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH

3

ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**The Beneficial Holder of the Class 9 Existing Preferred Interests set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 4**.  **Certifications.**

By signing this Class 9 Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Existing Preferred Interests being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Existing Preferred Interests being voted;

(b) that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the Entity has cast the same vote with respect to all Existing Preferred Interests in a single Class; and

(d) that no other Class 9 Beneficial Holder Ballots with respect to the amount of the Item 1 have been cast or, if any other Class 9 Beneficial Holder Ballots have been cast with respect to such Existing Preferred Interests, then any such earlier Class 9 Beneficial Holder Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | *(Print or Type)* |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | *(If other than Holder)* |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND**
**RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR**
**OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

---

**IF THE BALLOTING AGENT DOES**
**NOT *ACTUALLY RECEIVE* THE CLASS 9 MASTER**
**BALLOT SUBMITTED ON YOUR BEHALF WHICH REFLECTS**
**YOUR VOTE ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M.**
**PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED),**
**YOUR VOTE TRANSMITTED BY THIS CLASS 9 MASTER BALLOT MAY BE**
**COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE**
**DEBTORS.**

---

5

| Class 9 — Existing Preferred Interests |
| :---: |

### INSTRUCTIONS FOR COMPLETING THIS CLASS 9 BENEFICIAL HOLDER BALLOT

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 9 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 9 Beneficial Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Bnakruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your vote is counted, you must submit your Class 9 Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Balloting Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Class 9 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 9 Beneficial Holder Ballot; and (c) sign and return the Class 9 Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. The Voting Deadline for the receipt of Master Ballots by the Balloting Agent is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Your completed Class 9 Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Balloting Agent on or before the Voting Deadline.

4. **The following Class 9 Beneficial Holder Ballots submitted to your Nominee will *not* be counted**:

    (a) **any Class 9 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;**
    (b) **Class 9 Beneficial Holder sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;**
    (c) **Class 9 Beneficial Holder Ballots sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee;**
    (d) **any Class 9 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Interest;**
    (e) **any Class 9 Beneficial Holder Ballot cast by an Entity that does not hold an Interest in Class 9;**
    (f) **any unsigned Class 9 Beneficial Holder Ballot;**
    (g) **any Class 9 Beneficial Holder Ballot submitted by a Holder not entitled to vote pursuant to the Plan.**
    (h) **any non-original Class 9 Beneficial Holder Ballot; and/or**
    (i) **any Class 9 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 9 Beneficial Holder Ballot marked both to accept and reject the Plan.**

5. If your Class 9 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 9 Beneficial Holder Ballot to your Nominee. No Class 9 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6. If you deliver multiple Class 9 Beneficial Holder Ballots to the Nominee with respect to the same Interest prior to the Voting Deadline, the last received valid Class 9 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 9 Beneficial Holder Ballots.

7. You must vote all of your Interests within Class 9 either to accept or reject the Plan and may **not** split your vote. Further, if a holder has multiple Interests within Class 9, the Debtors may, in their discretion, aggregate the Interests of any particular holder with multiple Interests within Class 9 for the purpose of counting votes.

8. This Class 9 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or Interest or (b) an assertion or admission of an Interest.

9. **Please be sure to sign and date your Class 9 Beneficial Holder Ballot**. If you are signing a Class 9 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 9 Beneficial Holder Ballot.

10. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class. Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 9 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, Holders of Claims and Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, and neither the Debtors nor the Balloting Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

### PLEASE MAIL YOUR CLASS 9 BENEFICIAL HOLDER BALLOT PROMPTLY.

### IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 9 BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:

### US/CANADA TOLL FREE: (855) 631-5345

### INTERNATIONAL: (347) 338-6451

### OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## **SCHEDULE 3G**

**Form of Class 9 Registered Holder Ballot**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARKER DRILLING COMPANY, *et al.*,[3] | ) | Case No. 18-36958 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**REGISTERED HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 9 EXISTING PREFERRED INTERESTS (REGISTERED HOLDERS)**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the AMended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "Disclosure Statement Order"). Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 9 ballot (this "Class 9 Registered Holder Ballot") because you are a Holder of a Class 9 Existing Preferred Interest as of January 22, 2019 (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

---

[3]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949), Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

9

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 9 Registered Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling; (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; (iii) emailing parkerdrillingballots@primeclerk.com; or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE: 855-631-5345**

**INTERNATIONAL: 347- 338- 6451**

This Class 9 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 9 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 9, Existing Preferred Interests, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1**.  **Amount of Interest.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 9 Existing Preferred Interest in the following aggregate amount (insert amount in box below):

_____

**Item 2**.  **Class 9 Existing Preferred Interests Vote on Plan.**

The Holder of the Class 9 Existing Preferred Interest against the Debtors set forth in Item 1 votes to (please check one):

| ☐   **ACCEPT** (vote FOR) the Plan | ☐   **REJECT** (vote AGAINST) the Plan |
|---|---|

**Item 3**.  **Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following provision:**

     **As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

     1.     **the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;**

10

2.  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.  the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.  any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\* \* \*

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**The Registered Holder of the Class 9 Existing Preferred Interests set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

11

**Item 4**. **Certifications**.

By signing this Class 9 Ballot, the undersigned certifies to the Court and the Debtors:

- that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Existing Preferred Interest being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Existing Preferred Interest being voted;

- that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- that the Entity has cast the same vote with respect to all Existing Preferred Interesst in a single Class; and

- that no other Class 9 Registered Holder Ballots with respect to the amount of the Existing Preferred Interest identified in Item 1 have been cast or, if any other Class 9 Registered Holder Ballots have been cast with respect to such Existing Preferred Interest, then any such earlier Class 9 Registered Holder Ballots are hereby revoked.

| Name of Holder: | |
|---|---|
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS HEREIN.**

**IF THE BALLOTING AGENT DOES
NOT *ACTUALLY RECEIVE* THE CLASS 9 REGISTERED HOLDER BALLOT ON OR BEFORE
FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING
DEADLINE IS NOT EXTENDED),
YOUR VOTE TRANSMITTED BY THIS CLASS 9 REGISTERED HOLDER BALLOT MAY BE
COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE
DEBTORS.**

| Class 9 — Existing Preferred Interests |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 9 BALLOT

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 9 Registered Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 9 Registered Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the holders if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in at least one class of Claims that votes on the Plan and at least two-thirds in amount of the Allowed Interests in each class of Interests voting on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 9 Registered Holder Ballot is counted, you *must either*: (a) complete and submit this hard copy Class 9 Registered Holder Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://cases.primeclerk.com/parkerdrilling. **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot**. To ensure that your hard copy Class 9 Registered Holder Ballot is counted, you must: (a) complete your Class 9 Registered Holder Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 9 Registered Holder Ballot; and (c) clearly sign and return your original Class 9 Registered Holder Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to Parker Ballot Processing, c/o Prime Clerk, LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022.

5. **Use of Online Ballot Portal**. To ensure that your electronic Class 9 Registered Holder Ballot is counted, please follow the instructions of the Debtors' case administration website at http://cases.primeclerk.com/parkerdrilling. You will need to enter your unique E-Ballot identification number indicated below. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

**E- Ballot ID:**_____

6. Your Class 9 Registered Holder Ballot *must* be returned to the Balloting Agent so as to be **actually received** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

7. **If a Class 9 Registered Holder Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, the following Class 9 Registered Holder Ballots will *not* be counted:**

   (a) any Class 9 Registered Holder Ballot that partially rejects and partially accepts the Plan;
   (b) Class 9 Registered Holder Ballots sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any indenture trustee, or the Debtors' financial or legal advisors;
   (c) Class 9 Registered Holder Ballots sent by facsimile or any electronic means other than via the online portal;
   (d) any Class 9 Registered Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Interest;
   (e) any Class 9 Registered Holder Ballot cast by an Entity that does not hold an Interest in Class 9; any Class 9 Registered Holder Ballot submitted by an Entity not entitled to vote pursuant to the Plan;
   (f) any unsigned Class 9 Registered Holder Ballot;
   (g) any non-original Class 9 Registered Holder Ballot;

(h) **any Class 9 Registered Holder Ballot not received by the Solicitation Agent by the Voting Deadline;**

(i) **any non-original Class 9 Registered Holder Ballot; and/or**

(j) **any Class 9 Registered Holder Ballot not marked to accept or reject the Plan or any Class 9 Registered Holder Ballot marked both to accept and reject the Plan.**

8. The method of delivery of Class 9 Registered Holder Ballots to the Balloting Agent is at the election and risk of each Holder of Existing Preferred Interest. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent *actually receives* the originally executed Class 9 Registered Holder Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

9. If multiple Class 9 Registered Holder Ballots are received from the same Holder of Existing Parker Preferred Stock with respect to the same Existing Preferred Interest prior to the Voting Deadline, the latest, timely received, and properly completed Class 9 Registered Holder Ballot will supersede and revoke any earlier received Class 9 Registered Holder Ballots.

10. You must vote all of your Existing Preferred Interest within Class 9 either to accept or reject the Plan and may *not* split your vote. Further, if a Holder has multiple Existing Preferred Interests within Class 9, the Debtors may aggregate the Interests of any particular Holder with multiple Existing Preferred Interest within Class 9 for the purpose of counting votes.

11. This Class 9 Registered Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or Interest or (b) an assertion or admission of a Claim or Interest.

12. <u>Please be sure to sign and date your Class 9 Ballot</u>. If you are signing a Class 9 Registered Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 9 Registered Holder Ballot.

13. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one Ballot coded for each different Class. Each Ballot votes *only* your Claims or Interests indicated on that Ballot, so please complete and return each Ballot that you received.

<u>**PLEASE MAIL YOUR CLASS 9 REGISTERED HOLDER BALLOT PROMPTLY**</u>

<u>**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 9 REGISTERED HOLDER BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:**</u>

**US/CANADA TOLL FREE: 855-631-5345**

**INTERNATIONAL: 347- 338- 6451**

<u>**OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.**</u>

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THE BALLOT ON OR BEFORE FEBRUARY 22 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS CLASS 9 REGISTERED HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## SCHEDULE 3H

**Form of Class 10 Master Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[4] | ) Case No. 18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**CLASS 10 EXISTING COMMON INTERESTS**

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED*
BY THE BALLOTING AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME
(THE "VOTING DEADLINE") IN ACCORDANCE WITH THIS DOCUMENT.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[4] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

17

You are receiving this master ballot (this "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[5] of Class 10 Existing Common Interests, as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders' Existing Common Interests in Class 10 (the "Class 10 Existing Common Interests"), to transmit to the Balloting Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 10 Existing Common Interests to accept or reject the Plan.** This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them: (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii) emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF EXISTING COMMON INTERESTS IN CLASS 10 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 10 EXISTING COMMON INTEREST.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Balloting Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

**Item 1.** **Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

    ☐ Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 10 Existing Common Interests listed in Item 2 below, and is the record Holder of such Interests, or

---

[5] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the aggregate principal amount of Class 10 Existing Common Interests listed in Item 2 below, or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a Beneficial Holders, that is the registered Holder of the aggregate principal amount of Class 10 Existing Common Interests listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 10 Existing Common Interests described in Item 2.

**Item 2.  Class 10 Existing Common Interests Vote on Plan.**

The undersigned transmits the following votes and releases of Beneficial Holders of Class 10 Existing Common Interests, and certifies that the following Beneficial Holders of Interests, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Interests as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each Holder must vote all such Beneficial Holder's Class 10 Existing Common Interests to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

| Your Customer Account Number for Each Beneficial Holder of Class 10 Existing Common Interests | Interests Held as of Voting Record Date | Item 2  Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | Item 3  If the box in Item 3 of the Beneficial Holder Ballot was completed, check the box in the column below  OPT OUT of the Third Party Release |
|---|---|---|---|---|---|
| | | Accept the Plan | or | Reject the Plan | |
| 1 | | ☐ | | ☐ | |
| 2 | | ☐ | | ☐ | |
| 3 | | ☐ | | ☐ | |
| 4 | | ☐ | | ☐ | |
| 5 | | ☐ | | ☐ | |
| 6 | | ☐ | | ☐ | |
| TOTALS | | | | | |

**Item 3.** **Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following provision:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1.     the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2.     any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.     the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.     any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

*          *          *

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED**

**"OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

**Item 5.  Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

a) it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 10 Existing Common Interests listed in Item 2 above;

b) it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

c) it is the registered Holder of all Class 10 Existing Common Interests listed in Item 2 above being voted;

d) it has been authorized by each Beneficial Holder of Class 10 Existing Common Interests listed in Item 2 above to vote on the Plan;

e) no other Master Ballots with respect to the same Class 10 Existing Common Interests identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Interests, then any such earlier Master Ballots are hereby revoked;

f) it has properly disclosed:  (i) the number of Beneficial Holder of Class 10 Existing Common Interests who completed the Beneficial Holder Ballots; (ii) the respective amounts of the Class 10 Existing Common Interests owned, as the case may be, by each Beneficial Holder of Class 10 Existing Common Interests who completed a Beneficial Holder Ballot; (ii) each such Beneficial Holder of Class 10 Existing Common Interests' respective vote concerning the Plan; (iv) each such Beneficial Holder of Class 10 Existing Common Interests' certification as to other Class 10 Existing Common Interests voted; and (v) the customer account or other identification number for each such Beneficial Holder of Class 10 Existing Common Interests; and

g) it will maintain Ballots and evidence of separate transactions returned by Beneficial Holder of Class 10 Existing Common Interests (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

Name of Nominee: _____
(Print or Type)

Participant Number:

_____

Name of Proxy Holder or Agent for Nominee (if applicable):

_____
(Print or Type)
_____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____
_____
_____

Date Completed: _____

Email Address: _____

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA
FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL
SERVICE TO:**

**Parker Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022
parkerdrillingballots@primeclerk.com**

| |
|---|
| **IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 10 MASTER BALLOT ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED BY THIS CLASS 10 MASTER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.** |

| Class 10 — Existing Common Interests |
|---|

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 10 Existing Common Interests and take any action required to enable each such Beneficial Holder to vote timely the Interests that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 10 Existing Common Interests shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Balloting Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **February 22, 2019, at 4:00 p.m.**, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Balloting Agent.

4. If you are transmitting the votes of any Beneficial Holder of Class 10 Existing Common Interests other than yourself, you may either:

   (a) **"Pre-validate" the individual Class 10 Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 10 Existing Common Interests for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Balloting Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 10 Existing Common Interests held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Balloting Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date; or**

   (b) **Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 10 Existing Common Interests for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Balloting Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Balloting Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the**

23

> **Master Ballot to the Balloting Agent so that the Master Ballot is actually received by the Balloting Agent on or before the Voting Deadline.**

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Balloting Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

6. The Master Ballot *must* be returned to the Balloting Agent so as to be *actually received* by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

7. If a Master Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following Master Ballots will *not* be counted**:

   (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest;

   (b) any Master Ballot cast by a Party that does not hold a Claim or Interest in a Class that is entitled to vote on the Plan;

   (c) any Master Ballot sent by facsimile or any electronic means other than electronic mail;

   (d) any unsigned Master Ballot;

   (e) any Master Ballot that does not contain an original signature; *provided, however*, that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;

   (f) any Master Ballot not marked to accept or reject the Plan; and

   (g) any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

8. The method of delivery of Master Ballots to the Balloting Agent is at the election and risk of each Nominee of Class 10 Existing Common Interests. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent *actually receives* the originally executed Master Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9. If a Beneficial Holder or Nominee holds a Claim or Interest in a Voting Class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim or Interest, as applicable, in that Voting Class.

10. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim or Interest prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11. The Master Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or Interest or (b) an assertion or admission of a Claim or Interest.

12. **Please be sure to sign and date the Master Ballot**. You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

13. If you are both the Nominee and the Beneficial Holder of any of the Class 10 Existing Common Interests and you wish to vote such Class 10 Existing Common Interests, you may return a Beneficial Holder Ballot or Master Ballot for such Class 10 Existing Common Interests and you must vote your entire Class 10 Existing Common Interests to either to accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, which partially rejects and partially accepts the Plan will not be counted.

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim or Interest in such Class, and all votes related to such Claim or Interest will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities hold Claims or Interests in a particular Class, these Claims or Interests will not be aggregated and will not be treated as if such creditor held one Claim or Interest in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

    (a) votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Class 10 Existing Common Interests as of the Record Voting Date, as evidenced by the record and depository listings;

    (b) votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, will not be counted in excess of the record amount of the Class 10 Existing Common Interests held by such Nominee;

    (c) to the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated holder Beneficial Holder Ballots, the Balloting Agent will attempt to reconcile discrepancies with the Nominee;

    (d) to the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 10 Existing Common Interests; and

    (e) for purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Balloting Agent may be asked to adjust such principal amount to reflect the Claim or Interest amount.

**PLEASE MAIL YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:**

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

**OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.**

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

**<u>SCHEDULE 3I</u>**

**Form of Class 10 Beneficial Holder Ballot**

[CUSIP]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

### CLASS 10 BALLOT FOR BENEFICIAL HOLDERS OF EXHISTING COMMON INTERESTS

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"). IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE BALLOTING AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

You are receiving this Class 10 ballot for Beneficial Holders[2] (the "Class 10 Beneficial Holder Ballot") because you are a Beneficial Holder of Existing Common Interests in Class 10 (the "Class 10 Existing Common Interests") as of January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing) (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Class 10 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 10 Existing Common Interests.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 10 Beneficial Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them: (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling, (ii), writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, (iii), emailing parkerdrillingballots@primeclerk.com, or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

This Class 10 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 10 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Interest. Your Interest has been placed in Class 10, Existing Common Interests, under the Plan. If you hold Claims or Interests in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 10 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Balloting Agent on or before the Voting Deadline, which is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

<u>**Item 1**</u>.  **Amount of Interest.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the beneficial Holder of Existing Common Interests in Class 10 in the following aggregate amount (insert amount in box below, unless otherwise completed by your Nominee):

Amount of Interest:_____

---

[2]  A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee.

<u>Item 2</u>. **Vote on Plan.**

The Beneficial Holder of the Class 10 Existing Common Interests against the Debtor(s) set forth in Item 1 votes to (please check <u>one</u>):

| | | | |
|---|---|---|---|
| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |

> **<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.</u>**

---

**Item 3.  Important information regarding the Third Party Release.**

**<u>Article VIII.C of the Plan contains the following provision</u>:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1.  the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2.  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.  the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.  any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*            \*            \*

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH

ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**The Beneficial Holder of the Class 10 Existing Common Interests set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

---

**Item 4.** **Certifications.**

By signing this Class 10 Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Existing Common Interests being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Existing Common Interests being voted;

(b) that the Entity (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the Entity has cast the same vote with respect to all Existing Common Interests in a single Class; and

(d) that no other Class 10 Beneficial Holder Ballots with respect to the amount of the Item 1 have been cast or, if any other Class 10 Beneficial Holder Ballots have been cast with respect to such Existing Common Interests, then any such earlier Class 10 Beneficial Holder Ballots are hereby revoked.

| Name of Holder: | |
| --- | --- |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**IF THE BALLOTING AGENT DOES
NOT *ACTUALLY RECEIVE* THE CLASS 10 MASTER
BALLOT SUBMITTED ON YOUR BEHALF WHICH REFLECTS
YOUR VOTE ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M.
PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED),
YOUR VOTE TRANSMITTED BY THIS CLASS 10 MASTER BALLOT MAY BE
COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE
DEBTORS.**

| Class 10 — Existing Common Interests |
|:---:|

## INSTRUCTIONS FOR COMPLETING THIS CLASS 10 BENEFICIAL HOLDER BALLOT

1. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 10 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 10 Beneficial Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one Class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for Confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your vote is counted, you must submit your Class 10 Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Balloting by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Class 10 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 10 Beneficial Holder Ballot; and (c) sign and return the Class 10 Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. The Voting Deadline for the receipt of Master Ballots by the Balloting Agent is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time. Your completed Class 10 Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Balloting Agent on or before the Voting Deadline.

4. **The following Class 10 Beneficial Holder Ballots submitted to your Nominee will *not* be counted**:

    (a) **any Class 10 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;**
    (b) **Class 10 Beneficial Holder sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;**
    (c) **Class 10 Beneficial Holder Ballots sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee;**
    (d) **any Class 10 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Interest;**
    (e) **any Class 10 Beneficial Holder Ballot cast by an Entity that does not hold a Interest in Class 10;**
    (f) **any unsigned Class 10 Beneficial Holder Ballot;**
    (g) **any Class 10 Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan;**
    (h) **any non-original Class 10 Beneficial Holder Ballot; and/or**
    (i) **any Class 10 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 10 Beneficial Holder Ballot marked both to accept and reject the Plan.**

5. If your Class 10 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 10 Beneficial Holder Ballot to your Nominee. No Class 10 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6. If you deliver multiple Class 10 Beneficial Holder Ballots to the Nominee with respect to the same Interest prior to the Voting Deadline, the last received valid Class 10 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 10 Beneficial Holder Ballots.

7.  You must vote all of your Interests within Class 10 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple Interests within Class 10, the Debtors may, in their discretion, aggregate the Interests of any particular Holder with multiple Interests within Class 10 for the purpose of counting votes.

8.  This Class 10 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or Interest or (b) an assertion or admission of a Claim or Interest.

9.  **Please be sure to sign and date your Class 10 Beneficial Holder Ballot**. If you are signing a Class 10 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 10 Beneficial Holder Ballot.

10. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 10 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, Holders of Claims and Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, and neither the Debtors nor the Balloting Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

**PLEASE MAIL YOUR CLASS 10 BENEFICIAL HOLDER BALLOT PROMPTLY.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 10 BENEFICIAL HOLDER BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:**

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

**OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.**

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT ON OR BEFORE FEBRUARY 22 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS CLASS 5 BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## SCHEDULE 3J

**Form of Class 10 Registered Holder Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**REGISTERED HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 10 EXISTING PARKER COMMON INTERESTS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED,
EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION
AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "<u>VOTING
DEADLINE</u>") IN ACCORDANCE WITH THE FOLLOWING.**

---

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "<u>Plan</u>") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "<u>Disclosure Statement</u>"). The Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on January 23, 2019 (the "<u>Disclosure Statement Order</u>"). Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 10 ballot (this "<u>Class 10 Registered Holder Ballot</u>") because you are a Holder of a Class 10 Existing Common Interest as of January 22, 2019 (the "<u>Voting Record Date</u>"). Accordingly, you have a right to vote to accept or reject the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949), Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 10 Registered Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) **at no charge** from Prime Clerk LLC (the "Balloting Agent") by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/parkerdrilling; (ii) writing to Parker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; (iii) emailing parkerdrillingballots@primeclerk.com; or (iv) calling the Balloting Agent at the following number:

**US/CANADA TOLL FREE: 855-631-5345**

**INTERNATIONAL: 347- 338- 6451**

This Class 10 Registered Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 10 Registered Holder Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Balloting Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Interest. Your Interest has been placed in Class 10, Existing Common Interests, under the Plan. If you hold Claims or Interests in more than one Class, you will receive a Ballot for each Class in which you are entitled to vote.

**Item 1**. **Amount of Interest**.

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 10 Existing Common Interest in the following aggregate amount (insert amount in box below):

_____

**Item 2**. **Class 10 Existing Common Interests Vote on Plan**.

The Holder of the Class 10 Existing Common Interest against the Debtors set forth in Item 1 votes to (please check one):

☐ **ACCEPT** (vote FOR) the Plan      ☐ **REJECT** (vote AGAINST) the Plan

**Item 3**. **Important information regarding the Third Party Release**.

**Article VIII.C of the Plan contains the following provision:**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

11

2.       any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, neeor other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.       the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.       any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*       \*       \*

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

The Registered Holder of the Class 10 Existing Common Interests set forth in Item 1 elects to:

☐ **OPT OUT** of the Third Party Release

\*      \*      \*

<u>Item 4</u>.  **Certifications**.

By signing this Class 10 Registered Holder Ballot, the undersigned certifies to the Court and the Debtors:

- that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Existing Common Interest being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Existing Common Interest being voted;

- that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- that the Entity has cast the same vote with respect to all Existing Common Interests in a single Class; and

- that no other Class 10 Registered Holder Ballot with respect to the amount of the Existing Common Interest identified in Item 1 have been cast or, if any other Class 10 Registered Holder Ballot have been cast with respect to such Existing Common Interest, then any such earlier Class 10 Registered Holder Ballot are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN.**

**IF THE BALLOTING AGENT
DOES NOT *ACTUALLY RECEIVE* THE CLASS 10
REGISTERED HOLDER BALLOT ON OR BEFORE FEBRUARY 22, 2019, AT 4:00 P.M.
PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED),
YOUR VOTE TRANSMITTED BY THIS CLASS 10 BALLOT MAY BE
COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE
DEBTORS.**

| Class 10 — Existing Common Interest |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 10 BALLOT

14. The Debtors are soliciting the votes of Holders of Claims and Interests with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Class 10 Registered Holder Ballot or in these instructions (the "<u>Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 10 Registered Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

15. The Plan can be confirmed by the Court and thereby made binding upon the holders if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in at least one class of Claims that votes on the Plan and at least two-thirds in amount of the Allowed Interests in each class of Interests voting on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

16. To ensure that your Class 10 Ballot is counted, you *must either*: (a) complete and submit this hard copy Class 10 Registered Holder Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://cases.primeclerk.com/parkerdrilling. **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

17. **<u>Use of Hard Copy Ballot</u>**. To ensure that your hard copy Class 10 Ballot is counted, you must: (a) complete your Class 10 Registered Holder Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 10 Registered Holder Ballot; and (c) clearly sign and return your original Class 10 Registered Holder Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to Parker Ballot Processing, c/o Prime Clerk, LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022.

18. **<u>Use of Online Ballot Portal</u>**. To ensure that your electronic Class 10 Registered Holder Ballot is counted, please follow the instructions of the Debtors' case administration website at http://cases.primeclerk.com/parkerdrilling. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

**E-Ballot ID:**_____

19. Your Class 10 Registered Holder Ballot *must* be returned to the Balloting Agent so as to be **actually received** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

20. **If a Class 10 Registered Holder Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, the following Class 10 Registered Holder Ballot will *not* be counted:**

    (a) **any Class 10 Registered Holder Ballot that partially rejects and partially accepts the Plan;**

    (b) **Class 10 Registered Holder Ballot sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any indenture trustee, or the Debtors' financial or legal advisors;**

    (c) **Class 10 Registered Holder Ballot sent by facsimile or any electronic means other than via the online portal;**

    (d) **any Class 10 Registered Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Interest;**

    (e) **any Class 10 Registered Holder Ballot cast by an Entity that does not hold an Interest in Class 10; any Class 10 Registered Holder Ballot submitted by an Entity not entitled to vote pursuant to the Plan;**

(f) **any unsigned Class 10 Registered Holder Ballot;**

(g) **any non-original Class 10 Registered Holder Ballot;**

(h) **any Class 10 Registered Holder Ballot not received by the Balloting Agent by the Voting Deadline;**

(i) **any non-original Class 10 Registered Holder Ballot; and/or**

(j) **any Class 10 Registered Holder Ballot not marked to accept or reject the Plan or any Class 10 Registered Holder Ballot marked both to accept and reject the Plan.**

21. The method of delivery of Class 10 Registered Holder Ballot to the Balloting Agent is at the election and risk of each Holder of Existing Common Interest. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent *actually receives* the originally executed Class 10 Registered Holder Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

22. If multiple Class 10 Registered Holder Ballot are received from the same Holder of Existing Common Interest with respect to the same Existing Common Interest prior to the Voting Deadline, the latest, timely received, and properly completed Class 10 Registered Holder Ballot will supersede and revoke any earlier received Class 10 Registered Holder Ballot.

23. You must vote all of your Existing Common Interests within Class 10 either to accept or reject the Plan and may *not* split your vote. Further, if a Holder has multiple Existing Common Interests within Class 10, the Debtors may aggregate the Interests of any particular Holder with multiple Existing Common Interests within Class 10 for the purpose of counting votes.

24. This Class 10 Registered Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim or Interest.

25. **Please be sure to sign and date your Class 10 Registered Holder Ballot**. If you are signing a Class 10 Registered Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 10 Registered Holder Ballot.

26. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class. Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you received.

**PLEASE MAIL YOUR CLASS 10 REGISTERED HOLDER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 10 REGISTERED HOLDER BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT THE FOLLOWING NUMBER:**

**US/CANADA TOLL FREE: 855-631-5345**

**INTERNATIONAL: 347- 338- 6451**

**OR EMAIL PARKERDRILLINGBALLOTS@PRIMECLERK.COM.**

---

**IF THE BALLOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE FEBRUARY 22 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS CLASS 10 REGISTERED HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## SCHEDULE 4A

**Form of Non-Impaired Non-Voting Status Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF NON-VOTING STATUS TO HOLDERS OF
## UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN

**PLEASE TAKE NOTICE THAT** on January 23, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* [Docket No. 297] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* [Docket No. 298] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, ***you are not entitled to vote on the Plan***. Specifically, under the terms of the Plan, as a Holder of a Claim (as currently asserted against the Debtors) that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are ***not*** entitled to vote on the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **March 5, 2019, at 2:30 p.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas, 77002.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **February 22, 2019, at 4:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| *Co-Counsel to the Debtors* |
|:---:|
| James H.M. Sprayregen, P.C.<br>Laura E. Krucks<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br><br>-and-<br><br>Christopher Marcus, P.C.<br>Brian E. Schartz, P.C.<br>Matthew C. Fagen<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>Patricia B. Tomasco<br>Matthew D. Cavenaugh<br>**JACKSON WALKER LLP**<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010 |
| *U.S. Trustee* |
| Hector Duran<br>Stephen Statham<br>**OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF TEXAS**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 |

| **Counsel to the Consenting Stakeholders** |
|---|
| James Savin<br>Kevin Eide<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1333 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br><br>-and-<br><br>Michael S. Stamer<br>**Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park, Bank of America Tower<br>New York, NY 10036 |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents **at no additional cost**, you should contact Prime Clerk, LLC, the balloting agent retained by the Debtors in the chapter 11 cases (the "Balloting Agent"), by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerdrillingballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

<u>**ARTICLE VIII**</u> **OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND** <u>**ARTICLE VIII.C**</u> **CONTAINS THE FOLLOWING THIRD-PARTY RELEASE.**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

**1.       the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;**

**2.       any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;**

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.      any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*      \*      \*

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.**

Houston, Texas
**[DATE]**

/s/
_____

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4284
Facsimile:    (713) 308-4184
Email:        ptomasco@jw.com
              mcavenaugh@jw.com

_Proposed Co-Counsel to the Debtors_
_and Debtors in Possession_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:    (713) 836-3601
Email:        brian.schartz@kirkland.com
              anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted _pro hac_ vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. ( admitted _pro hac_ vice )
Matthew Fagen (admitted _pro hac_ vice )
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        christopher.marcus@kirkland.com
              matthew.fagen@kirkland.com

_Co-Counsel to the Debtors_
_and Debtors in Possession_

## Schedule 4B

**Form of Opt Out Form**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a Holder of a Claim that is not entitled to vote on the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"). If you choose to opt out of the releases set forth in Article VIII.C of the Plan, either (1) complete an electronic Opt Out Form at http://cases.primeclerk.com/parkerdrilling or (2) complete, sign, and date this Opt Out Form and return it promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to Prime Clerk, LLC (the "Balloting Agent") at the address set forth below:

> **Use of Hard Copy Opt Out Form**. To ensure that your hard copy Opt Out Form is counted clearly sign and return your Opt Out Form in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to Parker Ballot Processing, c/o Prime Clerk, LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022.

> **Use of Online Ballot Portal**. To ensure that your electronic Opt Out Form is counted, please follow the instructions of the Debtors' case administration website at http://cases.primeclerk.com/parkerdrilling. You will need to enter your unique E-Ballot identification number indicated below. The online balloting portal is the sole manner in which Opt Out Forms will be accepted via electronic or online transmission. **Opt Out Forms will not be accepted by facsimile or electronic means (other than the online portal).**

E- Ballot ID:_____

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE BALLOTING AGENT BY FEBRUARY 22, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"). IF THE OPT OUT FORM IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1. Amount of Claim.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of either (1) Class 1 Other Secured Claims, (2) Class 2 Other Priority Claims, or (3) Class 6 General Unsecured Claims in the following aggregate amount (insert amount in box below):

Class 1 Other Secured Claims Amount $ _____

OR

Class 2 Other Priority Claims Amount $ _____

OR

Class 6 General Unsecured Claims Amount $ _____

> **Item 2. Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

> **As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims**

asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

5.    the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

6.    any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

7.    the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

8.    any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

*        *        *

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

2

**The Holder of the Claim set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 3.** **Certifications.**

By signing this Opt Out Form, the undersigned certifies:

(a) **that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of a Claim set forth in Item 1;**

(b) **that the Holder has received a copy of the Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class set forth in Item 1; and**

(d) **that no other Opt Out Form with respect to the amount(s) of Claims identified in Item 1 have been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims, then any such earlier Opt Out Forms are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | *(Print or Type)* |
| Signature: | |
| Name of Signatory: | |
| | *(If other than holder)* |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

3

**PLEASE EITHER (1) COMPLETE AN ELECTRONIC OPT OUT FORM AT HTTP://CASES.PRIMECLERK.COM/PARKERDRILLING OR (2) COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT PROMPTLY VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**Parker Ballot Processing
c/o Prime Clerk, LLC,
830 Third Avenue, 3rd Floor,
New York, NY 10022**

*[Remainder of page intentionally left blank.]*

4

## **SCHEDULE 5**

**Form of Notice to Disputed Claim Holders**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) ) ) Chapter 11 |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) ) Case No. 18-36958 (MI) |
| Debtors. | ) ) (Jointly Administered) |
| | ) |

**NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS**

      **PLEASE TAKE NOTICE THAT** on January 23, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

      **PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the Holder of a Claim or Interest that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim or Interest on the Plan unless one or more of the following events have taken place before February 20, 2019 (the date that is two business days before the Voting Deadline)** (each, a "Resolution Event"):

      1.      an order of the Court is entered allowing such Claim or Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

2.    an order of the Court is entered temporarily allowing such Claim or Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

3.    a stipulation or other agreement is executed between the Holder of such Claim or Interest and the Debtors temporarily allowing the Holder of such Claim or Interest to vote its Claim or Interest in an agreed upon amount; or

4.    the pending objection to such Claim or Interest is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, Disclosure Statement Order, the Plan, the Plan Supplement, and other documents and materials included in the Solicitation Package, except ballots, may be obtained **at no charge** from Prime Clerk, LLC, the Balloting Agent retained by the Debtors in the chapter 11 cases (the "Balloting Agent"), by: (a) visiting the Debtors' restructuring website at https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerdrillingballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.C CONTAINS THE FOLLOWING THIRD-PARTY RELEASE.**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

**1.    the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;**

**2.    any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;**

**3.    the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or**

2

4.      any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*      \*      \*

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.**

**PLEASE TAKE FURTHER NOTICE THAT** if a Resolution Event occurs, then no later than one business day thereafter, the Balloting Agent shall distribute a ballot, and a pre-addressed,

postage pre-paid envelope to you, which must be returned to the Balloting Agent no later than the Voting Deadline, which is on **February 22, 2019, at 4:00 p.m.**, prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims or Interests, you should contact the Balloting Agent in accordance with the instructions provided above.

Houston, Texas
**[DATE]**

/s/
_____

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4284
Facsimile:    (713) 308-4184
Email:         ptomasco@jw.com
                   mcavenaugh@jw.com

_Proposed Co-Counsel to the Debtors_
_and Debtors in Possession_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:    (713) 836-3601
Email:         brian.schartz@kirkland.com
                   anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted _pro hac_ vice )
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:         james.sprayregen@kirkland.com
                   laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted _pro hac_ vice )
Matthew Fagen (admitted _pro hac_ vice )
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:         christopher.marcus@kirkland.com
                   matthew.fagen@kirkland.com

_Co-Counsel to the Debtors_
_and Debtors in Possession_

## **SCHEDULE 6**

**Form of Cover Letter**



**January 25, 2019**

Via First Class Mail

RE:     **In re Parker Drilling Company, *et al.*,**
         **Chapter 11 Case No. 18-36958 (MI) (Jointly Adminstered)**

        TO ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN:

        Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court") on December 12, 2018.

        You have received this letter and the enclosed materials because you are entitled to vote on the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan").[2]  On January 23, 2019, the Court entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Package"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]     Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN. THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to Holders of Claims and Interests in connection with the solicitation of votes to accept the Plan. The Solicitation Package consists of the following:

    a.  this cover letter;

    b.  a copy of the Solicitation and Voting Procedures;

    c.  a Ballot (including, for the avoidance of doubt, Master Ballots, Beneficial Holder Ballots, and Registered Holder Ballots, as applicable), together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

    d.  the notice of the hearing to consider confirmation of the Plan;

    e.  the Disclosure Statement, as approved by the Bankruptcy Court (and exhibits thereto, including the Plan);

    f.  the Disclosure Statement Order (excluding the exhibits thereto, except the Solicitation and Voting Procedures); and

    g.  such other materials as the Court may direct.

Parker Drilling Company (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their estates and all other parties in interest. In addition, the Consenting Stakeholders, holding approximately 78.5% of the Debtors' Unsecured Notes, approximately 62% of the Debtors' outstanding preferred stock, and a material amount of the Debtors' outstanding common stock, have agreed to support the Plan. Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) or recoveries on account of Claims or Interests asserted in the Chapter 11 Cases.

**THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN. VOTES MUST BE ACTUALLY RECEIVED BY THE VOTING DEADLINE AT 4:00 P.M. PREVAILING CENTRAL TIME ON FEBRUARY 22, 2019.**

The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions, however, please feel free to contact Prime Clerk, LLC, the Balloting Agent retained by the Debtors in the Chapter 11 Cases (the "Balloting Agent"), by: (a) visiting the

Debtors' restructuring website at https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerdrillingballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE.**

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.**

---

Copies of certain orders, notices, and pleadings, including copies of this letter, the Notice of Confirmation, and the ballots, as well as other information regarding these chapter 11 cases are available for inspection free of charge on the Debtors' website at https://cases.primeclerk.com/ParkerDrilling. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov.

Sincerely,

_____

Parker Drilling Company on its own behalf and
for each of the Debtors

## SCHEDULE 7

**Form of Confirmation Hearing Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF HEARING TO CONSIDER
## CONFIRMATION OF THE FIRST CHAPTER 11 PLAN FILED BY THE
## DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES

    **PLEASE TAKE NOTICE THAT** on January 23, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* [Docket No. 297] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement Relating for Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* [Docket No. 298] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

    **PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **March 5, 2019, at 2:30 p.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas 77002.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

> **PLEASE BE ADVISED**: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **January 22, 2019 (or the date that is the first day of the Disclosure Statement Hearing)**, which is the date for determining which Holders of Claims and Interests in Classes 4, 5, 9, and 10, as applicable, are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **February 22, 2019, at 4:00 p.m.** prevailing Central Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you *must*: (a) follow the instructions carefully; (b) complete *all* of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is *actually received* by the Debtors' balloting agent, Prime Clerk, LLC (the "Balloting Agent") on or before the Voting Deadline. *A failure to follow such instructions may disqualify your vote*.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

> ### ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE.
>
> As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:
>
> 1. the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;
>
> 2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;
>
> 3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or
>
> 4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.
>
> Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction,

or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

*     *     *

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.

**Plan Objection Deadline**. The deadline for filing objections to the Plan is **February 22, 2019, at 4:00 p.m.,** prevailing Central Time (the "Plan Objection Deadline"). All objections to the relief sought at the Confirmation Hearing ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; ***and*** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be ***actually received*** on or before the Plan Objection Deadline:

3

| *Co-Counsel to the Debtors* |
|---|
| James H.M. Sprayregen, P.C.<br>Laura E. Krucks<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br><br>-and-<br><br>Christopher Marcus, P.C.<br>Brian E. Schartz, P.C.<br>Matthew C. Fagen<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>Patricia B. Tomasco<br>Matthew D. Cavenaugh<br>**JACKSON WALKER LLP**<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010 |
| *U.S. Trustee* |
| Hector Duran<br>Stephen Statham<br>**Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 |
| *Counsel to the Consenting Stakeholders* |
| James Savin<br>Kevin Eide<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1333 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br><br>-and-<br><br>Michael S. Stamer<br>**Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park, Bank of America Tower<br>New York, NY  10036 |

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.  The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain additional solicitation materials **at no charge** (or paper copies of solicitation materials if you received a CD-ROM or flash drive), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerdrillingballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

US/CANADA TOLL FREE:  (855) 631-5345

INTERNATIONAL:  (347) 338-6451

You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

Please be advised that the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**.  The Debtors will file the Plan Supplement (as defined in the Plan) on or before February 12, 2019, and will serve notice on all Holders of Claims and Interests entitled to vote on the Plan, which will:  (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

### BINDING NATURE OF THE PLAN:

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

[<em>Remainder of page intentionally left blank.</em>]

Houston, Texas
**[DATE]**

/s/
_____

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:  (713) 752-4284
Facsimile:  (713) 308-4184
Email:  ptomasco@jw.com
             mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:  (713) 836-3600
Facsimile:  (713) 836-3601
Email:  brian.schartz@kirkland.com
             anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:  james.sprayregen@kirkland.com
             laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac* vice)
Matthew Fagen (admitted *pro hac* vice)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  christopher.marcus@kirkland.com
             matthew.fagen@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **SCHEDULE 8**

### **Form of Plan Supplement Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on January 23, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors"), *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the Debtors filed the Plan Supplement with the Court on February 12, 2019 [Docket No. [●]]. The Plan Supplement contains the following documents (each, as defined in the Plan): (a) the material New Organizational Documents; (b) the New Second Lien Term Loan Agreement; (c) the New Warrant Agreement; (d) a list of retained Causes of Action; (e) a disclosure of the members of the Reorganized Parker Board; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit; (i) the form of the Management Incentive Plan; (j) the Registration Rights Agreement;

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]  Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

and (k) the material Exit Facility Documents. Such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **March 5, 2019, at 2:30 p.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **February 22, 2019, at 4:00 p.m.** prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be ***actually received*** on or before the Plan Objection Deadline:

| *Co-Counsel to the Debtors* |
|:---:|
| James H.M. Sprayregen, P.C. |
| Laura E. Krucks |
| **KIRKLAND & ELLIS LLP** |
| 300 North LaSalle |
| Chicago, Illinois 60654 |
| |
| -and- |
| |
| Christopher Marcus, P.C. |
| Brian E. Schartz, P.C. |
| Matthew C. Fagen |
| **KIRKLAND & ELLIS LLP** |
| 601 Lexington Avenue |
| New York, New York 10022 |
| |
| -and- |
| |
| Patricia B. Tomasco |
| Matthew D. Cavenaugh |
| **JACKSON WALKER LLP** |
| 1401 McKinney Street, Suite 1900 |
| Houston, Texas 77010 |

| U.S. Trustee |
|:---:|
| Hector Duran<br>Stephen Statham<br>**Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 |
| *Counsel to the Consenting Stakeholders* |
| James Savin<br>Kevin Eide<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1333 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br><br>-and-<br><br>Michael S. Stamer<br>**Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park, Bank of America Tower<br>New York, NY 10036 |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, **at no additional cost,** you should contact Prime Clerk, LLC, the Balloting Agent retained by the Debtors in the Chapter 11 Cases (the "Balloting Agent") by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerdrillingballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

**US/CANADA TOLL FREE: (855) 631-5345**

**INTERNATIONAL: (347) 338-6451**

You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

Houston, Texas
**[DATE]**

/s/

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4284
Facsimile:    (713) 308-4184
Email:        ptomasco@jw.com
              mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:    (713) 836-3601
Email:        brian.schartz@kirkland.com
              anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac* vice)
Matthew Fagen (admitted *pro hac* vice)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        christopher.marcus@kirkland.com
              matthew.fagen@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

# **SCHEDULE 9**

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF (A) EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED BY THE DEBTORS PURSUANT TO THE PLAN, (B) CURE AMOUNTS, IF ANY, AND (C) RELATED PROCEDURES IN CONNECTION THEREWITH

**PLEASE TAKE NOTICE THAT** on January 23, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Assumed Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Assumption Schedule") with the Court as part of the Plan Supplement on February 12, 2019 as contemplated under the Plan. The determination to assume the agreements identified on the Assumption Schedule is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **March 5, 2019, at 2:30 p.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to a contract that is listed on the Assumption Schedule. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan, including the Assumption Schedule.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are proposing to assume the Executory Contract(s) and Unexpired Lease(s) listed in **Exhibit A** attached hereto, to which you are a party.[3]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table above. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified above will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtors in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption. If an objection to the proposed assumption or related cure amount is sustained by the Court,

---

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtors expressly reserve the right to: (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date; and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is **February 22, 2019, at 4:00 p.m.** prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| Co-Counsel to the Debtors |
|:---:|
| James H.M. Sprayregen, P.C.<br>Laura E. Krucks<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br><br>-and-<br><br>Christopher Marcus, P.C.<br>Brian E. Schartz, P.C.<br>Matthew C. Fagen<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>Patricia B. Tomasco<br>Matthew D. Cavenaugh<br>**JACKSON WALKER LLP**<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010 |
| **U.S. Trustee** |
| Hector Duran<br>Stephen Statham<br>**Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 |

| *Counsel to the Consenting Stakeholders* |
|---|
| James Savin<br>Kevin Eide<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1333 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br><br>-and-<br><br>Michael S. Stamer<br>**Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park, Bank of America Tower<br>New York, NY 10036 |

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related cure or adequate assurances proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption and cure amount.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk, LLC, the Balloting Agent retained by the Debtors in the chapter 11 cases (the "Balloting Agent"), by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing

parkerinfo@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.C CONTAINS THE FOLLOWING THIRD-PARTY RELEASE.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1.      the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2.      any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.      any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

\*          \*          \*

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS

5

OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.

*[Remainder of page intentionally left blank.]*

Houston, Texas
**[DATE]**

/s/
_____
**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4284
Facsimile:    (713) 308-4184
Email:    ptomasco@jw.com
    mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:    (713) 836-3601
Email:    brian.schartz@kirkland.com
    anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac* vice)
Matthew Fagen (admitted *pro hac* vice)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    christopher.marcus@kirkland.com
    matthew.fagen@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Schedule of Contracts and Leases and Proposed Cure Cost**

| Debtor | Counterparty | Description of Assumed Contract or Lease | Cure Amount |
|--------|--------------|------------------------------------------|-------------|
|        |              |                                          |             |

## SCHEDULE 10

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE REGARDING EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE THAT** on January 23, 2019 the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Rejected Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on February 12, 2019, as contemplated under the Plan. The determination to reject the agreements identified on the Rejection Schedule is subject to revision.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]  Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **March 5, 2019, at 2:30 p.m.,** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** all proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court by the earlier of (1) 30 days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection, and (2) 30 days after notice of any rejection that occurs after the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, their Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Court.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **February 22, 2019, at 4:00 p.m.** prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

---

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute as to whther a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, expressly reserve the right to alter their treatment of such contract or lease within 45 days following entry of a final order resolving such dispute. In addition, the Debtors expressly reserve their right to: (a) remove any Executory Contract or Unexpired Lease from the Rejection Schedule and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date; and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

| Co-Counsel to the Debtors |
|---|
| James H.M. Sprayregen, P.C.<br>Laura E. Krucks<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br><br>-and-<br><br>Christopher Marcus, P.C.<br>Brian E. Schartz, P.C.<br>Matthew C. Fagen<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>Patricia B. Tomasco<br>Matthew D. Cavenaugh<br>**JACKSON WALKER LLP**<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010 |
| ***U.S. Trustee*** |
| Hector Duran<br>Stephen Statham<br>**Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 |
| ***Counsel to the Consenting Stakeholders*** |
| James Savin<br>Kevin Eide<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1333 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br><br>-and-<br><br>Michael S. Stamer<br>**Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park, Bank of America Tower<br>New York, NY 10036 |

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk, LLC, the balloting agent retained by the Debtors in the Chapter 11 Cases (the "Balloting Agent"), by: (a) visiting the Debtors' restructuring website at https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerinfo@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.C CONTAINS THE FOLLOWING THIRD-PARTY RELEASE.**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

**5.        the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;**

**6.        any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;**

**7.        the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or**

**8.        any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud**

4

or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

*    *    *

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS AND THE REORGANIZED DEBTORS; (B) THE HOLDERS OF NEW SECOND LIEN TERM LOAN; (C) THE NEW SECOND LIEN AGENT; (D) THE EXISTING ABL AGENT; (E) THE EXISTING ABL LENDER(S); (F) THE CONSENTING STAKEHOLDERS; (G) THE INDENTURE TRUSTEE; (H) THE EXIT FACILITY AGENT; (I) THE EXIT FACILITY LENDERS; (J) THE DIP FACILITY AGENT; (K) THE DIP FACILITY LENDERS; (L) THE EXISTING L/C ISSUER; (M) THE P-CARD ISSUER; (N) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, MANAGEMENT COMPANIES; (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (N), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, CONSULTANTS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; AND (P) ALL HOLDERS OF CLAIMS AND INTERESTS NOT DESCRIBED IN THE FOREGOING CLAUSES (A) THROUGH (O).

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (I) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE BALLOT RETURNED IN ADVANCE OF THE VOTING DEADLINE, OR (II) WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS IN NON-VOTING CLASSES, CHECK THE BOX LABELED "OPT OUT" ON THE APPLICABLE OPT OUT FORM RETURNED IN ADVANCE OF THE VOTING DEADLINE, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. FOR THE AVOIDANCE OF ANY DOUBT, A VOTE TO REJECT THE PLAN DOES NOT PREVENT A HOLDER OF CLAIMS OR INTERESTS FROM ITS INCLUSION AS A "RELEASING PARTY."**

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.

*[Remainder of page intentionally left blank.]*

Houston, Texas
**[DATE]**

/s/
_____

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4284
Facsimile:      (713) 308-4184
Email:          ptomasco@jw.com
                mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Facsimile:      (713) 836-3601
Email:          brian.schartz@kirkland.com
                anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac* vice)
Matthew Fagen (admitted *pro hac* vice)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          christopher.marcus@kirkland.com
                matthew.fagen@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## SCHEDULE 11

**Rights Offering Procedures**

## PARKER DRILLING COMPANY, ET AL. (THE "COMPANY")
## RIGHTS OFFERING PROCEDURES[1]

- **Holders of Existing Preferred Interests: To be able to exercise at least one of your Existing Preferred Stockholder Subscription Rights, you must hold at least one (1) share of Existing Preferred Stock.**

- **Holders of Existing Common Interests: To be able to exercise at least one of your Existing Common Stockholder Subscription Rights, you must hold at least seven (7) shares of Existing Common Stock.**

- **Holders of Notes: To be able to exercise at least one of your Subscription Rights, you must hold at least $1,000 principal amount of Notes.**

- **Backstop Commitment Parties: Pursuant to and in accordance with the Backstop Commitment Agreement, the Backstop Commitment Parties must exercise all of their Subscription Rights.**

- **If you exercise your Subscription Rights, you will have to PAY for such exercise at the Purchase Price, as described further below, and if applicable, arrange for the underlying Existing Common Stock, Existing Preferred Stock or Notes to be submitted in accordance with the procedures described further below.**

- **Holders of Existing Preferred Interests, Existing Common Interests and Notes are _not_ required to exercise any of their Subscription Rights (unless they are party to the Backstop Commitment Agreement), but they may if they wish to do so and they follow the required procedures.**

- **Holders of Allowed Existing Preferred Interests or Allowed Existing Common Interests who have exercised their applicable Subscription Rights will receive the Rights Offering Shares that were purchased _and_ a _pro rata_ share of New Common Stock and New Warrants pursuant to the Plan.**

- **Holders of Allowed Notes Claims ("Noteholders") who have exercised their applicable Subscription Rights will receive the Rights Offering Shares that were purchased _and_ a _pro rata_ share of the New Second Lien Term Loan and New Common Stock pursuant to the Plan.**

- **Additional information is provided in this document and in the subscription form enclosed herewith.**

---

[1] Terms used and not defined herein shall have the meaning assigned to them in the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and its Debtor Affiliates* (as may be amended, modified or supplemented in accordance with the terms thereof, the "Plan") or the Backstop Commitment Agreement attached as Exhibit C to the Restructuring Support Agreement.

Each Rights Offering Share (as defined below), other than Unsubscribed Shares purchased by the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement, is being distributed and issued by the Company without registration under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon the exemption provided in Section 1145 of the Bankruptcy Code (such offering, the "Rights Offering"). None of the Subscription Rights (as defined below) or the Rights Offering Shares issuable upon exercise of such Subscription Rights distributed to Eligible Holders that are not Backstop Commitment Parties pursuant to these Rights Offering Procedures in reliance upon the exemption provided in Section 1145 of the Bankruptcy Code have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security.

The Subscription Rights will not be detachable or transferable separately from the Notes, Existing Common Stock, or Existing Preferred Stock, as applicable.  Rather, the Subscription Rights together with the applicable Notes or Existing Interest with respect to which such Subscription Rights were activated, will trade together and be evidenced by the underlying Notes or Existing Interest until the Subscription Instruction Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying Notes or Existing Interest; and, provided further, that following the exercise of any Subscription Rights, the holder thereof shall be prohibited from transferring or assigning the Notes or Existing Interest, as applicable, corresponding to such Subscription Rights until the earlier of (i) termination of the Rights Offering and (ii) the revocation of exercise of such Subscription Rights to the extent permitted by these Rights Offering Procedures.

The Disclosure Statement (as defined below) has previously been distributed in connection with the Debtors' solicitation of votes to accept or reject the Plan (as defined below) and that document sets forth important information, including risk factors, that should be carefully read and considered by each Eligible Holder (as defined below) prior to making a decision to participate in the Rights Offering (as defined below).  Additional copies of the Disclosure Statement are available upon request from the Solicitation Agent.

The Rights Offering is being conducted by the Company in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

Eligible Holders (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Subscription Commencement Date | January 25, 2019 | Commencement of the Rights Offering and the first date on which holders of Existing Interest and the Notes are eligible to exercise Subscription Rights. |
| Subscription Instruction Deadline | 4:00 p.m. prevailing Central Time on February 26, 2019 | The deadline for Eligible Holders to subscribe for Rights Offering Shares. An Eligible Holder's Beneficial Holder Subscription Form (as defined below) and/or other instructions required by the Eligible Holder's Nominee (as defined below) must be received by such Nominee in sufficient time to allow such Nominee to deliver the relevant Notes or Existing Interest through ATOP (as defined below) by the Subscription Instruction Deadline; OR *only for Existing Interest held directly with the transfer agent*, the Eligible Holder's Subscription Form must be received by the Solicitation Agent at the address set forth in the Subscription Form provided to registered holders.  Eligible Holders are urged to consult with their Nominees to determine the necessary deadline to return their Beneficial Holder Subscription Forms to their Nominee.  For the avoidance of doubt, the Solicitation Agent may, in its reasonable discretion after consultation with the Debtors and the Requisite Commitment Parties, permit nominees and/or depositories to provide certain Eligible Holder position verification information to the Solicitation Agent on the next business day following the Subscription Instruction Deadline.<br><br>Eligible Holders who are not Backstop Commitment Parties must deliver the aggregate Purchase Price by the Subscription Instruction Deadline. |
| Subscription Payment Deadline | 4:00 p.m. prevailing Central Time on February 27, 2019 | Eligible Holders who are Backstop Commitment Parties must arrange for the Backstop Commitment Party Addendum to be provided to their Nominee so that the Nominee will receive confirmation that payment does not have to be made prior to the Subscription Payment Deadline. Eligible Holders who are Backstop Commitment Parties shall not be required to pay their respective aggregate Purchase Price until the Subscription Escrow Funding Date in accordance with the terms of the Backstop Commitment Agreement. |

To Eligible Holders and Nominees of Eligible Holders:

On December 12, 2018, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Plan") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division, and the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and its Debtor Affiliates* (as may be amended from time to time in accordance with its terms, the "Disclosure Statement"). Pursuant to the Plan: (i) each Holder of Existing Common Stock from the Subscription Commencement Date to the Subscription Instruction Deadline (the "Eligible Common Stockholders") shall be entitled to exercise Existing Common Stockholder Subscription Rights pursuant to the Existing Common Stockholder Rights Offering (as defined below); (ii) each Holder of Existing Preferred Stock from the Subscription Commencement Date to the Subscription Instruction Deadline (the "Eligible Preferred Stockholders") shall be entitled to exercise Existing Preferred Stockholder Subscription Rights (as defined below) pursuant to the Existing Preferred Stockholder Rights Offering (as defined below); and (iii) each Holder of Notes from the Subscription Commencement Date to the Subscription Instruction Deadline (the "Eligible Noteholders" and together with the Eligible Preferred Stockholders and the Eligible Common Stockholders, collectively, the "Eligible Holders") shall be entitled to exercise Noteholder Subscription Rights pursuant to the Noteholder Rights Offering (as defined below), in each case, in accordance with the terms and conditions of these Rights Offering Procedures.

For the avoidance of doubt, an Eligible Holder includes anyone who holds the relevant Notes or Existing Interest during the period beginning on the Subscription Commencement Date and ending on the Subscription Instruction Deadline (the "Rights Exercise Period"). The Existing Common Stockholder Rights Offering, the Existing Preferred Stockholder Rights Offering, and the Noteholder Rights Offering are collectively referred to herein as the "Rights Offering."

**Existing Common Stock:** To the extent holders of Class 10 Existing Common Interests vote as a Class to accept the Plan, then, pursuant to the Plan, each holder of Existing Common Stock during the Rights Exercise Period will have the right (but not the obligation) to subscribe for its *pro rata* portion of approximately 22.1053% of the Rights Offering Shares (as defined below) offered in the Rights Offering (the "Existing Common Stockholder Rights Offering," and such shares, the "Existing Common Stockholder Rights Offering Shares"), which Existing Common Stockholder Rights Offering Shares, collectively, will reflect an aggregate purchase price of $21,000,000, calculated by multiplying the number of Rights Offering Shares offered in the Existing Common Stockholder Rights Offering by the Purchase Price. The "Purchase Price" ($15.06 per share) shall be the quotient of the total Rights Offering proceeds ($95,000,000), divided by the shares of New Common Stock issued in connection with the rights offering (6.3 million shares).

**Existing Preferred Stock:** Pursuant to the Plan, each holder of Existing Preferred Stock during the Rights Exercise Period will have the right (but not the obligation) to subscribe for its *pro rata* portion of approximately 14.7368% of the Rights Offering Shares (as defined below) offered in the Rights Offering (the "Existing Preferred Stockholder Rights Offering," and such shares, the "Existing Preferred Stockholder Rights Offering Shares"), which Existing Preferred Stockholder Rights Offering Shares, collectively, will reflect an aggregate purchase price of $14,000,000, calculated by multiplying the number of Existing Preferred Stockholder Rights Offering Shares by the Purchase Price.

4

**Notes:**  Pursuant to the Plan, during the Rights Exercise Period the holders of the Notes will have the right (but not the obligation) to subscribe for its *pro rata* portion of 63.1579% of the Rights Offering Shares offered in the Rights Offering (the "Noteholder Rights Offering," and such shares, the "Noteholder Rights Offering Shares," and together with the Existing Common Stockholder Rights Offering Shares and the Existing Preferred Stockholder Rights Offering Shares, collectively, the "Rights Offering Shares"), which Noteholder Rights Offering Shares, collectively, will reflect an aggregate purchase price of $60,000,000.00, calculated by multiplying the number of Noteholder Rights Offering Shares by the Purchase Price.

Unless otherwise directed by the relevant depository, beneficial holders should return their subscription forms (each a "Beneficial Holder Subscription Form") only to the broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "Nominee") for processing.  Holders of Existing Interest that hold directly on the books of the transfer agent in their own name (and do not hold Existing Interest through a Nominee) will receive a subscription form (a "Registered Holder Subscription Form") that should be returned directly to the Solicitation Agent (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) in connection with any desired exercise.  Any Holder of an Existing Interest holding in their own name should follow all of the instructions outlined in the Registered Holder Subscription Form.

**As part of the exercise process, following exercise of Subscription Rights, the related Notes or Existing Interest held through DTC will be frozen from trading, as described below**. All Beneficial Holder Subscription Forms and/or other instructions required by the Nominee must be returned to the applicable Nominee in sufficient time to allow such Nominee to process and deliver the underlying Notes or Existing Interest through The Depository Trust Company ("DTC") Automated Tender Offer Program ("ATOP"), which is how the related Subscription Rights will be exercised. By giving the instruction to its Nominee to submit the underlying Notes or Existing Interest through ATOP, the holder is (i) authorizing its Nominee to exercise all Subscription Rights associated with the amount of Notes or Existing Interest as to which the instruction pertains; and (ii) certifying that it understands that, once submitted, the underlying Notes or Existing Interest will be frozen from trading until the Effective Date, at which point (a) the underlying Notes or Existing Interest will be cancelled pursuant to the Plan; (b) the holder will receive its pro rata share of the New Common Stock distributed to its Class pursuant to the Plan; and (c) the holder will additionally receive any related Rights Offering Shares. The amount of time necessary for a Nominee to process and deliver the applicable Notes or Existing Interest through ATOP may vary. Holders are urged to consult with their Nominees to determine the necessary deadline to return their Beneficial Holder Subscription Forms to their Nominee. Failure to submit such Beneficial Holder Subscription Form (or other instructions required by the Nominee) on a timely basis will result in forfeiture of an Eligible Holder's Subscription Rights. None of the Company, the Solicitation Agent or any of the Backstop Commitment Parties will have any liability for any such failure.

No Eligible Holder (except a Backstop Commitment Party) shall be entitled to participate in the Rights Offering unless the aggregate Purchase Price (as defined below) for the Rights Offering Shares it subscribes for is received by the Solicitation Agent by the Subscription Payment Deadline.  For all Eligible Holders (except a Backstop Commitment Party), payment of the aggregate Purchase Price must be made at the same time it returns its Beneficial Holder Subscription Form to its Nominee, but in no event later than the Subscription Instruction Deadline.

*Backstop Commitment Parties are party to the Backstop Commitment Agreement, have already been designated, and are known both to the company and to themselves*.

Special note for Backstop Commitment Parties.  Backstop Commitment Parties will receive (through their counsel) an addendum (the "Backstop Commitment Party Addendum"), and must arrange for the Backstop Commitment Party Addendum to be provided to their Nominee so that the Nominee will receive confirmation that payment does not have to be made prior to the Subscription Payment Deadline. An Eligible Holder that is a Backstop Commitment Party must provide its payment by the Subscription Escrow Funding Date to the Subscription Escrow Account in accordance with Section 2.4(b) of the Backstop Commitment Agreement.

**The rights and obligations of the Backstop Commitment Parties in the Rights Offering shall be governed by the Backstop Commitment Agreement to the extent the rights or obligations set forth therein differ from the rights and obligations set forth in these Rights Offering Procedures or any Beneficial Holder Subscription Form or Registered Holder Subscription Form.**

No interest is payable on any advanced funding of the Purchase Price.  If the Rights Offering is terminated for any reason, the aggregate Purchase Price previously received by the Solicitation Agent will be returned to Eligible Holders as provided in Section 6 hereof.  No interest will be paid on any returned Purchase Price.

**To participate in the Rights Offering, an Eligible Holder must complete all of the steps outlined below. If an Eligible Holder does not complete all of the steps outlined below by the Subscription Instruction Deadline, Subscription Payment Deadline, or the Backstop Funding Deadline, as applicable, such Eligible Holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering; provided that the Backstop Commitment Parties (in their capacities as Eligible Holders) shall not be required to submit funds in respect of the exercise of their Subscription Rights until the Subscription Escrow Funding Date in accordance with the terms of the Backstop Commitment Agreement.**

1.      **Rights Offering**

Eligible Common Stockholders have the right, but not the obligation, to participate in the Existing Common Stockholder Rights Offering, Eligible Preferred Stockholders have the right, but not the obligation, to participate in the Existing Preferred Stockholder Rights Offering, and Eligible Noteholders have the right, but not the obligation, to participate in the Noteholder Rights Offering; provided, however, that Eligible Holders that are Backstop Commitment Parties must exercise their Subscription Rights pursuant to the Backstop Commitment Agreement.

During the Rights Exercise Period, Eligible Common Stockholders are eligible to subscribe for their *pro rata* portion of the Existing Common Stockholder Rights Offering Shares, Eligible Preferred Stockholders are eligible to subscribe for their *pro rata* portion of the Existing Preferred Stockholder Rights Offering Shares, and Eligible Noteholders are eligible to subscribe to their *pro rata* portion of the Noteholder Rights Offering Shares.

Subject to the terms and conditions set forth in the Plan and these Rights Offering Procedures, each Eligible Common Stockholder during the Rights Exercise Period is entitled to subscribe for up to 0.1486 Existing Common Stockholder Rights Offering Shares per Share of Existing Common Stock at the Purchase Price.  You must hold at least seven (7) Shares of Existing Common Stock to be able to exercise at least one Subscription Right.

6

Subject to the terms and conditions set forth in the Plan and these Rights Offering Procedures, each Eligible Preferred Stockholder during the Rights Exercise Period is entitled to subscribe for up to 1.8590 Existing Preferred Stockholder Rights Offering Shares per Share of Existing Preferred Stock at the Purchase Price. You must hold at least one (1) Share of Existing Preferred Stock to be able to exercise at least one Subscription Right.

Subject to the terms and conditions set forth in the Plan and these Rights Offering Procedures, each Eligible Noteholder during the Rights Exercise Period is entitled to subscribe for up to 6.8094 Noteholders Rights Offering Shares per $1,000 of principal amount of 2022 Notes held by such Eligible Noteholder and up to 6.8094 Noteholders Rights Offering Shares per $1,000 of principal amount of 2020 Notes held by such Eligible Noteholder at the Purchase Price. **The difference in the number of Rights Offering Shares that an Eligible Noteholder is entitled to subscribe for with respect to each series of Notes takes into account the differing amounts, which reflects the current Claim amount(s) as of the Subscription Commencement Date, of pre-petition accrued and unpaid interest thereon. For the avoidance of doubt, holders should use their Principal Amount when calculating their Noteholders Rights Offering Shares on the subscription form.**

There will be no over-subscription privilege in the Rights Offering. Any Unsubscribed Shares will not be offered to other Eligible Holders but will be purchased by the applicable Backstop Commitment Parties in accordance with the Backstop Commitment Agreement. Subject to and in accordance with the terms and conditions of the Backstop Commitment Agreement, each Backstop Commitment Party is obligated to exercise all applicable Subscription Rights and to purchase its *pro rata* portion of the applicable Rights Offering Shares pursuant to and in accordance with the Backstop Commitment Agreement.

To the extent the Rights Offering Shares are distributed and issued in reliance upon the exemption provided in Section 1145 of the Bankruptcy Code, any Eligible Holder that subscribes for Rights Offering Shares and is deemed to be an "underwriter" under Section 1145(b) of the Bankruptcy Code will be subject to restrictions under the Securities Act on its ability to resell those securities. Resale restrictions are discussed in more detail in Article XII of the Disclosure Statement, entitled "Certain Securities Law Matters."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE RIGHTS OFFERING PROCEDURES (AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY BACKSTOP COMMITMENT PARTY), ALL SUBSCRIPTIONS SET FORTH IN THE BENEFICIAL HOLDER SUBSCRIPTION FORM ARE IRREVOCABLE.**

2.      **Rights Exercise Period**

The Rights Offering will commence and the Subscription Rights will be delivered on the Subscription Commencement Date and will expire at the Subscription Instruction Deadline. Each Eligible Holder intending to purchase Rights Offering Shares in any Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the applicable Subscription Form by the Subscription Instruction Deadline and must pay for any exercised Subscription Rights by the applicable deadline.

Any exercise (including payment) of the Subscription Rights to purchase Existing Common Stockholder Rights Offering Shares (the "Existing Common Stockholder Subscription Rights") by an Eligible Common Stockholder after the Subscription Instruction Deadline will not be allowed and any

7

purported exercise (including payment) received by the Solicitation Agent after the Subscription Instruction Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

Any exercise (including payment) of the Subscription Rights to purchase Existing Preferred Stockholder Rights Offering Shares (the "Existing Preferred Stockholder Subscription Rights") by an Eligible Preferred Stockholder after the Subscription Instruction Deadline will not be allowed and any purported exercise (including payment) received by the Solicitation Agent after the Subscription Instruction Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

Any exercise (or payment) of the Subscription Rights to purchase Noteholder Rights Offering Shares (the "Noteholder Subscription Rights" and, together with the Existing Common Stockholder Subscription Rights, and the Existing Preferred Stockholder Subscription Rights, collectively, the "Subscription Rights") by an Eligible Noteholder after the Subscription Instruction Deadline will not be allowed and any purported exercise received by the Solicitation Agent after the Subscription Instruction Deadline (or payment received after the Subscription Payment Deadline), regardless of when the documents or payment relating to such exercise were sent, will not be honored.

The Subscription Instruction Deadline may be extended by the Company with the prior written approval of the Requisite Commitment Parties, or as required by law.

### 3.    Delivery of Subscription Documents

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Subscription Rights, but subject to the terms and conditions contained herein. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the applicable Subscription Form and these Rights Offering Procedures will be sent to Eligible Holders at that time, together with appropriate instructions for the proper completion, due execution and timely delivery of the executed Subscription Form and the payment of the applicable aggregate Purchase Price for its Rights Offering Shares.

### 4.    Exercise of Subscription Rights

For any Eligible Holder holding through a Nominee: In order to exercise an Eligible Holder's Subscription Rights, such Eligible Holder's Nominee must submit the relevant portion of Notes or Existing Interest as to which the Subscription Rights pertain into the ATOP system to the account maintained by the Solicitation Agent with DTC. (For any Eligible Holder holding in their own name please follow the steps outlined in the Registered Holder Subscription Form that should have been mailed to you.)

If you held shares of Existing Common Interest as an employee of the Company through the Company's 401(k) Plan account you may exercise your Subscription Rights with respect to those shares of Existing Common Stock by electing what amount (if any) of your Subscription Rights you would like to exercise by properly completing the subscription form that is provided to you.  You must return your properly completed form in the prescribed manner.  Rights Offering Shares that you elect to purchase in the Rights Offering will be credited to you directly in book-entry form, and will not be credited to you in the Company's 401(k) Plan.

(a)    In order to validly exercise its Subscription Rights, each Eligible Holder that is not a Backstop Commitment Party must:

i.    return duly completed and executed its Beneficial Holder Subscription Form (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to its Nominee (or otherwise follow the directions of its Nominee), so that such holder's subscription instructions may be effected by the Nominee by delivering the applicable Notes or Existing Interest via DTC's ATOP system prior to the Subscription Instruction Deadline; and

ii.    at the same time it returns its Beneficial Holder Subscription Form to its Nominee, but in no event later than the Subscription Instruction Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Solicitation Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Beneficial Holder Subscription Form.

(b)    In order to validly exercise its Subscription Rights, each Eligible Holder that is a Backstop Commitment Party must:

i.    return its duly completed and executed Beneficial Holder Subscription Form to its Nominee (or otherwise follow the directions of its Nominee), so that such holder's subscription instructions may be effected by the Nominee by delivering the applicable Notes or Existing Interest via DTC's ATOP system prior to the Subscription Instruction Deadline;

ii.    ensure that the Backstop Commitment Party Addendum is provided to their Nominee so that the Nominee will receive confirmation that payment does not have to be made prior to the Subscription Payment Deadline; and

iii.    no later than the Subscription Escrow Funding Date, pay such amounts required to be paid by such Backstop Commitment Party under the Backstop Commitment Agreement to the Subscription Escrow Account.

**ALL BACKSTOP COMMITMENT PARTIES MUST MAKE PAYMENTS TO THE SUBSCRIPTION ESCROW ACCOUNT IN ACCORDANCE WITH THE BACKSTOP COMMITMENT AGREEMENT, AND SHOULD NOT PAY THEIR NOMINEE(S).**

(c)    With respect to 4(a) and (b) above, each Eligible Holder must duly complete, execute and return its Beneficial Holder Subscription Form to their Nominee (or otherwise follow their Nominee's instructions) in sufficient time to allow its Nominee to process its instructions and deliver the underlying Notes or Existing Interest through ATOP, and, solely with respect to the Eligible Holders that are not Backstop Commitment Parties, payment of the applicable Purchase Price, payable for the Rights Offering Shares elected to be purchased by such Eligible Holder, by the Subscription Instruction Deadline. Eligible Holders that are Backstop Commitment Parties must deliver payments in connection with the Rights Offering and as otherwise required under the Backstop Commitment Agreement to the Subscription Escrow Account by the Subscription Escrow Funding Date.

(d)    In the event that the funds received by the Solicitation Agent, as applicable, from any Eligible Holder (other than a Backstop Commitment Party) do not correspond to the

Purchase Price payable for the Rights Offering Shares elected to be purchased by such Eligible Holder, the number of the Rights Offering Shares deemed to be purchased by such Eligible Holder will be the lesser of (a) the number of the Rights Offering Shares elected to be purchased by such Eligible Holder as evidenced by the relevant ATOP submission(s) and (b) a number of the Rights Offering Shares determined by dividing the amount of the funds received by the Purchase Price, in each case up to such Eligible Holder's *pro rata* portion of Rights Offering Shares.

(e)     Other than with respect to the Backstop Commitment Parties, the cash paid to the Solicitation Agent in accordance with these Rights Offering Procedures will be deposited and held by the Solicitation Agent in a segregated account until released to the Debtors in connection with the settlement of the Rights Offering on or around the Effective Date. The Solicitation Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Solicitation Agent hereunder (or in the Subscription Escrow Account) shall not be deemed part of the Debtors' bankruptcy estates. Wire instructions for the subscription account will be included in the Registered Holder and Beneficial Holder Subscription Form sent to the holders of Existing Interest held directly with the transfer agent, and will be provided to DTC by the Solicitation Agent.

**5.      Transfer Restriction; Revocation**

(a)     The Subscription Rights will not be detachable or transferable separately from the Notes, Existing Common Stock, or Existing Preferred Stock, as applicable.  If any Subscription Rights are transferred by an Eligible Holder in contravention of the foregoing, the Subscription Rights will be cancelled, and neither such Eligible Holder nor the purported transferee will receive any Rights Offering Shares otherwise purchasable on account of such transferred Subscription Rights;

(b)     The Subscription Rights together with the underlying Notes or Existing Interest with respect to which such Subscription Rights were activated, will trade together as a unit, subject to such limitations, if any, that would be applicable to the transferability of the underlying Notes or Existing Interest; and

(c)     Once an Eligible Holder has properly exercised its Subscription Rights, subject to the terms and conditions contained in these Rights Offering Procedures and the Backstop Commitment Agreement in the case of any Backstop Commitment Party, such exercise will be irrevocable.  Moreover, following the exercise of any Subscription Rights, the holder thereof shall be prohibited from transferring or assigning the Notes or Existing Interests, as applicable, corresponding to such Subscription Rights until the earlier of (i) termination of the Rights Offering and (ii) the revocation of exercise of the Subscription Rights to the extent permitted by these Rights Offering Procedures.

**6.      Termination/Return of Payment**

Unless the Effective Date has occurred, the Rights Offering will be deemed automatically terminated without any action of any party upon the earlier of (i) termination of the Restructuring Support Agreement in accordance with its terms, (ii) termination of the Backstop Commitment Agreement in

accordance with its terms, (iii) the Debtors revoke or withdraw the Plan and (iv) the Outside Date (as such date may be extended pursuant to the terms of the Backstop Commitment Agreement). In the event the Rights Offering is terminated, any payments received pursuant to these Rights Offering Procedures will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, and the underlying Notes or Existing Interest will be returned to the Nominee that submitted them through ATOP.

### 7. Settlement of the Rights Offering and Distribution of the Rights Offering Shares

The settlement of the Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtors with these Rights Offering Procedures, and the simultaneous occurrence of the Effective Date. The Debtors intend that the Rights Offering Shares will be issued to the Eligible Holders in book-entry form, and that DTC, or its nominee, will be the holder of record of such Rights Offering Shares for any Rights Offering Shares exercised through a Nominee or those registered holders who wish to hold their Rights Offering Shares at a nominee. To the extent DTC is unwilling or unable to make the Rights Offering Shares eligible on the DTC system, the Rights Offering Shares will be issued directly to the Eligible Holders on the books and records of the transfer agent.

### 8. Fractional Shares

No fractional Rights Offering Shares will be issued in the Rights Offering. All share allocations (including each Eligible Holder's Rights Offering Shares) will be calculated and rounded down to the nearest whole share. The total amount of Rights Offering Shares that may be purchased pursuant to the Rights Offering shall be adjusted as necessary to account for the rounding described in this Section 8. No compensation shall be paid, whether in cash or otherwise, in respect of any rounded-down amounts.

### 9. Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors in consultation with the Requisite Commitment Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors, with the consent of the Requisite Commitment Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscriptions will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith in consultation with the Requisite Commitment Parties. In addition, the Solicitation Agent shall have no obligation to notify parties of or cure any defects to the forms returned in exercising the Subscription Rights.

*Before exercising any Subscription Rights, Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

All calculations shall be made in good faith by the Debtors with the consent of the Requisite Commitment Parties and in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

### 10. Modification of Procedures

With the prior written consent of the Requisite Commitment Parties, the Debtors reserve the right

to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures to effectuate the Rights Offering and to issue the Rights Offering Shares, provided, however, that the Debtors shall provide prompt written notice to each Eligible Holder of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date by posting a notice with respect to the modified or additional procedures on the Debtors' case website; and provided, further that any amendments or modifications to the terms of the Rights Offering are subject to the provisions of Section 10.7 of the Backstop Commitment Agreement.  In so doing, and subject to the consent of the Requisite Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith is necessary and appropriate to effectuate and implement the Rights Offering and the issuance of the Rights Offering Shares.

## 11.    DTC

Some or all of the Notes or Existing Interest are held in book-entry form in accordance with the practices and procedures of the DTC. The Debtors intend to comply with the practices and procedures of DTC for the purpose of conducting the Rights Offering, and, subject to compliance with Section 10 hereof, these Rights Offering Procedures will be deemed appropriately modified to achieve such compliance.

Without limiting the foregoing the Company intends that, to the extent practicable, the Rights Offering Shares will be issued in book entry form, except with respect to persons that may be deemed underwriters under section 1145(b) of the Bankruptcy Code (who are obligated to make themselves known to the Company), and that DTC, or its nominee, will be the holder of record of such Rights Offering Shares for any Rights Offering Shares exercised through a Nominee. The ownership interest of each holder of such Rights Offering Shares, and transfers of ownership interests therein, is expected to be recorded on the records of the direct and indirect participants in DTC. It is expected that all exercised Rights Offering Shares will be automatically allocated to exercising holders through DTC, along with the related distribution of New Common Stock, on or as soon as practicable after the Effective Date. Parties who are to receive shares on the books and records of the transfer agent shall complete Item 8 on the subscription form.

## 12.    Inquiries And Transmittal of Documents; Solicitation Agent

The Rights Offering Instructions for Eligible Holders attached hereto should be carefully read and strictly followed by the Eligible Holders.

Questions relating to the Rights Offering should be directed to the Solicitation Agent via email to Parkerrightsoffering@primeclerk.com (please reference "Parker Rights Offering" in the subject line) or at the following phone number: (855) 631-5345 (domestic toll-free) or (347) 338-6451 (international).  Please note that the Solicitation Agent is only able to respond to procedural questions regarding the Rights Offering, and cannot provide any information beyond that included in these Rights Offering Procedures and the Beneficial Holder Subscription Forms or Registered Holder Subscription Forms, as applicable.  An Eligible Holder must follow the directions of its Nominee with respect to providing instructions to it in connection with the Rights Offering.

The risk of non-delivery of any instructions, documents, and payments to any Nominee or to the Solicitation Agent or the Escrow Account is on the Eligible Holder electing to exercise its Subscription Rights and not the Debtors, the Solicitation Agent, or the Backstop Commitment Parties.

## PARKER DRILLING COMPANY
## RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE HOLDERS

**Terms used and not defined herein shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.  **Insert** the number of shares of the Existing Common Stock, Existing Preferred Stock and/or the Principal Amount of 2020 Notes and/or 2022 Notes as applicable, that you hold in Item 1 of your Beneficial Holder Subscription Form (if you do not know such amount, please contact your Nominee immediately).

2.  **Complete** the worksheet in Item 1 of your Beneficial Holder Subscription Form, which calculates the maximum number of Rights Offering Shares available for you to purchase. Such amount must be rounded down to the nearest whole share.

3.  **Complete** Item 2 of your Beneficial Holder Subscription Form to indicate the number of Rights Offering Shares you elect to purchase and the aggregate Purchase Price for such Rights Offering Shares. IMPORTANT: If you do not wish to purchase all of the Rights Offering Shares to which you are entitled, you must provide instructions to your Nominee to ONLY submit the relevant portion of Notes or Existing Interest into the ATOP system. For example, if you only wish to subscribe for 50% of your Existing Common Stock, then request that your Nominee submit only 50% of your Existing Common Stock through ATOP.

4.  **Read, complete and sign** the certification in Item 6 of your Beneficial Holder Subscription Form. Such execution shall indicate your acceptance and approval of the terms and conditions set forth in these Rights Offering Procedures.

5.  **Return** your signed Beneficial Holder Subscription Form to your Nominee, or otherwise follow your Nominee's instructions with respect to the Rights Offering, in sufficient time to allow your Nominee to process your instructions and deliver your underlying Existing Common Stock, Existing Preferred Stock, or Notes through ATOP by the Subscription Instruction Deadline. (**If you are a registered holder of Equity Interests in your own name on the books and records of the transfer agent**, you should follow the instructions in the Registered Holder Subscription Form to complete and return your form, and also attach a completed IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov. Payment instructions will also be included in the Registered Holder Subscription Form. Registered positions in the Existing Interest will be verified as of the Subscription Instruction Deadline and the Effective Date of the Plan to confirm that a Holder is entitled to participate in the Rights Offering.)

6.  **Arrange for full payment** of the aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2 of your Beneficial Holder Subscription Form. For any Eligible Holders that are not Backstop Commitment Parties,

please instruct your Nominee to coordinate payment of the Purchase Price and transmit and deliver such payment to the Solicitation Agent by the Subscription Instruction Deadline. Any Backstop Commitment Party should follow the payment instructions that will be provided in the Funding Notice.

7.   **For Backstop Commitment Parties ONLY, confirm** that you are a Backstop Commitment Party by providing the Backstop Commitment Party Addendum to your Nominee, so that the Nominee will receive confirmation that payment does not have to be made prior to the Subscription Payment Deadline. (*This instruction is only for Backstop Commitment Parties, each of which is aware of their status as a Backstop Commitment Party*).

---

• **The Subscription Instruction Deadline shall be 4:00 p.m. prevailing Central Time on February 26, 2019.**

• **The Subscription Payment Deadline shall be 4:00 p.m. prevailing Central Time on February 27, 2019.**

**Please note that the Beneficial Holder Subscription Form (and/or other instructions required by your Nominee) must be received by your Nominee in sufficient time to allow such Nominee to process and deliver the applicable Existing Common Stock, Existing Preferred Stock, or Notes through ATOP by the Subscription Instruction Deadline, along with the appropriate funding (with respect to Eligible Holders that are not Backstop Commitment Parties) or the subscription represented by your Beneficial Holder Subscription Form will not be counted and you will be deemed forever to have relinquished and waived your right to participate in the Rights Offering.**

**Eligible Holders that are Backstop Commitment Parties must deliver the appropriate funding to the Subscription Escrow Account by the Subscription Escrow Funding Date in accordance with the Backstop Commitment Agreement.**

---

## SCHEDULE 12

**Subscription Form**

**PARKER DRILLING COMPANY**
**RIGHTS OFFERING SUBSCRIPTION FORM**

**FOR USE BY ELIGIBLE HOLDERS**

**IN CONNECTION WITH DEBTORS'**
**DISCLOSURE STATEMENT DATED JANUARY 23, 2019**

---

**SUBSCRIPTION INSTRUCTION DEADLINE**

**AND**

**SUBSCRIPTION PAYMENT DEADLINE**

**The Subscription Instruction Deadline is 4:00 p.m. Central Time on February 26, 2019.**

**The Subscription Payment Deadline is 4:00 p.m. Central Time on February 27, 2019.**

**Please note that your Beneficial Holder Subscription Form (or other form of instruction required by your Nominee) must be received by your Nominee in sufficient time to allow such Nominee to deliver your underlying notes/shares through ATOP by the Subscription Instruction Deadline or your subscription will not be counted and will be deemed forever relinquished and waived; payment of the aggregate Purchase Price with respect to Eligible Holders that are not Backstop Commitment Parties must be made to the Solicitation Agent by the Subscription Payment Deadline.**

**Registered Holders of Existing Common or Existing Preferred Stock should return this form directly to the Solicitation Agent and coordinate payment to the appropriate account by the relevant funding date.**

**Eligible Holders that are Backstop Commitment Parties must deliver the appropriate funding directly to the Subscription Escrow Account no later than the Subscription Escrow Funding Date in accordance with the terms of the Backstop Commitment Agreement.** *Eligible Holders that are Backstop Commitment Parties must arrange for the Backstop Commitment Party Addendum to be provided to their Nominee so that the Nominee will receive confirmation that payment does not have to be made prior to the Subscription Payment Deadline.*

**The Rights Offering Shares are being distributed and issued by the Debtors without registration under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon the exemption provided in section 1145 of the Bankruptcy Code.**

**None of the Rights Offering Shares have been registered under the Securities Act, nor any State or local law requiring registration for offer or sale of a security.**

**Please consult the Plan, the Disclosure Statement and the Rights Offering Procedures (including the Rights Offering Instructions attached thereto) for additional information with respect to this Beneficial Holder Subscription Form.  Any terms capitalized but not defined herein shall have the meaning as set forth in the Plan or the Rights Offering Procedures.**

**If you have any questions, please contact the Solicitation Agent via email to Parkerrightsoffering@primeclerk.com, or at one of the following phone numbers: (855) 631-5345 (domestic toll-free) or (347) 338-6451 (international).**

2

**Item 1.  Amount of Claims.**

To subscribe, fill out all items as appropriate below. **If you hold your Allowed Notes Claims or Existing Common Stock through multiple Nominees, you <u>MUST</u> complete and submit a separate Subscription Form for the positions held at each Nominee.**

I certify that I am a holder of 2020 Notes, 2022 Notes, Existing Common Stock and/or an Existing Preferred Stock in the following amount(s) (insert amount(s) on the lines in the chart below) or that I am the authorized signatory of such holder.

| *If you own:* | *CUSIP/ISIN* | *Principal Amount/ Shares Held on the Subscription Instruction Deadline (insert below, as applicable)* | | *Rate to Convert Principal Amount into number of maximum rights (rates include accrued interest where applicable)* | | *The maximum rights allowed based on your claim is:* |
|---|---|---|---|---|---|---|
| 1a. 2020 Notes | CUSIP 701081AY7 / ISIN US701081AY70 | $_____ | x | .0068094 | = | 1a _____ (Maximum number of shares of New Common Stock) (Round down to nearest whole share) Insert into 2a below |
| 1b. 2022 Notes | CUSIP 701081AX9/ ISIN  US701081AY70 | $_____ | x | .0068094 | = | 1b _____ (Maximum number of shares of New Common Stock) (Round down to nearest whole share) Insert into 2b below |
| 1c. Existing Common Stock | CUSIP 701081408/ ISIN US7010814082 | _____ | x | 0.1486 | = | 1c _____ (Maximum number of shares of New Common Stock) (Round down to nearest whole share) Insert into 2c below |
| 1d. Existing Preferred Stock | CUSIP 701081309 | _____ | x | 1.8590 | = | 1d _____ (Maximum number of shares of New Common Stock) (Round down to nearest whole share) Insert into 2d below |

3

**Item 2.  Rights Calculation Worksheet**

**2a-d. Purchase Payment Amount**. By filling in the following blanks, you are indicating that the undersigned Eligible Holder is interested in purchasing the number of Rights Offering Shares specified below (specify number of Rights Offering Shares, which is not greater than the Maximum Participation Amount (as defined below) calculated in each of Items 1a, 1b, 1c and 1d above), on the terms and subject to the conditions set forth in the Rights Offering Procedures.

| 2a | _____ (Insert number of rights you elect to exercise not exceeding the amount in Item 1a above) | X | **$15.06** | = | _____ 2a.  Purchase Payment Amount |
|---|---|---|---|---|---|
| 2b | _____ (Insert number of rights you elect to exercise not exceeding the amount in Item 1b above) | X | **$15.06** | = | _____ 2b. Purchase Payment Amount |
| 2c | _____ (Insert number of rights you elect to exercise not exceeding the amount in Item 1c above) | X | **$15.06** | = | _____ 2c. Purchase Payment Amount |
| 2d | _____ (Insert number of rights you elect to exercise not exceeding the amount in Item 1d above) | X | **$15.06** | = | _____ 2d. Purchase Payment Amount |
| | Total number of shares of New Common Stock | | | | Total Purchase Amount: |

Each Eligible Holder of 2020 Notes Claims is entitled to subscribe for 6.8094 Rights Offering Shares per $1,000 of principal amount of the Notes (the "Maximum Participation Amount"), each Eligible Holder of 2022 Notes Claims is entitled to subscribe for 6.8094 Rights Offering Shares per $1,000 of principal amount of the Notes (the "Maximum Participation Amount").  Each Eligible

Common Stockholder is entitled to subscribe for 0.1486 Rights Offering Shares per share and each Eligible Preferred Stockholder is entitled to receive 1.8590 per share, all subject to the individual limits included in the calculations in the table above.

**If all or any portion of your Claim is determined not to be an Allowed Claim, your Maximum Participation Amount will be reduced, in accordance with the terms of the Plan, the Rights Offering Procedures and the Subscription Agreement, and to the extent the amount of the Rights Offering Shares which you subscribed and paid for exceeds your reduced Maximum Participation Amount, the amount of the Rights Offering Shares which you subscribed and paid for will be reduced to the reduced Maximum Participation Amount.**

**Item 3.  Backstop Commitment Party Representation.**

*(This section is **_only_** for Backstop Commitment Parties, each of whom is aware of its status as a Backstop Commitment Party, and a fully completed Backstop Commitment Party Addendum MUST be provided to your Nominee. A customized Backstop Commitment Party Addendum will be forwarded to each Rights Offering Party, and the Backstop Commitment Party is responsible for forwarding it to their Nominee so that the Nominee will receive confirmation that payment does not have to be made prior to the Subscription Payment Deadline.  Please note that checking the box below if you are not a Backstop Commitment Party may result in forfeiture of your rights to participate in the Noteholders Rights Offering.)*

☐  I am a known Backstop Commitment Party identified in the Backstop Commitment Agreement dated as of **December 12, 2018** among Parker Drilling Company and the Backstop Commitment Parties signatory thereto (the "Backstop Commitment Agreement"), and the Backstop Commitment Party Addendum has been provided to my Nominee.

5

**Item 4. Principal/Share Amount and Nominee/ DTC Information. (COMPLETE <u>ONLY</u> FOR NOTES/SHARES YOU ARE TENDERING THROUGH THE IDENTIFIED NOMINEE.)**
**<u>IMPORTANT NOTE</u>:  Eligible Holders must electronically deliver their underlying debt securities via DTC's Automated Tender Offer Program ("<u>ATOP</u>") or your applicable depository.**

**The undersigned hereby certifies that the undersigned has electronically tendered their positions in the following principal amount(s):**

| CUSIP/ISIN | Principal Amount/Shares Tendered | DTC ATOP Confirmation Number | Euroclear or Clearstream Ref Number | Nominee Holding Position at DTC or Other Applicable Depository |
|---|---|---|---|---|
| (2020 Notes)<br><br>CUSIP 701081AY7<br>ISIN US70108AY70 | $ | | | |
| (2022 Notes)<br><br>CUSIP 701081AX9<br>ISIN US701081AX97 | $ | | | |
| (Existing Common Stock)<br><br>CUSIP 701081408<br>ISIN US7010814082 | | | | |
| (Existing Preferred Stock)<br><br>CUSIP 701081309 | | | | |

**REGISTERED HOLDERS OF EXISTING PREFERRED OR EXISTING COMMON STOCK SHOULD NOT COMPLETE ITEM 4**

6

**Item 5.  Payment and Delivery Instructions**

For Eligible Holders that are Backstop Commitment Parties and did check the box in <u>Item 3</u>, payment of the aggregate Purchase Price in <u>Item 2</u> above shall be made by wire transfer ONLY of immediately available funds directly to the Subscription Escrow Account (except to the extent of any funding previously provided by any such Eligible Holder to the Solicitation Agent or the Subscription Escrow Account in accordance with the terms of the Backstop Commitment Agreement) by the Subscription Escrow Funding Date.

Please provide your completed Beneficial Holder Subscription Form (or other required instruction, as applicable) to your Nominee **in sufficient time** to allow such Nominee to deliver the principal amount shown in <u>Item 1</u> via ATOP by the Subscription Instruction Deadline.

Registered Holders of Existing Preferred Stock and Existing Common Stock should make payment directly to the Solicitation Agent (or Subscription Escrow Account if they are a Backstop Commitment Party in accordance with the Backstop Commitment Agreement).

> **PLEASE NOTE: UNLESS THE PARTY IS A REGISTERED HOLDER OF EXISTING PREFERRED STOCK OR EXISTING COMMON STOCK, NO SUBSCRIPTION WILL BE VALID UNLESS THE RELEVANT NOTES/SHARES HAVE BEEN TENDERED THROUGH ATOP BY THE SUBSCRIPTION INSTRUCTION DEADLINE.**
>
> **FOR ALL PARTIES OTHER THAN BACKSTOP COMMITMENT PARTIES, PAYMENT MUST BE MADE BY THE SUBSCRIPTION PAYMENT DEADLINE.**
>
> **ELIGIBLE HOLDERS THAT ARE BACKSTOP COMMITMENT PARTIES MUST DELIVER THE APPROPRIATE FUNDING DIRECTLY TO THE SUBSCRIPTION ESCROW ACCOUNT NO LATER THAN THE SUBSCRIPTION ESCROW FUNDING DATE.**

For Eligible Holders other than Backstop Commitment Parties, payment of the Purchase Payment Amount calculated pursuant to Item 2 a-d above shall be made by wire transfer ONLY in accordance with the following instructions:

U.S. Wire Instructions:

| | |
|---|---|
| Account Name : | Parker Drilling Rights Offering Account |
| Bank Account No.: | 9900000676 |
| ABA/Routing No.: | 084106768 |
| Bank Name: | Evolve Bank & Trust |
| Bank Address: | 6070 Poplar Ave., Suite 100, Memphis, TN 38119 |
| Reference: | [Insert claimant name and/or form number in memo field] |

International Wire Instructions:

| | |
|---|---|
| Correspondent/Intermediary Bank SWIFT | FRNAUS44 |
| Correspondent/Intermediary Bank Name | First National Banker's Bank |
| Correspondent/Intermediary Bank Address | 7813 Office Park Blvd, Baton Rouge, LA 70809 |
| Beneficiary Account Number | 084106768 |
| Beneficiary Name | Evolve Bank & Trust |
| Beneficiary Address | 6070 Poplar Ave, Suite 200, Memphis, TN 38119 |
| Memo, Special Instructions, Originator to Beneficiary Information, Bank to Bank Information | Credit: Parker Drilling Rights Offering Account Account #: 9900000676 [Insert claimant name and/or form number in memo field] |

*Please note that the failure to include the claimant name or form number in the reference field of any domestic or international wire payment may result in the rejection of the corresponding rights offering submission. Please also note that payments cannot be aggregated, and one wire should be sent per rights offering submission.

Please deliver your completed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Solicitation Agent so that it is received by the Subscription Instruction Deadline at:

Parker Drilling Rights Offering Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022
Email:  parkerrightsoffering@primeclerk.com

**<u>Originals are not required</u>**

> **PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS SUBSCRIPTION FORM ALONG WITH THE APPROPRIATE FUNDS ARE VALIDLY SUBMITTED TO THE SOLICITATION AGENT BY THE SUBSCRIPTION INSTRUCTION DEADLINE.**

**Item 6.  Certification.**

The undersigned hereby certifies that (i) the undersigned is the beneficial holder of the notes/shares set forth in <u>Item 1</u> above (the "<u>Holder</u>"), or the authorized signatory (the "<u>Authorized Signatory</u>") of such Holder acting on behalf of the Holder, (ii) the Holder has reviewed a copy of the Plan, the Disclosure Statement and the Rights Offering Procedures (including the Rights Offering Instructions attached thereto) and (iii) the Holder understands that the exercise of the rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Rights Offering Procedures and, if applicable, the Backstop Commitment Agreement.

By electing to subscribe for the amount of Rights Offering Shares in <u>Item 2 a-d</u> above,  the Holder (or the Authorized Signatory on behalf of the Holder) is hereby instructing its Nominee to arrange for the delivery of the notes/shares shown in <u>Item 1</u> via ATOP by the Subscription Instruction Deadline, and acknowledges that payment of the Aggregate Purchase Price associated with that the delivery of such notes/shares will be made by the Subscription Payment Deadline (solely with respect to Eligible Holders that are not Backstop Commitment Parties).  Registered Holders of Existing Common or Existing Preferred Stock should return this form directly to the Solicitation Agent.

**The Holder (or the Authorized Signatory on behalf of such Holder) acknowledges that, by executing this Beneficial Holder Subscription Form, the Eligible Holder named below has elected to subscribe for the number of Rights Offering Shares associated with the amounts tendered through ATOP, and will be bound to pay the Aggregate Purchase Price for the Rights Offering Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

U.S. Federal Tax EIN/SSN (optional): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

Signature:_____

Name of Signatory: _____

Title:_____

Address:_____

Telephone Number: _____

Fax:_____

Email:_____

10

**Item 7.**

**PLEASE COMPLETE THE FOLLOWING SECTION IN CASE A REFUND IS REQUIRED.**

**Wire information in the event a refund outside of DTC is needed:**

Account Name: _____

Beneficiary Address: _____

Bank Account No. (For International this may be IBAN): _____

ABA/Routing No.:_____

Bank Name:_____

Bank Address: _____

Reference: _____

Swift Instructions (if applicable): _____

**PLEASE NOTE THAT TO THE EXTENT THE RIGHTS OFFERING SHARES ARE DTC ELIGIBLE SUCH SHARES WILL ONLY BE DELIVERED TO THE ACCOUNT ASSOCIATED WITH THE UNDERLYING APPLICABLE DEBT AND/OR EQUITY SECURITIES POSITION ELECTRONICALLY DELIVERED VIA DTC'S ATOP.  REGISTERED HOLDERS WILL HAVE THEIR SHARES ISSUED ON THE BOOKS AND RECORDS OF THE TRANSFER AGENT**

**Item 8.**

**COMPLETE THE BELOW REGISTRATION INFORMATION FOR ALL RIGHTS OFFERING SHARES TO BE ISSUED ON THE BOOKS AND RECORDS AT THE TRANSFER AGENT.  PLEASE NOTE ALL PARTIES SHOULD COMPLETE THIS SECTION EVEN IF YOU DO NOT BELIEVE YOU WILL RECEIVE RIGHTS OFFERING SHARES ON THE BOOKS AND RECORDS OF THE TRANSFER AGENT.  IN THE EVENT THIS SECTION IS NOT COMPLETED, ANY RIGHTS OFFERING SHARES ISSUED ON THE BOOKS AND RECORDS OF THE TRANSFER AGENT WILL BE DONE SO USING THE INFORMATION IN <u>ITEM 6</u> ABOVE.**

Name of Registered Party: _____

Address 1:_____

Address 2:_____

City/State/Zip:_____

Contact Name:_____

Telephone:_____

Email:_____

U.S. Federal Tax EIN/SSN : _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

Signature:_____

Name of Signatory: _____

Title:_____

Address:_____

Telephone Number: _____

Fax:_____

Email:_____

12

**<u>Item 9. Holders of Existing Common Stock through the Company's 401(k).</u>**

☐       Check this Box if Existing Common Stock is held as part of Parker Drilling Company or any of its subsidiaries' 401(k) program.