IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| PARKER DRILLING COMPANY, *et al.*,[1] | Case No. 18-36958 (MI) |
| Debtors. | (Jointly Administered) |

## CHAPTER 11 EXAMINER'S REPORT

Sylvia Mayer, Chapter 11 Examiner in these cases (the "Examiner"), submits this Examiner's Report (the "Report") pursuant to the Court's Order Directing Appointment of Examiner [Docket No. 411] (the "Examiner Order"), and respectfully states as follows:

### A.     Appointment of the Examiner

On February 20, 2019, Barings LLC ("Barings"), a bondholder of the Debtors, filed an Emergency Motion for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104 [Docket No. 363] (the "Examiner Motion"). In the Examiner Motion, Barings argued, *inter alia*, that the Plan was inequitable in that it diverted disproportionate value to the Consenting Stakeholders, thereby denying such value to the Debtors' other stakeholders such as Barings. Barings concluded that, *inter alia*, such alleged disparate treatment is a result of the Consenting Stakeholders' undue influence upon the Debtors.[2]

A contested evidentiary hearing was held on the Examiner Motion on February 25, 2019. At the conclusion of the hearing, the Court announced a preliminary ruling. On February 26, 2019, the Court granted the Examiner Motion and entered the Examiner Order directing the United States Trustee (the "UST") to appoint an examiner consistent with the provisions of the Examiner Order. *See* Docket No. 411.

In accordance with the Examiner Order, on February 28, 2019, the UST filed an Expedited Application for Order Approving Appointment of Chapter 11 Examiner [Docket No. 416] (the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471). The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]     The Consenting Stakeholders consist of: Brigade Capital Management, LP ("Brigade"); Highbridge Capital Management, LLC, Värde Partners, Inc. ("Värde"); and Whitebox Advisors LLC.

"Appointment Application"), which sought the Court's approval to appoint Sylvia Mayer as Chapter 11 Examiner. The same day, the Court entered an Order Approving Appointment of Chapter 11 Examiner [Docket No. 417] (the "Appointment Order"). The Appointment Order requires Ms. Mayer to fulfill the duties set forth in the Examiner Order. Ms. Mayer subsequently retained Bracewell LLP to assist her in fulfilling her duties under the Appointment Order.[3]

**B.      Examination Process Undertaken**

Given the short time frame in which the Examiner was required to complete the investigation and file this Report, the Examiner worked closely with Barings, the Debtors and the Consenting Stakeholders to conduct its investigation in a focused, efficient, informal and cooperative manner to carry out this Court's directives. The Examiner acknowledges and appreciates that each of the Debtors, Barings, and the Consenting Stakeholders exhibited the highest degree of professionalism during this investigation, including each of them being cooperative and extremely responsive in all respects.

The Examiner's examination process included, but was not limited to:

1.      *Approximately seven (7) hours of telephonic interviews by the Examiner and her counsel, including, but not necessarily limited to, interviews of the following entities and persons:*

   a.      Kirkland & Ellis LLP ("Kirkland"), counsel to the Debtors;

   b.      Akin, Gump, Strauss, Hauer & Feld, LLP ("Akin"), counsel to the Consenting Stakeholders;

   c.      Freshfields Bruckhaus Deringer LLP ("Freshfields"), counsel for Barings;

   d.      Russell Mason, Director, and Adam Dunayer, Managing Director, Houlihan Lokey Capital, Inc. ("Houlihan"), investment banker to the Consenting Stakeholders;

   e.      Michael Searles, Director, Barings;

   f.      Bassam Latif, Managing Director, Moelis & Company ("Moelis"), investment banker and financial advisor to the Debtors; and

   g.      Michael Sumruld, Senior Vice President and Chief Financial Officer of the Debtors.

2.      *Review of approximately 100 megabytes of data received by the Examiner in response to informal document requests sent to the Debtors, Barings, and the Consenting Stakeholders, including, but not limited to requests seeking:*

   a.      Relevant docket entries in these cases;

---

[3]      Bracewell LLP will file a *nunc pro tunc* application for retention with the Court as soon as possible.

      b.      Additional documents (e.g. transcripts, corporate documents, research, etc.) each party would like the Examiner to consider;

      c.      Case law, transcripts, pleadings, orders, etc. addressing improper exclusion of a party from an ad hoc group and other relevant legal issues; and

      d.      All documents (e.g. letters, emails, text messages, instant messages, recordings, notes, presentations, meeting agendas, or meeting minutes) related to:

         i.      any communication to or from Barings, or its representatives, concerning the Parker Drilling bankruptcy or the Consenting Stakeholders group; and

        ii.      any discussion or decision regarding Barings joining the Consenting Stakeholders group and/or becoming a restricted entity, such that it was restricted from selling its Parker Drilling equities in the public marketplace.

### 3.    *Independent Research*

In addition to the interviews and document review described above, the Examiner and her counsel independently reviewed the docket for this case and conducted their own research regarding relevant issues.

### 4.    *Appendix*

Contemporaneous with the filing of this Report, the Examiner has filed an Appendix including certain of the materials relied upon in preparing this Report. It should be noted that the Appendix does not contain all materials considered or reviewed by the Examiner. In particular, among other things, the Appendix does not include (a) items available on the docket in this case, (b) published decisions, or (c) certain documents produced to the Debtors, Consenting Stakeholders, Barings and/or the Examiner marked confidential.

## C.    Statement of Issues and Brief Answers

Pursuant to paragraph 1 of the Examiner Order, the Court ordered the Examiner to investigate and report upon the two questions set forth below (the "Relevant Questions"). Subject to the findings of fact and analysis described in detail in this Report, the Examiner's brief answers to each of these questions are also set forth below.

### 1.    *Improper Exclusion*

Question: Did the Debtors or the Consenting Stakeholders improperly exclude Barings, LLC from participating in these bankruptcy cases, pre-petition or post-petition?

Brief Answer: No.

> ### 2. *Estoppel*
>
> Question:   Is Barings, LLC estopped from arguing against certain allegedly improper plan provisions by proposing that Barings be allowed to reap the benefits of those same allegedly improper plan provisions?
>
> Brief Answer:  No.

## D. Examiner's Factual Findings

### 1. *Prepetition Factual Findings*

As early as May 2018, industry publications reported that the Debtors had retained Kirkland and Moelis to assist in options for improving the Debtors' capital structure.[4]  Thereafter, the Debtors (including Moelis) began fielding multiple inbound calls from current stakeholders and potential investors in the Debtors.[5]  On June 4, 2018, it was publicly reported that an ad hoc group of the Debtors' unsecured bondholders had retained Akin and Houlihan in anticipation of engaging the Debtors in restructuring discussions.[6]  From that point forward, Houlihan, on behalf of the Consenting Stakeholders, also received inbound calls from current stakeholders and potential investors in the Debtors seeking information about the Debtors and the restructuring efforts.[7]  Some of the inquiries received by the Debtors resulted in restructuring term sheets separate and apart from that submitted by the Consenting Stakeholders.[8]  The Debtors evaluated formal inbound proposals and presented those proposals to their board of directors.[9]

In late July 2018, Barings, a bondholder, contacted Houlihan to discuss information surrounding the Debtors.  On July 30, 2018, a call took place that included Russell Mason (Houlihan) and Michael Searles (Barings).[10]  That initial call was a high level discussion of the state of the Debtors and the holdings of Barings.[11]  Mr. Searles states that Barings "expressed a desire to be a part of"[12] the ad hoc group on this call and "attempted to express an interest to join that group."[13]  According to Mr. Searles, it is generally Barings' position that if an ad hoc group is forming, then it wants to join the group.[14]  Mr. Mason does not recall such expressions on this

---

[4]   Rachel Butt *et al*., Parker Drilling taps counsel, advisor for liability management, Debtwire (May 16, 2018, 13:06 EDT), https://www.debtwire.com/intelligence/view/prime-2639873?searchTerm=parker drilling taps counsel.  App'x 1.

[5]   Bracewell LLP, *Memorandum of Examiner Call Moelis & Co.*, Mar. 2, 2019, Mem. at 1. App'x 2.

[6]   Rachel Butt & Hema Oza, *Parker Drilling Bondholders tap advisor, law firm – Update*, DEBTWIRE (June 04, 2018, 09:44 EDT), https://www.debtwire.com/intelligence/view/prime-2649990?searchTerm=parker drilling bondholders tap advisor.  App'x 3.

[7]   Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 1. App'x 4.

[8]   Kirkland & Ellis LLP, Sylvia Mayer—Examiner, Parker Drilling Presentation (Feb. 27, 2019) ("K&E Examiner Presentation") [redacted].  App'x 5.

[9]   K&E Examiner Presentation at 7-14.

[10]   Hearing Transcript of Emergency Motion to Appoint Examiner dated Feb. 25, 2019 ("Hr'g Tr.") 52:09-23, App'x 6; E-mail from Searles (July 28, 2018, 11:34 EDT) (BAR-00000208), App'x 8; E-mail from Russell Mason, Houlihan Lokey (July 29, 2018, 17:55 EDT) (BAR-00000213), App'x 9.

[11]   Hr'g Tr. 52:17-23, Feb. 25, 2019.  App'x 6.

[12]   Hr'g Tr. 52:19, Feb. 25, 2019.  App'x 6.

[13]   Hr'g Tr. 53:05, Feb. 25, 2019.  App'x 6.

[14]   Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 3. App'x 4.

call (or any other call).[15]  Consistent with Mr. Mason's recollection, prior to the July 30, 2018 call, Barings contacted Brigade (a member of the Consenting Stakeholders) and, according to email correspondence from Brigade, Barings did not request to be part of the ad hoc group.[16]

On August 21, 2018, it was reported that the ad hoc group of stakeholders "went restricted"[17] such that the members of the group (now known to have been the Consenting Stakeholders) were prevented from trading notes or equity in exchange for becoming privy to confidential corporate information.

Over three months after the initial Barings/Houlihan call, a second call including Mr. Searles (Barings) and Mr. Mason (Houlihan) took place on November 8, 2018.[18]  That call was primarily a substantive discussion of the Debtors' business outlook.[19]  Mr. Searles states that on that call he again expressed Barings' "interest and desire to be a part of the [ad hoc stakeholders'] group going forward."[20]  However, Mr. Mason states that Barings did not ask to join the ad hoc group on that call, or any other call.[21]

Mr. Searles asserts that Barings would have been an important addition to the ad hoc group because Barings held only bonds, and no equity, and thus stood to act as an appropriate check and balance on the distribution of value.[22]  However, the Consenting Stakeholders include at least one participant, Värde, which, from when it went restricted in 2018 through at least February 20, 2019 (the date the Consenting Stakeholders filed their 2019 Statement), held and continues to hold only bonds and no equity in the Debtors.[23]  Notably, both as of the execution of the RSA and the filing of 2019 Statement, Värde held nearly 50% of the 2020 bonds and 35% of the 2022 bonds.[24]  In stark contrast, Barings holds approximately $35 million of the 2022 bonds, representing approximately 10%.[25]

Generally, absent a situation where a group has established a minimum holdings threshold for joining the group (an exception not applicable in this case), when Houlihan is the advisor to an ad hoc group, Houlihan does not have authority to approve or deny a third party's request to join the group.[26]  Upon receiving such a request, Houlihan brings the request to its client and legal

[15]   Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 3. App'x 4.
[16]   E-mail from S. Hoffman to Adam Dunayer and Carney Hawks (July 25, 2018), PARKER_CSH0000011. App'x 10.
[17]   Rachel Butt & Hema Oza, Parker Drilling bondholders go restricted, Debtwire (Aug. 21, 2018, 18:56 EDT), https://www.debtwire.com/intelligence/view/prime-2692027?searchTerm=parker drilling bondholders go restricted.  App'x 11.
[18]   Hr'g Tr. 55:09, Feb. 25, 2019.  App'x 6.
[19]   Hr'g Tr. 55:19-23, Feb. 25, 2019.  App'x 6.
[20]   Hr'g Tr. 55:24-56:01, Feb. 25, 2019.  App'x 6.
[21]   Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 4. App'x 4.
[22]   Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 7-8. App'x 4
[23]   RSA Signature Pages (which include holdings as of execution).  App'x 12; Verified Statement Pursuant to Bankruptcy Rule 2019 [of Consenting Stakeholders], [Dkt. No. 365] (the "2019 Statement").  The Consenting Stakeholders have represented to the Examiner that Värde at no time held common or preferred stock from the date it became restricted to the date of the filing of the 2019 Statement.
[24]   RSA Signature Pages.  App'x 12; 2019 Statement.
[25]   Hr'g Tr. 9:4-5, Feb. 25, 2019.  App'x 6.
[26]   Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 3. App'x 4.

#5893502

Case 18-36958   Document 439   Filed in TXSB on 03/04/19   Page 6 of 19

counsel.[27]  In this case, Houlihan never informed the members of the ad hoc group or Akin of any requests by Barings to join the group because Houlihan maintains that no such request was made.[28]

At no point prepetition did Barings reach out to Akin, as counsel for the Consenting Stakeholders.[29]  At no point prepetition did Barings reach out to Kirkland, as counsel for the Debtors, or to Moelis, as financial advisor and investment banker for the Debtors.[30]  In Moelis' experience, bondholders seeking to join an ad hoc group are aggressive and engage in a persistent "calling campaign" to gain the attention of critical constituents.[31]  However, Barings' first time to contact the Debtors or its advisors with relation to the Debtors' restructuring was postpetition by means of the letter sent on February 1, 2019.[32]

No party provided the Examiner with any documentary evidence indicating that, prepetition, Barings requested to join the ad hoc group.  No party provided the Examiner with any documentary evidence indicating that, prepetition, either the Debtors or the Consenting Stakeholders excluded Barings from joining the ad hoc group.  The only evidence that Barings sought to be included in the ad hoc group prepetition is Mr. Searles' testimony that he made the request on both the July 30, 2018 and November 8, 2018 phone calls with Mr. Mason.  However, none of the internal correspondence received from Barings evidences that Barings made such a request or that Barings was complaining internally about having been excluded from the group.[33]

Moreover, Barings states that it has been a member of other ad hoc groups, and in some instances has excluded other parties from such ad hoc groups on various bases, including, for example, institutional reputation and their holdings.[34]  Conversely, Barings acknowledged that there have been other situations when Barings was excluded from a group.[35]  As a result, by Barings own admission, ad hoc groups have the prerogative to admit or exclude other holders.

According to Mr. Searles, when Barings seeks to be included in an ad hoc group, Barings orally reports its efforts to its internal investment committee.[36]  Mr. Searles states that once Barings was aware a group was forming in this case, Barings advised its investment committee that a group was forming and that Barings wanted to join the group.[37]  Although Barings did not produce any documentary evidence substantiating that it informed the investment committee that it had sought to join the ad hoc group at any time, Mr. Searles explained that this type of information is typically shared verbally, so there is unlikely to be any documentary evidence of such a request.[38]

---

[27]     Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 3. App'x 4.
[28]     Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 3. App'x 4.
[29]     Hr'g Tr. 134:7-23, Feb. 25, 2019. App'x 6.
[30]     Hr'g Tr. 102:4-7, Feb. 25, 2019. App'x 6.
[31]     Bracewell LLP, *Memorandum of Examiner Call Moelis & Co.*, Mar. 2, 2019, Mem. at 4. App'x 2.
[32]     Hr'g Tr. 114:8-12, Feb. 25, 2019.  App'x 6.
[33]     Internal Barings emails produced by Barings, BATES range BAR00000017-BAR00002542 (with breaks). These emails are not included in the Appendix because of confidentiality, but have been produced to the Examiner, Debtors, and Consenting Stakeholders.
[34]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC,* March 2, 2019, Mem. at 9. App'x 13.
[35]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC,* March 2, 2019, Mem. at 8. App'x 13.
[36]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC,* March 2, 2019, Mem. at 3. App'x 13.
[37]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC,* March 2, 2019, Mem. at 4. App'x 13.
[38]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC,* March 2, 2019, Mem. at 4. App'x 13.

#5893502

If Barings seeks to "go restricted," then it must first obtain approval from its internal investment committee, but such approval was never sought regarding this case.[39]   In contrast, Barings continued to trade (or seek to trade) in the Debtors' debt on a prepetition basis as late as November 2018[40] and sold some of its 2022 notes on a postpetition basis.[41]

Barings explained that, prepetition, it avoided contacting any Debtor-side advisors in order to minimize the risk that it would become restricted.[42]   However, in the experience of Moelis, it is typical for bondholders to reach out to company-side advisors, and an advisor like Moelis is practiced and able to discuss facts without disclosing material non-public information that would inadvertently lead a party to become restricted.[43]   Moreover, Moelis is currently involved in an unrelated company side representation and Barings has reached out to Moelis in that case.[44]

As evidenced by the Debtors' dialog with Saba Capital Management, L.P. ("Saba"), the Debtors were open to input from a variety of parties.   Throughout the prepetition period, the Debtors engaged in dialog with and considered proposals from Saba.[45]   Saba was the largest stockholder and also held some of the bonds.[46]   Saba reached out early and often in the prepetition process in order to be certain it was involved in restructuring discussions.[47]   Saba executed a non-disclosure agreement on August 2, 2018 and met with management on August 6, 2018.[48]   After two of Saba's proposals were rejected, negotiations with Saba essentially came to a halt in early November 2018.[49]   On November 5, 2018, at Saba's request, the Debtors released nonpublic information previously shared with Saba to "cleanse" Saba.[50]   While the formal negotiations ceased between the Debtors and Saba, the parties remained in contact and, shortly before the bankruptcy filing, Saba's counsel signed a nondisclosure agreement to get updated on the negotiations and the plan structure.[51]

---

[39]   Bracewell LLP, *Memorandum of Examiner Call with Barings LLC,* March 2, 2019, Mem. at 3. App'x 13.

[40]   E-mail from Bryan High to Stuart Mathieson (Nov. 15, 2018, 08:19 EST), BAR-00000630 (not provided in Appendix per fn. 33, *supra*).

[41]   Deposition of Michael Searles dated Feb. 24, 2019 ("Searles Dep.") 45:21-46:06.  App'x 14.

[42]   Hr'g Tr. 154:9-21, Feb. 25, 2019.  App'x 6.

[43]   Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 4. App'x 2.

[44]   Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 3. App'x 2.

[45]   Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 2, 3, 5, 6. App'x 2.

[46]   Hr'g Tr. 39:9-11, Dec. 13, 2018. App'x 19.

[47]   Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 2, 3, 5, 6. App'x 2.

[48]   K&E Examiner Presentation at 2.  App'x 5.

[49]   Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 6. App'x 2.

[50]   K&E Examiner Presentation at 2.  App'x 5.

[51]   Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 6.  App'x 2.

#5893502

2.      *Postpetition Factual Findings*

The Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on December 12, 2018.[52]   The Debtors and Consenting Stakeholders entered into a Restructuring Support Agreement ("RSA") to implement a prearranged restructuring transaction culminating in an approved plan of reorganization.[53]   Accordingly, on the Petition Date, the Debtors filed a proposed Joint Chapter 11 Plan of Reorganization[54] and a proposed Disclosure Statement related thereto.[55]   On January 21, 2019, the Debtors filed a proposed Amended Joint Chapter 11 Plan of Reorganization[56] (the "Plan") and a proposed Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization[57] (the "Disclosure Statement").

The Plan includes the issuance of new shares of common stock in Parker Drilling Company to be purchased through an approved Rights Offering (the "Rights Offering Shares").[58]   The proposed Rights Offering is valued at $95.0 million.[59]   To the extent that common stock remains unsubscribed after the Rights Offering, the Consenting Stakeholders have agreed to backstop the Rights Offering by jointly consenting to purchase any unsubscribed Rights Offering Shares.[60]

Postpetition, Saba continued its persistent engagement with the Debtors.  Among other things, it filed a notice of appearance on the second day of the case[61] and appeared at the first day hearings where Saba expressed its desire to continue its dialog with the Debtors regarding the plan terms.[62]

In the Examiner Motion, Barings alleged that "approximately six weeks after the Plan was filed, the Debtors and the … [Consenting Stakeholders] permitted Saba [] to join the … [Consenting Stakeholders] in backstopping the Rights Offering."[63]   However, Barings' statement is incorrect.  Under the Amendment to Restructuring Support Agreement and Amended Restated Backstop Commitment Agreement (the "Amended BCA")[64], Saba committed to subscribe its pro rata share of the Rights Offering.[65]   Saba is not committed to backstop the Rights Offering and does not have the right to exercise any unsubscribed shares in the Rights Offering beyond its

---

[52]     Chapter 11 Voluntary Petition [Dkt. No. 1, Case No. 18-36958].  All future references to the docket will be to Case No. 18-36958 unless otherwise specified.

[53]     Declaration of John Edward Menger, Chief Restructuring Officer of Parker Drilling Company in Support of Chapter 11 Petitions and First Day Motions [Dkt. No. 15].

[54]     Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates [Dkt. No. 17].

[55]     Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and its Debtor Affiliates [Dkt. No. 21].

[56]     Notice of Filing of Amended Joint Chapter 11 Plan of Reorganization (the "Amended Plan") [Dkt. No. 297].

[57]     Notice of Filing of Disclosure Statement for the Amended Plan [Dkt. No. 298].

[58]     Amended Plan, Art. IV, § F [Dkt. No. 297].

[59]     Amended Plan, Art. IV, § F [Dkt. No. 297].

[60]     Amended Plan, Art. IV, § F [Dkt. No. 297]; *see generally* Amended and Restated Backstop Commitment Agreement [Dkt. No. 326]

[61]     Dkt. No. 44.

[62]     December 13, 2018 Courtroom Minutes; Hr'g Tr. 39:8-40:15, Dec. 13, 2018.

[63]     Examiner Motion, p. 6, fn. 3.

[64]     Dkt. No. 326.

[65]     *See* Section 2.1(b) of amended BCA [Dkt. No. 326].

Required Rights.[66]  Both the Consenting Stakeholders and the Debtors have confirmed that Saba is not allowed to participate in the backstop.[67]  Instead, in exchange for making an early commitment to exercise its full participation in the Rights Offering, Saba received the benefit of payment of some of its professionals' fees.[68]

On January 8, 2019, nearly a month after the bankruptcy filing, Mr. Searles (Barings) had his first postpetition call with Mr. Mason (Houlihan).[69]  The purpose of the January 8th call was to better understand the terms of the Plan and to express Barings' concerns, including Barings' concern that the Consenting Stakeholders were diverting value away from bondholders for the benefit of equity holders and themselves.[70]  During that call, Barings did not ask to join the Consenting Stakeholders group.[71]

By letter dated February 1, 2019, Barings' counsel informed the Debtors and Consenting Stakeholders that it had "grave concerns regarding the inequitable treatment of certain creditor classes" in the Plan.[72]  Barings stated that various terms of the Plan lacked a "legitimate basis or principled rationale," and that the economics of the Backstop Commitment Agreement "smack of self-dealing."[73]  Thereafter, in response to a request from Kirkland for a proposed resolution to the issues raised in the Barings' February 1, 2019 letter, Barings stated that it would be willing to accept "its pro rata share … of the Noteholders' backstop…."[74]  That offer was rejected by the Debtors.[75]

In its Examiner Motion and comments made at the February 25, 2019 hearing, Barings reiterated that it believes the terms of the Backstop Commitment are improper, and in fact, a "perversion of the bankruptcy process."[76]  However, in an effort to resolve the dispute, Barings stated at the hearing that it would withdraw its request for an examiner if it could participate in the Backstop Commitment equally and ratably.[77]  The Consenting Stakeholders rejected this proposal.[78]

---

[66]     *See* Schedule 2 to Amended BCA [redacted]. App'x 15.

[67]     Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 8. App'x 4; Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 6.  App'x 2.

[68]     Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 8. App'x 4; Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 2, 2019, Mem. at 6. App'x 2; *see also, generally*, Notice of (I) First Amendment to RSA, (II) Saba's Joinder to RSA, and (III) Amended and Restated Backstop Commitment Agreement [Dkt. No. 326].

[69]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC*, Mar. 2, 2019, Mem. at 6. App'x 13.

[70]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC*, Mar. 2, 2019, Mem. at 6. App'x 13.

[71]     Bracewell LLP, *Memorandum of Examiner Call with Barings LLC*, Mar. 2, 2019, Mem. at 6. App'x 13.

[72]     Letter from Freshfields to Kirkland, and Akin, dated Feb. 1, 2019, PKD-EMHR256-258 (the "Feb. 1st letter from Freshfields"). App'x 16.

[73]     Feb. 1st letter from Freshfields.  App'x 16.

[74]     E-mail from M. Primoff to B. Schartz (Feb. 11, 2019), PDK-EMHR260. App'x 17.

[75]     E-mail from M. Fagen to M. Primoff (Feb. 13, 2019). App'x 18.

[76]     *See* Examiner Motion at 11, 12; Hr'g Tr. 9:22, Feb. 25, 2019. App'x 6.

[77]     Hr'g Tr. 10:09-11:15, Feb. 25, 2019. App'x 6.

[78]     Hr'g Tr. 17:6-7, Feb. 25, 2019. App'x 6.

E.      **Examiner's Conclusions**

    1.      *The Debtors Did Not Improperly Exclude Barings from Participating in the Debtors' Bankruptcy Cases*

        *a.      Prepetition*

There is no evidence that the Debtors sought to exclude Barings from the bankruptcy cases on a prepetition basis. Rather, the evidence shows that Barings, by its own design, had no contact with the Debtors or their advisors prior to the bankruptcy filing. Furthermore, the evidence suggests that the Debtors were open to proposals from all comers. Likewise, no party has alleged, and no evidence suggests, that the Debtors had any communications with the Consenting Stakeholders, or any other party, regarding Barings on a prepetition basis. Consequently, prepetition the Debtors did not exclude Barings from their bankruptcy cases or negotiation of their restructuring.

        *b.      Postpetition*

The Debtors filed bankruptcy on December 12, 2018. However, Barings did not make contact with the Debtors until it sent its February 1, 2019 letter. Barings has not alleged nor is there any evidence that Barings was barred from appearing in these bankruptcy cases at any time. Barings has admittedly monitored the docket in these cases and attempted to review anything filed on the docket.[79] Barings has availed itself of its right to participate in these cases by filing its Examiner Motion, a supplement in support of the Examiner Motion,[80] and an objection to confirmation of the Debtors' Plan,[81] as well as appearing at the February 25, 2019 hearing.

Moreover, until contacting the Debtors in February 2019, a few weeks before the confirmation hearing, Barings had never informed the Debtors of its interest in participating in the Restructuring Support Agreement and the Backstop Commitment. While the Debtors declined Barings settlement proposal to be added as a participant to the Backstop Commitment, the Debtors' decision not to modify the deal so close to confirmation does not constitute improper exclusion of Barings from the bankruptcy cases.

    2.      *The Consenting Stakeholders Did Not Improperly Exclude Barings from Participating in the Debtors' Bankruptcy Cases*

        *a.      Prepetition*

The recollections of Mr. Searles and Mr. Mason differ as to whether Barings ever asked Houlihan to be part of the ad hoc group of stakeholders that eventually became the Consenting Stakeholders. Additionally, it would be an anomaly for Houlihan to not pass on a request to join a group to the group itself and/or the group's legal counsel.[82] This presents a fact issue. Informing

---

[79]     Hr'g Tr. 103:2-20, Feb. 25, 2019. App'x 6.
[80]     See Dkt. No. 373.
[81]     See Dkt. No. 384.
[82]     Bracewell LLP, *Memorandum of Examiner Call with Houlihan Lokey*, Mar. 2, 2019, Mem. at 3. App'x 4; Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, March 2, 2019, Mem. at 5. App'x 2.

the issue is the lack of documentary evidence on all sides of an explicit request to join the group, a lack of evidence demonstrating a pattern of persistent behavior by Barings with regard to being admitted to the group, and a lack of any internal (or external) Barings communications of any kind expressing Barings' dissatisfaction with the responsiveness of Houlihan on this issue.  Conversely, the evidence shows that Barings contacted only Houlihan (and not the Debtors, Kirkland, Moelis, or Akin), did so via only two telephone calls (and email correspondence to arrange those calls), and continued to trade in the debt of the Debtors both pre- and postpetition.  The actions of Saba are also informative on a prepetition and, as discussed below, postpetition basis.  Saba reached out early and often in the prepetition process in order to be certain it was involved in restructuring discussions.[83]   Saba then executed a non-disclosure agreement on August 2, 2018, met with management on August 6, 2018, and submitted two proposals.[84]   There is no evidence of like action by Barings.

In sum, the overwhelming weight of the evidence supports a conclusion that the Consenting Stakeholders did not exclude Barings from participating in these bankruptcy cases on a prepetition basis.

      *b.*     *Postpetition*[85]

As discussed above in E(1)(b), Barings may avail itself of any legal right it has to participate in these bankruptcy proceedings.  Other than one phone call with Houlihan in January 2019 to get information and express its dislike of the proposed plan, Barings chose not to contact any party on a postpetition basis until its February 1, 2019 letter and to make no filing in these cases until its February 20th Examiner Motion.

In contrast, Saba, another stakeholder who was not part of the Consenting Stakeholders group continued its trend of persistent engagement postpetition when it filed a notice of appearance on the second day of the case,[86] and appeared at the first day hearing,[87] where Saba expressed its continued interest to work with the Debtors regarding the proposed plan.[88]   Saba eventually settled its differences with the Debtors prior to the January 22, 2019 disclosure statement hearing.[89]

*In re Seadrill Limited, et al.*, Case No. 17-60079 (Bankr. S.D. Tex.) also provides an interesting contrast to Barings' actions in this case.  In *Seadrill*, the company filed with a restructuring support agreement supported by an ad hoc group representing approximately 40 percent of the bondholders.  At the first day hearing, the debtors informed the court that they were

---

[83]    Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, March 2, 2019, Mem. at 2, 3, 5, 6. App'x 2

[84]    Bracewell LLP, *Memorandum of Examiner Call with Moelis & Co.*, Mar. 3, 2019, Mem. at 6. App'x 2.

[85]    The allegations by Barings related to the application of Fed. R. Bankr. 2019 to the Consenting Stakeholders is outside the scope of the Relevant Questions and therefore not addressed herein.  Barings has also asserted that the Consenting Stakeholders owed a fiduciary duty to Barings and other minority bondholders to negotiate the same recovery for all bondholders under any proposed plan, rather than agreeing to backstop rights that only inure to the benefit of the Consenting Stakeholders.  While Barings' concern may (or may not) be relevant to confirmation, it is not relevant to either of the Relevant Questions.

[86]    Notice of Appearance and Request for Notice [Dkt. No. 44].

[87]    Transcript of the First Day Hearings dated Dec. 13, 2018. App'x 19.

[88]    Hr'g Tr. 39:8-40:15, Dec. 13, 2018. App'x 19.

[89]    Debtors' Memorandum of Law in Support of Confirmation, ¶ 117 [Dkt. No. 420].

hoping to grow those in support of the deal from 40 percent to 60 percent of the bondholders and that they were already in talks with other interested bondholders who wanted to join the deal.[90]  By the second day hearing, the debtors advised the court that a separate group had formed and were becoming active.[91]  In a status report filed prior to the disclosure statement hearing and following "more than three months of diligence and engagement," the debtors informed the court that two groups of bondholders had submitted new capital proposals for consideration, including depositing ten percent of their respective proposed new capital.[92]  As a result of such negotiations, the debtors in Seadrill reset their disclosure statement hearing several times to allow for negotiations to continue.[93]  As evidenced by the forgoing, the *Seadrill* bondholders were persistent and aggressive in being heard, engaged in ongoing dialog with the debtors, and made substantive proposals to the debtors.

Barings actions in this case stand in stark contrast to *Seadrill*.  As noted above, other than possibly two prepetition phone calls with Houlihan (the substance of which are disputed), Barings at no time expressed an interest in negotiating with the Debtors or joining the Consenting Stakeholders.  Until February 2019, Barings has been a relatively passive participant in the restructuring process.  Even when it did finally reach out the Debtors and was invited to make a proposal, Barings' February 2019 proposal was limited to simply asking to be included in the Consenting Stakeholders' deal and offered nothing new for the Debtors to consider.

Nonetheless, even if it is assumed that Barings formally asked to be added to the ad hoc committee and their request was denied, no party has provided the Examiner with any law supporting the proposition that exclusion from an ad hoc group *on any basis* or *at any time* is somehow improper.  Nor has the Examiner located any such law independently.

On the other hand, in an analogous case with strikingly similar facts to the case at bar, *In re CHC Group Ltd., et al.*, Case No. 16-31854 (Bankr. N.D. Tex. 2016) (J. Houser), the court found that exclusion was not improper.  In *CHC*, postpetition negotiations between an ad hoc group of senior secured noteholders and the debtors resulted in a lockup agreement, a key provision of which was a backstop commitment agreement requiring the ad hoc group members to purchase, at a discount, any to-be-issued new notes (as opposed to equity in this case) that went unsold during a rights offering.[94]  A put option premium in the CHC case, not unlike the put option premium in this case, required the debtors to pay their plan sponsors/ad hoc group a fixed fee, payable in new notes if the rights offering was consummated, and payable in cash if the rights offering was not

---

[90]   *In re Seadrill Limited, et al.,* Case No. 17-60079 (Bankr. S.D. Tex.), Hr'g Tr. 23:2-6, Sept. 13, 2017 (as of first day hearing, "parties who have not signed on to the deal … have started reaching out and well [sic] continue to have discussions with them."). App'x 20.

[91]   Seadrill Hr'g Tr. 11:2-16, Oct. 10, 2017 (as of second day hearing, non-ad hoc bondholders have "started to organize" and retained counsel and financial advisors; individual holders also becoming active). App'x 21.

[92]   *See* Debtor's Statement Regarding Case Status and the Pending Motion Approve the Disclosure Statement, Seadrill Dkt. No. 965, App'x 22, and Debtor's Statement Regarding Case Status and the Pending Motion Approve the Disclosure Statement, Seadrill Dkt. No. 981. App'x 23.

[93]   *Id.*; *see also* various notice of reset disclosure statement hearing, Seadrill Dkt. Nos. 875, 927, 953. App'x 24.

[94]   *See In re CHC Group Ltd.*, Case No. 16-31854 (Bankr. N.D. Tex. Dec. 20, 2016), Transcript of Hearing on Various Motions ("CHC Transcript") 19:15-20:15 [Dkt. 1387]. App'x 25.

consummated.[95]

Angelo, Gordon & Co. ("AGCO") objected to the CHC debtors' motion for approval of a plan support agreement because of "the refusal of the Debtors and the Plan Sponsors to admit them to the group of senior secured noteholders who are parties to the Backstop Agreement so that they can share in the fees (now called the Put Option Premium) to be received by the Plan Sponsors if the PSA is approved."[96]   AGCO raised several related issues with the proposed plan support agreement, the backstop, and the proposed treatment under the plan.[97]   AGCO's objection was overruled, subject to the rights of all parties to object to confirmation of the CHC plan.[98]   Of particular relevance to this case, the CHC court held that:

> While AGCO sent a letter to the Debtors' counsel on October 25, 2016 indicating a desire to participate in the Backstop Agreement [CHC Exhibit 10], that is fundamentally different from offering to fund an alternative plan for the Debtors.  In short, and without prejudice to AGCO's unfair-discrimination objection at confirmation, the Plan Sponsors and the Debtors do not need AGCO's money to backstop the Rights Offering, as it has been fully committed to by the Plan Sponsors.  Finally, the Debtors can exercise their fiduciary out under the PSA if they believe a better alternative plan is available.[99],[100]

Here, the Debtors and Consenting Stakeholders do not need Barings money to backstop the Rights Offering, which has been fully committed by the Consenting Stakeholders.  Likewise, the Debtors in this case have a fiduciary out should Barings propose a better alternative plan,[101] which Barings has not done.  Like in *In re CHC*, there is no impropriety here in an ad hoc group such as the Consenting Stakeholders excluding another creditor who by time and circumstance is on the outside looking in, such as Barings.

As a practical matter, ad hoc committees by necessity have the right to decide who can or cannot join their group for a variety of reasons, which is why Barings itself has excluded parties from other ad hoc groups.[102]   Finally, bankruptcy plans with backstop agreements that provide soak up rights (i.e. the exclusive right to purchase unsubscribed equity at discounted rights offering rates) for backstop commitment parties only, like the Consenting Stakeholders, are not uncommon and have been approved several times, including by Bankruptcy Courts in the Southern District of

---

[95]     *See* CHC Transcript 20:19-21:7. App'x 25; Amended and Restated Backstop Commitment Agreement [Dkt. No. 326].

[96]     *See* CHC Transcript 17:9-14. App'x 25.

[97]     *See* CHC Transcript 17:9-18:24; 20:10-21:4. App'x 25.

[98]     *See* CHC Transcript 19:1-6. App'x 25.

[99]     CHC Transcript 28:7-28:17. App'x 25.

[100]    The CHC Court considered the same arguments regarding exclusion and disparate treatment again at confirmation, this time as raised in an objection by KLS Diversified Asset Management. The court overruled the objection on identical grounds.  *See* Objection to Confirmation of Debtors' Second Amended Joint Chapter 1 Plan and Brief in Support Thereof, CHC Dkt. No. 1608. App'x 29; Confirmation Order, CHC Dkt. No. 1794, pp. 21-26. App'x 30.

[101]    Restructuring Support Agreement §§ 7.01, 7.02, p. 91 of 272 [Dkt. No. 15]

[102]    Bracewell LLP, *Memorandum of Examiner Call with Barings LLC*, Mar. 2, 2019, Mem. at 8. App'x 13.

Texas.[103],[104]

In conclusion, there is no factual or legal support for the proposition that the Consenting Stakeholders acted improperly in failing to include Barings in the ad hoc group postpetition, and the only examples located buttress the proposition that exclusion from ad hoc groups and backstop commitment rights is both normal and not improper.

### 3.  *Barings Is Not Estopped from Arguing Against the Allegedly Improper Plan Provisions*

As discussed above, Barings decried the allegedly inequitable treatment of certain creditor classes under the Plan, and in particular states the terms of the Backstop Commitment are improper[105] but also, in the context of trying to resolve its concerns and the spirit of compromise, expressed a desire to join the Backstop Commitment in its February 11, 2019 email and at the February 24, 2019 hearing.[106]

Under Fifth Circuit precedent, there are three potentially applicable estoppel doctrines that could preclude Barings from arguing against the allegedly improper Plan provisions after having offered to settle by participating in such improper treatment: judicial estoppel, equitable estoppel, and estoppel by acquiescence.  However, as explained below, one or more requirement for each form of estoppel is not satisfied under the facts of this case.  Accordingly, Barings is not estopped from objecting to the Plan provisions.

### a.  *Judicial Estoppel*

The doctrine of judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding."[107]  Judicial estoppel "prevents internal inconsistency, precludes litigants from 'playing fast and loose' with the courts, and prohibits parties from deliberately changing positions based upon the exigencies of the moment."[108]  Judicial estoppel is invoked "where intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors

---

[103]   Kirkland & Ellis - Chart of Rights Offering Terms in Bankruptcy Cases. App'x 26.

[104]   As an aside, in *In re Pacific Drilling S.A.*, Case No. 17-13193 (MEW), United States Bankruptcy Court, Southern District of New York, in the context of a motion to approve a capital raise in connection with a proposed chapter 11 plan, the parties repeatedly revised the terms of a rights offering, private placement and backstop arrangement based on concerns raised by the court.  Ultimately, the court approved the motion, but noted in his decision that he had concerns about the economics.  Significantly, the decision does not address the propriety of excluding stakeholders from an ad hoc group and, thus, it is inapposite to the scope of this examination.  *Bench Decision*, dated October 1, 2018, Docket No. 631. App'x 27.

[105]   *Supra* at 8-9.

[106]   *Id*; E-mail from M. Primoff to B. Schartz (Feb. 11, 2019), PDK-MHR260. App'x 28.

[107]   *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996).

[108]   *Id*.

#5893502

seeking justice."[109]  "[B]ecause judicial estoppel is designed to protect the judicial system, not the litigants, detrimental reliance by the party opponent is not required."[110]

In determining whether to apply judicial estoppel, courts in this circuit look for the presence of three criteria: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently."[111]  Importantly, judicial estoppel "involves considerations of orderliness, regularity and expedition in *sworn positions at litigation*."[112]  Positions taken during settlement negotiations, which may be construed as contrary to positions taken in a case at bar, are not considered to have been litigated for the purpose of judicial estoppel.[113]  "[T]he purpose of settlements is, in fact, to avoid litigation."[114]

Here, the first requirement is not met because Barings' inconsistent position seeking the benefit of the Backstop Commitment was asserted as part of settlement discussions.[115]  Parties in bankruptcy proceedings often take public positions in pleadings that differ from private settlement discussions.  For example, in *In re CHC*, discussed above, AGCO (like Barings) had previously sent a letter to counsel for the debtors stating that the plan was inappropriate, but that its objections to the plan could be resolved if AGCO were to be included in the backstop agreement.[116]

The second requirement of judicial estoppel is that a court accepted the prior inconsistent position.[117]  The requirement of judicial acceptance "does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits."[118]  "Rather judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as party of a final disposition."[119]  Because Barings' interest in joining the Backstop Commitment was made in settlement discussions (both in private and in court) and not adopted in a ruling by the Court, the second requirement of judicial estoppel is not satisfied.

The third requirement of judicial estoppel is lack of inadvertence by the party asserting inconsistent legal positions.[120]  To find inadvertence, Barings must show that it "was unaware of

---

[109]   *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334-35 (5th Cir. 2004) (internal quotations omitted); *see also Hall v. GE Plastic Pacific PTE Ltd.* ("*Hall*"), 327 F.3d 391, 397 (5th Cir. 2003) ("[A] party cannot advance one argument and then, for convenience or gamesmanship after that argument as served its purpose, advance a different and inconsistent argument.").

[110]   *In re Superior Crewboats*, 374 F.3d at 334.

[111]   *In re Noram Res., Inc.*, No. 08-38222, 2012 WL 2467045, at *7 (Bankr. S.D. Tex. June 27, 2012).

[112]   *Moore v. United Services Auto. Ass'n*, 808 F.2d 1147, 1154 n.6 (5th Cir. 1987) (citing *Parkerson v. Borst*, 264 F. 761, 767 (internal citations omitted) (emphasis added).

[113]   *Moore v. United Services Auto. Ass'n*, 808 F.2d 1147, 1154 n.6 (5th Cir. 1987); *see also WorkSTEPS, Inc. v. ErgoScience, Inc*., 88 F. Supp. 3d 732, 744–45 (W.D. Tex. 2015), *vacated in part on other grounds*, 88 F. Supp. 3d 752 (W.D. Tex. 2015).

[114]   *Id.*

[115]   See *supra*, pp. 8-9; Hr'g Tr. 124:17-23. App'x 6.

[116]   *See* CHC Transcript 21:11-20. App'x 25.

[117]   *In re Noram Res.*, 2012 WL 2467045, at *7.

[118]   *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999).

[119]   *Id.*

[120]   *In re Noram Res.*, 2012 WL 2467045, at *7.

the facts giving rise to [its] inconsistent positions."[121]   Barings was most certainly aware of its objections to the Backstop Commitment and its willingness to join the same.  Because Barings did not act with inadvertence in taking inconsistent legal positions, the third requirement is satisfied.

Although the third requirement of judicial estoppel is satisfied here, the fact that Barings' prior inconsistent position was taken in settlement discussions and not subsequently adopted by the Court precludes application of judicial estoppel.

### b. Equitable Estoppel

Application of the equitable estoppel doctrine requires: "(1) a material misrepresentation (or concealment), (2) made with actual or constructive knowledge of the true facts, (3) with intent that the misrepresentation be acted upon by (4) a party without true knowledge or means of knowledge of the true facts, (5) who detrimentally relies or also acts on the misrepresentation."[122] Here, there is no evidence that Barings materially misrepresented or concealed its intent to object to the propriety of the Plan structure.

Further, there is no evidence that Debtor or the Consenting Stakeholders relied on Barings' conduct during settlement negotiations in determining whether to proceed with Plan confirmation. Upon receiving Barings' settlement proposal, Debtor's counsel stated that if Barings felt the "need[] to file papers to press the issues raised in [its] prior letters…it should do so and not wait for [Debtor's] response."[123] When Debtor rejected Barings' settlement proposal, Debtor's counsel reiterated that if Barings intended to "object to the Plan or engage in any related motion practice," Barings should "do so without delay."[124]  This evidence contradicts the notion that Debtor or the Consenting Stakeholders relied on Barings' conduct during settlement negotiations in determining whether to proceed with confirmation.  Without evidence of reliance, equitable estoppel is not applicable here.

### c. Estoppel by Acquiescence

Estoppel by acquiescence "involves the plaintiff's implicit or explicit assurances to the defendant which induces reliance by the defendant."[125]  As with equitable estoppel, there is no evidence of reliance by Debtor or the Consenting Stakeholders.  Estoppel by acquiescence is not applicable here.

## F.   Matters Not Within Scope of Examination

In their pleadings, in the transcript of the February 25, 2019 hearing, in their submissions to the Examiner, and in the various interviews conducted by the Examiner, the parties have raised

---

[121]   *In re Osyka Corp.*, 426 B.R. 653, 664 (Bankr. S.D. Tex. 2010).

[122]   *In re Diabetes Am., Inc.*, 485 B.R. 340, 356 (Bankr. S.D. Tex. 2012) (quoting *Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368 (5th Cir. 1990)).

[123]   Email from B. Schartz to M. Primoff, re: Parker – Barings, dated February 11, 2019, PDK-EMHR259. App'x 28.

[124]   Email from M. Fagen to M. Primoff re: Parker – Barings, dated February 13, 2019. App'x 18.

[125]   *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985); *see also H.G. Shopping Centers, L.P. v. Birney*, H-99-0622, 2000 WL 33538621, at *5 (S.D. Tex. Nov. 29, 2000).

a variety of legal and factual issues.  Pursuant to the Examiner Order, the Examiner is barred from any activity that exceeds the scope of the Relevant Questions posed in paragraph 1 of the Examiner Order.  While the Examiner has considered the legal and factual issues raised by each of the parties to ascertain their relevance to the limited scope of examination established by the Court, the Examiner ultimately concluded that determination of certain issues was outside the scope of the Examiner's purview.

    For the avoidance of doubt, the Examiner considered, among other concerns raised by the parties, the following issues and concluded that they were not dispositive of the two discrete Relevant Questions posed to the Examiner:

- Whether the Amended Plan is confirmable, including, but not limited to, whether the Amended Plan complies with Bankruptcy Code § 1123(a)(4).

- Whether one or all of the Consenting Stakeholders should be treated as an insider and how, if at all, that would impact the vote tabulation and the voting thresholds necessary to confirm the Amended Plan.

- Whether the economic terms represented by the Rights Offering and the Backstop Commitment are fair and reasonable and how that may impact the confirmability of the Plan.

- Whether sanctions under Rule 2019 or Rule 8011 of the Federal Rules of Bankruptcy Procedure are appropriate against one or more of the parties.

Consequently, other than having considered whether these concerns impact the Relevant Questions, the Examiner has made no determination on any of these concerns.


                              Respectfully Submitted,

                              */s/ Sylvia Mayer*
                              Sylvia Mayer
                              Texas Bar No. 00787028
                              smayer@smayerlaw.com
                              P.O. Box 6542
                              Houston, Texas 77265
                              Telephone:  (713) 893-0339
                              Facsimile:   (713) 661-3738

                           **CHAPTER 11 EXAMINER**

-17-

#5893502

BRACEWELL LLP

Jason G. Cohen
Texas Bar No. 24050435
Jason.Cohen@bracewell.com
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 221-2300
Facsimile:   (800) 404-3970

**PROPOSED COUNSEL TO CHAPTER 11 EXAMINER**

#5893502

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 4, 2019, a true and correct copy of the foregoing Examiner's Report was served electronically via the court's ECF noticing system on all parties registered to receive notice.

By:    /s/ *Jason G. Cohen*                                             
           Jason G. Cohen

-19-

#5893502